| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COLE SCHOTZ P.C.** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Michael D. Sirota, Esq. |
| Patrick J. Nash, Jr., P.C. (*pro hac vice* pending) | Warren A. Usatine, Esq. |
| Yusuf Salloum (*pro hac vice* pending) | Felice R. Yudkin, Esq. |
| Ashley L. Surinak (*pro hac vice* pending) | Daniel J. Harris, Esq. |
| 333 West Wolf Point Plaza | Court Plaza North, 25 Main Street |
| Chicago, Illinois 60654 | Hackensack, New Jersey 07601 |
| Telephone: (312) 862-2000 | Telephone: (201) 489-3000 |
| Facsimile: (312) 862-2200 | msirota@coleschotz.com |
| patrick.nash@kirkland.com | wusatine@coleschotz.com |
| yusuf.salloum@kirkland.com | fyudkin@coleschotz.com |
| ashley.surinak@kirkland.com | dharris@coleschotz.com |
| *Proposed Co-Counsel to the Debtors and Debtors in Possession* | *Proposed Co-Counsel to the Debtors and Debtors in Possession* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| STG LOGISTICS, INC., *et al*., | Case No. 26-[●] ([●]) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF THOMAS HIGBIE IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC
STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Thomas Higbie, declare under penalty of perjury that:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed

---

[1] The last four digits of Debtor STG Logistics, Inc.'s tax identification number are 8624. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/STGLogistics. The location of the Debtors' service address in these chapter 11 cases is: 5165 Emerald Parkway, Dublin, Ohio 43017.

investment banker for the debtors and debtors-in-possession (collectively, the "Debtors," and with their non-debtor subsidiaries, the "Company") in the above-captioned chapter 11 cases.[2]

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion") filed contemporaneously herewith.[3]

3. I am not being compensated specifically for this Declaration or related testimony, other than through payments received by PJT as a professional proposed to be retained by the Debtors, subject to approval by the Court.[4] Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, (b) my review of relevant documents, (c) information provided to me by the Debtors, the Debtors' management, and/or the Debtors' other advisors, (d) information provided to me by the employees of PJT working directly with me or under my supervision, or (e) my experience as a restructuring professional. If called to testify, I could and would testify to the statements set forth herein. I am over the age of 18 years and am authorized to submit this Declaration.

---

[2] The Debtors anticipate filing an application to retain PJT as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

[3] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Tyler Holtgreven, Chief Financial Officer of STG Logistics, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the First Day Declaration, the Motion, or the Interim Order (as defined in the Motion), as applicable.

[4] In accordance with PJT's engagement letter with the Debtors, subject to court approval, PJT will be entitled to receive certain fees in connection with the financing transactions described herein.

**Professional Background and Qualifications**

4.     PJT is a leading global financial advisory firm with more than 1,200 employees in fifteen (15) offices in the U.S., Europe, and Asia.  The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, fund placement, and shareholder engagement.  PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies.  The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing.  PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

5.     As noted above, I am a Partner in the Restructuring and Special Situations Group at PJT.  Prior to joining PJT in June 2023, I was a senior member of the investment team at The Forest Road Company and CEO of its broker dealer subsidiary, Forest Road Securities ("Forest Road"), where I led M&A, capital markets, and restructuring transactions.  Prior to my time at Forest Road, I spent sixteen (16) years in distressed debt and special situations investing.  Specifically, I was (a) a Portfolio Manager and Co-Head of Opportunistic Credit at Onex Credit, (b) a Managing Director at Solus Alternative Asset Management LP, where I was responsible for the firm's financial services and industrial and transportation investments, and (c) a research analyst in the Distressed Products Group at Deutsche Bank.  I received my Bachelor of Business Administration from the University of Michigan Ross School of Business in 2006.

