**SELENDY GAY PLLC**

Jennifer M. Selendy, Esq. (admitted *pro hac vice*)
Andrew R. Dunlap, Esq. (admitted *pro hac vice*)
David A. Coon, Esq. (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 390-9000
Facsimile: (212) 390-9399
jselendy@selendygay.com
adunlap@selendygay.com
dcoon@selendygay.com

*Co-Counsel to Axos Financial, Inc. and
Siemens Financial Services, Inc.*

**RIKER DANZIG LLP**

Joseph L. Schwartz, Esq.
Daniel A. Bloom, Esq.
John J. Harmon, Esq.
7 Giralda Farms, Suite 250
Madison, New Jersey 07940
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
dbloom@riker.com
jharmon@riker.com

*Co-Counsel to Axos Financial, Inc. and
Siemens Financial Services, Inc.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>STG LOGISTICS, INC., *et al.*,<br><br>      Debtors. | Chapter 11<br><br>Case No: 26-10258 (MEH)<br><br>(Jointly Administered) |
| AXOS FINANCIAL, INC. and SIEMENS FINANCIAL SERVICES, INC.,<br><br>    Plaintiffs,<br><br>    v.<br><br>RECEPTION PURCHASER, LLC, RECEPTION MEZZANINE HOLDINGS, LLC, STG DISTRIBUTION, LLC, STG DISTRIBUTION HOLDINGS, LLC, ANTARES CAPITAL LP, ANTARES ASSETCO LP, ANTARES CREDIT OPPORTUNITIES VI LLC, ANTARES CREDIT OPPORTUNITIES FUNDING VI LLC, ANTARES CREDIT OPPORTUNITIES MA II LP, ANTARES CREDIT OPPORTUNITIES CA LLC, ANTARES CREDIT OPPORTUNITIES CA SPV III LLC, ANTARES CREDIT FUND II LP, ANTARES | Adv. Pro. No. 26-_____(___) |

STRATEGIC CREDIT I MASTER LP, ANTARES STRATEGIC CREDIT I SPV LLC, ANTARES SENIOR LOAN EF MASTER II (CAYMAN) LP, ANTARES SENIOR LOAN EF II SPV LLC, ANTARES SENIOR LOAN MASTER FUND II LP, ANTARES SENIOR LOAN PARALLEL FUND II SPV LLC, ANTARES SENIOR LOAN PARALLEL MASTER FUND II LP, ANTARES CREDIT FUND I LP, ANTARES HOLDINGS LP, ALCOF III NUBT, L.P., AUDAX SENIOR DEBT (WCTPT) SPV II, LLC, AUDAX SENIOR LOAN FUND I (OFFSHORE) SPV II, LTD., AUDAX SENIOR DEBT CLO 4, LLC, AUDAX SENIOR DEBT CLO 6, LLC, AUDAX CREDIT OPPORTUNITIES (SBA) SPV, LLC, AUDAX SENIOR DEBT CLO 7, LLC, AUDAX SENIOR LOAN FUND V, L.P., AUDAX SENIOR DEBT CLO 8, LLC, AUDAX SENIOR DEBT CLO 9, LLC, AUDAX CREDIT BDC INC., THORNEY ISLAND LIMITED PARTNERSHIP, KNIGHTS OF COLUMBUS PRIVATE CREDIT FUND, LP, AUDAX SENIOR LOAN IDF FUND-E SPV II, LLC, AUDAX SD-A SPV, L.P., AUDAX SENIOR DEBT (PT), LLC, BALLYROCK CLO 20 LTD., BALLYROCK CLO 14 LTD., BALLYROCK CLO 15 LTD., BALLYROCK CLO 16 LTD., BALLYROCK CLO 17 LTD., BALLYROCK CLO 19 LTD., BALLYROCK CLO 2019-2 LTD., BALLYROCK CLO 18 LTD., BALLYROCK CLO 2019-1 LTD., IOF II ONSHORE FIRST LIEN, LLC, IOF II OFFSHORE FIRST LIEN, LLC, DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LTD, FORTRESS CREDIT BSL XVI LIMITED, FORTRESS CREDIT BSL XIX LIMITED, FORTRESS CREDIT BSL XV LIMITED, FORTRESS CREDIT BSL IX LIMITED, FORTRESS CREDIT BSL III LIMITED, FORTRESS CREDIT BSL VI LIMITED, FORTRESS CREDIT BSL VII LIMITED, FORTRESS CREDIT BSL VIII LIMITED, FORTRESS

CREDIT BSL X LIMITED, FORTRESS CREDIT BSL XI LIMITED, FORTRESS CREDIT BSL XII LIMITED, FORTRESS CREDIT BSL XIII LIMITED, FORTRESS CREDIT BSL XIV LIMITED, FORTRESS CREDIT BSL XVII LIMITED, FORTRESS CREDIT BSL XVIII LIMITED, FORTRESS CREDIT OPPORTUNITIES IX CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XI CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XIX CLO LLC, FORTRESS CREDIT OPPORTUNITIES XV CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XXI CLO LLC, FORTRESS CREDIT OPPORTUNITIES VIII CLO LLC, FDF III LIMITED, FDF IV LIMITED, FDF V LIMITED, FLF III-IV MA-CRPTF HOLDINGS FINANCE L.P., FLF III AB HOLDINGS FINANCE L.P., FLF III BAM HOLDINGS FINANCE L.P., FIDELITY CENTRAL INVESTMENT PORTFOLIOS LLC: FIDELITY FLOATING RATE CENTRAL FUND, FIDELITY INCOME FUND: FIDELITY TOTAL BOND FUND, FIDELITY ADVISOR SERIES I: FIDELITY ADVISOR FLOATING RATE HIGH INCOME FUND, FIDELITY SALEM STREET TRUST: FIDELITY SAI TOTAL BOND FUND, VARIABLE INSURANCE PRODUCTS FUND: FLOATING RATE HIGH INCOME PORTFOLIO, FIDELITY MERRIMACK STREET TRUST: FIDELITY TOTAL BOND ETF, FIDELITY PRIVATE CREDIT FUND, JNL/PPM AMERICA FLOATING RATE INCOME FUND, FIAM LEVERAGED LOAN LP, JNL/FIDELITY INSTITUTIONAL ASSET MANAGEMENT TOTAL BOND FUND, FIAM FLOATING RATE HIGH INCOME COMMINGLED POOL, FIDELITY INFLATION-FOCUSED FUND, FIDELITY FLOATING RATE HIGH INCOME MULTI-ASSET BASE FUND, FIDELITY FLOATING RATE HIGH INCOME FUND, FIDELITY DIRECT LENDING FUND I JSPV LLC, BLUE

EAGLE 2022-1B, LLC, BLUE EAGLE 2022-1C, LLC, HARBOURVIEW CLO VII-R, LTD., INVESCO CREDIT PARTNERS MASTER FUND III, LP, INVESCO SAKURA US SENIOR SECURED FUND, INVESCO SSL FUND LLC, INVESCO ZODIAC FUNDS – INVESCO EUROPEAN SENIOR LOAN ESG FUND, INVESCO ZODIAC FUNDS – INVESCO EUROPEAN SENIOR LOAN FUND, INVESCO ZODIAC FUNDS – INVESCO US SENIOR LOAN ESG FUND, INVESCO ZODIAC FUNDS – INVESCO US SENIOR LOAN FUND, INVESCO DYNAMIC CREDIT OPPORTUNITY, INVESCO FLOATING RATE ESG FUND, INVESCO FLOATING RATE INCOME FUND, INVESCO SENIOR FLOATING RATE FUND, INVESCO CLO 2022-1, LTD., INVESCO CLO 2022-2, LTD., INVESCO CLO 2022-3, LTD., INVESCO U.S. CLO 2024-1, LTD., INVESCO CLO 2021-2, LTD., INVESCO CLO 2021-3, LTD., ANNISA CLO, LTD., BARDOT CLO, LTD., BETONY CLO 2, LTD., MILOS CLO, LTD., RISERVA CLO LTD., VERDE CLO, LTD., ALINEA CLO, LTD., INVESCO CLO 2021-1, LTD., RECETTE CLO, LTD., UPLAND CLO, LTD., INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2023, L.P., INVESCO PEAK NINE, L.P., DIVERSIFIED CREDIT PORTFOLIO LTD., SENTRY INSURANCE COMPANY, INVESCO TETON FUND LLC, ISQ INFRASTRUCTURE CREDIT FUND U.S. POOLING II, L.P., PA SENIOR CREDIT OPPORTUNITIES FUND, L.P. (ON BEHALF OF ITS UNLEVERED SERIES), PENNANTPARK INVESTMENT CORPORATION PENNANTPARK CREDIT OPPORTUNITIES FUND IV AGGREGATOR, LP, PENNANTPARK CLO III, LTD, PENNANTPARK CLO V, LLC, PENNANTPARK CLO VII, LLC, PENNANTPARK CLO VI, LLC PRUDENTIAL HONG KONG LIMITED, JNL/PPM AMERICA FLOATING RATE

INCOME FUND, A SERIES OF THE JNL
SERIES TRUST, BLUEMOUNTAIN CLO
2014-2 LTD., BLUEMOUNTAIN CLO 2015-
3 LTD., BLUEMOUNTAIN CLO 2015-4
LTD., BLUEMOUNTAIN CLO 2016-2 LTD.,
BLUEMOUNTAIN CLO 2016-3 LTD.,
BLUEMOUNTAIN CLO 2018-1 LTD.,
BLUEMOUNTAIN CLO 2018-2 LTD.,
BLUEMOUNTAIN CLO 2018-3 LTD.,
BLUEMOUNTAIN CLO XXII LTD.,
BLUEMOUNTAIN CLO XXIII LTD.,
BLUEMOUNTAIN CLO XXIV LTD.,
BLUEMOUNTAIN CLO XXIX LTD.,
BLUEMOUNTAIN CLO XXV LTD.,
BLUEMOUNTAIN CLO XXVI LTD.,
BLUEMOUNTAIN CLO XXVIII LTD.,
BLUEMOUNTAIN CLO XXX LTD.,
BLUEMOUNTAIN CLO XXXI LTD.,
BLUEMOUNTAIN CLO XXXII LTD.,
BLUEMOUNTAIN CLO XXXIII LTD.,
BLUEMOUNTAIN CLO XXXIV LTD.,
BLUEMOUNTAIN CLO XXXV LTD.,
BLUEMOUNTAIN FUJI US CLO I LTD.,
BLUEMOUNTAIN FUJI US CLO II LTD.,
BLUEMOUNTAIN FUJI US CLO III LTD.,
PA SENIOR CREDIT FUNDING SPV, LLC,
PROSPECT CAPITAL CORPORATION,
CITIZENS BANK, NATIONAL
ASSOCIATION, DEUTSCHE BANK AG,
LONDON BRANCH, AND DEUTSCHE
BANK AG, NEW YORK BRANCH,

Defendants.

## **COMPLAINT**

Plaintiffs Axos Financial, Inc. ("Axos") and Siemens Financial Services, Inc. ("Siemens,"

and together with Axos, "Plaintiffs"), by and through their undersigned attorneys, file this

adversary proceeding complaint pursuant to Rule 7001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") against Defendants Reception Purchaser, LLC ("Reception

Purchaser"), Reception Mezzanine Holdings, LLC ("Reception Mezzanine," and together with

Reception Purchaser, "STG"); STG Distribution, LLC ("STG Distribution"), STG Distribution Holdings, LLC ("STG Distribution Holdings," and together with STG Distribution, "UnSub"); Antares Capital LP ("Antares," the "Administrative Agent," or the "Agent"); the participating lenders Fidelity Central Investment Portfolios LLC: Fidelity Floating Rate Central Fund, Fidelity Income Fund: Fidelity Total Bond Fund, Fidelity Advisor Series I: Fidelity Advisor Floating Rate High Income Fund, Fidelity Salem Street Trust: Fidelity SAI Total Bond Fund, Variable Insurance Products Fund: Floating Rate High Income Portfolio, Fidelity Merrimack Street Trust: Fidelity Total Bond ETF, Fidelity Private Credit Fund, PennantPark Investment Corporation, PA Senior Credit Funding SPV, LLC, Prospect Capital Corporation, Audax Senior Debt (WCTPT) SPV II, LLC, Audax Senior Loan Fund I (Offshore) SPV II, Ltd., Audax Senior Debt CLO 4, LLC, Audax Senior Debt CLO 6, LLC, Audax Credit Opportunities (SBA) SPV, LLC, Audax Senior Debt CLO 7, LLC, Audax Senior Loan Fund V, L.P., Audax Senior Debt CLO 8, LLC, Audax Senior Debt CLO 9, LLC, Citizens Bank, National Association, Deutsche Bank AG, London Branch, Deutsche Bank AG, New York Branch,  and participating lenders affiliated with the following advisor and manager entities: Antares Assetco GP LLC, Antares Capital Advisers LLC, and Antares Holdings GP Inc. (the "Antares Managers"); Arbour Lane Fund III GP, LLC ("Arbour Lane"); Audax Management Company (NY), LLC ("Audax Management"); Ballyrock Investment Advisors LLC ("Ballyrock Advisors"); Constitution Capital Credit Partners LP ("Constitution Capital"); Drawbridge Special Opportunities Advisors LLC ("Drawbridge Advisors"); FC BSL CLO Manager II LLC, FC BSL CLO Manager IV LLC, FC BSL CLO Manager LLC, FC BSL IX Management LLC, FC BSL Management LLC Series III, FC BSL VI Management LLC, FC BSL VII Management LLC, FC BSL VIII Management LLC, FC BSL X Management LLC, FC BSL XI Management LLC, FC BSL XII Management LLC, FC BSL XIII Management LLC, FC BSL

XIV Management LLC, FC BSL XVII Management LLC, FC BSL XVIII Management LLC, FCOD CLO Management LLC, FDF Management LLC Series III, FDF Management LLC Series IV, and FDF V Management LLC, FLF III-IV MA-CRPTF Advisors LLC, Fortress Lending Advisors III LLC, Fortress Lending Advisors III LLC (the "Fortress Managers"); FIAM LLC, Fidelity Institutional Asset Management Trust Company, and Fidelity Investments Canada ULC (the "Fidelity Managers"); Global Atlantic Financial Group ("Global Atlantic"); HarbourView Asset Management Corporation ("HarbourView Management"), Invesco Senior Secured Management, Inc. ("Invesco Management"); ISQ Global Credit Fund GP, LLC ("ISQ Global"); PASCOF GP, LLC ("PASCOF"); PennantPark Capital IV GP, LLC, PennantPark Investment Advisers, LLC, PennantPark Senior Loan Fund, LLC, and PennantPark Senior Secured Loan Fund I LLC (the "PennantPark Managers"); PPM America, Inc. ("PPM America"); Sound Point Capital Management, LP ("Sound Point Management") (collectively with all identified participating lenders, the "Defendant Lenders," and together with STG, UnSub, and Antares, "Defendants"). Plaintiffs allege as follows on the basis of personal knowledge and information and belief:

## NATURE OF ACTION

### Introduction

1.      This adversary proceeding represents the continuation of a dispute that was being litigated in a prepetition lawsuit that Plaintiffs brought in New York state court more than a year ago.  In that case, just nine days before STG's and the other Debtors' (collectively, the "Debtors") bankruptcy filings, Plaintiffs successfully defeated Defendants' motions to dismiss all of Plaintiffs' principal claims that the Scheme (defined herein) was invalid and breached the governing credit agreement.  In light of the fact that the automatic stay is in effect, and in an effort to expedite determinations with respect to the disputes among the parties in this adversary proceeding, Plaintiffs bring this adversary proceeding to obtain relief for the harm that the Scheme

has wrought on Plaintiffs' bargained-for rights, which has only worsened after the Debtors' bankruptcy filings.

2.      Defendants executed a bad-faith scheme (the "Scheme") that violated Plaintiffs' bargained-for rights as holders of STG loans and significantly diminished the loans' value. Defendants carried out the Scheme via a so-called liability management transaction ("LMT") (also known as "lender on lender violence"), a now common tactic for failing companies to restructure their debt through an intentional breach of credit agreements or bond indentures.  While defendants invariably argue that some loophole in the credit agreement permitted the company to transfer value from one group of lenders to another, the primary strategy in defending LMT transactions has always been to avoid any day of reckoning in court in order to profit from the breach.  As is common with all LMTs, the Scheme at issue betrayed the central bargained-for right of ratable treatment of similarly-situated lenders by benefiting a select group of favored lenders—who before the Scheme held the same tranche of loans as Plaintiffs on a *pro rata* basis.  The "goodies" provided to the favored lenders in the form of greater credit support and higher interest came at the expense of Plaintiffs and other lenders who were excluded from the Scheme (together, the "Excluded Lenders").  Compared to earlier LMTs, however, the newly devised structure of the Scheme and the business context in which it was unleashed make the Scheme particularly egregious.

3.      Through the Scheme, Defendants stripped collateral and guarantees from Plaintiffs and structurally subordinated them to Defendants' new loans in violation of the governing credit agreement.  Specifically, STG transferred the critical collateral assets and guarantors backing Plaintiffs' loans to UnSub, a newly created so-called "unrestricted subsidiary" that is not a guarantor of Plaintiffs' loans under the relevant credit agreement.  By making that transfer of

8

collateral, Defendants drastically reduced the bargained-for credit support for Plaintiffs' loans. STG also prepaid in full the loans of a select group of favored lenders, and those favored lenders simultaneously extended UnSub new loans (the "UnSub Loans").  Those new loans are backed by the transferred assets, and also by whatever assets remain at STG (through newly-granted guarantees and security interests in those remaining assets).  As a result, the Excluded Lenders lost not only the credit support of the assets improperly transferred from STG to UnSub, but also saw the credit support they retained from STG's remaining assets diluted substantially.  At the same time, Defendants purported to make scorched-earth amendments to the governing credit agreement to strip away all critical lender protections for the lenders excluded from the Scheme, including payment and default provisions that are the central benefit of the bargain for those lenders.  Those credit agreement amendments were an integral and necessary component of the Scheme, which could not have been accomplished without the amendments.