6.     I have nineteen (19) years of industry experience leading public and private financing transactions, including DIP financings, rescue financings, rights offerings, exchange offers, and other restructuring and strategic liability management transactions, as well as advising

companies, creditors, and sponsors in restructurings and special situations. I have worked across numerous industries, including transportation, logistics, industrials, automotive, aerospace, power, utilities, oil and gas, media, telecom, consumer, retail, financials, and real estate. I have been involved in a number of restructurings, including the following publicly disclosed transactions: Everstream Solutions LLC, Lehman Brothers, Washington Mutual Bank, General Growth Properties, Extended Stay, Delphi Corporation, Visteon Corporation, Jack Cooper Ventures, Republic Airways, American Airlines, US Concrete, Genco Shipping, Eagle Bulk, Overseas Shipholding Group, Eitzen Chemical, Hornbeck Offshore, GulfMark Offshore, Dayton Superior Corp., Core Scientific, Intelsat SA, and Puerto Rico Electric Power Authority.

**The Debtors' Retention of PJT**

7. In July 2025, the Debtors re-engaged PJT to assist the Debtors in their evaluation of financing and strategic alternatives related to the Debtors' capital structure and liquidity needs.[5] Since that time, I have led the PJT team that has worked closely with the Debtors' management team, financial staff, creditors, and the Debtors' other advisors, to evaluate the need for financing and otherwise assist in the Debtors' recapitalization and restructuring efforts. PJT's work in that regard has included, among other things: (a) analyzing the Debtors' liquidity and projected cash flows; (b) understanding the Debtors' business, operations, and finances; (c) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives; (d) providing strategic advice to the Debtors' senior management and board of directors, including the special committee; (e) participating in negotiations with the Debtors' existing lenders and other parties in interest; (f) negotiating and analyzing DIP financing proposals; and (g) assisting the Debtors in connection

---

[5] The Debtors initially engaged PJT as investment banker on or about August 9, 2024 to provide financial advisory services in connection with a series of financial transactions consummated in October 2024, at which point PJT's initial engagement concluded.

4

with preparations for commencement of these chapter 11 cases. As a result of this work and engagement with the Debtors' other restructuring professionals, I am familiar with the Debtors' capital structure, business operations, and current liquidity needs along with the Debtors' proposed DIP Facility (defined below).

### The Debtors' Efforts to Obtain Financing

8.  The Debtors began exploring a range of strategic alternatives in mid-2025 to alleviate pressure on their business, including seeking a capital infusion from existing stakeholders as well as third-party financing sources. As discussed herein, I believe that the proposed $150 million new money delayed-draw priming debtor-in-possession term loan financing facility (inclusive of the roll-up of the FLFO Term Loan Claims and FLSO Term Loan Claims, the "DIP Facility") is the best source of funding currently available to the Debtors under the circumstances, providing both funding during the pendency of the chapter 11 proceedings and a pathway to a successful emergence from chapter 11.

9.  *The Ad Hoc Group Proposal.* Beginning in early July 2025, the Debtors and their advisors, including PJT, the Consenting Sponsors (defined below), and an ad hoc group of Holders of FLFO Term Loan Claims and FLSO Term Loan Claims represented by Gibson, Dunn & Crutcher LLP and Evercore Group L.L.C. (the "Ad Hoc Group") engaged in discussions regarding a value-maximizing path forward through a comprehensive restructuring transaction. After receiving the Ad Hoc Group's initial proposal in August 2025 (the "Ad Hoc Group Proposal"), the Debtors, their advisors, and the Ad Hoc Group continued discussions over the next several months. These discussions involved at least fifteen (15) alternative proposals and counterproposals, and ultimately culminated in agreement to the DIP Facility by and among the Debtors, the Backstop Parties (as defined herein), and certain Holders of FLFO Term Loan Claims and FLSO Term Loan