4.      Defendants knew that their Scheme ran afoul of several lender protections in the then-existing credit agreement governing Plaintiffs' loans.  Indeed, several of those protections had been added to the credit agreement just months earlier to ***expressly prohibit exactly this type of abusive transaction***, ***in exchange for the lenders' forbearance for nearly two years on leverage covenants***.  Defendants' subsequent Scheme revealed that STG never intended to abide by those negotiated protections.  Instead, they were adopted as part of a bad-faith effort to provide the Debtors with temporary financial runway while STG fully intended to strip away and disregard those newly-granted lender protections as needed to further restructure its debt on better terms than those for which it had actually bargained.

5.      STG's, the other Debtors', and the Defendant Lenders' tactics in the chapter 11 cases represent the culmination of their bad-faith efforts to appropriate Plaintiffs' bargained-for

value through the Scheme.  As a result of the Scheme, the Defendant Lenders have been given exclusive opportunities to extend STG superpriority postpetition debt that purports to prime Plaintiffs' liens under 11 U.S.C. § 364 and provides for substantial fees to the Defendant Lenders, but does not provide any protections to Plaintiffs.  STG, the other Debtors, and the Defendant Lenders are also seeking to finalize the Scheme's improper value transfer through a selective and discriminatory roll-up of the Defendant Lenders' prepetition debt without also rolling up *pro rata* portions of Plaintiffs' prepetition secured loans, which deprives Plaintiffs of their rights as similarly-situated first-lien lenders.  And by excluding Plaintiffs from the proposed roll-up, the DIP effectively ensures that the Defendant Lenders, notwithstanding their identical *pro rata* lien position to Plaintiffs under the operative credit agreement, will hold the only debt capable of credit bidding obligations incurred *pari passu*, leaving Plaintiffs with no opportunity to credit bid in an asset sale and leading to a gross inequity in the treatment of similarly-situated creditors.

### Defendants' Scheme

6.       Private equity firm Wind Point Partners ("Wind Point") acquired STG, a leader in the market for containerized logistics, in July 2016 for an undisclosed amount, funded in part by Oaktree Capital Management ("Oaktree," and together with Wind Point, the "Equity Sponsors"). In March 2022, STG acquired the intermodal division of XPO Logistics, one of the largest providers of container transportation services in North America.  The combined business became North America's leading provider of fully integrated, port-to-door containerized logistics services. As part of that transaction, STG was recapitalized by Wind Point and Oaktree.

7.       The XPO acquisition was financed in the syndicated loan market.  Thus, pursuant to a March 24, 2022 Credit Agreement (together with amendments thereto, the "Credit Agreement"), STG received term loans with total face value of $725 million (the "Term Loans") and two tranches of revolver loans totaling $150 million (the "Revolver Loans," and together with

Term Loans, the "Loans") from certain syndicating banks, which Loans were then sold to a broad group of lenders that could buy and sell them on secondary markets.  Axos's predecessor-in-interest Axos Bank purchased Term Loans, and Siemens purchased Term Loans and Revolver Loans, in 2022 shortly after the initial syndication.  Defendant Lenders also purchased loans in the secondary market.

8.      The Loans held by Plaintiffs are "first-lien" loans, meaning that Plaintiffs, along with all other first-lien lenders, have a priority right to recover on STG's assets in the event STG defaults on the Loans.  Pursuant to the Credit Agreement, all lenders are to bear the risks and benefits of the Loans equally—for example, the Credit Agreement requires that any loan prepayments be applied to all lenders' Loans on a *pro rata* basis (except in narrow circumstances inapplicable to the Scheme), and that any additional debt STG incurs must be *pari passu* with or junior to the existing Loans in priority.  The Credit Agreement also includes a series of affirmative and negative covenants that safeguard lenders' rights, such as covenants restricting STG's ability to incur additional debt or liens, or to dispose of assets.

9.      During the first year that followed Siemens' and Axos Bank's purchase of the Loans, STG enjoyed strong financial performance as the post-pandemic market drove demand for freight and similar services that STG provided.  However, STG's performance began to decline in 2023 as market trends shifted away from goods and towards consumer services and the industry was beset by a range of problems including strikes, labor shortages, and regulatory scrutiny.  In December 2023, STG was sued by the New Jersey attorney general for abusing its workforce by misclassifying employees as independent contractors, following civil class actions challenging the same practices.  By February 2024, STG was experiencing liquidity constraints, and the Equity Sponsors began negotiating a transaction with Antares and a "steering committee" comprised of

favored lenders holding a majority of Loans (the "May SteerCo") to address STG's liquidity issues. Despite Plaintiffs' efforts to join, they were excluded from the May SteerCo.

10.     In May 2024, the Equity Sponsors agreed to inject $30 million in additional equity capital into STG, and the lenders on the May SteerCo negotiated an amended Credit Agreement (the "Fifth Amended Agreement") that granted STG a seven-quarter holiday (from the quarter ending March 31, 2024 through the quarter ending September 30, 2025) from financial covenants imposing a maximum leverage ratio on the company.  In return, all STG lenders received significant additional protections in the Fifth Amended Agreement, including several protections prohibiting STG from restructuring its debt in the future through a non-*pro-rata* transaction and/or one that transfers STG's collateral assets to an unrestricted subsidiary.  Those protections, coupled with the Credit Agreement's sacred rights requiring adversely affected lenders' consent to amendments that have the effect of changing the priority of liens or collateral proceeds or that subordinate in whole or in part the liens securing Plaintiffs' Loans, supported Plaintiffs' reasonable expectations that their Loans would not be structurally subordinated through an abusive LMT using unrestricted subsidiaries.  Plaintiffs learned of the specifics of this transaction (the "May Transaction") and the amendments reflected in the Fifth Amended Agreement only after the transaction was executed on May 1, 2024, but were nonetheless pleased with the additional lender protections that were secured by the May SteerCo.

11.     The parties who executed the May Transaction understood at the time that the May Transaction was merely a short-term "band-aid": a first step in trying to resolve STG's troubles that would need to be followed by additional actions if they were to succeed in improving STG's financial position and avoiding bankruptcy.  Plaintiffs were ready and willing to support a *pro rata* transaction that provided the company with additional liquidity.  However, as the Scheme would

later reveal, STG agreed to implement the added lender protections in bad faith, solely as a means of buying itself additional time and with no intent to honor them.

12.    On August 16, 2024, STG released its second-quarter financials, which showed continued poor financial performance.  Around this same time, Plaintiffs found it increasingly difficult to obtain any information from Antares (the lenders' Agent under the Credit Agreement), the Equity Sponsors, or the company regarding STG's financial status or the Equity Sponsors' plans for addressing STG's continuing liquidity issues.  Plaintiffs later learned that Antares— which owed obligations to all lenders as Agent under the Credit Agreement—had signed a non-disclosure agreement in relation to a secret negotiation occurring among STG, the Equity Sponsors, and a new select group of lenders (the "Ad Hoc Group," a subset of the Defendant Lenders) comprised of some of the same lenders in the May SteerCo.

13.    As it turned out, this group was secretly negotiating the Scheme, which represented the very sort of abusive LMT that the Fifth Amended Agreement expressly prohibits, and which (if valid) would fundamentally reshape STG's capital structure for the benefit of the Defendant Lenders and to the detriment of the Excluded Lenders, including Plaintiffs.  Defendants purported to effectuate the Scheme via several fully-integrated, simultaneous steps:

> a.    *First*, STG, the Defendant Lenders in the Ad Hoc Group, together with Antares (which was both the Administrative Agent under the relevant credit agreement and a lender that participated in the Scheme), purported to make an amendment to the Credit Agreement (the "Sixth Amended Agreement") that stripped away critical lender protections (including crucial provisions that had been added only months before) that prohibited this very sort of transaction as well as every negative covenant and substantially all of the

affirmative covenants and Events of Default defined in the Fifth Amended Agreement.  For example, the Scheme purportedly granted STG the right to refuse to make interest payments before maturity without triggering a default that would entitle the Excluded Lenders to enforce remedies for such non-payment, thus eviscerating one of the core benefits of the bargain to lenders.

b.    *Second*, STG created an unrestricted subsidiary (UnSub) that was not subject to the Credit Agreement's liens and guarantees and transferred substantially all of STG's assets (including critical collateral assets and guarantors supporting Plaintiffs' Loans) to UnSub, meaning that those assets (if the transfer was effective) no longer provide credit support for Plaintiffs' Loans.

c.    *Third*, Defendants provided a substantial non-*pro-rata* benefit to the Ad Hoc Group in exchange for its participation in the Scheme by facilitating STG's prepayment in full of the Ad Hoc Group's Loans at a premium to their trading price—at or near the face value of the Loans—in exchange for the Ad Hoc Group's simultaneous extension of new loans to UnSub via a new credit agreement that was executed on the same day as the Sixth Amended Agreement (the "Dropdown Credit Agreement").  Specifically, the Ad Hoc Group extended UnSub $137 million in new debt financing in the form of First Lien First Out ("FLFO") loans, and additionally extended UnSub a mix of FLFO loans and First Lien Second Out ("FLSO") term loans in exchange for the Ad Hoc Group's Loans that STG prepaid.  This

$137 million loan was never intended to fund UnSub but was always intended to be loaned back to STG.

d.   *Fourth*, and solely to try to avoid judicial review of this transaction, STG and its advisors offered a less-favorable deal to Defendant Lenders outside the Ad Hoc Group in exchange for a release.  Specifically, STG and its advisors solicited agreement from the Defendant Lenders outside the Ad Hoc Group to have their Loans prepaid in exchange for extending UnSub a mix of FLSO and First Lien Third Out ("FLTO") term loans (which, together with the FLFO and FLSO loans, constitute the UnSub Loans) on worse terms than the Ad Hoc Group received (the "Second-Class Offer"). The Second-Class Offer was coerced through non-disclosure agreements that precluded lenders from speaking to one another regarding the impending Scheme or coordinating potential challenges thereto.  Moreover, lenders who accepted this offer were required to agree not to challenge the transaction in court.

e.   The new UnSub Loans, which had an aggregate face value of up to $941 million, were backed by the assets transferred to UnSub, as well as an up to $941 million first-lien guarantee from STG and an interest in an up to $941 million first-lien secured intercompany loan that UnSub extended to STG pursuant to an agreement also signed that same day (the "Intercompany Loan Agreement").[1]  Both the first-lien guarantee and the first-lien security

---

[1] The precise aggregate face value of the UnSub Loans, and the corresponding amounts of the intercompany loan and STG's guarantee of the UnSub Loans, is unknown to Plaintiffs because

interest in the intercompany loan sit *pari passu* with the liens held by Plaintiffs and other Excluded Lenders.  As a result, the Defendant Lenders now enjoy the credit support of not only the material assets transferred from STG to UnSub, but also the assets left behind at STG, diluting the credit support that the Excluded Lenders retain from those remaining assets.

f.    Finally, after keeping them in the dark for months, STG extended the lenders initially excluded from the first two offers (including Plaintiffs) a still-worse deal in exchange for a release.  Specifically, STG and its advisors offered to prepay those lenders' Term Loans in exchange for new UnSub loans on even worse terms than the Second-Class Offer (the "Consolation Prize"): $0.40 of FLSO UnSub Loans for every dollar of prepaid Term Loans, plus $0.30 of FLTO UnSub Loans for every dollar of prepaid Term Loans.  Lenders accepting the Consolation Prize would therefore take a much deeper discount on their Term Loans than the Defendant Lenders, with a worse mix of UnSub loan tranches than the Defendant Lenders, meaning they would sit lower in priority than the Defendant Lenders despite everyone starting from the same first-lien position.  The Excluded Lenders holding Revolver Loans were offered to have those loans prepaid in exchange for 100 cents on the dollar of FLSO UnSub Loans, lower in priority than the FLFO UnSub Loans the Defendant Lenders in the Ad Hoc

---

Defendants have not disclosed the percentage of lenders that agreed to have their Term Loans and/or Revolver Loans prepaid and exchanged for new UnSub Loans in connection with the Scheme.  Because the aggregate face value of the UnSub Loans, and the corresponding amounts of the intercompany loan and STG's guarantee of the UnSub Loans, would equal $941 million if 100% of lenders had agreed to the Scheme, this complaint uses that amount as an illustrative figure.

Group now hold.  Any lender that accepted this offer also had to agree not to challenge the transaction in court.

14.    The Scheme had obvious winners and losers.  Through the Scheme, the Defendant Lenders in the Ad Hoc Group captured a premium on their Loans, and all Defendant Lenders secured a superior credit position as compared to the other lenders who previously shared the same first-lien position.  In particular, the Defendant Lenders: (i) received improved priority on the collateral and guarantor assets transferred to UnSub; (ii) retained the credit support of STG's remaining assets through new liens and guarantees on those assets; and (iii) received enhanced covenants in the Dropdown Credit Agreement that included materially tighter limitations on restricted payments, permitted investments, incremental debt capacity, and future LMTs (such as a prohibition on the creation of unrestricted subsidiaries, thus protecting against the exact maneuver used to victimize the Excluded Lenders in the Scheme).  Furthermore, despite the new UnSub Loans being less risky than Excluded Lenders' Loans because of their improved credit support, the UnSub Loans perversely bear a *higher* interest rate than the Loans held by Excluded Lenders, who received no compensation for the much greater risk they now face as a result of the Scheme.

15.    The Excluded Lenders were forced to choose between accepting a coercive Consolation Prize offer to prepay their Loans at a deep discount or being entirely excluded from the transaction and left with a significantly-diminished collateral and guarantee pool—and the threat of STG discontinuing interest payments to anyone who did not accept.  Plaintiffs, who refused to accept the coercive Consolation Prize offer, were harmed by the Scheme that transferred substantial value from the Excluded Lenders to the Defendant Lenders.  Specifically, Plaintiffs: (i) facially lost all liens on, and guarantees provided by, the assets transferred to UnSub; (ii) had

their liens on remaining STG assets diluted by the *pari passu* first-lien guarantee of the UnSub Loans and UnSub's *pari passu* first-lien secured intercompany loan; and (iii) were left with a Credit Agreement stripped of substantially all affirmative and negative covenants, substantially all Events of Default, mandatory prepayments, and any obligation to make pre-maturity interest payments.  The Excluded Lenders therefore faced STG's potential refusal to make interest payments before maturity without triggering an Event of Default that would entitle the Excluded Lenders to seek remedies for STG's failure to abide by interest payment obligations, which represent one of the core benefits of the bargain to lenders.  Furthermore, following the Scheme, the seven-quarter holiday from compliance with leverage covenants that STG secured through the Fifth Amended Agreement has become permanent, meaning that STG kept and improved upon the benefit it received in exchange for the added lender protections while simultaneously purporting to eliminate those protections without the consent of the adversely affected lenders.

16.    The value of Plaintiffs' Loans was significantly reduced as a result of the Scheme, as reflected by the Loans' trading prices.  On August 26, 2024, shortly before rumors broke of a likely STG LMT, the Term Loans traded at approximately $0.72 on the dollar.  By October 4, 2024, the day after the Scheme was executed and announced, the price of Term Loans had plummeted to $0.47 on the dollar.  Moreover, as a practical matter, the Scheme has rendered Plaintiffs' Loans essentially unsaleable because there is only a small quantity of Loans left behind after the Scheme (making them extremely illiquid), the Scheme has stripped away all critical lender protections as well as STG's obligations to make pre-maturity interest payments and to report financial information to holders of the Loans, and the Scheme effected a severe diminution in collateral support for the Loans.

17.    Defendants did not have the unilateral right to reverse critical lender protections when doing so directly and adversely affected non-consenting lenders, and the Scheme is not permitted under the Credit Agreement.  Indeed, the Scheme was structured and executed on the premise that all lenders could be coerced to accept the Consolation Prize deal and the result that substantial value was transferred away from them and given to their fellow lenders, or that any Excluded Lenders would hold positions too small to justify litigation.  The high rate of lender participation in the Scheme was therefore the product of Defendants' coercive tactics.

18.    The Credit Agreement amendments reflected in the Sixth Amended Agreement were an integral and necessary part of the Scheme, but those purported amendments were prohibited by numerous sacred rights in the Fifth Amended Agreement.  The sacred rights in the Fifth Amended Agreement required consent from all directly and adversely affected lenders to any amendment that would postpone interest payments (Section 10.1(a)(ii)), reduce the principal amount of the Defendant Lenders' Loans through non-*pro-rata* prepayments (Section 10.1(a)(iii)), alter the priority or *pro rata* treatment of Loans (Section 10.1(a)(iv)), release substantially all collateral backing the Loans (Section 10.1(a)(vii)), and/or subordinate lenders' existing Loans or liens securing these Loans to other loans or liens  (Section 10.1(a)(viii)).  Because the Scheme did each of these things, and the Excluded Lenders who were directly and adversely affected by the Scheme did not consent to the Sixth Amended Agreement, the Scheme is invalid.

19.    Defendant Lenders exited the Credit Agreement (through non-*pro-rata* prepayment of their loans) to avoid suffering the consequences of those bad faith amendments.  Therefore, in the alternative, even if Defendants had discretion under the Credit Agreement to enter into such amendments to facilitate the Scheme without Plaintiffs' consent (they did not), they abused that discretion and thereby breached the implied covenant of good faith and fair dealing by stripping

lender protections that the Defendant Lenders would not have agreed to remove if they remained parties to the Credit Agreement and by violating Plaintiffs' reasonable expectations that they would not be structurally subordinated by way of a LMT using unrestricted subsidiaries.