5

Claims (the "FLFO/FLSO Additional DIP Lenders," and together with the Backstop Parties, the "DIP Lenders").  Notably, the DIP Facility is presently supported by approximately 90% of the Holders of FLFO Term Loan Claims, approximately 70% of the Holders of FLSO Term Loan Claims, approximately 31% of the Holders of FLTO Term Loan Claims, and approximately 95% of the Holders of STG Distribution RCF Claims.  I understand that the support of at least 50.01% of the FLFO Term Loan Claims constitutes a requisite number of such Holders to consent to the use of existing cash collateral (the "Cash Collateral") and to the priming of the prepetition liens under the respective facilities of each of the FLFO Term Loan, FLSO Term Loan, FLTO Term Loan, Reception Purchaser RCF Loan, Reception Purchaser Term Loan, and Intercompany Term Loan.  Given the Debtors' limited unencumbered assets available to secure postpetition financing and the apparent lack of an equity cushion (as based on the Debtors' latest balance sheet attached as Exhibit C to the First Day Declaration and the reported trading prices of the FLFO Term Loan, FLSO Term Loan, and FLTO Term Loan) behind the over $1.1 billion in prepetition funded debt, this support for the DIP Facility, including the priming nature thereof, is necessary to avoid a value-destructive priming fight.  Additionally, the Ad Hoc Group Proposal was tied to the Restructuring Support Agreement and provides visibility to emerging from chapter 11.

10. The DIP Facility will provide the Debtors with the use of Cash Collateral on a consensual basis, and immediate access to significant incremental liquidity.  I understand that access to both Cash Collateral and the new money term loans under the DIP Facility are necessary for the Debtors to be able to pay the administrative costs of these chapter 11 cases, to fund ordinary course operations, and to effectuate the Restructuring Transactions contemplated under the Restructuring Support Agreement.

11. **Other DIP Financing Proposals.** While negotiating with the Ad Hoc Group, on August 28, 2025, the Debtors received a debtor-in-possession financing proposal from Wind Point Partners AAV II, L.P. ("Wind Point") and Reception Oaktree Aggregator, L.P. ("Oaktree/Duration," collectively with Wind Point, the "Consenting Sponsors," and the proposal, the "Initial Sponsor Proposal"). The Initial Sponsor Proposal contemplated a $150 million new money delayed-draw term loan financing facility provided by the Consenting Sponsors. Notably, the liens securing the Consenting Sponsors' proposed DIP financing would be secured on a *pari passu* first lien basis, but junior in payment priority to the Debtors' prepetition first-out loans. The Debtors, with the assistance of their advisors, including PJT, engaged in extensive discussions with the Consenting Sponsors regarding the terms of the Initial Sponsor Proposal.

12. Subsequently, on October 3, 2025, the Debtors received a revised financing proposal from the Consenting Sponsors (the "Updated Sponsor Proposal"). The Updated Sponsor Proposal was made on largely the same terms as the Initial Sponsor Proposal, but the Updated Sponsor Proposal included a sharing of the DIP facility with Holders of FLFO Term Loan Claims. In an attempt to reach more consensual terms, the Debtors, the Consenting Sponsors, and the Ad Hoc Group engaged in arm's-length negotiations around terms for a proposed DIP financing and recapitalization transaction led by the Consenting Sponsors. Ultimately, the parties were unable to coalesce around the terms of the proposed Sponsor-led DIP financing.

13. Additionally, on October 29, 2025, the Debtors received a proposal from RenWave Kore, LLC ("RenWave," and such proposal, the "RenWave Proposal"). The RenWave Proposal contemplated a transaction that would provide the Company with an infusion of at least $125 million in addition to repaying the FLFO Term Loan Claims in full. The Debtors' advisors, including myself, engaged with RenWave and its advisors to understand and assess the viability

of the RenWave Proposal. The Debtors determined, in their reasonable business judgement, that the RenWave Proposal did not have the requisite support of existing stakeholders, but, nonetheless, the Debtors and their advisors continued to facilitate engagement with relevant stakeholders, including the Ad Hoc Group. Following a number of discussions between the Debtors' advisors and the Ad Hoc Group, the Ad Hoc Group indicated that it would not support the RenWave Proposal. The Debtors' advisors promptly communicated the same to RenWave.