20.     As a result, the Fifth Amended Agreement remains in force.  The Scheme breached that agreement in numerous ways: (i) STG and UnSub incurred new liens not subject to any contractual exception, in violation of the prohibitions on the incurrence of liens and indebtedness in Sections 6.1 and 6.5; (ii) STG transferred assets to UnSub in violation of Section 6.2, which prohibits the disposal of property absent an exception (none of which apply here), Section 6.3, which prohibits the transfer of "substantially all of [STG's] assets," and Section 6.18, which prohibits the transfer of Material Property (as defined in the Fifth Amended Agreement) to a subsidiary; (iii) the Scheme was a prohibited affiliate transaction in violation of Section 6.6; (iv) STG prepaid the Defendant Lenders' Loans without complying with the *pro rata* waterfall and distribution requirements of Sections 2.7 and 2.8(d); and (v) because several of the aforementioned breaches triggered Events of Default under Section 8.1(c), STG failed to comply with Section 2.10(c)'s requirement that during an Event of Default the Agent must distribute any payments it receives in respect of the Loans in the order specified in Section 2.10(c).

21.     STG's non-*pro-rata* prepayment of the Defendant Lenders' Loans also breached Section 2.10(a), which is unchanged between the Fifth Amended Agreement and Sixth Amended Agreement.  That provision requires any prepayment of Loans to be "for the ratable account" of all outstanding lenders, including Plaintiffs, except in limited circumstances that are inapplicable here.

### The State Court Litigation

22.     On January 8, 2025, Plaintiffs filed a complaint (as amended or otherwise modified from time to time, the "Complaint") in the Supreme Court of the State of New York (the "New

York Court") against STG, the Defendant Lenders, and Antares, seeking, among other things, a declaratory judgment that the Sixth Amended Agreement is invalid, equitable relief, and damages for the harm they suffered as a result of the Scheme. *See Axos Financial Inc. et al. v. Reception Purchaser LLC, et al.*, Index No. 650108/2023 (Sup. Ct. N.Y. Cnty.).

23.     On March 31, 2025, the Defendants filed with the New York Court four motions to dismiss the Complaint (collectively, the "Motions to Dismiss").  On May 30, 2025, Plaintiffs filed oppositions to the Motions to Dismiss, and the State Court conducted a hearing on the Motions to Dismiss on August 12, 2025.

24.     In a January 3, 2026 decision attached hereto as **Exhibit A**, the New York Court denied the Motions to Dismiss as to twelve out of thirteen causes of action in the Complaint, dismissing only one claim for fraudulent transfer under the New York Uniform Voidable Transactions Act based on the court's conclusion that Illinois law, not New York law, governed any fraudulent transfer claim arising from the Scheme. *See Axos Fin., Inc. v. Reception Purchaser*, LLC, 2026 N.Y. Slip Op 50019(U) (Sup. Ct. N.Y. Cnty. 2026).  The New York Court concluded that Plaintiffs sufficiently alleged that "the [Sixth Amended Agreement], the Dropdown Credit Agreement, and the Intercompany Agreement had the same purpose, were executed at the same time, and are mutually dependent," and that the "Defendants do not dispute their reliance on the interconnection of all three contracts to execute the October Transaction," such that those contracts can appropriately be considered a single, integrated transaction under New York law, and that Plaintiffs properly "allege a calculated plot perpetrated by Defendants … to deprive Plaintiffs of their contractual rights."

25.     Among other things, the New York Court concluded that Plaintiffs pleaded violations of each of the five sacred rights underlying Plaintiffs' declaratory judgment claim.  For

example, the New York Court concluded that Plaintiffs properly alleged "a violation of their sacred right to receive their entitled pre-maturity interest payments" because "[a]lthough Plaintiffs currently receive interest payments, they do so only at the will of STG.  This alleged violation impacts the reasonable expectation of Plaintiffs when investing in these loans to receive a specified stream of cash flow on specific dates."  The court also concluded that Plaintiffs properly alleged a violation of the Fifth Amended Agreement's anti-subordination sacred right based on the Scheme's structural subordination of Plaintiffs' Loans through the double-dip LMT structure, which represents a "textbook case of subordination because all lenders originally shared in the collateral on an equal and *pro-rata* basis, but after the Scheme, Defendants' loans to UnSub had improved collateral priority over the now-subordinated loans of Plaintiffs."

26.    Furthermore, the New York Court ruled that "Plaintiffs sufficiently allege facts and conduct in support of their claim for breach of the implied covenant that are distinct from their breach of contract claims" including that "[e]ven if the [Sixth Amended Agreement] is deemed to be operative, Plaintiffs allege that Defendants acted in bad faith by secretly conspiring to execute the Scheme, which fundamentally undermined the bargained-for lender protections that the parties agreed to in the [Fifth Amended Agreement]."  The New York Court additionally concluded that Plaintiffs sufficiently alleged "Antares' 'gross negligence' and/or 'willful misconduct' through the participation of Antares Capital in the Scheme," including "that Antares Capital entered an NDA with select lending parties, their non-responsive stance as to Plaintiffs' requests for STG's financial information, the potential for conflict between their role as Administrative Agent and their relationship with the Antares Lenders, and their collusion in the Scheme," concluding that Antares therefore "cannot evade liability under [the Credit Agreement's agent exculpation provisions] at this stage."

27.     As the Motions to Dismiss were pending before the New York Court, the parties proceeded through fact discovery, with the deadline for substantial completion of document productions passing in October 2025 (though Plaintiffs and Defendants continue to negotiate regarding deficiencies in Defendants' document productions).  The parties also agreed to specific dates for fact depositions in January and February 2026, but in early January agreed to postpone those depositions in view of the Debtors' forthcoming chapter 11 filings.

**Proceedings in this Court**

28.     On January 12, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Among other things, on the Petition Date, the Debtors filed a Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [Docket No. 19] (the "DIP Motion").

29.     On January 13, 2026, Plaintiffs submitted a preliminary objection to the DIP Motion [Docket No. 77].  That same day, the Court granted the DIP Motion on an interim basis over Plaintiffs' objection, and instead directed that a reservation of rights provision be placed into the proposed interim DIP financing order, and on January 14, 2026 the Court entered an Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief [Docket No. 84] (the "Interim DIP Order").

30.     In response to the Debtors' counsel advising the New York Court that the Debtors had filed their bankruptcy cases, on January 16, 2026, the New York Court entered an order that the parties' litigation in that court was stayed pending the resolution of the chapter 11 cases, pursuant to 11 U.S.C. § 362(a).

31.     Plaintiffs now bring the present adversary proceeding to hold Defendants accountable for their brazen and egregious attempt to benefit themselves by depriving Plaintiffs of their contractual rights and the fruits of their bargain under the Credit Agreement.

## THE PARTIES

### A.     Plaintiffs

32.     Plaintiff Axos Financial, Inc. is a financial services company incorporated in Delaware that holds Term Loans extended to STG.

33.     Plaintiff Siemens Financial Services, Inc. is a financial services company incorporated in Delaware that holds Term Loans and Revolver Loans extended to STG.

### B.     Defendants

34.     Reception Purchaser, LLC is a Delaware limited liability company with its principal place of business in Bensenville, Illinois.  Reception Purchaser is the borrower under the Credit Agreement.

35.     Reception Mezzanine Holdings, LLC is a Delaware limited liability company with its principal place of business in Bensenville, Illinois.  Reception Mezzanine is the parent company of Reception Purchaser and is a party to the Credit Agreement.

36.     STG Distribution Holdings, LLC and its subsidiary STG Distribution, LLC are Delaware limited liability companies with their principal places of business in Bensenville, Illinois.  STG Distribution Holdings, LLC and STG Distribution, LLC are unrestricted subsidiaries of STG formed as part of the Scheme.

37.    Antares Capital LP is a Delaware limited partnership with its principal place of business in Chicago, Illinois.  Antares is the Administrative Agent and Collateral Agent under the Credit Agreement.

38.    Antares Assetco LP, Antares Credit Opportunities VI LLC, Antares Credit Opportunities Funding VI LLC, Antares Credit Opportunities MA II LP, Antares Credit Opportunities CA LLC, Antares Credit Opportunities CA SPV III LLC, Antares Credit Fund II LP, Antares Strategic Credit I Master LP, Antares Strategic Credit I SPV LLC, Antares Senior Loan EF Master II (Cayman) LP, Antares Senior Loan EF II SPV LLC, Antares Senior Loan Master Fund II LP, Antares Senior Loan Parallel Fund II SPV LLC, Antares Senior Loan Parallel Master Fund II LP, Antares Credit Fund I LP, and Antares Holdings LP (collectively, the "Antares Lenders") are investment funds and vehicles sponsored, managed, or advised by one or more of the Antares Managers.  Antares Assetco GP LLC and Antares Capital Advisers LLC are Delaware limited liability companies with their principal places of business in Ontario, Canada and Chicago, Illinois, respectively.  Antares Holdings GP Inc. is incorporated in Nova Scotia and has its principal place of business in Ontario, Canada.  The Antares Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

39.    ALCOF III NUBT, L.P. (the "ALCOF Lender") is an investment fund or vehicle sponsored, managed, or advised by Arbour Lane, a Delaware limited liability company with its principal place of business in Stamford, Connecticut.  The ALCOF Lender formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

40.    Audax Senior Loan Fund I (Offshore) SPV II, Ltd. and Audax Senior Debt CLO 4, LLC ("Audax Cayman") are Cayman Islands limited liability companies.  Audax Senior Debt

(WCTPT) SPV II, LLC, Audax Senior Debt CLO 6, LLC, Audax Credit Opportunities (SBA) SPV, LLC, Audax Senior Debt CLO 7, LLC, Audax Senior Debt CLO 8, LLC, and Audax Senior Debt CLO 9, LLC, are Delaware limited liability companies with principal places of business in New York, New York.  Audax Senior Loan Fund V, L.P. is a Delaware limited partnership with its principal place of business in Boston, Massachusetts.  Audax Credit BDC Inc., Thorney Island Limited Partnership, Knights of Columbus Private Credit Fund, LP, Audax Senior Loan IDF Fund-E SPV II, LLC, Audax SD-A SPV, L.P., and Audax Senior Debt (PT), LLC are investment funds and vehicles sponsored, managed, or advised by Audax Management, a Delaware limited liability company with its principal place of business in New York, New York.  Those lenders (collectively, the "Audax Lenders") formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

41.     Ballyrock CLO 20 Ltd., Ballyrock CLO 14 Ltd., Ballyrock CLO 15 Ltd., Ballyrock CLO 16 Ltd., Ballyrock CLO 17 Ltd., Ballyrock CLO 19 Ltd., Ballyrock CLO 2019-2 Ltd., Ballyrock CLO 18 Ltd., and Ballyrock CLO 2019-1 Ltd. (collectively, the "Ballyrock Lenders"), are investment funds and vehicles sponsored, managed, or advised by Ballyrock Advisors, a Delaware limited liability company with a principal place of business in Boston, Massachusetts. The Ballyrock Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

42.     IOF II Onshore First Lien, LLC and IOF II Offshore First Lien, LLC (collectively, the "Constitution Lenders") are investment funds and vehicles sponsored, managed, or advised by Constitution Capital, a Delaware limited partnership with its principal place of business in Andover, Massachusetts.  The Constitution Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

43.     Drawbridge Special Opportunities Fund LTD (the "Drawbridge Lender") is an investment fund or vehicle sponsored, managed, or advised by Drawbridge Advisors, a Delaware limited liability company with its principal place of business in New York, New York.  The Drawbridge Lender formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

44.     Fortress Credit BSL XVI Limited, Fortress Credit BSL XIX Limited, Fortress Credit BSL XV Limited, Fortress Credit BSL IX Limited, Fortress Credit BSL III Limited, Fortress Credit BSL VI Limited, Fortress Credit BSL VII Limited, Fortress Credit BSL VIII Limited, Fortress Credit BSL X Limited, Fortress Credit BSL XI Limited, Fortress Credit BSL XII Limited, Fortress Credit BSL XIII Limited, Fortress Credit BSL XIV Limited, Fortress Credit BSL XVII Limited, Fortress Credit BSL XVIII Limited, Fortress Credit Opportunities IX CLO Limited, Fortress Credit Opportunities XI CLO Limited, Fortress Credit Opportunities XIX CLO LLC, Fortress Credit Opportunities XV CLO Limited, Fortress Credit Opportunities XXI CLO LLC, Fortress Credit Opportunities VIII CLO LLC, FDF III Limited, FDF IV Limited, FDF V Limited, FLF III-IV MA-CRPTF Holdings Finance L.P., FLF III AB Holdings Finance L.P., and FLF III BAM Holdings Finance L.P. (collectively, the "Fortress Lenders") are investment funds and vehicles sponsored, managed, or advised by one or more of the Fortress Managers, all of which are Delaware limited liability companies with principal places of business in New York, New York.  The Fortress Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

45.     Fidelity Central Investment Portfolios LLC: Fidelity Floating Rate Central Fund is a Delaware limited liability company with a principal place of business in Boston, Massachusetts. Fidelity Income Fund: Fidelity Total Bond Fund, Fidelity Advisor Series I: Fidelity Advisor

Floating Rate High Income Fund, Fidelity Salem Street Trust: Fidelity SAI Total Bond Fund, Variable Insurance Products Fund: Floating Rate High Income Portfolio, and Fidelity Merrimack Street Trust: Fidelity Total Bond ETF, are Massachusetts funds with principal places of business in Boston, Massachusetts.  Fidelity Private Credit Fund is a Delaware statutory trust with a principal place of business in Boston, Massachusetts.  JNL/PPM America Floating Rate Income Fund, FIAM Leveraged Loan LP, JNL/Fidelity Institutional Asset Management Total Bond Fund, FIAM Floating Rate High Income Commingled Pool, Fidelity Inflation-Focused Fund, Fidelity Floating Rate High Income Multi-Asset Base Fund, Fidelity Floating Rate High Income Fund, and Fidelity Direct Lending Fund I JSPV LLC are investment funds and vehicles sponsored, managed, or advised by one or more of the Fidelity Managers.  Those lenders are collectively referred to herein as the "Fidelity Lenders."  FIAM LLC is a Delaware limited liability company with its principal place of business in Smithfield, Rhode Island.  Fidelity Institutional Asset Management Trust Company is a New Hampshire company with its principal place of business in Merrimack, New Hampshire.  Fidelity Investments Canada ULC is an Alberta company with its principal place of business in Toronto, Ontario.  The Fidelity Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

46.     Blue Eagle 2022-1B, LLC and Blue Eagle 2022-1C, LLC (collectively, the "Global Atlantic Lenders") are investment funds and vehicles sponsored, managed, or advised by Global Atlantic, a Bermuda limited liability company with its principal place of business in Hamilton, Bermuda.  The Global Atlantic Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

47.     HarbourView CLO VII-R, Ltd. (the "HarbourView Lender") is an investment fund or vehicle sponsored, managed, or advised by HarbourView Management, a New York corporation

with its principal place of business in New York, New York. The HarbourView Lender formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

48.     Invesco Credit Partners Master Fund III, LP, Invesco Sakura US Senior Secured Fund, Invesco SSL Fund LLC, Invesco Zodiac Funds – Invesco European Senior Loan ESG Fund, Invesco Zodiac Funds – Invesco European Senior Loan Fund, Invesco Zodiac Funds – Invesco US Senior Loan ESG Fund, Invesco Zodiac Funds – Invesco US Senior Loan Fund, Invesco Dynamic Credit Opportunity, Invesco Floating Rate ESG Fund, Invesco Floating Rate Income Fund, Invesco Senior Floating Rate Fund, Invesco CLO 2022-1, Ltd., Invesco CLO 2022-2, Ltd., Invesco CLO 2022-3, Ltd., Invesco U.S. CLO 2024-1, Ltd., Invesco CLO 2021-2, Ltd., Invesco CLO 2021-3, Ltd., Annisa CLO, Ltd., Bardot CLO, Ltd., Betony CLO 2, Ltd., Milos CLO, Ltd., Riserva CLO Ltd., Verde CLO, Ltd., Alinea CLO, Ltd., Invesco CLO 2021-1, Ltd., Recette CLO, Ltd., Upland CLO, Ltd., Invesco Credit Partners Opportunities Fund 2023, L.P., Invesco Peak Nine, L.P., Diversified Credit Portfolio Ltd., Sentry Insurance Company, and Invesco Teton Fund LLC (collectively, the "Invesco Lenders") are investment funds and vehicles sponsored, managed, or advised by Invesco Management, a Delaware corporation with its principal place of business in New York, New York. The Invesco Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

49.     ISQ Infrastructure Credit Fund U.S. Pooling II, L.P. (the "ISQ Lender") is an investment fund or vehicle sponsored, managed, or advised by ISQ Global, a Delaware limited liability company with its principal place of business in Miami, Florida. The ISQ Lender formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

50.    PA Senior Credit Opportunities Fund, L.P. (on behalf of its Unlevered Series) (the "PASCOF Lender") is an investment fund or vehicle sponsored, managed, or advised by PASCOF, a Delaware limited liability company with its principal place of business in Darien, Connecticut. The PASCOF Lender formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

51.    PennantPark Investment Corporation is a Maryland corporation with its principal place of business in Miami Beach, Florida.  Pennantpark Credit Opportunities Fund IV Aggregator, LP, PennantPark CLO III, LTD, Pennantpark CLO V, LLC, Pennantpark CLO VII, LLC, and Pennantpark CLO VI, LLC are investment funds and vehicles sponsored, managed, or advised by the PennantPark Managers, which are Delaware limited liability companies with principal places of business in Miami Beach, Florida.  Those lenders are collectively referred to herein as the "PennantPark Lenders."  The PennantPark Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

52.    Prudential Hong Kong Limited and JNL/PPM America Floating Rate Income Fund, a Series of the JNL Series Trust (collectively, the "PPM Lenders") are investment funds and vehicles sponsored, managed, or advised by PPM America, a Delaware corporation with its principal place of business in Chicago, Illinois.  The PPM Lenders formerly held Term Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

53.    BlueMountain CLO 2014-2 Ltd., BlueMountain CLO 2015-3 Ltd., BlueMountain CLO 2015-4 Ltd., BlueMountain CLO 2016-2 Ltd., BlueMountain CLO 2016-3 Ltd., BlueMountain CLO 2018-1 Ltd., BlueMountain CLO 2018-2 Ltd., BlueMountain CLO 2018-3 Ltd., BlueMountain CLO XXII Ltd., BlueMountain CLO XXIII Ltd., BlueMountain CLO XXIV

Ltd., BlueMountain CLO XXIX Ltd., BlueMountain CLO XXV Ltd., BlueMountain CLO XXVI

Ltd., BlueMountain CLO XXVIII Ltd., BlueMountain CLO XXX Ltd., BlueMountain CLO XXXI

Ltd., BlueMountain CLO XXXII Ltd., BlueMountain CLO XXXIII Ltd., BlueMountain CLO

XXXIV Ltd., BlueMountain CLO XXXV Ltd., BlueMountain Fuji US CLO I Ltd., BlueMountain

Fuji US CLO II Ltd., and BlueMountain Fuji US CLO III Ltd. (collectively, the "Sound Point

Lenders") are investment funds and vehicles sponsored, managed, or advised by Sound Point

Management, a Delaware limited partnership with its principal place of business in New York,

New York.  The Sound Point Lenders formerly held Term Loans and/or Revolver Loans that were

prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

54.    PA Senior Credit Funding SPV, LLC ("PA Senior Credit") is a Delaware limited

liability company.  PA Senior Credit formerly held Term Loans and/or Revolver Loans that were

prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

55.    Prospect Capital Corporation ("Prospect Capital") is a Maryland corporation with

its principal place of business in New York, New York.  Prospect Capital formerly held Term

Loans and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part

of the Scheme.