14. Approximately two weeks later, on November 13, 2025, the Debtors received a revised proposal from RenWave (the "Revised RenWave Proposal"). The Revised RenWave Proposal contemplated RenWave funding up to $150 million in DIP financing that would be junior in priority to the FLFO Claims but senior in priority to the FLSO Term Loan Claims and FLTO Term Loan Claims and would be equitized pursuant to either a credit bid in a section 363 sale or a sale through a chapter 11 plan. The Revised RenWave Proposal also provided for the cash-out of the FLFO Term Loan Claims. The Debtors and their advisors, including myself, engaged in good-faith, arm's-length negotiations with RenWave regarding the Revised RenWave Proposal and subsequently presented the Revised RenWave Proposal to the Ad Hoc Group. The Ad Hoc Group again indicated that it would not support the transactions contemplated in the Revised RenWave Proposal. Specifically, it is my understanding that the Ad Hoc Group would not consent to the priming of their FLSO Term Loan Claims as contemplated by RenWave's proposed DIP facility.[6]

---

[6] The basis of this understanding is the Ad Hoc Group's investment banker, Evercore Inc. ("Evercore"), conveying to PJT both verbally (on multiple occasions) and in writing that the Ad Hoc Group would not consent to a third-party priming debtor-in-possession facility in any capacity. That is what Evercore told me on November 24, 2025 and earlier this year. Furthermore, in response to a November 24, 2025 email sent by one of my colleagues, an Evercore senior managing director confirmed in writing that same day that "our group won't agree to being primed in any capacity." **Exhibit 1** is a true and correct copy of that email exchange between PJT and Evercore, a copy of which was forwarded onto me.

15. Given the absence of requisite support for the RenWave Proposal by Holders of FLSO Term Loan Claims, it became clear to the Debtors and their advisors that the Revised RenWave Proposal was very likely not actionable. At a minimum, pursuit of the Revised RenWave Proposal would result in a value-destructive priming fight that would cause delays in the chapter 11 process at the very outset, postpone the Debtors' access to necessary Cash Collateral and new money financing to the detriment of the business; increase administrative costs, and signal to key stakeholders, including customers and vendors, increased instability, further deviation from "business as usual," and a lack of support from the Debtors' existing lenders at this critical juncture.

16. **Third-Party Outreach.** Beginning in November 2025, PJT commenced a marketing process for new money financing from third-party institutions to address the Debtors' liquidity need, ultimately contacting twenty-one (21) potential lenders to solicit alternative postpetition financing proposals. Of those twenty-one (21) third parties contacted, one (1) signed a non-disclosure agreement, received access to non-public information, and conducted due diligence. Notwithstanding these efforts, no third-party lender was willing to provide financing on a junior or unsecured basis, nor offered any postpetition facility without a first priority lien on substantially all the Debtors' assets. I, therefore, believe that any third-party providing DIP financing would require a priming position and through discussions with the Ad Hoc Group it became clear that any such proposal would be challenged by the Ad Hoc Group and would likely lead to extensive litigation at significant cost and risk to the Debtors and their stakeholders. Thus, none of the contacted parties offered to provide liquidity to the Debtors on terms comparable to or better than those proposed by the DIP Lenders.

17. Accordingly, the Debtors determined, in consultation with their advisors, to move

forward with the DIP Facility in a sound exercise of their business judgment. Based on my experience, I believe that the DIP Facility is the best source of postpetition financing currently available to the Debtors given the facts and circumstances of these chapter 11 cases.