56.    Citizens Bank, National Association ("Citizens Bank") is a National Bank with its

principal place of business in Providence, Rhode Island.  Citizens Bank formerly held Term Loans

and/or Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the

Scheme.

57.    Deutsche Bank AG, London Branch and Deutsche Bank AG, New York Branch

(collectively, the "Deutsche Bank Branches") are registered branches of the German company

Deutsche Bank AG located at 21 Moorfields, London, EC2Y 9DB and One Columbus Circle, New

York, NY 10019, respectively.  The Deutsche Bank Branches formerly held Term Loans and/or

Revolver Loans that were prepaid in the Scheme and extended UnSub Loans as part of the Scheme.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. § 1334.

59.     Certain of Plaintiffs' claims, including claims for equitable subordination and

equitable liens, are core proceedings under 28 U.S.C. § 157.

60.     Certain of Plaintiffs' claims against Defendants are non-core claims for which

Plaintiffs consent to entry of a final order or judgment by this Court pursuant to the terms of the

parties' stipulation filed with this Court on February 4, 2026 [Docket No. 215].

61.     Defendants Reception Purchaser, LLC, Reception Mezzanine Holdings, LLC, STG

Distribution, LLC, and STG Distribution Holdings, LLC are subject to this Court's jurisdiction as

Debtors in the chapter 11 cases.

62.     All other Defendants are subject to this Court's jurisdiction pursuant to Federal

Rule of Bankruptcy Procedure 7004 because each has established minimum contacts with the

United States.  Where a federal statute or rule provides for nationwide service of process, as does

Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having

minimum contacts with the United States.  This Court has personal jurisdiction over all Defendants

based on their contacts with the United States.

63.     Reception Purchaser, Reception Mezzanine, Antares, and the Defendant Lenders

are additionally subject to this Court's jurisdiction pursuant to Paragraph 13(b) and Section

10.16(b) of the Fifth Amended Agreement, or alternatively Paragraph 14(b) and Section 10.16(b)

of the Sixth Amended Agreement, pursuant to which they irrevocably and unconditionally

submitted to the jurisdiction of courts in the United States, for any legal action or proceeding with respect to any Loan Document as defined in the Credit Agreement.

64.     Reception Purchaser, Reception Mezzanine, STG Distribution, STG Distribution Holdings, and the Defendant Lenders are additionally subject to this Court's jurisdiction under Section 10.16(b) of the Dropdown Credit Agreement, pursuant to which they irrevocably and unconditionally submitted to the jurisdiction of courts in the United States, for any legal action or proceeding with respect to any Loan Document as defined in the Dropdown Credit Agreement.

65.     Venue of this adversary proceeding in this Court is proper pursuant to 28 U.S.C. § 1409 because this is the district in which the related chapter 11 cases are pending.

## FACTUAL ALLEGATIONS

### I.     Liability Management Transactions

66.     The Scheme at issue is a so-called LMT whereby a sometimes-distressed borrower, its equity sponsor(s), and a favored group of its lenders scheme in secret to restructure the borrower's debt at the expense of an excluded group of lenders, frequently in breach of the governing credit agreement.  The economic effect of these breaching transactions is to transfer bargained-for value from the excluded lenders to the favored lenders, the company's equity sponsors, and sometimes—but not always—the company itself.  In all their forms, breaching LMTs betray the central bargained-for principle of ratable treatment of similarly-situated lenders by benefiting a subset of favored lenders in a tranche at the expense of the excluded lenders in that same tranche.  As a result, these transactions are also known in the industry as "lender on lender violence."

67.     LMTs rose in prevalence in the throes of the COVID-19 pandemic, purportedly as a tool to address distressed companies' liquidity constraints and avoid expensive chapter 11 proceedings.  On paper, the purpose of the transaction is almost always to create a purported

"runway" for the company in hopes that its financial position will improve so that it can repay all of its lenders. However, LMTs have now evolved into a mechanism for private equity owners to delay the day of reckoning for over-leveraged and distressed portfolio companies and privilege their favored repeat lenders at the expense of smaller lenders, especially collateralized loan obligations ("CLOs"). Therefore, another purpose of LMTs, barring the miraculous recovery of the often overleveraged company, is to position the favored lenders to achieve better recoveries than the excluded participants in the same tranche in any ensuing bankruptcy. Accordingly, to the extent that an LMT does not save the company, including the Scheme at issue here, it at least serves to hinder the recovery of the excluded lenders, including in a potential bankruptcy, to the benefit of favored lenders.

68.     One of the early types of LMTs is known as an "uptier transaction," in which a borrower exchanges existing loans of the favored lenders for new higher priority loans and incurs new "superpriority" loan tranches of debt extended by those favored lenders. Remarkably, despite being less risky, the new superpriority tranches are paid higher interest rates and the exchanges are frequently done at a premium over market price. The new superpriority tranches of debt rank ahead of debt held by the excluded lenders, thereby subordinating the excluded lenders—even though prior to the LMT, the excluded lenders were entitled to the same rights, including equal priority, as the favored lenders. The architects of uptier transactions purportedly relied on so-called "open market purchase" provisions to justify the non-*pro-rata* debt exchanges for favored lenders despite more than a decade of uniform industry practice which permitted borrowers to buy back their debt on a non-*pro-rata* basis (as open market purchases) solely if the debt were assigned

34

back to the company and retired.[2]  Uptier transactions are therefore generally in breach of the underlying loan agreements because they violate industry custom as well as excluded lenders' contractual rights and undermine excluded lenders' reasonable expectation for equal treatment relative to their fellow lenders.  These transactions were litigated in *Serta*, *Boardriders*, and *TriMark*[3] and resulted in many more-recent agreements incorporating so-called "Serta blockers"— provisions that explicitly preclude subordination of similarly-situated loans falsely labeled as open market purchases.

69.     In recent years, victimized lenders have increasingly, often successfully, challenged uptier transactions in court or drafted new provisions precluding such transactions.  However, the current Scheme demonstrates that distressed companies' financial and legal advisors have not given up on breaching LMTs despite unfavorable caselaw precedents.  Instead, they have unsuccessfully attempted to sidestep those precedents by relying on alternative types of LMTs that have not yet been directly challenged in court—and by incorporating increasingly elaborate and coercive tactics to avoid judicial review going forward.

70.     One increasingly popular form of LMT is the so-called "dropdown transaction," in which a borrower structurally subordinates excluded lenders by moving valuable assets to a subsidiary that is out of the reach of excluded lenders to support new debt incurrences to the favored lenders.  To ensure that the excluded lenders cannot have a claim as to assets moved to the subsidiary, the subsidiary to which the borrower moves the assets is often an "unrestricted

---

[2] *See In re Serta Simmons Bedding, L.L.C.*, 2024 WL 5250365, at *17 (5th Cir. Dec. 31, 2024) (holding that non-*pro-rata* debt exchange in uptier transaction "was not a permissible open market purchase" under credit agreement).

[3] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022); *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.* ("*TriMark*"), 150 N.Y.S.3d 894 (N.Y. Sup. Ct. 2021); *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886 (N.Y. Sup. Ct. Oct. 17, 2022).

subsidiary"—*i.e.*, a subsidiary that is excluded from the financial covenants and obligations imposed on the parent company borrower by lenders—or a "non-guarantor restricted subsidiary"—*i.e.*, a subsidiary that, unlike most other subsidiaries of the parent company borrower, does not serve as a guarantor of the parent's debt.

71.    Most recently, dropdown transactions have evolved to be even more aggressive, incorporating the new unrestricted subsidiary's incurrence of new debt extended by the favored lenders, and sometimes new lenders, that is backed by the dropped-down assets *and is also guaranteed by the parent-borrower's assets*.  The subsidiary then provides the debt proceeds to the parent-borrower in the form of an intercompany loan secured by the parent-borrower's remaining assets, with the favored lenders holding a claim on the security interest in those assets. As such, in addition to the favored lenders' claim on the dropped-down assets (which are now out of the excluded lenders' reach), the favored lenders retain at least two claims on the collateral assets remaining at the original borrower.  These claims are often structured to rank *pari passu* with, instead of superior to, the excluded lenders' claim on those assets—another attempt to supposedly avoid triggering the anti-subordination prohibitions while achieving the same subordinating result.  If the borrower is unable to repay all of its outstanding debt, the favored lenders have materially increased their ability to recover on the assets that originally backed all lenders' debt equally by securing *two* paths of recovery, while the excluded lenders' chance of recovery is materially diminished.  These newly-devised transactions—which go beyond what even the most jaded lender could have reasonably imagined a few years before—have been aptly described in the industry as "double dip" or "*pari*-plus" LMTs.  The Scheme at issue here is such a transaction.

72.     Financial and legal advisors often incorrectly tout such dropdown or "UnSub" transactions as a workaround for anti-subordination Serta blockers.  But just like the favored lenders in an uptier transaction, lenders who participate in a dropdown transaction receive loans with superior repayment priority compared to the lenders who are excluded.  Whether such a novel structural subordination is prohibited by credit agreements' anti-subordination or other provisions depends on the precise contractual language but, in any event, it is uniformly a direct assault on the parties' intended bargain.

73.     Additionally, a key feature of the LMT playbook—and of Defendants' Scheme— is an attempt to hinder excluded lenders from exercising their fundamental rights to challenge breaches of credit agreements in court.  Initially, LMT architects often attempted to intimidate excluded lenders from bringing lawsuits by amending "no-action" clauses in credit agreements to require collective action through the administrative agent, or to require that challenging lenders pre-fund a cash indemnity or bear the legal costs incurred by defendants in defending any claim that did not ultimately prevail.  When those efforts failed in litigation, newer LMTs (such as the Scheme) introduced the "carrot" of various "consolation prize" deals given to less-favored lenders in exchange for releases of claims coerced with the "stick" of complete exclusion and stripped-down credit agreements that resembled bare promissory notes.  The latest coercive tactic, also present in the Scheme, is to purportedly grant the company unfettered discretion to decline to make required interest payments—creating an intolerable situation for many smaller lenders, including CLOs, who therefore have no choice but to accept consolation prize offers and forego their right to challenge the breaching LMT.

74.     The current transaction was organized by STG and a group of STG's sophisticated lenders who know the old LMT playbook all too well.  In simple terms, and as explained in further

detail below, STG and certain lenders amended the Credit Agreement in May 2024 to fortify all existing lenders against various types of potential LMTs. STG later persuaded a group of majority lenders to reverse course and purportedly eliminate these lender-friendly amendments five months later to execute a "double-dip" LMT at the expense of their fellow lenders, including Plaintiffs.

## II.    Plaintiffs' Purchase of STG's Debt

75.    STG, a national provider of containerized logistics services, was formed in March 2022 through such a leveraged buyout. Specifically, Wind Point merged one of its portfolio companies (St. George Logistics) with a business segment of XPO Logistics in order to create STG and financed the merger using $725 million in term loans (*i.e.*, the Term Loans), and two tranches of revolver loans totaling $150 million (*i.e.*, the Revolver Loans).

76.    A group of financial institutions (a "syndicate") arranged by Antares and other arrangers collectively funded the Loans and then promptly sold (or "syndicated") the Loans to multiple investors to spread the risks. These investors thus became lenders to STG.

77.    Siemens purchased STG's Term Loans and Revolver Loans in April 2022. Axos Bank purchased STG's Term Loans in May and June 2022, and in December 2024 Axos Bank assigned all of its interests, rights, and obligations concerning the Loans, including all claims and causes of action relating to the Scheme, to its parent company Axos Financial, Inc. The Defendant Lenders purchased the Loans in the same manner as Siemens and Axos Bank, and their Loans ranked *pari passu* with Plaintiffs' Loans.

78.    At the time Siemens and Axos Bank purchased the Loans in 2022, STG was marketed to potential lenders as providing a "Top-Tier Network of Scale," stemming from an "unrivaled nationwide warehouse network" and "network capacity to all major ports and US rail markets." STG also touted itself as benefiting from "Strong Industry Tailwinds" in light of "[f]avorable macroeconomic trade conditions, persistent supply chain evolution, and accelerating

e-commerce trends driving import / export and warehousing service demand," leading to "[f]orecasted growth rates in excess of 2x forecasted GDP growth."

79.    Plaintiffs and other lenders' rights and protections are set forth in the Credit Agreement.  For example, except in narrow circumstances inapplicable to the Scheme, the Credit Agreement guarantees that additional first-lien debt cannot be incurred by STG unless it is *pari passu* with or junior to existing Loans, and that all lenders who hold the Loans will share the risks and benefits of the Loans equally.  The Credit Agreement also requires that prepayments of the Loans under most circumstances must be applied "for the ratable account" of all outstanding lenders.  This requirement established a general expectation of *pro rata* treatment of lenders.

80.    The Fifth Amended Agreement provides a narrow exception to the requirement that prepayments of Loans be made *pro rata* to all lenders.  Specifically, Section 2.7(d) provides for voluntary Term Loan prepayments defined as "Discounted Buybacks" if several requirements are met, including that "no Default or Event of Default has occurred and is continuing on both the date a Discounted Buyback Notice … is delivered to Agent and Lenders and the date a Discounted Buyback … is made (both before and after giving effect thereto)," and the prepayments be made using "internally generated funds."  Section 2.7(d) thus allows STG to buy back and then retire outstanding debt on a non-*pro-rata* basis, which benefits all lenders by reducing STG's overall debt load.

81.    The Credit Agreement also includes numerous affirmative and negative covenants, including covenants that restrict the types of additional debt or liens that STG and its subsidiaries can incur, the ability of STG to dispose of assets, the ability of STG to engage in consolidations or mergers, and the ability of STG to transact with its affiliates.

82.     Pursuant to Section 10.6(a) of the Credit Agreement (which is unchanged between the Fifth Amended Agreement and Sixth Amended Agreement), STG agreed to "indemnify, hold harmless, and defend … each Lender … and each of their respective Related Persons (each such Person being an 'Indemnitee') from and against all Liabilities (including … Attorneys' Costs … and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party … or any other Person) in any matter relating to or arising out of, in connection with or as a result of … any Loan Document."

83.     Meanwhile, as Agent under the Credit Agreement, Antares owes certain obligations to all lenders, including providing lenders regular updates on STG's performance, compliance with covenants, and other material developments; maintaining accurate records of all transactions related to the Loans; and ensuring the parties abide by their respective obligations under the Credit Agreement.

## III.    Fortifying the Agreement: The May 2024 Transaction

84.     STG performed well during the year after Siemens and Axos Bank purchased the Loans, owing in large part to increased consumption and a resulting increased demand for freight services in the immediate wake of the COVID-19 pandemic.  However, STG's performance began to decline in 2023, and its downturn accelerated during the second half of that year, owing to both a glut in capacity from new market entrants during pandemic-induced periods of high demand, and a shift in consumer spending away from goods and towards services.  Like other companies in the industry, STG's problems were further exacerbated by strikes, labor shortages, and increased regulatory pressures.  In December 2023, STG was sued by the New Jersey attorney general for misclassifying employees as independent contractors, following a civil class action challenging the same practices.  STG originally forecasted that these headwinds and operational hardships would subside, but that did not prove to be the case.  Instead, STG's financial performance

deteriorated further in early 2024, at which time the Equity Sponsors and Antares began to look for a solution to the company's liquidity constraints.

85.    In February 2024, Antares reached out to STG lenders—including Plaintiffs—proposing to organize a steering committee of lenders to lead negotiations to potentially provide relief for STG's liquidity issues.  Plaintiffs expressed to Antares their interest in being part of the steering committee.  However, despite the initial outreach, Plaintiffs were not included in the steering committee or in negotiations concerning potential relief for STG.

86.    Around the same time, Antares worked with a select group constituting a slight majority of lenders to form the May SteerCo, which began negotiating means of providing STG with financial relief.  In doing so, Antares and the May SteerCo excluded Plaintiffs and other lenders who had requested to participate in these negotiations.