### The Reasonableness of the Economic Terms of the DIP Facility, Taken as a Whole

18. As noted in the Motion and the First Day Declaration, in the lead up to the Petition Date, the Debtors reached an agreement with the DIP Lenders to provide the DIP Facility and access to the consensual use of Cash Collateral. The proposed DIP Facility is comprised of "new money" super priority debtor-in-possession term loans in an aggregate principal amount of up to $150 million and a "roll up" of $143,750,000 in the collective aggregate principal amount of FLFO Term Loan Claims and FLSO Term Loan Claims. Specifically, the DIP Facility consists of: (a) $150 million of New Money DIP Loans, with $85 million available upon entry of the Interim Order, $40 million available upon entry of the Final Order, and $25 million of incremental loans available immediately prior to the effective date of the Plan (the "Incremental New Money DIP Loans"); and (b) a $143,750,000 roll up on a 1.15:1 basis, excluding the Incremental New Money DIP Loans, of FLFO Term Loan Claims (the "1O Roll-Up DIP Loans") and FLSO Term Loan Claims (the "2O Roll-Up DIP Loans," together with the 1O Roll-Up DIP Loans, the "Roll-Up DIP Loans"), with $97,750,000 of the Roll-Up DIP Loans issued upon entry of the Interim Order (the "Interim Roll-Up DIP Loans") and $46,000,000 issued upon entry of the Final Order (the "Final Roll-Up DIP Loans"). The Roll-Up DIP Loans are subordinated in right of payment and lien priority to the New Money DIP Loans and the 2O Roll-Up DIP Loans are subordinated in right of payment and lien priority to the 1O Roll-Up DIP Loans. The Incremental New Money

10

DIP Loans were sized such that the Debtors will be able to maintain, what I understand to be, an important liquidity threshold—$75 million pro forma liquidity—through December 31, 2026.

19. The DIP Facility is fully backstopped by the Ad Hoc Group (in such capacity, the "Backstop Parties"). All Holders of FLFO Term Loan Claims will be offered the opportunity to participate ratably in the DIP Facility; *provided* that the Holders of FLFO Term Loan Claims that participate in the DIP Facility have agreed to collectively offer to assign up to 10% of their right to participate in each of the New Money DIP Loans and the Roll-Up DIP Loans to the Holders of FLSO Term Loan Claims (including, for the avoidance of doubt, Holders of FLSO Term Loan Claims that are members of the Ad Hoc Group).[7] The Debtors and the DIP Lenders also agreed, in connection with the DIP Facility, to the consensual use of Cash Collateral on the terms and conditions set forth in the Interim Order.

I. **The Roll-Up of the FLFO Term Loan Claims and FLSO Term Loan Claims Is Fair and Reasonable.**

20. The roll up of the FLFO Term Loan Claims and the FLSO Term Loan Claims was a condition precedent to obtaining the New Money DIP Loans from the DIP Lenders. As a result, I believe that the Debtors' agreement to the Roll-Up DIP Loans is a requirement for the Debtors to obtain the DIP Facility.

21. Specifically, without the Roll-Up DIP Loans, the Ad Hoc Group explicitly indicated to the Company's advisors in writing that it would not consent to the Debtors' immediate use of Cash Collateral or agree to provide the New Money DIP Loans. Additionally, I understand that inclusion of a roll-up is a common feature in debtor-in-possession financing arrangements, and, following a benchmarking analysis of precedent debtor-in-possession financings achieved in

---

[7] To the extent any Holder of FLSO Term Loan Claims elects to not participate in the DIP Loans, then such portion of DIP Loans attributable to such Holder shall not be offered to any other Holder of FLSO Term Loan Claims.

other chapter 11 cases, my team and I determined that the 1.15:1 ratio of roll-up to new money in this case is within the observed range of precedent transactions. Finally, because participation in the DIP Facility is being offered to Holders of FLFO Term Loan Claims and Holders of FLSO Term Loan Claims, the inclusion of a roll-up incentivizes more of the Debtors' prepetition lenders to sign onto and support the Restructuring Transactions. Thus, the terms of the Roll-Up DIP Loans are reasonable and a critical and integrated component of the DIP Facility.

## II.   The DIP Facility Fees Are Fair and Reasonable.

22.   Further, the DIP Facility contains certain customary fees, terms, and other conditions. The DIP Facility contemplates the following key economic features.