87.    Ultimately, the Equity Sponsors and the May SteerCo reached agreement on the May Transaction, pursuant to which the Equity Sponsors provided STG $30 million in additional equity capital and the parties agreed to place certain financial covenants—specifically, a maximum leverage ratio—on a seven-quarter holiday, in exchange for the inclusion of additional lender protections in the Credit Agreement.

88.    The parties knew when they negotiated the May Transaction that it would only serve as a "band-aid" providing STG short-term aid, and that additional actions would be needed to stabilize STG's liquidity and debt position.  The May Transaction strengthened various lender protections in the Fifth Amended Agreement, including amendments that explicitly restricted STG and the Equity Sponsors from launching certain types of LMTs in the future.

89.    Among other things, the Fifth Amended Agreement protects lenders against a dropdown LMT using unrestricted subsidiaries by removing "Unrestricted Subsidiary" as a

defined term in the Agreement and carving out such entities from the definition of an "Excluded Subsidiary"—*i.e.*, a subsidiary that is excluded from certain obligations and requirements outlined in the Credit Agreement.   The Fifth Amended Agreement also removed exceptions for "Unrestricted Subsidiaries" from various negative covenants.  Fifth Amended Agreement §§ 6.1–6.6, 6.8–6.9, 6.12–6.14, 6.16.

90.     Relatedly, the Fifth Amended Agreement protects lenders against a dropdown LMT through the use of non-guarantor restricted subsidiaries by amending Section 9.10—which concerns the release of collateral or guarantors—to place strict constraints on releasing subsidiaries as guarantors of the Loans.  *Id.* § 9.10 (adding requirement that any transaction causing such a subsidiary to be released from guarantees be "for a bona fide business purpose" and that the "primary purpose" could "not [be] to obtain the release of such obligations").

91.     The Fifth Amended Agreement also added a new Section 6.18, which prohibits the disposition of "Material Property" (defined as any property that is "material to the operation of the business of [STG and its subsidiaries] taken as a whole") to a subsidiary that is not a "Credit Party" under the Credit Agreement.  *Id.* § 6.18.  Provisions such as Section 6.18 are commonly known as "J.Crew blockers," because they prevent debtors from transferring valuable assets to unrestricted subsidiaries, a maneuver infamously used by J.Crew Group, Inc. in a 2016 LMT.

92.     Furthermore, the Fifth Amended Agreement tightened a series of negative covenants to further restrict STG and its subsidiaries from engaging in certain activities that might negatively impact lenders, such as the incurrence of liens and indebtedness, disposition of assets, and making restricted payments.  *Id.* §§ 6.1–6.6, 6.8.

93.     The Fifth Amended Agreement additionally reaffirmed and strengthened provisions of the Credit Agreement's sacred rights protecting lenders against non-*pro-rata* LMTs,

including LMTs involving non-*pro-rata* prepayment of existing Loans and incurrence of new purportedly senior loans.  Even before the May Transaction, the Credit Agreement included a sacred right requiring the consent of all "directly and adversely affected" lenders to amendments that "change or have the effect of changing the priority or *pro rata* treatment of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise)." *Id.* § 10.1(a)(iv)(A).  The Credit Agreement further provides that if lenders are not "provided a reasonable opportunity … to receive the most-favorable treatment, … including the opportunity to participate on a *pro rata* basis on the same terms in any new loans or other Indebtedness permitted to be issued" in connection with a change in the priority or *pro rata* treatment of Loans, then such lenders are "directly and adversely affected." *Id.* § 10.1(a)(Y).  Underscoring the importance of these provisions in ensuring that lenders have a meaningful opportunity to consent to and participate on equal terms in any LMT affecting the priority or *pro rata* treatment of the Loans, the Fifth Amended Agreement added language stating that "it is understood and agreed that any opportunity to participate and/or receive[] such most favorable treatment must be held open to all Lenders for at least five Business Days." *Id.*

94.     Plaintiffs did not learn about the specific terms of the Fifth Amended Agreement until it was executed on May 1, 2024.  Unlike the Defendants' later Scheme, however, the May Transaction benefited *all* lenders equally by fortifying the lender protections in the Credit Agreement.  Furthermore, the benefits that STG received through the May Transaction—the $30 million equity injection and the seven-quarter financial covenant holiday—partially relieved the

company's liquidity constraints and reduced the risk of default, thus further benefiting all lenders on an equal basis.

95.     Because the Fifth Amended Agreement strengthened lender protections and closed potential avenues for LMTs involving, among other things, dropdowns to unrestricted subsidiaries or non-*pro-rata* treatment of Loans, it gave the appearance that STG intended that any further actions to stabilize its liquidity position **would not** involve a non-*pro-rata* LMT or dropdown transaction.  However, as the Scheme demonstrates, STG had no intention of honoring the Fifth Amended Agreement's protections against abusive non-*pro-rata* LMTs.  Instead, STG agreed to those newly-granted lender protections in bad faith to provide the company temporary financial runway, while secretly intending to strip and disregard those protections as needed to further restructure its debt on better terms than those for which it had actually bargained.

## IV.     The Scheme

### A.     STG's Continuing Problems

96.     On August 16, 2024, STG released its second-quarter financials, disclosing that its adjusted EBITDA declined 94.6% year-over-year from $37 million to $2 million, while revenue declined 6% year-over-year to $392 million.  The company's continued poor performance confirmed, as the parties anticipated at the time of the May Transaction, that additional actions were needed to shore up STG's finances.

97.     In the months leading up to and immediately following the release of STG's second-quarter financials, Plaintiffs and other Excluded Lenders made numerous inquiries to Antares, Wind Point, Oaktree, and STG itself about the company's liquidity needs and any contemplated refinancing plans, including the possibility of a bankruptcy filing or a LMT. Plaintiffs expressed their willingness to assist STG, including by offering to join any lender steering committee to negotiate potential solutions.

44

98.     Plaintiffs were greeted with silence in return.  While Antares had previously performed its obligations as Agent by keeping all lenders abreast of the company's performance and industry news and closely tracking lenders' trades of the Loans, as STG's financial situation continued to worsen—and especially after the May Transaction—Antares, the Equity Sponsors, and STG stonewalled Plaintiffs, leaving them largely in the dark about the company's continually deteriorating financial situation and any ongoing discussions about how to address it.

99.     When one of the Plaintiffs finally got in touch with Antares, it was informed that Antares had signed a non-disclosure agreement in relation to a secret negotiation occurring among STG, the Equity Sponsors, and certain Defendant Lenders—many of whom had been included in the May SteerCo.  In other words, Antares abandoned the duty it owed to *all* lenders as Agent to instead collude with a select group of lenders and devise a Scheme at the expense of others.

**B.     Defendants Attempt to Eviscerate Protections for Excluded Lenders and Siphon Away STG's Assets to Benefit Favored Lenders**

100.    The reason for Antares' and the Equity Sponsors' secrecy became clear in October 2024.  After negotiating behind closed doors, Defendants agreed to a transaction that, if valid, would fundamentally reshape STG's debt obligations to the benefit of those who negotiated the deal and to the detriment of those who were excluded.  Defendants purport to have effectuated this transaction—the Scheme—by executing three integrated, mutually dependent agreements, all dated October 3, 2024: the Sixth Amended Agreement, the Dropdown Credit Agreement, a new Pari Passu Intercreditor Agreement, and the Intercompany Loan Agreement.

101.    As explained above, the Fifth Amended Agreement enhanced the Credit Agreement by adding a series of important lender protections.  Through the Sixth Amended Agreement, however, Defendants attempted to erase not only the new lender protections added in the Fifth Amended Agreement, but also numerous other protections present in the original Credit

Agreement on which Plaintiffs reasonably relied when purchasing the Loans.  For example, STG

and the Defendant Lenders sought to eliminate every negative covenant, which contained key

lender protections including, but not limited to:

| Section | Fifth Amended Agreement | Sixth Amended Agreement |
|---|---|---|
| 6.1 | Restricted STG's and subsidiaries' ability to incur new liens. | DELETED |
| 6.2 | Restricted STG's ability to dispose of property. | DELETED |
| 6.3 | Restricted STG's ability to merge or consolidate, or to sell all or substantially all of its assets. | DELETED |
| 6.4 | Restricted STG's ability to make investments, loans, advances, and guarantees. | DELETED |
| 6.5 | Restricted STG's and subsidiaries' ability to incur debt and issue equity. | DELETED |
| 6.6 | Restricted STG's ability to enter into transactions with any of its affiliates. | DELETED |
| 6.8 | Restricted STG's ability to pay dividends or other distribution payments with respect to equity interests or payments. | DELETED |
| 6.18 | Restricted STG's ability to assign material assets to non-credit party subsidiaries. | DELETED |

102.    STG and the Defendant Lenders also purported to eliminate substantially all of the

affirmative covenants found in the Fifth Amended Agreement, including, but not limited to,

covenants to maintain financial statements of unrestricted subsidiaries, notify lenders of major

events such as Events of Default, and maintain books for the Agent to inspect.

103.     With respect to the provisions governing Events of Default, the Sixth Amended
Agreement included two dramatic changes.  First, STG and the Defendant Lenders purportedly
eliminated every Event of Default other than the non-payment of loan principal or interest.
Second, STG and the Defendant Lenders amended the Credit Agreement to allow the Borrower
Representative (Reception Purchaser) to extend the grace period for paying interest on the Loan
unilaterally to the maturity date without triggering an Event of Default.  The result of these changes
was effectively to eliminate every Event of Default short of a failure to pay principal and interest
at maturity.

104.     Through the Sixth Amended Agreement, STG and the Defendant Lenders also
purported to reintroduce the company's ability to designate unrestricted subsidiaries, which had
been eliminated in the Fifth Amended Agreement.  Specifically, the Sixth Amended Agreement
added "any Unrestricted Subsidiary" to the definition of "Excluded Subsidiary," empowered STG
to designate unrestricted subsidiaries at any time, and designated two newly created subsidiaries—
STG Distribution and STG Distribution Holdings—as unrestricted subsidiaries as of the effective
date of the Sixth Amended Agreement.  And at the same time Defendants gutted the critical lender
protections that had been installed in the Fifth Amended Agreement just five months prior (in
effect conceding that the Fifth Amended Agreement did not permit the Scheme), they siphoned
off substantial and valuable assets from STG.  Through the Dropdown Credit Agreement,
Reception Purchaser transferred two of STG's most valuable business segments to UnSub.

105.     The Scheme handed substantial benefits to the lenders in the Ad Hoc Group by
prepaying their existing Loans in exchange for their extension of a mix of new FLFO and FLSO
UnSub Loans, backed not only by the material assets transferred from STG to UnSub but also by
a *pari passu* first-lien guarantee from STG and a security interest in a *pari passu* first-lien secured

intercompany loan from UnSub to STG—providing the Ad Hoc Group with added credit support from the assets left behind at STG (and in the process diluting the remaining credit support that the Excluded Lenders retain from those assets).

106.    Knowing their Scheme was not permitted under the Fifth Amended Agreement, Defendants tried to minimize potential lender challenges by extending a slightly worse offer to the Defendant Lenders outside of the Ad Hoc Group.  Under the terms of the Second-Class Offer, lenders who agreed to facilitate the Scheme had their Loans prepaid in exchange for a mix of UnSub Loans on inferior terms—with a greater discount and worse tranche mix—than the Ad Hoc Group received.

107.    In many (but not all) circumstances, a credit agreement that governs lenders' rights can be amended with the consent of a majority of the lenders.  The reasoning is straightforward: a majority of lenders—who would bear the consequences of an amendment on equal footing with other lenders holding the same debt—would not rationally agree to an amendment unless it is fair to them (and therefore to all lenders).  Accordingly, majority-consent amendment rights are premised on the understanding that a majority of lenders will not abuse their amendment rights in a way that harms the minority while sparing the majority from the amendment's impact.  In this case, the lenders' reasonable expectations that a majority of lenders would not agree to harmful amendments while exiting the Credit Agreement (such that only the minority lenders would suffer the consequences) was reinforced by the fact that the Credit Agreement's sacred rights require ***all*** lenders' consent for, among other things, changes to the prohibitions on non-*pro-rata* prepayments of Loans.

108.    As part of the Scheme, however, the Defendant Lenders agreed to eviscerate the existing Credit Agreement while simultaneously exiting that agreement entirely when their Loans

48

were prepaid—meaning that the Defendant Lenders would not suffer any of the consequences of the Sixth Amended Agreement, and instead only the Excluded Lenders would bear that harm. The Defendant Lenders would never have agreed to the Sixth Amended Agreement had they remained parties to the Credit Agreement instead of simultaneously exiting the agreement.

### C.    Aftermath of the Scheme

109.    The Scheme effected a significant wrongful value transfer from the Excluded Lenders to the Defendant Lenders.

110.    The Defendant Lenders were richly rewarded for their participation in the Scheme. Compared to the Excluded Lenders—who were only offered to receive $0.40 of FLSO UnSub Loans for every dollar of prepaid Term Loans, plus $0.30 of FLTO UnSub Loans for every dollar of prepaid Term Loans—the Defendants Lenders had their Loans prepaid on much better terms by receiving a smaller haircut on the face value of their prepaid Loans and an improved tranche mix of new UnSub Loans. The UnSub Loans held by the Defendant Lenders also bear a higher interest rate: While the Loans incurred by STG carry an interest rate of SOFR + 6.0%,[4] the UnSub Loans bear higher interest rates of SOFR + 8.3%, 7.5%, and 7.0%, respectively. Additionally, the Defendant Lenders' UnSub Loans are supported by a *pari passu* first-lien guarantee from existing guarantors of the Excluded Lenders' Loans that were not moved to UnSub, as well as a *pari passu* first-lien security interest in the secured intercompany loan UnSub extended to STG. The enhanced credit support the Defendant Lenders obtained through the Scheme was of significant value given STG's financial struggles.

---

[4] "SOFR" refers to the Secured Overnight Financing Rate, which is a means of the cost of borrowing cash overnight collateralized by Treasury securities. Since the retirement of LIBOR, SOFR has become commonly used as a benchmark rate for the calculation of interest rates.

111.    Finally, the Defendant Lenders secured for themselves the benefit of all the protections that they gutted in the Sixth Amended Agreement, including enhanced covenants imposing materially tighter limitations on restricted payments, permitted investments, incremental debt capacity, and future liability management transactions (including a prohibition on the creation of unrestricted subsidiaries).  Defendants clearly understood the value of these affirmative and negative covenants, but because the Defendant Lenders' Loans were prepaid in the Scheme, they did not hesitate to eliminate these standard protections for the Excluded Lenders they left behind by entering the last-minute amendments as they exited the Credit Agreement.

112.    Plaintiffs and the other Excluded Lenders, on the other hand, are worse off than they were before the Scheme.  As a result of the Scheme, material assets transferred to UnSub now provide credit support *only* to the Defendant Lenders, and the Defendant Lenders also retain claims on STG's assets, diluting the Excluded Lenders' claims on those remaining assets.  The Defendant Lenders thus ensured that if the company becomes unable to pay its obligations, they will have a higher chance of recovery than the Excluded Lenders who were entitled to equal treatment pursuant to the Fifth Amended Agreement.  The Scheme therefore hindered Plaintiffs' and other Excluded Lenders' ability to recover on their Loans.

113.    Plaintiffs were not given an opportunity to participate in the Scheme on the same terms as the Defendant Lenders.  Rather, Plaintiffs' only option to participate in the transaction was to accept a Consolation Prize exchange offer, by which they would have exchanged their Loans for UnSub Loans at a greater discount and lower priority than the Defendant Lenders' UnSub Loans, while releasing any claims challenging the Sixth Amended Agreement.  Despite the Consolation Prize's substantially worse terms than the Defendant Lenders received, the Scheme put significant coercive pressure on the Excluded Lenders to accept the offer, because they would

otherwise be forced to live with Loans that lost most of their valuable collateral and guarantees, would likely lose out on interest payments before maturity, and were stripped of nearly every lender protection.  The Consolation Prize offer underscores Defendants' bad faith, because Defendants not only managed to coerce many Excluded Lenders into having their Loans prepaid at a significant discount, but Defendants also reduced the number of holdout Excluded Lenders who could challenge the Scheme by requiring a release of claims by any lenders accepting the Consolation Prize.

114.    The reduction in value of the Loans as a result of the Scheme is reflected in their trading prices.  On August 26, 2024, shortly before rumors broke of a likely STG LMT, the Term Loans traded at approximately $0.72 on the dollar.  By October 4, 2024, the day after the Scheme was executed and announced, the price of Term Loans had plummeted to $0.47 on the dollar. Moreover, as a practical matter, the Scheme has rendered Plaintiffs' Loans essentially unsaleable because there is only a small quantity of Loans left behind after the Scheme (making them extremely illiquid), the Scheme has stripped away all critical lender protections as well as STG's obligations to make pre-maturity interest payments and to report financial information to holders of the Loans, and the Scheme effected a severe diminution in collateral support for the Loans.

## V.    Defendants' Scheme Breached the Fifth Amended Agreement

### A.    The Scheme is an Integrated Transaction

115.    The execution of the Sixth Amended Agreement, STG's prepayment of the Defendant Lenders' Loans at a premium of their trading value (at or near the face value of the Loans) in exchange for the incurrence of UnSub Loans, and UnSub's extension of the intercompany loan to STG constituted a single integrated transaction.  Defendants executed the Sixth Amended Agreement, the Dropdown Credit Agreement, and the Intercompany Loan Agreement on the same date for the same purpose.  Indeed, Defendants used the Recitals to the

Sixth Amended Agreement to memorialize the fact that the Scheme was a single integrated transaction. In addition to the execution of the Sixth Amended Agreement itself, the Recitals defined "Sixth Amendment Transactions" as collectively consisting of (i) the designation of UnSub; (ii) the transfer of assets from STG to UnSub; (iii) the execution of the Dropdown Credit Agreement; (iv) the prepayment of the Defendant Lenders' Loans in exchange for the incurrence of the UnSub Loans; and (v) UnSub's extension of the intercompany loan via the Intercompany Loan Agreement.