(a) *Interest Rate:*  Interest on the DIP Loans outstanding at such time shall accrue at a rate equal to 8.00% per annum. All interest on the DIP Loans shall be payable in-kind by being capitalized and added to the principal amount of outstanding DIP Loans on the last day of the applicable interest period; *provided* that all interest shall either be (i) waived or (ii) cancelled, as determined by the Required Lenders, in connection with the Restructuring Transactions;

(b) *Backstop Fee:*  5.55% of the principal amount of the new money DIP Commitments on the Closing Date payable *pro rata* to the Backstop Parties in proportion to their backstop allocation of the DIP Commitments, which shall be indefeasibly earned, due, and payable in-kind on the Closing Date by adding the amount of such fee to the principal amount of the New Money DIP Loans; *provided* that the Backstop Premium (and all paid in-kind interest and accrued interest in respect thereof) shall either be (i) waived or (ii) cancelled, as determined by the Required Lenders, in connection with the Restructuring Transactions;

(c) *Commitment Fee:*  (i) 5.00% of the principal amount of the Initial New Money Term Loan Commitments on the Closing Date payable in-kind on a *pro rata* basis to the DIP Lenders in proportion to their respective allocations of such DIP Commitments, which shall be indefeasibly earned, due, and payable in-kind on the Closing Date by adding the amount of such fee to the principal amount of the New Money DIP Loans and (ii) 5.00% of the principal amount of the Delayed New Money Term Loan Commitments on the Delayed Draw New Money Term Loans funding date, payable in-kind on a *pro rata* basis to the DIP Lenders in proportion to their respective allocations of such DIP Commitments; *provided* that the Commitment Fee shall either be (i) waived or

12

(ii) cancelled, as determined by the Required Lenders, in connection with the Restructuring Transactions; and

(d) **Exit Fee:** 5.00% of the aggregate amount (inclusive of all amounts paid in kind) of the New Money DIP Loans actually funded, payable in-kind on the Termination Date by adding the amount of such fee to the aggregate amount of the New Money DIP Loans *pro rata* to applicable DIP Lenders in proportion to their holdings of DIP Loans; *provided* that the Exit Fee shall either be (i) waived or (ii) cancelled, as determined by the Required Lenders, in connection with the Restructuring Transactions.

23. Negotiations around the proposed DIP Facility and its terms, including the interest rate and fees, included the exchange of several proposals between the Debtors and the DIP Lenders over the course of five (5) months. Based on the discussions I participated in and observed throughout these negotiations, these negotiations were conducted at arm's length and in good faith. For instance, the Debtors successfully negotiated to reduce the Commitment Fee and Exit Fee from the Ad Hoc Group's originally proposed 5.55% for each fee to the agreed-upon 5.00% for both fees. Additionally, the Debtors also increased the percentage of the proposed DIP Facility that will be offered to the Holders of FLSO Term Loan Claims through the DIP Facility Subscription by 7.5% (from the 2.5% that the Ad Hoc Group originally proposed, to 10% in the DIP Facility). Based on my participation in and observation of these negotiations, I also believe that the DIP Facility's principal economic terms are a material component of the overall terms that were specifically required by the DIP Lenders in order to extend postpetition financing.

24. As described in the Motion, the proposed DIP Facility contains a number of debtor-friendly terms, which in my experience, are terms often unavailable to companies similarly situated to the Debtors. Such favorable terms include: (a) the equitization of the DIP Facility fees and interest, including, with respect to the Backstop Parties, the Backstop Fee; (b) the continued consensual use of Cash Collateral; (c) the option to refinance the DIP Facility; and (d) interest and fees *solely* on a payment-in-kind basis. Furthermore, the interest rate is on the lower end of the

observed range of precedent debtor-in-possession financings and the total all-in fees of 15.55% are well within the range.

25.  Accordingly, under the current circumstances, given the lack of viable alternatives, and based on my experience as a restructuring professional, I believe that the fees and other economic terms provided for in the DIP Facility, taken as a whole, are fair, reasonable, and in the Debtors' best interest. They represent the best terms currently available to the Debtors under the current circumstances.