116.    Moreover, in its Recitals, the Dropdown Credit Agreement expressly referenced the Sixth Amended Agreement and Intercompany Loan Agreement as collectively used to effectuate the Scheme. Specifically, those Recitals acknowledged that the Defendant Lenders had "provided [their] consent to the Drop-Down Transaction and agreed to make other amendments and modifications to the Existing Credit Agreement as described in that Certain Sixth Amendment to the Existing Credit Agreement, dated as of the Closing Date," October 3, 2024. The Scheme could not have been accomplished without execution of the Sixth Amended Agreement, including because it violated several provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement.

117.    The Defendant Lenders would not have consented to the Sixth Amended Agreement, which gutted all meaningful lender protections, had they not also agreed to simultaneously have their existing Loans prepaid and exchanged for UnSub Loans with superior priority on the company's collateral assets, governed by a Dropdown Credit Agreement reflecting the same protections the Defendant Lenders agreed to strip from the Excluded Lenders.

### B.    The Sixth Amended Agreement is Invalid and Unenforceable

118.    The Sixth Amended Agreement could not be validly executed without the consent of Plaintiffs and other Excluded Lenders. While majority consent is sufficient to effectuate many

amendments to a credit agreement, it is not sufficient to alter "sacred rights" that are considered so fundamental to lenders that all adversely affected lenders must consent to such changes. Defendants' Scheme violated multiple sacred rights under Section 10.1 of the Fifth Amended Agreement, which requires the written consent of all lenders "directly and adversely affected" to effectuate any "amendment or wavier of, or supplement or other modification … to, any Loan Document … or any provision thereof" or any "consent with respect to any departure by any Credit Party from any such Loan Documents" that would achieve one of the results enumerated under Section 10.1.

119.    *First*, Section 10.1(a)(ii) requires the consent of all lenders "directly and adversely affected" to "postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders."

120.    As a part of their Scheme, STG, the Defendant Lenders, and Antares purported to amend Section 8.1 of the Fifth Amended Agreement to allow STG unfettered discretion to extend the grace period for interest payments until maturity without triggering a default.  The Sixth Amended Agreement thus made all scheduled pre-maturity payment deadlines entirely illusory and effectively postponed the fixed date for interest payments until maturity.  The Excluded Lenders, including Plaintiffs, were directly and adversely affected by this amendment, because they were deprived of their right to receive the scheduled pre-maturity interest payments to which they are entitled.  Section 10.1(a)(ii) therefore required Plaintiffs' consent to the Sixth Amended Agreement, which Defendants did not obtain.

121.    *Second*, Section 10.1(a)(iii) requires the consent of all lenders "directly and adversely affected" to "reduce the principal of … *any Loan* … payable hereunder." (Emphasis added.)

122.    The Scheme, of which the Sixth Amended Agreement was an integral part, involved prepayment of the Defendant Lenders' Loans in exchange for the incurrence of the UnSub Loans.  To effectuate this prepayment, the Defendant Lenders sent their Loans to STG to be cancelled by Antares, thereby reducing the principal of their Loans to zero.  Because the prepayment of the Defendant Lenders' Loans is an integrated component of the Scheme that had the direct effect of reducing the value of Plaintiffs' Loans, and because the Scheme could not have been accomplished without execution of the Sixth Amended Agreement (including because STG's non-*pro-rata* prepayment of Defendant Lenders' Loans and reduction of their principal to zero was prohibited by provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement, such as Sections 2.7 and 2.8), Plaintiffs were directly and adversely affected by the principal reductions, which significantly depressed the trading price of their Loans by approximately 35 percent.  Plaintiffs' consent to the Sixth Amended Agreement was thus required, but was not obtained by Defendants.

123.    *Third*, Section 10.1(a)(vii) requires the consent of all lenders "directly and adversely affected" to "discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents."  Furthermore, Section 10.1(a) expressly provides that "all Lenders shall be deemed to be directly and adversely affected by an amendment" which releases substantially all of the Collateral.

124.    The Scheme, of which the Sixth Amended Agreement was an integral part, involved transfer of two key business segments from STG to UnSub, by which STG purported to release those business segments as collateral assets backing the Loans.  These two business segments—known as LTL (*i.e.*, less-than-truckload shipping) and STGD (*i.e.*, STG Distribution)—have much stronger growth potential than the assets remaining at STG, which include the drayage and intermodal business segments that have been particularly impacted by ongoing economic trends and compete with larger-scale public companies such as J.B. Hunt, Hub Group, and C.H. Robinson.  The transferred assets therefore constituted substantially all of STG's collateral backing the Loans.  Because the Credit Agreement provides that any such transfer directly and adversely affects all lenders, and because the Scheme could not have been accomplished without execution of the Sixth Amended Agreement (including because STG's transfer of its key business segments to UnSub was prohibited by provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement, such as Sections 6.2, 6.3, 6.6, and 6.18), Plaintiffs' consent was required but not obtained by Defendants.

125.    *Fourth*, Section 10.1(a)(iv)(A) requires the consent of all lenders "directly and adversely affected" to "***change or have the effect of changing the priority or pro rata treatment*** of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (***including*** as a result in whole or in part of ***allowing the issuance or incurrence***, pursuant to this Agreement ***or otherwise***, of ***new loans or other Indebtedness having any priority*** over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, ***in exchange for any Obligations*** or ***otherwise***)."   (Emphasis added.) Section 10.01(a) further provides that if Lenders are not "provided a *reasonable opportunity*, as determined in the good faith judgment of Agent, to receive the *most-favorable treatment*, …

including the opportunity to participate on a *pro rata* basis on the *same terms* in any new loans or other Indebtedness permitted to be issued" in connection with a change in priority or *pro rata* treatment of Loans, then such Lenders are "directly and adversely affected" under Section 10.1(a)(iv)(A).  (Emphasis added.)

126.    Defendants' Scheme, of which the Sixth Amended Agreement was an integral part, had the effect of changing the priority and *pro rata* treatment of Loans in ways that were precisely prohibited by Section 10.1(a)(iv)(A).  The Defendant Lenders' Loans were prepaid, and their Commitments were reduced, on a non-*pro-rata* basis in exchange for new UnSub Loans with superior priority over the Excluded Lenders' Loans on collateral that, before the Scheme, secured all lenders' Loans equally.  The Scheme thus had the direct and adverse effect of subordinating Plaintiffs' Loans to the Defendant Lenders' UnSub Loans, because following the Scheme Plaintiffs lack any claims on the collateral assets transferred to UnSub or the guarantors that were released through the transfer to UnSub, and Defendant Lenders' new UnSub Loans have improved priority compared to Excluded Lenders' Loans with respect to the assets that previously secured all lenders equally, increasing the risk and reducing the value of Plaintiffs' Loans.  STG's prepayments of the Defendant Lenders' Loans were not Discounted Buybacks permitted under Section 2.7(d), including because: (i) the prepayments were not made from "internally generated funds" as required by Section 2.7(d)(i), but instead were made in exchange for new, higher-priority UnSub Loans without Plaintiffs' consent in violation of Section 10.1(a)(iv)(A); and (ii) several Events of Default had occurred and were continuing when the Scheme was effectuated.

127.    The Scheme could not have been accomplished without execution of the Sixth Amended Agreement, including because STG's non-*pro-rata* prepayment of Defendant Lenders' Loans, UnSub's incurrence of new UnSub Loans, and STG's incurrence of a secured intercompany

loan were prohibited by provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement, such as Sections 2.7, 2.8, 6.1, 6.5, and 6.6.

128.    In addition, Defendants' Scheme had the effect of changing the priority and *pro rata* treatment of Loans through Defendants' amendment of Section 2.7, which governs the optional partial prepayments of Loans, to remove the requirement that such prepayments must occur "in the manner set forth in Section 2.8(f)['s]" payment waterfall provision in the event that STG's notice of prepayment does not specify the scheduled installments for prepayment.  That waterfall requires payments to be made, in the first instance, *pro rata* to existing lenders. Accordingly, the amendment allows STG to partially prepay *a select group* of lenders' Loans without ratably repaying other lenders' Loans as required under the Fifth Amended Agreement— directly increasing the risk and reducing the value of Plaintiffs' Loans.

129.    The Excluded Lenders were not provided a "reasonable opportunity" to receive the "most-favored treatment" in the Scheme, including "to participate on a *pro rata* basis on the same terms" as the Defendant Lenders.  Rather, the Consolation Prize exchange that STG offered to the Excluded Lenders was on substantially worse terms than those that were offered to the Ad Hoc Group and other Defendant Lenders.  Accordingly, under Section 10.1(a)(iv)(A), Plaintiffs were "directly and adversely affected" by the Scheme that had the direct effect of devaluing their Loans, and which could not have been accomplished without execution of the Sixth Amended Agreement. Plaintiffs' consent was therefore required but not obtained by Defendants.

130.    *Fifth*, Section 10.1(a)(viii) requires the consent of all lenders "directly and adversely affected" to "subordinate the Liens securing the Obligations to Liens securing Indebtedness for borrowed money or subordinate all or any portion of the Obligations to any Indebtedness for borrowed money."  The Credit Agreement provides that if Lenders "have not

been provided a reasonable opportunity, as determined in the good faith of Agent, to participate on a *pro rata* basis on the same terms in any new loans or other Indebtedness permitted to be issued as a result of such amendment, modification, waiver or consent," then such Lenders "shall be deemed to be directly affected" under Section 10.1(a)(viii).

131.     Defendants' Scheme, of which the Sixth Amended Agreement was an integral part, subordinated Plaintiffs' Loans to the Defendant Lenders' UnSub Loans because following the Scheme Plaintiffs lack any claims on the collateral assets transferred to UnSub or the guarantors that were released through the transfer to UnSub.  As a result, the Scheme gave the Defendant Lenders' new UnSub Loans improved priority compared to Excluded Lenders' Loans with respect to the assets that prior to the Scheme had secured all lenders equally, directly increasing the risk and reducing the value of Plaintiffs' Loans.  The Scheme could not have been accomplished without execution of the Sixth Amended Agreement, including because STG's non-*pro-rata* prepayment of Defendant Lenders' Loans, UnSub's incurrence of new UnSub Loans, and STG's incurrence of a secured intercompany loan was prohibited by provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement, such as Sections 2.7, 2.8, 6.1, 6.5, and 6.6.

132.     Plaintiffs were not given a "reasonable opportunity … to participate" in the UnSub Loans "on a *pro rata* basis on the same terms" offered to the Defendant Lenders.  Plaintiffs' only option to participate in the Scheme was to accept the Consolation Prize offer, pursuant to which Plaintiffs' Loans—which were previously *pari passu* with all other lenders—would be prepaid and exchanged for UnSub Loans at a greater discount and lower-priority tranche mix than the Defendant Lenders received.  Accordingly, under Section 10.1(a)(viii), Plaintiffs were directly and adversely affected when their Loans were subordinated to the Defendant Lenders' new UnSub

Loans through the Scheme, which could not have been accomplished without execution of the Sixth Amended Agreement.  Plaintiffs' consent was therefore required but not obtained by Defendants.

133.    The sacred rights discussed above required Plaintiffs' consent before the Sixth Amended Agreement could be executed, and neither Plaintiffs nor the other Excluded Lenders gave such consent, therefore the Sixth Amended Agreement is invalid and unenforceable.

### C.    Defendants' Scheme Breached the Fifth Amended Agreement

134.    Because Defendants' ploy to amend the Fifth Amended Agreement is invalid, the Fifth Amended Agreement is still operative.  Defendants' Scheme breached that Agreement in several ways.

135.    *Breach of Section 6.1.*  Section 6.1 of the Fifth Amended Agreement requires that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property," other than for purposes permitted in Section 6.1.  As part of Defendants' Scheme, UnSub incurred three tranches of secured first-lien loans, and STG also incurred a secured intercompany loan, neither of which qualify for any of the exceptions permitted by Section 6.1. The Scheme therefore violated Section 6.1's prohibition on the incurrence of liens.

136.    *Breach of Section 6.2.*  Section 6.2 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly Dispose of (whether in one or a series of transactions) any Property" unless such disposal is permitted by Section 6.2's exceptions.  Defendants' Scheme involved STG transferring ownership of two valuable business segments to UnSub.  This disposal of assets was not permitted by any of Section 6.2's exceptions and therefore violated Section 6.2's prohibition on the disposition of property.

59

137.    *Breach of Section 6.3.*  Section 6.3 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge with, consolidate with or into, dissolve or liquidate into or convey, transfer, lease or otherwise dispose of … all or substantially all of its assets" unless one of the enumerated exceptions applies.

138.    Defendants' Scheme involved STG's transfer to UnSub of two valuable business segments representing substantially all of its assets.  The Scheme violated Section 6.3's prohibition on transfer of substantially all of STG's assets because the transfer is not permitted by any of Section 6.3's exceptions.

139.    *Breach of Section 6.5.*  Section 6.5 of the Fifth Amended Agreement requires that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness," other than for purposes permitted in Section 6.5.

140.    As part of the Scheme, UnSub—a subsidiary of STG—incurred three tranches of secured first-lien loans, and STG incurred a secured intercompany loan, none of which qualify for any of the exceptions permitted by Section 6.5.  Therefore, the Scheme violated Section 6.5's prohibition on the incurrence of indebtedness.

141.    *Breach of Section 6.6.*  Section 6.6 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to … enter into any transaction with any Sponsor or any Affiliate of any Sponsor, of the Borrowers or of any such Subsidiary," unless such a transaction is permitted by Section 6.6's exceptions.

142.    As part of the Scheme, STG transferred collateral and guarantor assets to its Affiliate UnSub, guaranteed new UnSub Loans, and entered into the Intercompany Loan

Agreement with UnSub.  Because none of Section 6.6's exceptions applied to these transactions, they violated Section 6.6's prohibition on affiliate transactions.

143.    *Breach of Section 6.18.*  Section 6.18 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to make any Investment, Restricted Payment, or Disposition of, other otherwise assign or transfer, any Material Property to a Subsidiary that is not a Credit Party."  "Material Property" is defined as any property that is "material to the operation of the business of [STG and its subsidiaries] taken as a whole."

144.    Defendants' Scheme involved STG transferring valuable business segments to UnSub that are material to STG's operations.  Therefore, the Scheme involved a transfer of Material Property to a Subsidiary that violated Section 6.18.

145.    *Breach of Sections 2.7 & 2.8*:  Section 2.7 of the Fifth Amended Agreement provides that STG's "[o]ptional partial prepayments of Revolv[er] Loans shall be applied in accordance with Section 2.10(a) [*i.e.* the *pro rata* requirements]," STG "may at any time … prepay the Loan in whole or in part in an amount greater than or equal to $100,000 …," and "[o]ptional partial prepayments of Term Loans shall, subject to Section 2.10(a) [*i.e.* the *pro rata* requirements], be applied" according to STG's "notice of prepayment and, in the absence of such direction, in the manner set forth in Section 2.8(f)."  Section 2.8(f) in turns provides payment waterfall provisions, which require any prepayments be applied "first, *pro rata* to each Class of Term Loan based upon the respective outstanding principal balances thereof …, third, to prepay outstanding Revolv[er] Loans (*pro rata* based on the then aggregate outstanding principal balance of the Tranche A Revolving Loans and the Tranche B Revolving Loans …)."

146.    As part of the Scheme, STG partially prepaid the Defendant Lenders' Term Loans and Revolver Loans without complying with Section 2.8(f)'s waterfall provisions.  STG's

prepayments of the Defendant Lenders' Loans were not Discounted Buybacks permitted under Section 2.7(d), including because: (i) the prepayments were not made from "internally generated funds" as required by Section 2.7(d)(i), but instead were made in exchange for new, higher-priority UnSub Loans; and (ii) several Events of Default had occurred and were continuing when the Scheme was effectuated.  The Scheme therefore violated Section 2.7.

147.    Similarly, Section 2.8(d) provides that "[p]romptly upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of Indebtedness" that is not permitted under the Fifth Amended Agreement, STG must deliver "an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with Section 2.8(f)."  "Net Issuance Proceeds" are defined as "cash proceeds (including proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of a Borrower."

148.    Through the Scheme, UnSub received $137 million in new debt financing, which constitutes "Net Issuance Proceeds."  Since the incurrence of the UnSub Loans corresponding to this new money was not permitted under the Fifth Amended Agreement, STG was obligated to distribute the amount UnSub received to the Excluded Lenders.  Its failure to do so violated Section 2.8(d).

149.    *Breach of Section 10.11(b).*  Section 10.11(b) provides that "[i]f any Lender [] obtains any payment of any Obligation of any Credit Party … ([] other than … a Discounted Buyback … ) and such payment exceeds the amount such Lender would have been entitled receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase by cash from other Lenders such participation in

their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as thought it had been received by Agent and applied in accordance with this Agreement."  As alleged above, the prepayment of the Defendant Lenders' Loans in the Scheme was not a Discounted Buyback under the Fifth Amended Agreement, and Section 2.10(a) requires "[a]ll payments" made on account of the existing Loans to be made "for the ratable account of" all existing lenders.  Because the Defendant Lenders received or will receive payments as a result of the Scheme that exceeded their ratable share, they are obligated under Section 10.11(b), but failed to, purchase participations in Plaintiffs' Loans in cash to ensure that Plaintiffs obtained their ratable shares of any non-*pro-rata* payments they obtained in or subsequent to the Scheme, including in connection with the debtors' chapter 11 cases.