### The Proposed DIP Facility Is the Best Postpetition Financing Arrangement Currently Available to the Debtors

26.  Based on the efforts of the Debtors and their advisors to secure postpetition financing, my experience in raising DIP financings in comparable cases, current market conditions, the Debtors' circumstances, and my participation in, and supervision of, the negotiations around the proposed DIP Facility, I believe that there are no alternative sources of financing currently available on both better terms, taken as a whole, than the DIP Facility and which would avoid a value-destructive priming fight. Simply put, the DIP Facility provides liquidity to ensure the Debtors have the runway to finalize the marketing process of the Debtors' businesses and either facilitate the sale of assets or implement the Restructuring Transactions contemplated by the Restructuring Support Agreement.

27.  *First*, the proposed DIP Facility provides the Debtors with the requisite financing within these chapter 11 cases and a pathway to emerge successfully from chapter 11. Specifically, the proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to administer these chapter 11 cases effectively and efficiently.

28. ***Second***, the principal economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, rollup, and interest rate, are reasonable under the circumstances and fall within the observed range for debtor-in-possession financings of this type. Additionally, fees and interest are structured on a payment-in-kind basis, which will allow the Debtors to maintain sufficient liquidity during these chapter 11 cases.

29. ***Third***, the Debtors' market test uncovered no other practical alternatives. As noted, the Debtors, with the assistance of their advisors, solicited interest from third-party investors to determine whether the Debtors could obtain financing on better terms. Ultimately, the Debtors did not receive any proposals from third parties to provide DIP financing on a junior or unsecured basis. Thus, no alternative sources of postpetition financing are currently available to the Debtors (whether unsecured or secured) on terms better than the DIP Facility. The Debtors and their advisors have and will continue to consider any future postpetition financing proposals as potential alternatives to the proposed DIP Facility.

30. ***Finally***, the Debtors were, and remain, cognizant of the reality that obtaining DIP financing alone does not ensure a successful bankruptcy case—the Debtors also need a path to emerge successfully from chapter 11. The DIP Facility, as a result of the Debtors' extensive negotiations with the Ad Hoc Group, and as part of the overall Restructuring Support Agreement, provides the Debtors—whose relationship with customers, vendors, and overall business would be irreparably harmed in a prolonged chapter 11 case—with a framework to efficiently emerge from these chapter 11 cases.

## **Conclusion**

31. Overall, for the reasons stated above and based on my professional opinion and experience with and analysis of DIP financing transactions as well as my participation and

involvement in the marketing and negotiation of the postpetition financing alternatives for the Debtors, I believe that the proposed DIP Facility, taken as a whole, is fair and reasonable, features economic terms comparable to similar financings, has the support of key economic and financial stakeholders, and offers the best currently available financing option for the Debtors under the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on: January 12, 2026

By:
*/s/ Thomas Higbie*
Thomas Higbie
Partner
PJT Partners LP

**Exhibit 1**

| | |
|---|---|
| **From:** | D"Souza, Avinash |
| **To:** | *singhj@pjtpartners.com |
| **Cc:** | Mott, Carey; Levine, Evan |
| **Subject:** | Re: [EXTERNAL] Stg dip |
| **Date:** | Monday, November 24, 2025 10:56:11 PM |

**CAUTION:** Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Hey - think you already know the answer, but our group won't agree to being primed in any capacity. Noted on the timing of the market check.

Avinash

Get Outlook for iOS

**From:** Singh, John <SinghJ@pjtpartners.com>
**Sent:** Monday, November 24, 2025 19:49
**To:** D'Souza, Avinash <dsouza@Evercore.com>
**Cc:** Mott, Carey <Carey.Mott@pjtpartners.com>
**Subject:** [EXTERNAL] Stg dip

**EXTERNAL EMAIL:** This email originated from outside of Evercore. Do not click links or open attachments unless you recognize the sender and are certain the content is safe.

Hey buddy - can you guys come back on the email regarding priming from a 3rd party dip. Willing to let it prime, prime between 1L and 2L or no priming at all?

Thx. We need to do a market check starting tomorrow.

John

**John Singh**
Partner
PJT Partners
280 Park Avenue | New York, NY 10017
office. +1.212.364.5646
mobile. +1.646.661.8372

*Partners have limited liability status.*