150.    *Breach of Section 2.10(c)*.  Section 2.10(c) provides that "[d]uring the continuance of an Event of Default … all payments received by Agent … shall be applied" in an order specified in Section 2.10(c).  Under Section 8.1(c), an Event of Default occurs upon any failure by a Credit Party to "perform or observe any term, covenant or agreement" reflected in Sections 6.1–6.18.

151.    As described above, the Scheme violated Sections 6.1, 6.2, 6.3, 6.5, 6.6, and 6.18, each of which constituted an Event of Default under Section 8.1(c) (concerning the breach of any provision in Article VI).  An additional Event of Default was triggered under Section 8.1(a) (concerning the nonpayment of principal or interest) when STG failed to make a scheduled payment of principal and interest on Plaintiffs' Loans that was due on December 31, 2025.

152.    Accordingly, Section 2.10(c) obligated the Agent to distribute any payments it received in respect of any Obligation in the order specified in Section 2.10(c).  In effecting the Scheme, Defendants did not do so, and therefore breached Section 2.10(c).

## VI.    Chapter 11 Filing and Proposed DIP Structure

153.    Following STG's January 12, 2026 filing of the chapter 11 cases, the Debtors have used tactics such as the DIP Motion to attempt to consolidate the ill-gotten value that STG and the Defendant Lenders obtained via the Scheme, and to hand additional disproportionate economic value and opportunities to the Defendant Lenders to the exclusion of Plaintiffs.

154.    As a result of the Scheme, the Defendant Lenders—but not Plaintiffs—hold UnSub Loans.  Because the UnSub Loans are structurally senior to Plaintiffs' Loans (including because the UnSub Loans provide the Defendant Lenders improved priority on the collateral and guarantor assets transferred to UnSub, while retaining the credit support of STG's remaining assets through new liens and guarantees on those assets), the Defendant Lenders are in line to receive greater recoveries through any asset sale or plan of reorganization than Plaintiffs, despite Plaintiffs' entitlement to *pari passu* treatment with their fellow first-lien lenders.

155.    The non-*pro rata* allocation of value in bankruptcy as a result of the Scheme is compounded by STG's proposed DIP financing.  Participation in the DIP facility is limited exclusively to holders of FLFO and FLSO UnSub Loans—including the Defendant Lenders, but not Plaintiffs.  Thus, Plaintiffs are therefore categorically excluded from the DIP and from the substantial value that accompanies DIP participation.

156.    Most notably, the DIP facility permits the Defendant Lenders—but not Plaintiffs— to roll up a substantial portion of their prepetition loans into superpriority DIP obligations with priming liens, effectively eliminating downside risk and locking in recoveries.  The Defendant Lenders, but not Plaintiffs, also receive the economic upside associated with the DIP facility, including backstop, commitment, and exit fees—benefits to which Plaintiffs should be entitled given their identical situation prior to the Scheme.  Furthermore, the Interim DIP Order and the proposed Final DIP Order permit holders of UnSub Loans—but not Plaintiffs—to receive adequate

64

protection liens, adequate protection superpriority claims, and adequate protection payments on account of the liens securing the UnSub Loans which were wrongfully elevated in priority over the liens securing Plaintiffs' loans.

157.    Exclusive participation in the DIP facility further confers on the Defendant Lenders the ability to credit bid in any sale of STG's assets, to Plaintiffs' exclusion.  Because credit-bidding rights attach to allowed secured claims, and because only the Defendant Lenders hold rolled-up DIP claims, only they may credit bid the full amount of their obligations.  Finally, the Defendant Lenders' UnSub Loans and DIP obligations enable them to capture the vast majority of equity interests in the reorganized company.  All told, notwithstanding Plaintiffs' position as *pari passu* first-lien lenders, through the Scheme the Defendant Lenders have been able to capture virtually all meaningful value of the debtors in the chapter 11 process, on a non-*pro rata* basis.

## FIRST CAUSE OF ACTION
### Declaratory Judgment
### (Against STG, Defendant Lenders, and Antares)

158.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

159.    The Fifth Amended Agreement is a valid and enforceable contract.

160.    Plaintiffs, STG, the Defendant Lenders, and Antares are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

161.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

162.    Section 10.1(a) of the Fifth Amended Agreement requires the written consent from lenders "directly and adversely affected" by any "waiver, amendment, supplement (including any additional Loan Document) or consent" that postpones interest payments, reduces the principal amount of any Loan, alters the priority or *pro rata* treatment of Loans, releases substantially all collateral backing the Loans, and/or subordinates lenders' existing Loans or liens securing these Loans to other loans or liens.

163.    The Scheme, including the execution of the Sixth Amended Agreement, constituted a single integrated transaction.    Defendants executed the Sixth Amended Agreement, the Dropdown Credit Agreement, and the Intercompany Loan Agreement on the same date for the same purpose.    In its Recitals, the Dropdown Credit Agreement expressly referenced the Sixth Amended Agreement and Intercompany Loan Agreement as collectively used to effectuate the Scheme.    Specifically, those Recitals acknowledged that the Defendant Lenders had "provided [their] consent to the Drop-Down Transaction and agreed to make other amendments and modifications to the Existing Credit Agreement as described in that Certain Sixth Amendment to the Existing Credit Agreement, dated as of the Closing Date," October 3, 2024.    The Defendant Lenders would not have consented to the Sixth Amended Agreement, which gutted all meaningful lender protections, had they not also agreed to simultaneously have their existing Loans prepaid and exchanged for UnSub Loans with superior priority on the company's collateral assets, governed by a Dropdown Credit Agreement reflecting the same protections the Defendant Lenders agreed to strip from the Excluded Lenders.

164.    The Scheme directly and adversely affected Plaintiffs.    The Scheme removed substantially all of the collateral backing Plaintiffs' Loans and diluted Plaintiffs' collateral support from STG's remaining assets through STG's incurrence of a new guarantee of the UnSub Loans and a secured intercompany loan from UnSub.    The Scheme additionally purported to strip critical rights and protections from the Credit Agreement.    The Scheme could not have been accomplished without execution of the Sixth Amended Agreement, including because it was prohibited by provisions of the Fifth Amended Agreement that were removed or amended in the Sixth Amended Agreement, such as Sections 2.7, 2.8, 6.1, 6.2, 6.3, 6.5, 6.6, and 6.18.    Plaintiffs' likelihood of recovery on the Loans, and the Loans' value, have substantially decreased as a result.

165.    The Scheme purported effectively to eliminate STG's duty to make scheduled interest payments until maturity by amending Section 8.1 of the Credit Agreement to provide STG with the discretion to extend unilaterally the grace period on interest payments until maturity without triggering an Event of Default.

166.    The Scheme also purported to reduce the principal of the Defendant Lenders' Loans to zero by prepaying their Loans in full and cancelling them in exchange for new UnSub Loans extended by the Defendant Lenders.

167.    The Scheme additionally changed or had the effect of changing the priority or *pro rata* treatment of "any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement *or otherwise*, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise)" by:

    a.    Prepaying the Defendant Lenders' Loans, and reducing their Commitments to zero, on a non-*pro-rata* basis in exchange for new UnSub Loans with superior priority than the Excluded Lenders' Loans on the collateral assets that, before the Scheme, secured all lenders' Loans equally; and

    b.    Amending Section 2.7 to remove a *pro rata* payment waterfall requirement that previously applied in the event that STG's notice of prepayment does not specify the scheduled installments for prepayments.

168.    STG's prepayments of the Defendant Lenders' Loans were not Discounted Buybacks permitted under Section 2.7(d), including because: (i) the prepayments were not made from "internally generated funds" as required by Section 2.7(d)(i), but instead were made in

exchange for new, higher-priority UnSub Loans without Plaintiffs' consent in violation of Section 10.1(a)(iv)(A); and (ii) several Events of Default had occurred and were continuing when the Scheme was effectuated.

169.    Plaintiffs were never offered a reasonable opportunity to receive the most favorable treatment received by the Defendant Lenders, including an opportunity to have their Loans prepaid in exchange for new UnSub Loans on the same terms as the Ad Hoc Group.

170.    The Scheme further purported to release substantially all of the collateral backing the Loans by transferring STG's valuable business segments assets to UnSub.

171.    The Scheme additionally purported to "subordinate [Plaintiffs'] Liens securing the Obligations to Liens securing Indebtedness" by wholly eliminating Plaintiffs' liens on the assets transferred to UnSub that secure the UnSub Loans, thus giving the Defendant Lenders' new UnSub Loans improved priority compared to Excluded Lenders' Loans with respect to the assets that prior to the Scheme secured all lenders equally.

172.    Section 10.1(a) of the Fifth Amended Agreement therefore required Plaintiffs' consent before the Sixth Amended Agreement could be executed, and neither Plaintiffs nor the other Excluded Lenders gave such consent, therefore the Sixth Amended Agreement is invalid and unenforceable.

173.    Plaintiffs respectfully seek a declaration that the Sixth Amended Agreement is not a valid and enforceable contract and is thus void, and that the agreements purporting to effectuate the Sixth Amendment Transactions (including the Dropdown Credit Agreement, the Intercompany Loan Agreement, and the new Pari Passu Intercreditor Agreement) are invalid and *void ab initio*.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Against STG and Antares)

174.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

175.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

176.    Plaintiffs, STG, and Antares are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

177.    Plaintiffs performed their obligations under the Fifth Amended Agreement.

178.    Section 2.10(a) of the Fifth Amended Agreement requires that "[a]ll payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent and *for the ratable account* of the Persons holding the applicable Obligations."

179.    STG breached Section 2.10(a) of the Fifth Amended Agreement by prepaying the Defendant Lenders' Loans in exchange for UnSub Loans without making such prepayments *pro rata* to all lenders holding Loans.  In addition, Antares breached its obligation under Section 2.10(a) to distribute any payments from STG to existing lenders—including Plaintiffs—*pro rata*. The prepayments were not otherwise expressly permitted by the Credit Agreement.

180.    Plaintiffs have been damaged by STG's and Antares's breach of the Fifth Amended Agreement.

181.    As to Antares, Plaintiffs seek specific performance of Antares's obligations under Section 2.10(a), which requires Antares to distribute any prepayments of Loans by STG for the ratable account of all lenders.  Alternatively, Plaintiffs seek damages in an amount to be determined at trial for Antares's failure to distribute Plaintiffs their *pro rata* share of payments from STG to existing lenders as required by Section 2.10(a).

182.    As to STG, Plaintiffs seek specific performance of STG's and Antares's obligations under Section 2.10(a), which requires STG to prepay enough of Plaintiffs' Loans to ensure that all prepayments made by STG in connection with the Scheme are for the ratable account of all lenders holding Loans immediately prior to the Scheme.  Alternatively, Plaintiffs seek avoidance of the Loan prepayments made by STG in connection with the Scheme, of STG's transfer of assets to UnSub in the Scheme, and of the UnSub Loans and the obligations of STG incurred in the Scheme. Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Breach of Contract
### (Against STG)

183.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

184.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

185.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

186.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

187.    Section 6.1 of the Fifth Amended Agreement requires that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property," other than for purposes permitted in Section 6.1.

188.    As part of Defendants' Scheme, UnSub incurred three tranches of secured first-lien loans, and STG also incurred a secured intercompany loan, neither of which qualify for any of the exceptions permitted by Section 6.1.  The Scheme therefore violated Section 6.1's prohibition on the incurrence of liens.

70

189.    Plaintiffs seek avoidance of the UnSub Loans and the obligations of STG incurred in the Scheme.

190.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against STG)

191.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

192.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

193.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

194.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

195.    Section 6.2 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly Dispose of (whether in one or a series of transactions) any Property" unless such disposal is permitted by Section 6.2's exceptions.

196.    The Scheme involved STG transferring ownership of two valuable business segments to UnSub.  This disposal of assets was not permitted by any of Section 6.2's exceptions and therefore violated Section 6.2's prohibition on the disposition of property.

197.    Plaintiffs seek avoidance of STG's transfer of assets to UnSub in the Scheme.

198.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Breach of Contract
### (Against STG)

199.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

200.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

201.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

202.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

203.    Section 6.3 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge with, consolidate with or into, dissolve or liquidate into or convey, transfer, lease or otherwise dispose of … all or substantially all of its assets" unless one of the enumerated exceptions applies.

204.    Defendants' Scheme involved STG's transfer to UnSub of two valuable business segments representing substantially all of its assets.  Because the transfer is not permitted by any of Section 6.3's exceptions, the Scheme violated Section 6.3's prohibition on transfer of substantially all of STG's assets.

205.    Plaintiffs seek avoidance of STG's transfer of assets to UnSub in the Scheme.

206.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Breach of Contract**
**(Against STG)**

207.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

208.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

209.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

210.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

211.    Section 6.5 of the Fifth Amended Agreement requires that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness," other than for purposes permitted in Section 6.5.

212.    As part of the Scheme, UnSub—a subsidiary of STG—incurred three tranches of secured first-lien loans, and STG incurred a secured intercompany loan, none of which qualify for any of the exceptions permitted by Section 6.5.  Therefore, the Scheme violated Section 6.5's prohibition on the incurrence of indebtedness.

213.    Plaintiffs seek avoidance of the UnSub Loans and the obligations of STG incurred in the Scheme.

214.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Breach of Contract
### (Against STG)

215.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

216.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

217.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

218.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

219.    Section 6.6 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to … enter into any transaction with any Sponsor or any Affiliate of any Sponsor, of the Borrowers or of any such Subsidiary," unless such a transaction is permitted by Section 6.6's exceptions.

220.    As part of the Scheme, STG transferred collateral assets to its Affiliate UnSub, guaranteed new UnSub Loans, and entered into the Intercompany Loan Agreement with UnSub. Because none of Section 6.6's exceptions applied to these transactions, they violated Section 6.6's prohibition on affiliate transactions.

221.    Plaintiffs seek avoidance of STG's transfer of assets to UnSub in the Scheme, and of the UnSub Loans and the obligations of STG incurred in the Scheme.

222.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### Breach of Contract
### (Against STG)

223.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

224.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

225.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

226.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

227.    Section 6.18 of the Fifth Amended Agreement provides that "[n]o Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to make any Investment, Restricted Payment, or Disposition of, other otherwise assign or transfer, any Material Property to a Subsidiary that is not a Credit Party."  "Material Property" is defined as any property that is "material to the operation of the business of [STG and its subsidiaries] taken as a whole."

228.    Defendants' Scheme involved STG transferring valuable business segments to UnSub that are material to STG's operations.  Therefore, the Scheme involved a transfer of Material Property to a Subsidiary that violated Section 6.18.

229.    Plaintiffs seek avoidance of STG's transfer of assets to UnSub in the Scheme.

230.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**Breach of Contract**
**(Against STG)**

231.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

232.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

233.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

234.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

235.    Under Section 2.3 of the Fifth Amended Agreement (and amendments thereto, if valid), a payment of principal and interest on Plaintiffs' Loans was due on December 31, 2025. STG has not made such payment.

236.    In the Scheme, STG prepaid the Defendant Lenders' Loans on a non-*pro-rata* basis in exchange for new UnSub Loans.  Plaintiffs were never offered a reasonable opportunity to receive the most favorable treatment received by the Defendant Lenders, including an opportunity to have their Loans prepaid in exchange for new UnSub Loans on the same terms as the Ad Hoc Group.  Accordingly, following the Scheme, only Plaintiffs continue to hold STG's Loans, and Plaintiffs alone suffered the harm from STG's non-payment of principal and interest on Plaintiff's Loans that was due on December 31, 2025.

237.    Plaintiffs seek specific performance of STG's payment obligations under Section 2.3 of the Fifth Amended Agreement.

238.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Breach of Contract**
**(Against STG)**

239.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

240.     The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

241.     Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

242.     Plaintiffs performed all their obligations under the Fifth Amended Agreement.

243.     Section 2.7 of the Fifth Amended Agreement provides that STG's "[o]ptional partial prepayments of Revolv[er] Loans shall be applied in accordance with Section 2.10(a) [*i.e.* the *pro rata* requirements]," STG "may at any time … prepay the Loan in whole or in part in an amount greater than or equal to $100,000 …," and "[o]ptional partial prepayments of Term Loans shall, subject to Section 2.10(a) [*i.e.* the *pro rata* requirements], be applied" according to STG's "notice of prepayment and, in the absence of such direction, in the manner set forth in Section 2.8(f)."

244.     Section 2.8(f) in turns provides payment waterfall provisions, which require any prepayments be applied "first, *pro rata* to each Class of Term Loan based upon the respective outstanding principal balances thereof …, third, to prepay outstanding Revolv[er] Loans (*pro rata* based on the then aggregate outstanding principal balance of the Tranche A Revolving Loans and the Tranche B Revolving Loans …)."

245.     As part of the Scheme, STG partially prepaid the Defendant Lenders' Term Loans and Revolver Loans without complying with Section 2.8(f)'s waterfall provisions.   STG's prepayments of the Defendant Lenders' Loans were not Discounted Buybacks permitted under Section 2.7(d), including because: (i) the prepayments were not made from "internally generated

funds" as required by Section 2.7(d)(i), but instead were made in exchange for new, higher-priority UnSub Loans; and (ii) several Events of Default had occurred and were continuing when the Scheme was effectuated.  The Scheme therefore violated Section 2.7.

246.    Plaintiffs seek specific performance of STG's obligations under Section 2.7, which requires STG to prepay enough of Plaintiffs' Term Loans and Revolver Loans to ensure that all prepayments made by STG in connection with the Scheme comply with the payment waterfall set forth in Section 2.8(f).

247.    Alternatively, Plaintiffs seek avoidance of the Term Loan and Revolver Loan prepayments made by STG in connection with the Scheme.

248.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### Breach of Contract
### (Against STG)

249.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

250.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

251.    Plaintiffs and STG are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

252.    Plaintiffs performed all their obligations under the Fifth Amended Agreement.

253.    Section 2.8(d) provides that "[p]romptly upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of Indebtedness" that is not permitted under the Fifth Amended Agreement, STG must deliver "an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with Section 2.8(f)."  "Net Issuance Proceeds" are defined as "cash proceeds (including proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of

underwriting discounts and out-of-pocket costs and expenses paid or incurred in connection

therewith in favor of any Person not an Affiliate of a Borrower."

254.    Through the Scheme, UnSub received $137 million in new debt financing, which

constitutes "Net Issuance Proceeds."  Since the incurrence of the UnSub Loans corresponding to

this new money was not permitted under the Fifth Amended Agreement, STG was obligated to

distribute the amount UnSub received to the Excluded Lenders.  Its failure to do so violated Section

2.8(d).

255.    Plaintiffs seek specific performance of STG's and Antares's obligations under

Section 2.8(d), which requires STG to distribute an amount equal to the Net Issuance Proceeds

from the UnSub Loans for application to the Loans in accordance with Section 2.8(f).

256.    Alternatively, Plaintiffs seek avoidance of the UnSub Loans.

257.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### Breach of Contract
### (Against STG and Antares)

258.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

259.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth

Amended Agreement is void and unenforceable.

260.    Plaintiffs, STG, and Antares are parties to, or assignees and successors in interest

to, the Fifth Amended Agreement.

261.    Plaintiffs performed their obligations under the Fifth Amended Agreement.

262.    Section 2.10(c) provides that "[d]uring the continuance of an Event of Default …

all payments received by Agent … shall be applied" in an order specified in Section 2.10(c).

Under Section 8.1(c), an Event of Default occurs upon any failure by a Credit Party to "perform

or observe any term, covenant or agreement" reflected in Article VI, namely Sections 6.1–6.18.

263.    As described above, the Scheme violated Sections 6.1, 6.2, 6.3, 6.5, 6.6, and 6.18, each of which constituted an Event of Default under Section 8.1(c).  Accordingly, Section 2.10(c) obligated the Agent to distribute any payments it received in respect of any Obligation in the order specified in Section 2.10(c).  In effecting the Scheme, Antares did not do so, and therefore breached Section 2.10(c).

264.    Plaintiffs seek a declaration that an Event of Default has occurred pursuant to Section 8.1(c), and additionally seek specific performance of Antares's obligations under Section 2.10(c), which requires Antares to make payments to Plaintiffs in an amount to ensure that any payments Antares received in respect of any Obligation in connection with the Scheme were distributed consistent with the order specified in Section 2.10(c).

265.    Alternatively, Plaintiffs seek avoidance of the Loan prepayments made by STG in connection with the Scheme, of STG's transfer of assets to UnSub in the Scheme, and of the UnSub Loans and the obligations of STG incurred in the Scheme.

266.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### THIRTEENTH CAUSE OF ACTION
**Breach of Contract**
**(Against the Defendant Lenders)**

267.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

268.    The Fifth Amended Agreement is a valid and enforceable contract; the Sixth Amended Agreement is void and unenforceable.

269.    Plaintiffs and the Defendant Lenders are parties to, or assignees and successors in interest to, the Fifth Amended Agreement.

270.    Plaintiffs performed their obligations under the Fifth Amended Agreement.

271.    Section 10.11(b) of the Fifth Amended Agreement requires that "[i]f any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of

any Credit Party … (and other than pursuant to … A Discounted Buyback  … ) and such payment

exceeds the amount such Lender would have been entitled to receive if all payments had gone to,

and been distributed by, agent in accordance with the provisions of the Loan Documents, such

Lender shall purchase for cash from other Lenders such participations in their Obligations as

necessary for such Lender to share such excess payment with such Lenders to ensure such payment

is applied as though it had been received by Agent and applied in accordance with this Agreement."

272.    The Defendant Lenders received prepayments of their existing Loans in full (which

prepayments were not Discounted Buybacks for the reasons described above); received newly

issued UnSub Loans secured by substantially all of the collateral that prior to the Scheme backed

Plaintiffs' Loans, as well as by STG's remaining assets through STG's incurrence of a new

guarantee of the UnSub Loans and a secured intercompany loan from UnSub; and received

exclusive opportunities and economic benefits not available to Plaintiffs, including opportunities

to participate in DIP financing and roll-ups of prepetition loans to the exclusion of Plaintiffs.

273.    The Defendant Lenders breached Section 10.11(b) of the Fifth Amended

Agreement by receiving payments that exceed the amounts the Defendant Lenders would have

been entitled to receive if all payments had gone to, and been distributed by, agent in accordance

with the *pro rata* requirements of Section 2.10(a) of the Fifth Amended Agreement, and by failing

to purchase for cash from Plaintiffs participations in their Loans as necessary for the Defendant

Lenders to share such excess payments with Plaintiffs to ensure such payments were applied *pro

rata*.

274.    Plaintiffs have been damaged by the Defendant Lenders' breach of the Fifth

Amended Agreement.

275.     Plaintiffs seek specific performance of Section 10.11(b) of the Fifth Amended Agreement, which requires the Defendant Lenders to purchase participations in Plaintiffs' Loans for cash to ensure that Plaintiffs receive the benefit of the Scheme on account of their Loans to the same extent as any Defendant Lender on account of their Loans or UnSub Loans (including any Defendant Lender in the Ad Hoc Group). Such benefits include, but are not limited to, any benefits that the Defendant Lenders receive in connection with the chapter 11 cases as a result of any asset sale, reorganization, exclusive access to DIP lending opportunities, selective roll-up of their prepetition UnSub Loans, non-*pro rata* allocation of fees and economics associated with the DIP facility, exclusive credit-bidding rights, and/or disproportionate access to equity interest in the post-emergence company.

276.     Alternatively, Plaintiffs seek damages in an amount to be determined at trial for the Defendant Lenders' failure to purchase participations in Plaintiffs' Loans for cash to ensure that Plaintiffs receive the benefit of the Scheme on account of their Loans to the same extent as any Defendant Lender on account of their Loans or UnSub Loans (including any Defendant Lender in the Ad Hoc Group).

## FOURTEENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against STG, Defendant Lenders, and Antares)

277.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

278.     Plaintiffs bring this claim in the alternative, only if the Fifth Amended Agreement granted Defendants the discretion to enter into the Sixth Amended Agreement.

279.     Every contract contains an implied covenant of good faith and fair dealing, which requires contract parties to refrain from doing anything that will have the effect of destroying or injuring the right of the other parties to receive the fruits of the contract.  The conduct of STG, Antares, and the Defendant Lenders in adopting the Sixth Amended Agreement breached the

implied covenant by denying Plaintiffs the fruits of their bargain.  Plaintiffs reasonably expected when purchasing the Loans that they were purchasing first-lien loans and would receive equal and fair treatment as compared to all other holders of the Loans, including that when a majority of holders of the Loans exercised their discretion to amend the Credit Agreement, such lenders would bear the consequences of the amendments alongside other lenders under the Credit Agreement (such as Plaintiffs), and that a majority of Lenders would not use Credit Agreement amendments in bad faith in an LMT to position certain favored Lenders to achieve better recoveries than the excluded participants in the same tranche in any ensuing bankruptcy.  In addition, following Defendants' agreement to remove "Unrestricted Subsidiary" as a defined term in the Fifth Amended Agreement, to carve out such entities from the definition of an "Excluded Subsidiary," and to remove exceptions for "Unrestricted Subsidiaries" from various negative covenants, Plaintiffs reasonably expected that STG would not engage in an abusive dropdown LMT that would structurally subordinate Plaintiffs through the use of unrestricted subsidiaries.  That reasonable expectation was reinforced by the Credit Agreement's sacred rights requiring adversely affected lenders' consent to amendments that have the effect of changing the priority of liens or collateral proceeds (Section 10.1(a)(iv)(A)) or that subordinate in whole or in part the liens securing Plaintiffs' Loans (Section 10.1(a)(viii)).

280.    Through the Scheme, Defendants denied Plaintiffs the fruits of their bargain through an integrated Scheme that used the Sixth Amended Agreement to facilitate the transfer of substantially all of STG's collateral securing Plaintiffs' Loans while encumbering STG with substantial new obligations, reducing the likelihood for Plaintiffs' Loans to be paid.  At the same time, STG prepaid the Loans held by a select group of the Defendant Lenders in exchange for new, superior UnSub Loans that are secured by the valuable assets that STG moved out of Plaintiffs'

reach and are additionally backed by the remaining assets at STG.  These draconian actions were accomplished via scorched-earth amendments to the Credit Agreement of which the Defendant Lenders did not have to bear the consequences, because they exited the Credit Agreement simultaneously with their consent to the Sixth Amended Agreement, and which amendments were intended to hinder the recovery of Plaintiffs, including in a future bankruptcy, to the benefit of the Defendant Lenders.

281.   Defendants thus abused any discretion they had to enter into the Sixth Amended Agreement without Plaintiffs' consent, and thereby breached the implied covenant of good faith and fair dealing, by stripping lender protections that the Defendant Lenders would not have agreed to remove if they remained parties to the agreement and by violating Plaintiffs' reasonable expectations that they would not be structurally subordinated by way of a dropdown LMT using unrestricted subsidiaries.

282.   Defendants' conduct damaged Plaintiffs by denying them the fundamental benefit of the bargain to which they were entitled under the Fifth Amended Agreement.

283.   Plaintiffs seek avoidance of the Loan prepayments made by STG in connection with the Scheme, of STG's transfer of assets to UnSub in the Scheme, and of the UnSub Loans and the obligations of STG incurred in the Scheme.

284.   Alternatively, Defendants seek a declaration that the Sixth Amended Agreement is void.

285.   Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

**FIFTEENTH CAUSE OF ACTION**
**Equitable Subordination & Equitable Liens**
**(Against Defendant Lenders)**

286.   If the Court finds that the Scheme was valid (which it was not), Plaintiffs respectfully ask the Court to (a) equitably subordinate all claims of the Defendant Lenders to the

claims of Plaintiffs; and (b) grant Plaintiffs equitable liens to the "Collateral" (as such term is defined in the Fifth Amended Agreement) with priority over any liens purportedly held by the Defendant Lenders by virtue of their holding of the UnSub Loans.

287.    The Defendant Lenders, together with STG, UnSub, and Antares, carried out the Scheme to gain an unfair advantage over Plaintiffs.  Before the Scheme, Plaintiffs and the Defendant Lenders, as first-lien lenders to STG, were entitled to the same rights and benefits under the Fifth Amended Agreement.  After the Scheme, however, Plaintiffs: (i) lost all liens on, and guarantees provided by, the assets transferred to UnSub; (ii) had their liens on remaining STG assets diluted by the *pari passu* first-lien guarantee of the UnSub Loans and UnSub's *pari passu* first-lien secured intercompany loan; and (iii) were left with a Credit Agreement stripped of substantially all affirmative and negative covenants, substantially all Events of Default, mandatory prepayments, and any obligation to make pre-maturity interest payments.  Meanwhile, the Defendant Lenders in the Ad Hoc Group captured a premium on their Loans, and all Defendant Lenders secured a superior credit position as compared to the other lenders who previously shared the same first-lien position.

288.    The Defendant Lenders' conduct was inequitable because they executed the Scheme in secret to obtain non-*pro-rata* benefits while simultaneously exiting the Credit Agreement (through non-*pro-rata* prepayment of their Loans) to avoid suffering the consequences of the Scheme's bad faith amendments, which stripped lender protections that the Defendant Lenders would not have agreed to remove if they remained parties to the Credit Agreement.

289.    Upon principles of equitable subordination, any and all claims of the Defendant Lenders as a lender of the debtors should be subordinated for purposes of distribution to the claims of Plaintiffs, pursuant to Sections 510(c) and 105(a) of the Bankruptcy Code.  Equitably

subordinating the Defendant Lenders' claims is not inconsistent with the Bankruptcy Code because the remedy sought is necessary to offset the harms inflicted upon Plaintiffs.

290.    Plaintiffs also seek equitable liens on the Collateral (as such term is defined in the Fifth Amended Agreement) with priority over any liens purportedly held by the Defendant Lenders by virtue of their holding of the UnSub Loans.

291.    By the Fifth Amended Agreement, Plaintiffs and the Defendant Lenders entered into express agreements that granted them liens in the assets of STG and its subsidiaries to secure their obligations under the Fifth Amended Agreement, therefore demonstrating a clear intent to create a security interest.  The parties intended to create a security interest in specific assets, as defined and identified in the Fifth Amended Agreement as the "Collateral."

292.    Through the Scheme, STG transferred substantially all collateral assets securing Plaintiffs' Loans to UnSub, thereby depriving Plaintiffs of their security interests in those assets. STG further had UnSub issue UnSub Loans to the Defendant Lenders, and the UnSub Loans are not only secured by the assets transferred to UnSub but also have at least two means of recovery on STG's remaining assets (including a *pari passu* first-lien security interest in UnSub's intercompany loan to STG and a *pari passu* guarantee interest in the remaining assets).  The UnSub Loans therefore further diluted Plaintiffs' claims on the remaining assets.  The Defendant Lenders should not be allowed to retain the fruits from this illegal and inequitable scheme.

293.    Absent the requested relief, Plaintiffs have no adequate legal remedy to right the injustice inflicted upon them because, prior to the Scheme, they, as secured creditors, were undoubtedly entitled to first-lien claims to *all of* the Collateral as defined in the Fifth Amended Agreement.  Upon principles of equity, Plaintiffs are entitled to equitable liens to the Collateral

(as such term is defined in the Fifth Amended Agreement) with priority over any liens purportedly

held by the Defendant Lenders through their holding of the UnSub Loans.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

a.  A declaratory judgment that the Sixth Amended Agreement and the agreements purporting to effectuate the Sixth Amendment Transactions (including the Dropdown Credit Agreement, the Intercompany Loan Agreement, and the new Pari Passu Intercreditor Agreement) are invalid and *void ab initio*;

b.  A declaratory judgment that an Event of Default has occurred pursuant to Sections 8.1(a) and (c) of the Fifth Amended Agreement;

c.  Avoidance of all transfers made, and debt, liens, and obligations incurred, in the Scheme;

d.  Specific performance of Antares's obligations under Section 2.10(a), which requires Antares to distribute any prepayments of Loans by STG for the ratable account of all lenders;

e.  Specific performance of STG's obligations under Section 2.10(a) of the Fifth Amended Agreement, which requires STG to prepay enough of Plaintiffs' Loans to ensure that all prepayments made by STG in connection with the Scheme are for the ratable account of all lenders holding Loans immediately prior to the Scheme;

f.  Specific performance of STG's obligations under Section 2.7 of the Fifth Amended Agreement, which requires STG to prepay enough of Plaintiffs' Term Loans and Revolver Loans to ensure that all prepayments made by

STG in connection with the Scheme comply with the payment waterfall set forth in Section 2.8(f) of the Fifth Amended Agreement;

g.    Specific performance of Section 2.3 of the Fifth Amended Agreement, or alternatively, of the Sixth Amended Agreement, requiring STG to make payments of principal and interest to Plaintiffs;

h.    Specific performance of STG's and Antares's obligations under Section 2.8(d) of the Fifth Amended Agreement, which requires STG to distribute an amount equal to the Net Issuance Proceeds from the UnSub Loans for application to the Loans in accordance with Section 2.8(f) of the Fifth Amended Agreement;

i.    Specific performance of Antares's obligations under Section 2.10(c) of the Fifth Amended Agreement, which requires Antares to make payments to Plaintiffs in an amount to ensure that any payments Antares received in respect of any Obligation in connection with the Scheme were distributed consistent with the order specified in Section 2.10(c) of the Fifth Amended Agreement;

j.    Specific performance of Section 10.11(b) of the Fifth Amended Agreement, requiring the Defendant Lenders to purchase participations in Plaintiffs' Loans for cash to ensure that Plaintiffs receive the benefit of the Scheme on account of their Loans to the same extent as the Defendant Lenders on account of their Loans or UnSub Loans (including any Defendant Lender in the Ad Hoc Group);

k.  Money damages in amounts to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowed by law;

l.  An order granting Plaintiffs equitable liens on the "Collateral" securing their Loans (as such term is defined under the Fifth Amended Agreement), with such liens taking priority over any liens purportedly held by the Defendant Lenders;

m.  An order equitably subordinating the claims of the Defendant Lenders to the claims of Plaintiffs;

n.  Indemnification from STG pursuant to Section 10.06(a) of the Fifth Amended Agreement (and Sixth Amended Agreement, if valid) for costs and expenses, including attorneys' fees in an amount to be determined following trial; and

o.  Such other and further relief as the Court may deem just and proper.

Dated:  New York, NY                      Respectfully submitted,
        February 4, 2026


                                          By:   /s/ *Joseph L. Schwartz*
                                                _____

**SELENDY GAY PLLC**                      **RIKER DANZIG LLP**
Jennifer M. Selendy, Esq. (admitted *pro hac vice*)   Joseph L. Schwartz, Esq.
Andrew R. Dunlap, Esq. (admitted *pro hac vice*)      Daniel A. Bloom, Esq.
David A. Coon, Esq. (admitted *pro hac vice*)         John J. Harmon, Esq.
1290 Avenue of the Americas               7 Giralda Farms, Suite 250
New York, New York 10104                  Madison, New Jersey 07940
Telephone: (212) 390-9000                 Telephone: (973) 538-0800
Facsimile: (212) 390-9399                 Facsimile: (973) 538-1984
jselendy@selendygay.com                   jschwartz@riker.com
adunlap@selendygay.com                    dbloom@riker.com
dcoon@selendygay.com                      jharmon@riker.com

*Co-Counsel to Axos Financial, Inc. and*   *Co-Counsel to Axos Financial, Inc. and*
*Siemens Financial Services, Inc.*          *Siemens Financial Services, Inc.*