**Order Filed on February 10, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

# FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through one hundred

(100), is **ORDERED**.

**DATED: February 10, 2026**

**Honorable Mark E. Hall
United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
Patrick Nash (admitted *pro hac vice*)
Yusuf Salloum (admitted *pro hac vice* )
Ashley L. Surinak (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
patrick.nash@kirkland.com
yusuf.salloum@kirkland.com
ashley.surinak@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| STG LOGISTICS, INC., *et al* | Case No. 26-10258 (MEH) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The last four digits of Debtor STG Logistics, Inc.'s tax identification number are 8624. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/STGLogistics. The location of the Debtors' service address in these chapter 11 cases is: 5165 Emerald Parkway, Dublin, Ohio 43017.

| | |
|---|---|
| (Page 3) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364, 506(c), 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001, 6004, and 9013 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), seeking entry of this order (this "Final Order" and together with the Interim Order[3], the "DIP Orders"):

> (i) authorizing STG Distribution, LLC, in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for (a) STG Distribution Holdings, LLC ("Holdings"), (b) Reception Mezzanine Holdings, LLC ("Reception Mezzanine"), (c) each subsidiary of Reception Mezzanine that guaranteed, purported to guarantee, or was required to guarantee, any obligations under the STG Distribution Credit Agreement, and (d) each of the other Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower, the "DIP Guarantors") on a joint and several basis, the DIP Borrower's obligations in connection with a superpriority senior secured credit facility (including the New Money DIP Loans and the Roll-Up DIP Loans (each as defined herein), the "DIP Facility") in an amount not to exceed $293,750,000 in aggregate principal amount (inclusive of the New Money DIP Loans (as defined herein) and the Roll-Up DIP Loans (as defined herein)) (such loans, the "DIP Loans") from the DIP Lenders (as defined herein), in each case in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below), substantially in the form attached hereto as **Exhibit A** and all other terms and conditions of the DIP Documents (as defined below), consisting of:

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms later in this Final Order, the Motion, or the DIP Credit Agreement (as defined herein), as applicable.

[3]   As used herein, "Interim Order" refers to the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief* [Docket No. 84].

(Page 4)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(a)  New Money DIP Loans.  $150,000,000 of superpriority senior secured multiple draw term loans (the "New money term loans (the "New Money Commitments" and the term loans made thereunder, the "New Money DIP Loans"), where (I) $85,000,000 of which were funded upon entry of the Interim Order (the "Interim New Money DIP Loans"), (II) $40,000,000 of which shall be made available upon entry of this Final Order (the "Final New Money DIP Loans"), and (III) up to $25,000,000 of which may be made available immediately prior to the effective date of the Plan in the form of incremental term loans (subject to Article III of the DIP Credit Agreement) (the "Incremental New Money DIP Loans" and together with the Interim New Money DIP Loans and the Final New Money DIP Loans, collectively, the "New Money DIP Loans");

(b)  Roll-Up DIP Loans:  a "roll-up" in the collective aggregate principal amount of $143,750,000 the ("Roll-Up DIP Loans"), in each case, calculated in accordance with the DIP Documents, with:

(i)  Interim Roll-Up DIP Loans:  $97,750,000 were rolled-up upon entry of the Interim Order and funding of the Interim New Money DIP Loans, accruing interest pursuant to the DIP Credit Agreement commencing with entry of the Interim Order; and

(ii)  Final Roll-Up DIP Loans:  $46,000,000 rolling-up subject to, and effective upon, entry of this Final Order and funding of the Final New Money DIP Loans, accruing interest pursuant to the DIP Credit Agreement commencing with entry of this Final Order;

(c)  Interim Facility.  Upon entry of the Interim Order, the maximum amount of the New Money Commitments that were disbursed to the DIP Borrower was $85,000,000.

(ii)  authorizing the DIP Borrower and the DIP Guarantors to enter into and perform under that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement dated January 14, 2026, among the DIP Borrower, Newco Holdings, the Company, Holdings, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "DIP Agent," and together with the DIP Lenders, the "DIP Secured Parties") (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time (including as modified herein), the "DIP Credit Agreement") and all agreements, documents, and instruments delivered or executed in connection therewith, in each case as may be

4

| | |
|---|---|
| (Page 5) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof (including any fee letter executed by the DIP Borrower in connection with the DIP Facility (including the Roll-Up), and other guarantee and security documentation, collectively, the "DIP Documents");

(iii)     authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), (y) solely in accordance with the Approved DIP Budget subject to any Permitted Budget Variances (each as defined below) set forth in the DIP Orders and in the DIP Credit Agreement, and (z) to provide working capital for, and for other general corporate purposes of, the Debtors and certain of the Debtors' subsidiaries, including for funding the Carve Out (as defined below) and for payment of any Adequate Protection Payments (as defined below), in each case solely in accordance with the Approved DIP Budget subject to any Permitted Budget Variances;

(iv)     granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral;

(v)     to the extent provided by the Bankruptcy Code, granting the DIP Agent for the benefit of the DIP Lenders valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in the Prepetition Collateral (as defined below), whether any such foregoing property is presently-owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below) (in each case other than Excluded Property (as defined in the DIP Credit Agreement)), with the foregoing clauses (a) and (b) subject only to the (x) Carve Out, (y) the RCF Reserve Account, and (z) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition Secured Parties as of the Petition Date by operation of law or permitted by the STG Distribution Documents (as defined below) and liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "Prior Senior Liens");

(vi)     to the extent provided by the Bankruptcy Code, granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) with priority over any and all administrative expenses of any kind or nature subject and

(Page 6)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

subordinate only to the payment of the Carve Out on the terms and conditions set forth in the DIP Orders and in the DIP Documents;

(vii)   authorizing payment of certain fees and expenses, including, but not limited to any indemnity obligations of the DIP Secured Parties;

(viii)   waiving the Debtors' and the estates' right to surcharge against the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(ix)   for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(x)   waiving the equitable doctrine of marshaling with respect to the DIP Secured Parties and the STG Distribution Secured Parties; and

(xii)   granting related relief.

The Court having considered the Motion, the exhibits thereto, the *Declaration of Tyler Holtgreven, Chief Financial Officer of STG Logistics, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 33] (the "First Day Declaration"), the *Declaration of Thomas Higbie in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 20] (the "Higbie Declaration"), the *Declaration of Jason Keyes in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense*

(Page 7)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

*Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 21] (the "<u>Keyes Declaration</u>"), and the other evidence submitted or adduced and the arguments of counsel made at the interim hearing held on January 13, 2026 (the "<u>Interim Hearing</u>"); and upon the First Day Declaration, the Higbie Declaration, the Keyes Declaration, and the record of the Interim Hearing; and the Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having entered, at the Interim Hearing, the Interim Order; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the final relief granted herein need be given under the circumstances; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

(Page 8)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[4]

A.       *Petition Date*.  On January 12, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey commencing the Cases (the "Court").  On January 13, 2026, the Court entered an order approving joint administration of the Cases.

B.       *Debtors in Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.

C.       *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, the Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* of the United States District Court for the District of New Jersey, entered on July 23, 1984 and amended on June 6, 2025 (Bumb, C.J.).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Cases and proceedings on the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

| | |
|---|---|
| (Page 9) | |
| Debtors: | STG LOGISTICS, INC., *et al*. |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

D.     *Creditors' Committee*.  On January 28, 2026, the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

E.     *Notice*.   Notice of the Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or Final Hearing is or shall be required.

F.     *Debtors' Stipulations*.  Subject only to the rights of parties in interest specifically set forth in paragraph 14 of this Final Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Final Order), the Debtors stipulate and agree that (collectively, paragraphs F(i) through (vii) below are referred to herein as the "Debtors' Stipulations"):

(i)     *STG Distribution Loans*.

(a)     The STG Distribution Lenders (as defined below) provided STG Distribution Term Loans (as defined below) in a total aggregate principal amount outstanding as of the Petition Date of $979,976,052, and $40,000,000 in STG Distribution Revolving Commitments (as defined below) under that certain STG Distribution Credit Agreement, dated as of October 3, 2024, among the DIP Borrower, Holdings, Reception Purchaser, LLC ("Reception Purchaser"), Reception Mezzanine, the other Credit Parties party thereto (collectively with the DIP Borrower, Holdings, Reception Purchaser, Reception Mezzanine, the "STG Distribution Loan Parties"), the lenders from time to time party thereto, and Wilmington Savings Fund Society, FSB

(Page 10)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

as administrative agent and collateral agent (in such capacities, the "STG Distribution Agent," and together with the STG Distribution Lenders and the other Secured Parties (as defined in the STG Distribution Credit Agreement (as defined below)), which such Secured Parties shall include, for the avoidance of doubt, the First-Out Term Secured Parties, the Second-Out Secured Parties, the Third-Out Secured Parties, and the Revolving Secured Parties (each as defined below), the "STG Distribution Secured Parties") (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "STG Distribution Credit Agreement," and together with the other Loan Documents (as defined in the STG Distribution Credit Agreement), the "STG Distribution Documents").

(b)     The STG Distribution Credit Agreement includes three tranches of STG Distribution Term Loans (as defined below). Certain of the Lenders (the "First-Out Term Lenders," and together with the other relevant first-out term Secured Parties, the "First-Out Term Secured Parties") provided First-Out Term Loans (the "First-Out Term Loans," and the attendant Obligations (as defined in the STG Distribution Credit Agreement), the "First-Out Term Loan Obligations," and the claims on account of such First-Out Term Loan Obligations, the "First-Out Term Loan Claims") in a total aggregate principal amount outstanding as of the Petition Date of $209,105,951 under the STG Distribution Credit Agreement. Certain of the Lenders (the "Second-Out Term Lenders," and together with the other relevant second-out Secured Parties, the "Second-Out Secured Parties") provided Second-Out Term Loans (the "Second-Out Term Loans," and the attendant Obligations, the "Second-Out Term Loan Obligations," and the claims on account of

(Page 11)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

such Second-Out Term Loan Obligations, the "Second-Out Term Loan Claims") in a total aggregate principal amount outstanding as of the Petition Date of $668,651,248 under the STG Distribution Credit Agreement. Certain of the Lenders (the "Third-Out Term Lenders," together with the First-Out Term Lenders and the Second-Out Term Lenders, the "STG Distribution Term Loan Lenders" and the Third-Out Term Lenders together with the other relevant third-out Secured Parties, the "Third-Out Secured Parties"; the Third-Out Secured Parties together with the First-Out Term Secured Parties, and the Second-Out Secured Parties, the "STG Distribution Term Loan Secured Parties") provided Third-Out Term Loans (the "Third-Out Term Loans," together with the First-Out Term Loans and the Second-Out Term Loans, the "STG Distribution Term Loans" and the attendant Obligations on the Third-Out Term Loans, the "Third-Out Term Loan Obligations," and together with the First-Out Term Loan Obligations and the Second-Out Term Loan Obligations, the "STG Distribution Term Loan Obligations" and the claims on account of such Third-Out Term Loan Obligations, the "Third-Out Term Loan Claims," and together with the First-Out Term Loan Claims and the Second-Out Term Loan Claims, the "STG Distribution Term Loan Claims") in a total aggregate principal amount outstanding as of the Petition Date of $100,673,003 under the STG Distribution Credit Agreement. The STG Distribution Credit Agreement includes a revolving credit facility (the "STG Distribution Revolving Credit Facility"). Certain of the Lenders (the "STG Distribution Revolving Lenders," and together with the STG Distribution Term Loan Lenders, the "STG Distribution Lenders," and the STG Distribution Revolving Lenders, together with the other relevant revolving Secured Parties, the "Revolving

(Page 12)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Secured Parties")) provided Revolving Loan Commitments (the "STG Distribution Revolving Commitments"), of which the Debtors have drawn a total aggregate of $25,023,458 (the "STG Distribution Revolving Loans" and together with the STG Distribution Term Loans, the "STG Distribution Loans"), and the attendant Obligations to the STG Distribution Revolving Loans, the "STG Distribution Revolving Loan Obligations," and together with the STG Distribution Term Loan Obligations, the "STG Distribution Obligations" and the claims on account of such STG Distribution Revolving Loans (the "STG Distribution Revolving Claims"). The STG Distribution Credit Agreement includes payment subordination provisions such that (x) the First-Out Term Loan Obligations and STG Distribution Revolving Loan Obligations (*pari passu* with each other) have payment priority over the Second-Out Term Loan Obligations and the Third-Out Term Loan Obligations, until the First-Out Term Loan Obligations and STG Distribution Revolving Loan Obligations have been paid in full in cash, and (y) the Second-Out Term Loan Obligations have payment priority over the Third-Out Term Loan Obligations, until the Second-Out Term Loans Obligation have been paid in full in cash.

(c)     As of the Petition Date, the STG Distribution Loan Parties were jointly and severally indebted to the STG Distribution Secured Parties pursuant to the STG Distribution Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $979,976,052 on account of STG Distribution Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other

(Page 13)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the STG Distribution Credit Agreement), in each case, owing under or in connection with the STG Distribution Documents (including, for the avoidance of doubt, each of the First-Out Term Loan Obligations, the Second-Out Term Loan Obligations, and the Third-Out Term Loan Obligations, and the STG Distribution Revolving Loans Obligations).

(d)   <u>Loan Collateral</u>.   In connection with the STG Distribution Credit Agreement, certain STG Distribution Loan Parties entered into that certain Guaranty and Security Agreement, dated as of October 3, 2024, made by the Credit Parties (as defined in the STG Distribution Credit Agreement) in favor of the STG Distribution Agent for the benefit of the STG Distribution Secured Parties (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Guaranty and Security Agreement</u>").   Pursuant to the Guaranty and Security Agreement and the other STG Distribution Documents, the STG Distribution Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "<u>STG Distribution Liens</u>") on the Collateral (as defined in the Guaranty and Security Agreement) (the "<u>STG Distribution Collateral</u>").   Specifically, pursuant to the STG Distribution Documents, the First-Out Term Loan Obligations, Second-Out Term Loan Obligations, and Third-Out Term Loan Obligations are secured by valid, binding, perfected, and enforceable security interests in and liens on substantially all assets of the Debtors (including the

(Page 14)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Collateral (as defined in the STG Distribution Credit Agreement)). The STG Distribution Collateral consists of substantially all assets of the STG Distribution Loan Parties. The STG Distribution Liens and the STG Distribution Collateral are subject to the Prepetition Pari Passu Intercreditor Agreement (as defined below) and the other STG Distribution Documents.

(ii) *Intercompany Credit Agreement*.

(a) The Intercompany Lender (as defined herein) provided (i) First-Out New Money Term Loans (as defined in the Prepetition Intercompany Credit Agreement (as defined herein)) in a total aggregate principal amount outstanding as of the Petition Date of $146,012,626, (ii) First-Out Closing Date Purchased Term Loans (as defined in the Prepetition Intercompany Credit Agreement) in a total aggregate principal amount outstanding as of the Petition Date of $44,591,693, (iii) Second-Out Closing Date Purchased Term Loans (as defined in the Prepetition Intercompany Credit Agreement) in a total aggregate principal amount outstanding as of the Petition Date of $615,335,675, and (iv) Third-Out Closing Date Purchased Term Loans (as defined in the Prepetition Intercompany Credit Agreement) in a total aggregate principal amount outstanding as of the Petition Date of $93,237,701 (collectively, the "Intercompany Loan Obligations", and together with the STG Distribution Obligations, the "Prepetition Loan Obligations"), in each case, under that certain Intercompany Credit Agreement, dated as of October 3, 2024, among Reception Purchaser (the "Intercompany Borrower"), Reception Mezzanine, the other Credit Parties party thereto (together with the Intercompany Borrower and Reception Mezzanine, the "Intercompany Loan Parties" and, together with the STG Distribution

(Page 15)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Loan Parties, the "Prepetition Loan Parties"), STG Distribution, LLC, as lender thereunder (in such capacity, the "Intercompany Lender"), and Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (in such capacity, the "Intercompany Agent" and together with the STG Distribution Agent, the "Prepetition Agents", and the Intercompany Agent and the Intercompany Lender, being the "Intercompany Secured Parties," and together with the STG Distribution Secured Parties, the "Prepetition Secured Parties") (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Intercompany Credit Agreement," and together with the other Loan Documents (as defined in the Prepetition Intercompany Credit Agreement), the "Prepetition Intercompany Documents", and together with the STG Distribution Documents, the "Prepetition Loan Documents").

(b)     As of the Petition Date, the Intercompany Loan Parties were jointly and severally indebted to the Intercompany Secured Parties pursuant to the Prepetition Intercompany Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $979,976,052 on account of Term Loans (as defined in the Prepetition Intercompany Credit Agreement) *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising,

(Page 16)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

due, or owing, and all other Obligations (as defined in the Prepetition Intercompany Credit Agreement), in each case, owing under or in connection with the Prepetition Intercompany Documents.

(c)     Intercompany Loan Collateral.     In connection with the Prepetition Intercompany Credit Agreement, certain Intercompany Loan Parties entered into that certain Guaranty and Security Agreement, dated as of October 3, 2024, made by the Grantors (as defined therein) in favor of the Intercompany Agent for the benefit of the Intercompany Lender (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Intercompany Collateral Agreement").     Pursuant to the Prepetition Intercompany Credit Agreement, the Intercompany Collateral Agreement, and the other Prepetition Intercompany Documents, the Intercompany Loan Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "Intercompany Liens", and, together with the STG Distribution Liens, the "Prepetition Liens") on the Collateral (as defined in the Intercompany Collateral Agreement) (the "Intercompany Collateral," and together with the STG Distribution Collateral, the "Prepetition Collateral").     Specifically, pursuant to the Prepetition Intercompany Documents, the Intercompany Loan Obligations are secured by valid, binding, perfected, and enforceable security interests in and liens on substantially all assets of the Debtors (including the Collateral (as defined in the STG Distribution Credit Agreement)).     The Intercompany Collateral consists of substantially all assets of the Intercompany Loan Parties.     The

(Page 17)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Intercompany Liens and the Intercompany Collateral are subject to the Prepetition Pari Passu Intercreditor Agreement and the other Prepetition Intercompany Documents.

    (iii)    *Reception Purchaser Credit Agreement*.

    (a)    The Reception Purchaser Lenders (as defined below) provided Term Loans (as defined in the Reception Purchaser Credit Agreement (as defined below)) in a total aggregate principal amount outstanding as of the Petition Date of $55,967,592, and $1,851,851 in Revolving Loan Commitments (as defined the Reception Purchaser Credit Agreement) (the "Reception Purchaser Obligations") under that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Reception Purchaser Credit Agreement," and together with the other Loan Documents (as defined in the Reception Purchaser Credit Agreement), the "Reception Purchaser Documents") dated as of March 24, 2022, by and among Reception Purchaser, the other Credit Parties (as defined in the Reception Purchaser Credit Agreement, the "Reception Purchaser Loan Parties") from time to time party thereto, Antares Capital LP, as administrative agent and collateral agent (the "Reception Purchaser Agent") and the lenders from time to time party thereto (collectively, the "Reception Purchaser Lenders," and together with the Reception Purchaser Agent, the "Reception Purchaser Secured Parties").

    (b)    Reception Purchaser Collateral.  In connection with the Reception Purchaser Credit Agreement, certain Reception Purchaser Loan Parties entered into that certain Guaranty and Security Agreement, dated as of March 24, 2022, made by the Grantors (as defined therein) in favor of the Reception Purchaser Agent for the benefit of the Reception Purchaser

(Page 18)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Lender (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) granting security interests in and liens (the "Reception Purchaser Liens") on the Collateral (as defined in the Guaranty and Security Agreement) (the "Reception Purchaser Collateral"). The Reception Purchaser Liens and the Reception Purchaser Collateral are subject to the Prepetition Pari Passu Intercreditor Agreement and the other Prepetition Intercompany Documents.

(iv) *Cash Collateral*. Any and all of the Debtors' cash, including, without limitation, any amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").

(v) *Bank Accounts*. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(vi) *Validity, Perfection, and Priority of Prepetition Liens, Reception Purchaser Liens, and Prepetition Loan Obligations*. Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (A) the Prepetition Liens are valid, binding, enforceable, non-

(Page 19)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

avoidable, and properly perfected liens on and security interests in the Prepetition Collateral;

(B) the Prepetition Liens and Reception Purchaser Liens are subject and subordinate only to Prior

Senior Liens; (C) the Prepetition Liens and Reception Purchaser Liens are subject to the terms of

the Prepetition Pari Passu Intercreditor Agreement (as defined below); (D) the Prepetition Loan

Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan

Parties; (E) the Prepetition Liens encumber all of the Prepetition Collateral as the same existed on

the Petition Date; (F) the Prepetition Liens were granted to or for the benefit of the Prepetition

Secured Parties for fair consideration and reasonably equivalent value and were granted

contemporaneously with, or covenanted to be provided as an inducement for, the making of the

loans and/or commitments and other financial accommodations secured thereby; (G) no offsets,

challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the

Prepetition Liens or Prepetition Loan Obligations exist, and no portion of the Prepetition Liens or

Prepetition Loan Obligations is subject to any challenge or defense including impairment, set-off,

right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction,

recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset,

defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to

the Bankruptcy Code or applicable nonbankruptcy law; and (H) the Debtors and their estates have

no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims,

setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance

claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or

| (Page 20) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Agents, the Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Loan Documents, the Prepetition Loan Obligations, or the Prepetition Liens.

(vii)   *Prepetition Pari Passu Intercreditor Agreement*.  Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of, or entered into as permitted by and in accordance with, the Prepetition Documents and the Reception Purchaser Documents, including that certain Prepetition Pari Passu Intercreditor Agreement, dated October 3, 2024 among the Reception Purchaser Agent as collateral agent for the Reception Purchaser Secured Parties, the STG Distribution Agent, as collateral agent for the STG Distribution Secured Parties, the Intercompany Agent (as defined below), as collateral agent for the Intercompany Secured Parties, and each additional Representative and Collateral Agent from time to time party thereto, and each of the Grantors from time to time party thereto (as defined therein) (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Pari Passu Intercreditor Agreement"), shall (i) remain in full force and effect, and (ii) not be deemed to be amended, altered or modified by the terms of this Final Order or the DIP Documents, in each case, unless expressly set forth herein or therein.

(Page 21)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

G.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)    The Debtors have a need to obtain the DIP Facility and to continue using Cash Collateral on a final basis (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Budget Variances set forth herein and in the DIP Credit Agreement) to, among other things, (A) permit the orderly continuation of their businesses; (B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors and certain subsidiaries thereof.  The DIP Facility will also reassure the Debtors' and their non-Debtor affiliates' customers and employees that the Debtors will have access to additional liquidity to meet their commitments during the Cases.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value, continued operations over the immediate term, and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and without authorization to continue to use Cash Collateral, and subject to the Carve Out (as defined below) as provided herein.

(ii)    The extensions of credit under the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(Page 22)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(iii)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Secured Parties the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in the DIP Orders and the DIP Documents.

(iv)     The DIP Facility (including the Roll-Up) has been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (the obligations under the DIP Facility (including the Roll-Up DIP Loans), the DIP Credit Agreement, and the DIP Documents, inclusive of the Roll-Up Obligations, collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any

(Page 23)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(v) *Adequate Protection*. Each of the Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof, subject only to the rights of parties in interest specifically set forth in paragraph 14 of this Final Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Final Order).

(vi) *Sections 506(c) and 552(b)*. In light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code including, (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(vii) *Consent by Required Lenders*. Holders constituting Required First-Out Lenders (as defined in the STG Distribution Credit Agreement) and the Controlling Claimholders (as defined in the Prepetition Pari Passu Intercreditor Agreement) have consented to, or are deemed

(Page 24)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

to consent to, conditioned upon the entry of this Final Order, the Debtors' incurrence of the DIP Facility (including the Roll-Up DIP Loans), and continued use of Cash Collateral on the terms and conditions set forth in the DIP Orders, including, without limitation, the terms of the adequate protection provided for in the DIP Orders.

H.      *Good Cause Shown; Best Interest*.   Good cause has been shown for entry of this Final Order, and entry of this Final Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.

I.      *Notice*.   In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and applicable Local Rules, notice of the Final Hearing and the emergency relief requested in the Motion has been provided by the Debtors.   Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Final Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

J.      *Arm's Length, Good Faith Negotiations*.   The terms of this Final Order were negotiated in good faith and at arm's length between the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.   The Prepetition Secured Parties have acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facility (including the Roll-Up DIP Loans) and the Debtors'

(Page 25)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

continued use of Cash Collateral, including in respect of all of the terms of this Final Order, all documents related thereto, and all transactions contemplated by the foregoing.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      <u>DIP Financing Approved</u>.  The Motion is granted on a final basis as set forth herein, the DIP Facility is approved on a final basis, and the use of Cash Collateral on a final basis is authorized, subject to the terms of this Final Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to the Motion and entry of this Final Order and the relief requested herein, to the extent not withdrawn or resolved, are overruled on the merits.  This Final Order shall become effective immediately upon its entry.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(e)(2) and the Local Rules.

3.      <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)      The DIP Borrower's and the DIP Guarantors' prior entry into, execution and delivery of, and continued performance under the DIP Documents are hereby approved on a final basis, including the DIP Credit Agreement, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of the DIP Orders and the DIP Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall

(Page 26)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of the DIP orders, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Borrower and the DIP Agent (acting at the direction of the required lenders under and pursuant to the DIP Credit Agreement (the "Required DIP Lenders")) and acceptable to the Required DIP Lenders.  The DIP Orders, the DIP Credit Agreement, and other DIP Documents shall govern and control the DIP Facility, as applicable. The DIP Agent is hereby authorized on a final basis to execute and enter into its respective obligations under the DIP Documents, as applicable, subject to the terms and conditions set forth therein and the DIP Orders.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Documents or the Motion with this Final Order, the terms and conditions of this Final Order shall govern and control.  To the extent there exists any conflict among the terms and conditions of the Motion and the DIP Documents, the terms and conditions of the DIP Documents shall govern and control. Except as specifically amended, supplemented, or other modified hereby, all of the provisions of the Interim Order shall remain in full force and effect and are hereby ratified by this Final Order.

(b)      From entry of the Interim Order and as ratified by this Final Order, the DIP Borrower is hereby authorized to borrow on a final basis, and the DIP Guarantors are hereby authorized to guarantee on a final basis, borrowings up to an aggregate principal amount of $182,750,000 of the DIP Loans (inclusive of the Roll-Up DIP Loans), of which $85,000,000 of

(Page 27)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

the New Money DIP Loans were funded on January 14, 2026, in each case, subject to and in accordance with the Carve Out, the DIP Orders and the DIP Credit Agreement without any further action by the Debtors or any other party.

(c)     Effective upon (a) the entry of the Interim Order and the funding of the Interim New Money DIP Loans, and as ratified by this Final Order, and without any further action by the Debtors or any other party, at least $87,975,000 of First-Out Term Loans and up to $9,775,000 of Second-Out Term Loans held by DIP Lenders that funded the Interim New Money DIP Loans were automatically deemed exchanged via assignment on a cashless basis into and were deemed to constitute DIP Obligations in an aggregate principal amount of $97,750,000 (the "Interim Roll-Up" and "Interim Roll-Up Obligations") and (b) the entry of this Final Order and the funding of the Final New Money DIP Loans, without any further action by the Debtors or any other party, at least $41,400,000 of First-Out Term Loans and up to $4,600,000 of Second-Out Term Loans held by DIP Lenders that fund the Final New Money DIP Loans shall be automatically deemed exchanged via assignment on a cashless basis into and deemed to constitute DIP Obligations in an aggregate principal amount of $46,000,000 (the "Final Roll-Up" and "Final Roll-Up Obligations", and collectively with the Interim Roll-Up and Interim Roll-Up Obligations, the "Roll-Up" and "Roll-Up Obligations"), pursuant to the terms of the DIP Orders, the Prepetition Loan Documents (as expressly modified herein), any other Loan Documents (as defined in the Prepetition Loan Documents) (as expressly modified herein), the DIP Documents, and any other documents evidencing the Roll-Up Obligations.  The Prepetition Secured Parties would not

(Page 28)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

otherwise consent to the continued use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without approval of the Roll-Up upon entry of this Final Order.  The Roll-Up Obligations shall be authorized as and deemed for all purposes to be consideration in exchange for, and solely on account of, the agreement of the Prepetition Secured Parties to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any STG Distribution Term Loan Obligations.  Because the Roll-Up Obligations are subject to the reservation of rights in paragraph 14 hereof, they will not prejudice the rights of any other party-in-interest.

(d)  In accordance with the terms of the DIP Orders and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and the DIP Orders, and consistent with the Approved DIP Budget, subject to the Carve Out and any Permitted Budget Variances, as set forth in the DIP Orders and the DIP Documents.  Attached as <u>Exhibit B</u> to the Interim Order and incorporated herein by reference is an initial budget prepared by the Debtors and approved by the Required DIP Lenders (the "<u>Initial DIP Budget</u>").

(e)  In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized on a final basis, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated

(Page 29)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

thereby, or other DIP Documents), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Documents and the STG Distribution Agent under the STG Distribution Documents and the Reception Purchaser Agent under the Reception Purchaser Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility and the DIP Orders, including, without limitation:

(1)      the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

(2)      the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that are not material; provided, that, any such non-material amendments shall be provided to the U.S. Trustee and counsel for the Creditors' Committee; provided that, prior to entering into or making any amendment, waiver, consent, or other modification to and under the DIP Documents that is adverse to the Debtors' estates or to general unsecured creditors (an "Adverse Amendment"), the Debtors shall consult in good faith with the

(Page 30)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Creditors' Committee and shall file such proposed Adverse Amendment on the docket of these Cases. The Creditors' Committee and the U.S. Trustee shall have five (5) days following the Debtors' filing of the proposed Adverse Amendment to file with the Court an objection to such Adverse Amendment.  If the U.S. Trustee or the Creditors' Committee files an objection to the Adverse Amendment, then such Adverse Amendment shall not become effective absent an agreement between the parties or a determination by this Court regarding the propriety of such Adverse Amendment.

(3)        the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, the STG Distribution Agent and the Reception Purchaser Agent, as applicable, of the fees referred to in the DIP Documents and the DIP Orders, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the DIP Orders, whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), Evercore, Inc. (as financial advisor), the Operational Consultant, Porzio, Bromberg & Newman, P.C. (as local counsel), and any other professionals or advisors retained by the Ad Hoc Group in connection with the Restructuring Transactions (the "DIP

(Page 31)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Lenders/STG Distribution Lenders Group") in connection with the Cases (collectively, the "DIP Lenders/STG Distribution Lenders Advisors"); (b) ArentFox Schiff LLP (as counsel to the DIP Agent) (the "DIP Agent Advisor") and (c) Davis Polk & Wardwell LLP (as counsel) and Greenberg Traurig, LLP (as local counsel) to the Reception Purchaser Agent (collectively, the "Reception Purchaser Agent Advisors"); which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 20 of this Final Order; and

(4)          the performance of all other acts required under or in connection with the DIP Documents.

(f)          From entry of the Interim Order and as ratified by this Final Order, subject to the Carve Out, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of the DIP Orders for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or the DIP Orders shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable

| (Page 32) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of the STG Distribution Agent, the Reception Purchaser Agent, or the Prepetition Secured Parties, in each case, pursuant to the DIP Documents, the provisions of the DIP Orders, or any subsequent order of the Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

(g)      The DIP Guarantors are hereby authorized and directed on a final basis to jointly, severally, and unconditionally guarantee, and upon entry of the Interim Order, and as ratified by this Final Order, shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower in accordance with and subject to the terms of this Order and the DIP Documents.

4.      <u>Budget and Variance Reporting</u>.

(a)      The Initial DIP Budget attached to the Interim Order as <u>Exhibit B</u> was approved by, and is in form and substance acceptable to the Required DIP Lenders, and all

(Page 33)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Subsequent DIP Budgets shall be in form and substance acceptable to the Required DIP Lenders in consultation with the Creditors' Committee.

(b)     On or before the Friday of every four week period beginning with the date of entry of the Interim Order, the Debtors and/or the DIP Agent (at the direction of the applicable Required DIP Lenders) may request an updated budget, and in such case, the Debtors will deliver to the applicable DIP Agent, the DIP Lenders/STG Distribution Lenders Advisors, counsel to the STG Distribution Agent, and the advisors to the Creditors' Committee, an updated budget for the subsequent 13-week period (a "Subsequent DIP Budget"), which shall be in form and substance acceptable to the Required DIP Lenders in consultation with the Creditors' Committee. The Initial DIP Budget or any Subsequent DIP Budget shall be deemed to constitute the "Approved DIP Budget" for purposes of this Final Order with the most recently delivered budget constituting the "Approved DIP Budget" solely upon approval, as set forth herein, by the Required DIP Lenders (which must be in writing (including from the DIP Lenders/STG Distribution Lenders Advisors), email being sufficient) in consultation with the Creditors' Committee. In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect and the Debtors shall be required to work in good faith with the Required DIP Lenders and the Creditors' Committee to modify such Subsequent DIP Budget until the Required DIP Lenders approve (in consultation with the Creditors' Committee) such Subsequent DIP Budget as an "Approved DIP Budget." Each Approved DIP Budget delivered shall be accompanied by such

(Page 34)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

supporting documentation as requested by the Required DIP Lenders or the Creditors' Committee. Each Approved DIP Budget shall be prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof. "Budget Period" means the initial four-week period set forth in the Approved DIP Budget in effect at such time.

(c)    Commencing on the Friday of the third full calendar week after the Petition Date, Permitted Budget Variances shall be tested on each Friday on (i) a four-week basis for Actual Receipts (as defined below) and (ii) a two-week (or, in the case of the first delivery of the Variance Report (as defined below), three-week) basis for the Debtors' actual expenditures and disbursements (the "Operating Disbursements") (each such date for (i) and (ii), a "Testing Date"). Commencing after the third full week after the Petition Date, on or before 5:00 p.m. (prevailing Eastern time) on the fourth business day of every second calendar week ending on Friday, the Debtors shall deliver to the DIP Agent, the DIP Lenders/STG Distribution Lenders Advisors, counsel to the STG Distribution Agent, and advisors to the Creditors' Committee a budget variance report/reconciliation (each, a "Variance Report") in form and substance reasonably satisfactory to the Required DIP Lenders (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Operating Disbursements for the immediate two-week period ending on the applicable Testing Date (or, in the case of the first delivery of the Variance Report, three-week); (ii) the Debtors' actual receipts (the "Actual Receipts") for the four-week period ending on the applicable Testing Date in accordance with the DIP Credit Agreement; (iii) a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Receipts and the Operating

(Page 35)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Disbursements for each period ending on Friday from those reflected for the corresponding period in the most recent Approved DIP Budget to the amount of Debtors' Budgeted Receipts and Budgeted Disbursements, in each case for the foregoing clauses (i) and (ii), on both a line item and aggregate bases, set forth in the Approved DIP Budget with respect to such two-week (or, in the case of the first delivery of the Variance Report, three-week) period ending on the applicable Testing Date; and (iv) as to each material variance contained in the Approved DIP Budget Variance Report and required to be tested pursuant to this clause (c), an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any such material variance.

(d)    The Debtors shall not permit: (i) for the two-week period (or, in the case of the first delivery of the Variance Report, three-week) ending on any Testing Date, the Debtors' Operating Disbursements (in the aggregate) to be more than 115% of the Budgeted Disbursements (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period; and (ii) for the four-week period ending on any Testing Date, the Debtors' Actual Receipts (in the aggregate) to be less than 80% of the Budgeted Receipts (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period (the "Permitted Budget Variances"; all references in this Final Order and the DIP Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Permitted Budget Variances). For purposes of Permitted Budget Variances testing, the fees and expenses of Professional Persons (as defined

| (Page 36) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

below) and the DIP Lenders/STG Distribution Lenders Advisors, the DIP Agent Advisor and the

Reception Purchaser Agent Advisors and Adequate Protection Payments shall be excluded.

    5.   <u>Access to Records</u>.  The Debtors shall provide the DIP Lenders/STG Distribution

Lenders Advisors and advisors to the Creditors' Committee with all reporting and other

information required to be provided to the DIP Agent under the DIP Documents.  In addition to,

and without limiting, whatever rights to access the DIP Secured Parties have under the DIP

Documents, upon notice to counsel to the Debtors (email being sufficient), at reasonable times

during normal business hours, and in a manner that does not interfere with the ordinary course

activities and operations of the Debtors, the Debtors shall permit representatives, agents, and

employees of the DIP Secured Parties to have reasonable access to requested information

(including historical information and the Debtors' books and records) and personnel, including

regularly scheduled meetings as mutually agreed with senior management of the Debtors and other

company advisors (during normal business hours), and the DIP Secured Parties shall be provided

with access to all information they shall reasonably request.

    6.   <u>DIP Superpriority Claims</u>.  Subject to, and subordinate in all respects to, the Carve

Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall

constitute allowed superpriority administrative expense claims against each of the Debtors' estates

(the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) to the extent set

forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate

protection claims, diminution claims, and all other claims against the Debtors, now existing or

(Page 37)
Debtors:              STG LOGISTICS, INC., *et al.*
Case No.              26-10258 (MEH)
Caption of Order:     Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting
                      Related Relief

hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including to the extent allowed under the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, the DIP Collateral and any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"); *provided* that the DIP Secured Parties shall, with respect to the New Money DIP Loans, use good faith commercially reasonable efforts to first seek recovery on account of DIP Superpriority Claims from DIP Collateral other than proceeds of any Challenge (as defined below) or Avoidance Action, in each case, subject to clauses (y) and (z) of this sentence, related to (a) actual fraud, willful misconduct, lender liability, or other intentional wrongful acts or (b) any lack of perfection, granting of a security interest, recharacterization, preference, or equitable subordination, in each case commenced against any DIP Secured Party or Prepetition Secured Party, other than, as to this clause, (y) any such proceeds from Avoidance Actions or other actions by a party other than a DIP Secured Party or Prepetition Secured Party that directly harmed any of the DIP Secured Parties or their affiliates (whether in their capacity as

(Page 38)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

DIP Secured Parties or Prepetition Secured Parties) or (z) any claim or cause of action asserted in *Axos Financial, Inc. and Siemens Financial Services, Inc. v. Reception Purchaser, LLC, et al.*, Case Index No. 650108/2025 (N.Y. Sup. Ct.) and/or the adversary proceeding filed by Axos Financial, Inc. and Siemens Financial Services, Inc. under Adv. Pro. No. 26-26-01032 (MEH), in each case as may be amended (collectively, the "Excluded Actions"). Except as set forth in the DIP Orders or the DIP Credit Agreement, no other superpriority claims shall be granted or allowed in the Cases.

7.    DIP Liens.

(a)    As security for the DIP Obligations, effective and perfected upon the date of the Interim Order and as ratified by this Final Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lenders of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted on a final basis by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clauses (i) and (ii) below, but excluding the Excluded Property (as defined in the DIP Credit Agreement), being collectively referred to as the "DIP Collateral"),[5] subject only to (x) Prior Senior Liens and (y) the

---

[5]    Notwithstanding anything to the contrary herein, the DIP Collateral shall not include the RCF Reserve Account or the Funded Reserve Account, and none of the DIP Secured Parties or the Prepetition Secured Parties (other than the RCF Reserve Beneficiaries) shall be permitted to exercise any rights or remedies with respect to the RCF Reserve Account or the Funded Reserve Account, except that the DIP Secured Parties shall have a security interest in any residual interest in the RCF Reserve Account solely to the extent of any funds remaining after all letters of credit have been terminated and the RCF Reserve Beneficiaries have been fully reimbursed for any draws

| | |
|---|---|
| (Page 39) | |
| Debtors: | STG LOGISTICS, INC., *et al*. |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the DIP Orders and the DIP Documents, the "<u>DIP Liens</u>"); *provided* that, solely as to the DIP Liens securing the Roll-Up Obligations, (i) the DIP Collateral shall not include the proceeds of Excluded Actions and (ii) the DIP Secured Parties shall use good faith commercially reasonable efforts to first seek recovery from DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order before seeking recovery from other DIP Collateral:

(i)    <u>Lien On Any Unencumbered Property</u>.  Subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), a 100% equity pledge of all first-tier foreign subsidiaries and all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered

---

thereunder.  The rights of the DIP Secured Parties with respect to such residual interest in the RCF Reserve Account shall be subject and subordinate to the rights of the RCF Reserve Beneficiaries in all respects.

(Page 40)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

cash, if any, (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date to the fullest extent permitted under applicable law); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, profits, and economic rights and interests of the foregoing, all products and proceeds of the foregoing and all proceeds and property recovered in respect of Avoidance Actions in each case excluding the Excluded Property (as defined in the DIP Credit Agreement); provided that, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein but subject to the Carve Out, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Interim Order and as ratified by this

(Page 41)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Final Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(ii)    <u>Liens Priming the Prepetition Liens</u>.  Subject only to the Carve Out, the Prior Senior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property, in each case excluding the Excluded Property (as defined in the DIP Credit Agreement), of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein but subject to the Carve Out, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Interim Order and as ratified by this Final Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(iii)    <u>Liens Junior to Certain Other Liens</u>.  Subject only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors immediately junior only to the Prior Senior Liens.

8.    <u>Adequate Protection for the STG Distribution Secured Parties</u>.  Subject only to the Carve Out and the rights of parties in interest specifically set forth in the DIP Orders, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the STG Distribution Collateral

| | |
|---|---|
| (Page 42) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(including Cash Collateral), as applicable, for any diminution in value of such interests (each such diminution, a "<u>Diminution in Value</u>"),[6] resulting from, among other things, the imposition of the priming DIP Liens on the STG Distribution Collateral, the Carve Out, the Debtors' use of the STG Distribution Collateral (including Cash Collateral), and the imposition of the automatic stay, and/or any other reason permitted pursuant to the Bankruptcy Code, the STG Distribution Agent, for the benefit of itself and the other STG Distribution Secured Parties, was granted pursuant to the Interim Order, and as ratified by this Final Order, the following (collectively, the "<u>STG Distribution Adequate Protection Obligations</u>"):

(a)     <u>STG Distribution Adequate Protection Liens</u>.     As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (collectively, the "<u>STG Distribution Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and all proceeds or property recovered from Avoidance Actions other than proceeds of Excluded Actions; *provided* that the STG Distribution Secured Parties shall use good faith commercially reasonable efforts to first seek recovery from DIP Collateral other

---

[6]     Notwithstanding anything herein to the contrary, the provision of adequate protection pursuant to the terms hereof or any other DIP Document does not relieve any party of the requirement to obtain a determination by the Court of Diminution in Value in its interest in the applicable Collateral.

(Page 43)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

than DIP Collateral identified in clause 7(a)(i) of this Final Order.  Subject to the terms of the DIP Orders, STG Distribution Adequate Protection Liens shall be (i) subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Prior Senior Liens, (ii) solely with respect to the DIP Collateral belonging to the Reception Purchaser Loan Parties, *pari passu* to the Reception Purchaser Adequate Protection Liens (as defined below), and (iii) solely with respect to the DIP Collateral belonging to the Intercompany Loan Parties, *pari passu* to the Intercompany Adequate Protection Liens (defined below).  The STG Distribution Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b) STG Distribution Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in the Cases to the extent of any postpetition Diminution in Value (the "STG Distribution Adequate Protection Superpriority Claims"), but (i) junior to the Carve Out and the DIP Superpriority Claims, (ii) solely for the Reception Purchaser Loan Parties, *pari passu* to the Reception Purchaser Adequate Protection Superpriority Claims (as defined below), and (iii) solely for Intercompany Loan Parties, *pari passu* to the Intercompany Adequate Protection Superpriority Claims (as defined below); *provided* that the STG Distribution Secured Parties shall use good faith commercially reasonable efforts to first seek recovery from

(Page 44)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al*. |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order (and, for the avoidance of doubt, proceeds of Excluded Actions). Subject to the Carve Out and the DIP Superpriority Claims, and to the extent allowed under the Bankruptcy Code, the STG Distribution Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(c)     STG Distribution Adequate Protection Payments. As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 20 of this Final Order, all reasonable and documented fees and expenses of the STG Distribution Secured Parties (the "STG Distribution Adequate Protection Fees"), in the case of the DIP Lenders/STG Distribution Lenders Advisors and the DIP Agent Advisor whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(e)(3) of this Final Order, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the DIP Orders, including, for the avoidance of doubt (i) the DIP Lenders/STG Distribution Lenders Advisors and (ii) the DIP Agent Advisor (all payments referenced in this sentence, collectively, the "STG Distribution Adequate Protection Payments"). None of the STG Distribution Adequate Protection Fees shall be subject to separate approval by the Court, and no

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)  <u>Right to Seek Additional Adequate Protection</u>.  This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the STG Distribution Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the STG Distribution Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the STG Distribution Collateral, during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the STG Distribution Secured Parties that the adequate protection granted herein does in fact adequately protect any of the STG Distribution Secured Parties against any Diminution in Value of their respective interests in the STG Distribution Collateral (including Cash Collateral).

9.    <u>Adequate Protection for the Intercompany Secured Parties</u>.  Subject only to the Carve Out, the rights of parties in interest specifically set forth in the DIP Orders, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Intercompany Collateral, as applicable, for any Diminution in Value, resulting from, among other things, the imposition of the priming DIP Liens on the Intercompany Collateral, the Carve Out, the Debtors' use of the Intercompany Collateral, and the imposition of the automatic stay, the Intercompany Agent, for

(Page 46)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

the benefit of itself and the Intercompany Lender, was granted pursuant to the Interim Order, and as ratified by this Final Order, the following (collectively, the "<u>Intercompany Adequate Protection Obligations</u>"):

(a)    <u>Intercompany Adequate Protection Liens</u>.  As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (collectively, the "<u>Intercompany Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral held by the Intercompany Loan Parties and all proceeds or property recovered from Avoidance Actions other than proceeds of Excluded Actions; <u>provided</u>, that the Intercompany Secured Parties shall use good faith commercially reasonable efforts to first seek recovery from DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order. Subject to the terms of the DIP Orders, Intercompany Adequate Protection Liens shall be (i) subordinate only to the (A) Carve Out, (B) the DIP Liens and (C) the Prior Senior Liens, and (ii) *pari passu* with the STG Distribution Adequate Protection Liens and Reception Purchaser Adequate Protection Liens (as defined below).  Intercompany Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and

| | |
|---|---|
| (Page 47) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code) held by an Intercompany Loan Party.

(b)      Intercompany Adequate Protection Superpriority Claims.      As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases of the Intercompany Loan Parties ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Intercompany Adequate Protection Superpriority Claims," and together with the STG Distribution Adequate Protection Superpriority Claims, the "Adequate Protection Superpriority Claims"), but (i) junior to the Carve Out, the DIP Superpriority Claims, (ii) solely for the Reception Purchaser Loan Parties, *pari passu* to the Reception Purchaser Adequate Protection Superpriority Claims, and (iii) *pari passu* to the STG Distribution Adequate Protection Superpriority Claims; provided, that the Intercompany Secured Parties shall use good faith commercially reasonable efforts to first seek recovery from DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order (and, for the avoidance of doubt, proceeds of Excluded Actions).   Subject to the preceding sentence, the Intercompany Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(Page 48)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(c)  <u>Intercompany Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 20 of this Final Order, all reasonable and documented fees and expenses of the Intercompany Agent (the "<u>Intercompany Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(e)(3) of this Final Order, including all reasonable and documented fees and expenses of ArentFox Schiff LLP (all payments referenced in this sentence, collectively, the "<u>Intercompany Adequate Protection Payments</u>").  None of the Intercompany Adequate Protection Fees shall be subject to separate approval by the Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

10.  <u>Adequate Protection for the Reception Purchaser Secured Parties</u>.  Subject only to the Carve Out and the rights of parties in interest specifically set forth in the DIP Orders, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Reception Purchaser Collateral, as applicable, for any Diminution in Value resulting from, among other things, the imposition of the priming DIP Liens on the Reception Purchaser Collateral, the Carve Out, the Debtors' use of the Reception Purchaser Collateral, and the imposition of the automatic stay, and/or any other reason permitted pursuant to the Bankruptcy Code, the Reception Purchaser Agent, for the benefit of itself and the other Reception Purchaser Secured Parties, was granted

| | |
|---|---|
| (Page 49) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

pursuant to the Interim Order, and as ratified by this Final Order, the following (collectively, the "<u>Reception Purchaser Adequate Protection Obligations</u>" and together with the STG Distribution Adequate Protection Obligations and the Intercompany Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"):

(a)    <u>Reception Purchaser Adequate Protection Liens</u>.   As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (collectively, the "<u>Reception Purchaser Adequate Protection Liens</u>" and, together with the STG Distribution Adequate Protection Liens and the Intercompany Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral constituting Reception Purchaser Collateral and all proceeds or property recovered from Avoidance Actions of the Reception Purchaser Loan Parties.   Subject to the terms of the DIP Orders, Reception Purchaser Adequate Protection Liens shall be (i) subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Prior Senior Liens, and (ii) *pari passu* to (a) solely with respect to the DIP Collateral belonging to the Intercompany Loan Parties, the Intercompany Adequate Protection Liens and (b) the STG Distribution Adequate Protection Liens.   The Reception Purchaser Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral constituting Reception Purchaser

(Page 50)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)    <u>Reception Purchaser Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in the Cases of the Reception Purchaser Loan Parties ahead of and senior to any and all other administrative expense claims in the Cases to the extent of any postpetition Diminution in Value (the "<u>Reception Purchaser Adequate Protection Superpriority Claims</u>" and, together with the STG Distribution Adequate Protection Superpriority Claims and the Intercompany Adequate Protection Superpriority Claims, the "<u>Adequate Protection Superpriority Claims</u>"), but (i) junior to the Carve Out and the DIP Superpriority Claims, and (ii) *pari passu* to (a) solely for Intercompany Loan Parties, the Intercompany Adequate Protection Superpriority Claims and (b) the STG Distribution Adequate Protection Superpriority Claims.  Subject to the preceding sentence, the Reception Purchaser Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(Page 51)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(c)     Reception Purchaser Adequate Protection Payments.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 20 of this Final Order, all reasonable and documented fees and expenses of the Reception Purchaser Agent (the "Reception Purchaser Adequate Protection Fees"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(e)(3) of this Final Order, including all reasonable and documented fees and expenses of the Reception Purchaser Agent Advisors (all payments referenced in this sentence, collectively, the "Reception Purchaser Adequate Protection Payments" and, together with the STG Distribution Adequate Protection Payments, the "Adequate Protection Payments"). None of the Reception Purchaser Adequate Protection Fees shall be subject to separate approval by the Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

11.     Additional Adequate Protection for the Prepetition Secured Parties. The Prepetition Secured Parties shall also receive the following adequate protections:

(a)     Other Covenants.  The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order approving the Debtors' cash management motion.  The Debtors' failure to comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations, and intellectual property rights material to the conduct of their business and the maintenance of

| (Page 52) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

properties and insurance and such failure continuing beyond any cure periods set forth in the DIP Credit Agreement shall be an Event of Default (as defined below).

(b)     <u>Reporting Requirements</u>.   As additional adequate protection to the Prepetition Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement subject in all respects to any cure period set forth in the DIP Credit Agreement.  Any information provided under such reporting requirements shall simultaneously be provided to the advisors to the Creditors' Committee.

(c)     <u>Miscellaneous</u>.  Except for (i) the Carve Out, and (ii) as otherwise provided in paragraphs 6 and 7 of this Final Order, the Adequate Protection Liens granted pursuant to paragraphs 8 through 10 of this Final Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 of the Bankruptcy Code or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest, or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 of the Bankruptcy Code or otherwise.

(d)     The rights of the Creditors' Committee and the U.S. Trustee to assert that any Adequate Protection Payment should be subject to recharacterization as a payment of principal to the extent that this Court enters a final order finding that the recipient of such Adequate Protection Payment is unsecured or undersecured are hereby reserved.

12.     <u>Carve Out</u>.

(Page 53)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(a)     <u>Carve Out</u>.  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the STG Distribution Agent (at the direction of the Required DIP Lenders) after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $6,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (or by the Prepetition Secured Parties after repayment of the DIP Obligations in full), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve</u>

| (Page 54) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the STG Distribution Agent (at the direction of the Required DIP Lenders) after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Reception Purchaser Agent and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility (or the occurrence of the Termination Date for the Debtors' use of Cash Collateral and the expiration of the applicable Remedies Notice Period and during the continuation of an Event of Default (as defined herein)), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Delivery of Weekly Fee Statements.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors, the DIP Agent, the DIP Lenders/STG Distribution Lenders Advisors, and the advisors to the Creditors' Committee a statement setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided* that, within one (1) business day of the occurrence of

| (Page 55) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the DIP Agent, the advisors to the DIP Lenders, and the advisors to the Creditors' Committee). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due (such Professional Person, a "Defaulting Professional Person"), such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person; provided that such Defaulting Professional Person may cure its failure to provide a Weekly Statement once during the pendency of these Cases by delivering a Weekly Statement as soon as reasonably practicable (but in no event later than 3 business days) after the applicable deadline to deliver such Weekly Statement so long as a Carve Out Notice has not been delivered.

(c)   Carve Out Reserves. Commencing with the week ended January 17, 2026, and on or before the Thursday of each week thereafter (except as to the Post-Carve Out Trigger

| | |
|---|---|
| (Page 56) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Notice Cap), the Debtors shall utilize all cash on hand (other than amounts in the RCF Reserve Account) as of such date to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors and the DIP Agent, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Budget during such week, plus (b) the Post-Carve Out Trigger Notice Cap, plus (c) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the week occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account maintained at the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account; provided that when the Allowed Professional Fees included in the Carve-Out  have been paid in full, including any Allowed Professional Fees allowed following delivery of the Carve Out Trigger Notice, any funds remaining in the Funded Reserve Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and the DIP Orders. For the avoidance of doubt, the Funded Reserve Account shall not constitute DIP Collateral, except that the DIP Secured Parties shall have a residual interest in the Funded Reserve Account in accordance with the terms of this paragraph 12 and solely to the extent of any funds remaining after the Allowed Professional Fees included in the Carve-Out has been paid in full.  For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of

(Page 57)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

the New Money DIP Loans.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent (at the direction of the Required DIP Lenders) (or by the STG Distribution Agent (at the direction of the Required DIP Lenders) after repayment of the DIP Obligations in full) to the Debtors with a copy to counsel to the Creditors' Committee and the Reception Purchaser Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to, and the Debtors shall utilize all cash on hand (other than amounts in the RCF Reserve Account) as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees accrued prior to the Termination Declaration Date.  The Debtors shall deposit and hold such amounts in a segregated account maintained at the Debtors in trust to pay such then unpaid Allowed Professional Fees incurred through the Termination Declaration Date (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  For the avoidance of doubt, the DIP Lenders shall have no obligation to fund the Pre-Carve Out Trigger Notice Reserve in excess of the DIP Loans already funded to the Debtors prior to the Termination Declaration Date and any such remaining DIP Loans that has not yet been funded to the Debtors prior to the Termination Declaration Date shall not be used to fund the Pre-Carve Out Trigger Notice Reserve. On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor (other than amounts in the RCF Reserve Account), after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger

(Page 58)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Notice Cap (if not previously funded). The Debtors shall deposit and hold such amounts in a segregated account maintained at the Debtors in trust to pay such unpaid Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. Any remaining DIP Loans that have not yet been funded to the Debtors prior to the Termination Declaration Date shall not be used to fund the Post-Carve Out Trigger Notice Reserve. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until indefeasibly paid in full, and then to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all New Money Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all New Money Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in

(Page 59)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

accordance with their rights and priorities under the Intercompany Credit Agreement as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents, or the DIP Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 12, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 12, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or the DIP Orders (other than as set forth herein with respect to amounts in the RCF Reserve Account), following delivery of a Carve Out Trigger Notice, the DIP Agent, the STG Distribution Agent, and the Reception Purchaser Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have an automatically perfected lien and a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents or if the DIP Obligations have been indefeasibly paid in full, to the applicable Prepetition Agents, for application in accordance with the Prepetition Secured Debt Facilities.  Further, notwithstanding anything to the contrary in the DIP Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and

(Page 60)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(iii) in no way shall the Initial DIP Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing (A) be construed as a cap or limitation on the amount of the Allowed Professional Fees, nor as a cap or limitation on the amount of fees under 28 U.S.C. § 1930, due and payable by the Debtors or (B) restrict any Professional Persons from seeking allowance of compensation with the Court in accordance with the compensation procedures approved in the Cases.  For the avoidance of doubt and notwithstanding anything to the contrary in the DIP Orders (other than as set forth in paragraph 23 of this Final Order), the DIP Facility, or in the Prepetition Secured Debt Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the DIP Claims, the DIP Liens, the Adequate Protection Liens, and claims pursuant to section 507(b) of the Bankruptcy Code, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Liens.

(d)     <u>Carve Out Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any

(Page 61)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP Documents, the Bankruptcy Code, and applicable law.

13.     Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Secured Parties.  Subject only to the Carve Out and paragraph 23 of this Final Order, notwithstanding any other provision in the DIP Orders or the other DIP Documents to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Documents, the Prepetition Documents, the Prepetition Pari Passu Intercreditor Agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers

(Page 62)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties. The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies. For all adequate protection purposes throughout the Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date. For the avoidance of doubt, such request will survive termination of this Final Order.

14.     <u>Reservation of Certain Creditors' Committee and Third Party Rights and Bar of Challenges and Claims</u>.  Subject to the Challenge Period (as defined below), the stipulations, admissions, waivers, and releases contained in the DIP Orders, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in the DIP Orders, including the Debtors' Stipulations and the Interim Roll-Up Obligations and the Final Roll-Up Obligations, shall be binding upon all other parties in interest, including the Creditors' Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by

| (Page 63) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules by the earlier of (i) the date of the confirming the Debtors' chapter 11 plan of reorganization and (ii) March 15, 2026 or, in the case of the Creditors' Committee, April 28, 2026 (or such later date agreed by and between the Creditors' Committee and the Required DIP Lenders, without the need for further order of the Court) (the "Challenge Period," and the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); provided, however, that if, prior to the end of the Challenge Period, (x) the Cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus fifteen (15) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens (including in respect of any Cash Collateral) of the Prepetition Agents and the other Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Loan Obligations, the Reception Purchaser Obligations, or the Roll-Up Obligations (any such claim, a "Challenge"), and (ii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and

| | |
|---|---|
| (Page 64) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

overruled):  (a) any and all such Challenges by any party (including the Creditors' Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in the Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Cases) shall be forever barred; (b) the Prepetition Loan Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the stipulations and admissions contained in the DIP Orders, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in the DIP Orders shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in the Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in the DIP Orders, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on the Creditors' Committee and any other person or entity except

(Page 65)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in the DIP Orders vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Documents, the Prepetition Liens, and the Prepetition Loan Obligations, and a separate order of the Court conferring such standing on the Creditors' Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Creditors' Committee or such other party in interest; provided, that, if the Creditors' Committee files a motion seeking standing to bring a Challenge which attaches one or more draft complaints that detail the alleged Challenges for which the Creditors' Committee seeks standing to file prior to the expiration of the Challenge Period, the Challenge Period Termination Date shall be tolled solely for the Committee with respect to the claims identified in such complaint until 11:59 p.m. (prevailing Eastern Time) on the date that is two business days after such standing motion is adjudicated by the Court.  Subject to other provisions in the DIP Orders, for the avoidance of doubt, any trustee appointed or elected shall, until expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by another party in interest on behalf of the Debtors' estates), be deemed a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be

(Page 66)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in the DIP Orders.  Upon a successful Challenge brought pursuant to this paragraph 14, the Court may fashion an appropriate remedy. For the avoidance of doubt, approval of the Roll-Up or the Debtors' use of Cash Collateral pursuant to the terms hereof shall not prejudice this paragraph 14. Accordingly, notwithstanding any other provision in any DIP order, (a) any successful Challenge to the Prepetition Obligations, the Prepetition Liens, or the Prepetition Collateral pursuant to the provisions of this paragraph 14 shall apply to any corresponding DIP Obligations, DIP Liens, or DIP Collateral, in each case, solely as relates to the Roll-Up DIP Loans and (b) the Roll-Up does not cure any prepetition lien deficiencies, and all such deficiencies are subject to Challenge as set forth herein. For the further avoidance of doubt, the payment of fees and expenses to professionals pursuant to this Final Order (other than to Professional Persons) shall be without prejudice to the rights of the Creditors' Committee to assert such payments should be recharacterized or reallocated pursuant to a further order of the Court following a successful Challenge.

15.    <u>Termination Date</u>.   Following the Termination Date and the expiration of the Remedies Notice Period, consistent with the DIP Credit Agreement: (a) all DIP Obligations shall be immediately due and payable, all New Money Commitments will terminate, and the Carve Out Reserves shall be funded as set forth in the DIP Orders; (b) all authority to use Cash Collateral shall cease; <u>provided</u>, <u>however</u>, that during the Remedies Notice Period, the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates in accordance with the Approved DIP Budget, subject to any

(Page 67)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Permitted Budget Variances provided for in the DIP Credit Agreement; and (c) the DIP Secured

Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in

accordance with this Final Order.

16. <u>Events of Default</u>. The occurrence of any of the following events, unless waived

by the applicable Required DIP Lenders in accordance with the terms of the DIP Documents, shall

constitute an event of default (collectively, the "<u>Events of Default</u>"):  (a) the failure of the Debtors

to perform, in any material respect, any of the terms, provisions, conditions, covenants, or

obligations under the DIP Orders (subject to written notice and one (1) business day's cure period);

(b) the failure of the Debtors to comply with any of the case milestones set forth in the DIP Credit

Agreement (collectively, the "<u>Required Milestones</u>"), in accordance with the applicable DIP

Credit Agreement, unless such Required Milestone has been waived or extended by the applicable

Required DIP Lenders; or (c) the occurrence of an "Event of Default" under the DIP Credit

Agreement.  The applicable Required DIP Lenders shall provide written notice of any Event of

Default to the Debtors, the Reception Purchaser Agent, the Creditors' Committee, and the U.S.

Trustee; *provided* that such notice should be for informational purposes only and shall not be a

pre-requisite to the occurrence of an Event of Default.

17. <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the date of the

earliest to occur of (i) July 14, 2026 (as such date may be extended with the prior written consent

of the Required DIP Lenders), (ii) the date of consummation of a sale of all or substantially all of

the Debtors' assets, (iii) the effective date of a chapter 11 plan, and (iv) the date the DIP Loans

(Page 68)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

become due and payable in full under the DIP Documents, whether by acceleration or otherwise, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Orders, (a) the DIP Agent (at the direction of the applicable Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable in full in cash, as applicable, in accordance with the DIP Credit Agreement, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower; and (b) subject to paragraph 15 of this Final Order, the DIP Agent (at the direction of the applicable Required DIP Lenders) may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Date").  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such five (5)-business-day period, the "Remedies Notice Period"), with written notice having been provided to the Debtors, the Creditors' Committee, the Reception Purchaser Agent, and the U.S. Trustee:  (a) the DIP Agent

(Page 69)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(at the direction of the applicable Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and the DIP Orders to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out and the terms of the Prepetition Pari Passu Intercreditor Agreement; and (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Documents, the Prepetition Pari Passu Intercreditor Agreement, and the DIP Orders with respect to the Debtors' use of Cash Collateral. During the Remedies Notice Period, the Debtors and the Creditors' Committee shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court, and the Creditors' Committee's right to appear and be heard at any such hearing is preserved. Except as set forth in this paragraph or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the DIP Orders. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the applicable Required DIP Lenders) and the Prepetition Secured Parties shall be permitted to

(Page 70)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the DIP Orders, the DIP Documents, the STG Distribution Documents, and the Prepetition Pari Passu Intercreditor Agreement.  Notwithstanding anything to the contrary in the DIP Orders (other than as set forth in paragraph 23 of this Final Order), following an Event of Default, the Prepetition Secured Parties shall be stayed from enforcing any rights and remedies under the DIP Orders unless and until any DIP Agent has delivered a Carve Out Trigger Notice and has complied with its obligations in connection with the issuance thereof or consents to such enforcement.

18.     <u>Limitation on Charging Expenses Against Collateral</u>.    No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

19.     <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to continue to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in the DIP

(Page 71)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Orders and consistent with the Approved DIP Budget (subject to Permitted Budget Variances as set forth in the DIP Orders and the DIP Credit Agreement), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in the DIP Orders, from the date of the Interim Order through and including the date of termination of the DIP Credit Agreement.

20.    <u>Expenses and Indemnification</u>.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with the DIP Orders and to the extent permissible under the Bankruptcy Code, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(e)(3), 8(c), and 10(c) of this Final Order, all to the extent provided in the DIP Orders or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents), subject to paragraphs, 3(e)(3), 8(c), 9(c) and 10(c) of this Final Order, all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the STG Distribution Agent, the Reception Purchaser Agent, the Intercompany Agent, the First-Out Term

(Page 72)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Secured Parties, and the Revolving Secured Parties, incurred on or prior to such date without the need to be subject to the procedures set forth in paragraph 20(b) of this Final Order.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraphs 3(e)(3), 8(c), 9(c) and 10(c) of this Final Order (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than ten (10) calendar days (the "Review Period") after the receipt by counsel for the Debtors, the Creditors' Committee, and the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a summary cover letter setting out the nature of the services provided, provided that the Debtors, the U.S. Trustee, and the Creditors' Committee may request additional information regarding the Invoiced Fees; provided, further, that such invoices and any requested information may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work

(Page 73)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. The Debtors, the Creditors' Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, the Creditors' Committee, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). For avoidance of doubt, if no objection is filed within such ten-day Review Period, such invoice shall be paid without further order of the Court as promptly as possible and by no later than five days after the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement. If the Debtors, the U.S. Trustee, or the Creditors' Committee shall file with this Court an objection to any such fees or expenses, the undisputed amounts shall be paid immediately and the portion subject to such objection shall not be paid until resolution of such objection by this Court.

(c)      In addition, as provided in the DIP Credit Agreement, the Debtors will indemnify each of the applicable DIP Lenders, the DIP Agent, the STG Distribution Agent, the Intercompany Agent, the Reception Purchaser Agent, and the Prepetition Secured Parties (in each case solely in their capacity as such), and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing, in each case solely in their capacities as such (each

(Page 74)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

an "Indemnified Person"), and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided herein and in the DIP Credit Agreement; provided that the Debtors shall not indemnify any Indemnified Person against a successful Challenge. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP Superpriority Claims. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtors' indemnification obligations pursuant to the immediately preceding sentence.

21. No Third Party Rights. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22. Section 507(b) Reservation. Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the

(Page 75)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

23.     <u>Reserve for Holders of FLFO RCF Claims Providing the Exit RCF Commitment</u> . Notwithstanding anything to the contrary contained herein, the Debtors are hereby authorized and directed on a final basis to establish and fund a restricted segregated cash account (the "<u>RCF Reserve Account</u>") containing an amount equal to 100% of the principal amount of the letter of credit exposure of STG Distribution Revolving Lenders who are signatories to that certain restructuring support agreement, dated January 12, 2026, by and among the Debtors and the Consenting Stakeholders, including all exhibits thereto (including the Restructuring Term Sheet) (the "<u>Restructuring Support Agreement</u>," and such STG Distribution Revolving Lenders signatories thereto, the "<u>RCF Reserve Beneficiaries</u>") (which for the avoidance of doubt, shall equal $25,023,458 assuming 100% of FLFO RCF Holders are Committed RCF Holders) by signing up, or executing a joinder to, the Restructuring Support Agreement, to be held in trust for the sole benefit of the RCF Reserve Beneficiaries. The RCF Reserve Beneficiaries are hereby granted on a final basis a first priority, senior security interest in and lien on the RCF Reserve Account and the funds deposited therein, effective and automatically perfected in favor of the RCF

(Page 76)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Reserve Beneficiaries upon entry of the Interim Order, without the necessity of any execution or filing of control agreements or other documents or any other action by the Debtors or any other party. The RCF Reserve Account and the funds deposited therein (a) shall not constitute DIP Collateral, except that the DIP Secured Parties shall have a security interest in any residual interest in the RCF Reserve Account solely to the extent of any funds remaining after all letters of credit have been terminated and the RCF Reserve Beneficiaries have been fully reimbursed for any draws thereunder, which security interest in such residual shall be subject and subordinate to the interests of the RCF Reserve Beneficiaries, (b) shall not be subject to or used to fund the Carve Out (including the Funded Reserve Account or the Carve Out Reserves) or the Wind Down Amount (as defined in the Restructuring Support Agreement), or otherwise available for any use or purpose other than the repayment or cash collateralization of the STG Distribution Revolving Claims of the RCF Reserve Beneficiaries and (c) shall not be subject to any security interest or lien or used for any other obligation, rights or claim against any Debtor or otherwise available for any purpose, in each case other than as expressly set forth in this paragraph. The RCF Reserve Beneficiaries (or the Debtors or the STG Distribution Agent, in each case on behalf of and for the benefit of the RCF Reserve Beneficiaries, if applicable), shall draw amounts in the RCF Reserve Account to reimburse any draws under letters of credit upon the earliest to occur of (x) the entry of an order approving the sale of all or substantially all of the assets of the Debtors, (y) the conversion of the Cases to a liquidation proceeding (pursuant to chapter 7 of the Bankruptcy Code or the effectiveness of a plan of liquidation under chapter 11 of the Bankruptcy Code), and (z) the

(Page 77)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

occurrence of an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement and the acceleration by the DIP Secured Parties of the DIP Loans and taking control by the DIP Secured Parties of the DIP Collateral.  The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to permit the RCF Reserve Account and funds deposited therein to be used and applied in accordance with the foregoing, and is hereby lifted to the extent necessary to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required or necessary for the Debtors' performance of their obligations in accordance with the foregoing.

24.     Insurance.  Until the DIP Obligations have been paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral as required by the DIP Credit Agreement and shall name the DIP Agent as loss payees or additional insureds, as applicable, thereunder.

25.     No Waiver for Failure to Seek Relief.  The failure or delay of the DIP Agent or the applicable Required DIP Lenders to exercise rights and remedies under the DIP Orders, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

26.     Perfection of the DIP Liens and Adequate Protection Liens.

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 of the Interim Order and as ratified by paragraph 7 of this Final Order and the Adequate Protection Liens granted pursuant to paragraphs 8(a), 9(a), and

| | |
|---|---|
| (Page 78) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

10(a), of this Final Order, the DIP Agent and the STG Distribution Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder or under the DIP Documents.  Whether or not the DIP Agent or the STG Distribution Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests and the lien and security interest granted pursuant to paragraph 23 of this Final Order shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of the Interim Order.  If the DIP Agent or the STG Distribution Agent (at the direction of the applicable required lenders) determine to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall use commercially reasonable efforts to cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the STG Distribution Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in the DIP Orders.

(b)      A certified copy of the Interim Order and/or this Final Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the STG Distribution Agent in addition to or in lieu of such financing

(Page 79)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of the Interim Order and/or this Final Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of the Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) excluding any stamp-tax, the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or the DIP Orders, subject to applicable law.

27.     Release.  Subject to the rights and limitations set forth in paragraph 14 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of the Interim Order and as ratified by this Final Order, each of the DIP Secured Parties (in each case solely in their capacity as such), each

(Page 80)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, in each case solely in their capacities as such (collectively, the "Related Parties"), and, effective upon entry of this Final Order, each of the STG Distribution Secured Parties, the Intercompany Agent, and the Reception Purchaser Agent, each solely in their capacities as such, and, in each case, each of their respective Related Parties (in each case solely in their capacity as such), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the STG Distribution Obligations, the STG Distribution Liens, the STG Distribution Documents, the Obligations (as defined in the Reception Purchaser Credit Agreement), the Reception Purchaser Liens, or the Reception Purchaser Documents, or solely as to the Intercompany Agent, the Intercompany Loan Obligations, the Intercompany Liens, or the Prepetition Intercompany Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii)

| | |
|---|---|
| (Page 81) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the STG Distribution Secured Parties; <u>provided</u> that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents and the DIP Orders.

28.    <u>Credit Bidding</u>.    Subject to section 363(k) of the Bankruptcy Code and paragraph 14 hereof, the DIP Agent (at the direction of the applicable Required DIP Lenders) and the STG Distribution Agent (at the direction of the Required First-Out Term Lenders (as defined in the STG Distribution Credit Agreement)) shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, STG Distribution Adequate Protection Superpriority Claims and Roll-Up Obligations, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under sections 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code; <u>provided</u> that any party's credit bid rights pursuant to this paragraph shall be subject in all respects to the DIP Documents, Prepetition Pari Passu Intercreditor Agreement, and the DIP Orders.  For credit bidding purposes, DIP Lenders holding a majority of the then-outstanding New Money DIP Loans may credit bid up to the full amount of the then outstanding New Money DIP Loans and DIP Lenders holding a majority of the then-outstanding Roll-Up Obligations may credit bid up to the

| | |
|---|---|
| (Page 82) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

full amount of the then-outstanding Roll-Up Obligations; <u>provided</u>, <u>however</u>, that no Roll-Up Obligations may be credit bid unless the proposed transaction (y) indefeasibly repays in full the New Money DIP Loans or (z) DIP Lenders holding a majority of the then-outstanding New Money DIP Loans otherwise consent.

29.    <u>Preservation of Rights Granted Under this Final Order</u>.

(a)    Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the STG Distribution Documents or the DIP Orders (except as set forth in paragraph 23 of this Final Order), or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 31 herein.

(b)    In the event this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(Page 83)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(c)      Unless and until all DIP Obligations, STG Distribution Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all New Money Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the applicable Required DIP Lenders, and the STG Distribution Agent (acting at the direction of the applicable required lenders), (x) any modification, stay, vacatur, or amendment of this Final Order, (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the STG Distribution Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the STG Distribution Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and the DIP Orders (including subject to Permitted Budget Variances); and (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any

(Page 84)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

creditor of any Debtor; provided, however, that none of the foregoing shall require the Debtors to violate their fiduciary duties.

(d)      Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to the DIP Orders shall continue in full force and effect and shall maintain their priorities as provided in the DIP Orders until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to the DIP Orders, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)      Except as expressly provided in the DIP Orders or in the DIP Documents, and subject to the rights of parties in interest specifically set forth in paragraph 14 of this Final Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Final Order), the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry

(Page 85)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in the Cases, in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of the DIP Orders shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the applicable Required DIP Lenders and the DIP Agent (acting at the direction of the applicable Required DIP Lenders) it being understood that the Restructuring Transactions (as defined in the Restructuring Support Agreement) are acceptable to the Required DIP Lenders and the DIP Agent.

(f)    Other than as set forth in the DIP Orders, subject to the Carve Out, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any

| | |
|---|---|
| (Page 86) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

30.    Surety LC Collateral.  Notwithstanding anything set forth to the contrary in the Motion, the DIP Credit Agreement, any other DIP Documents, the Interim Order, or this Final Order, nothing therein shall be deemed to limit, impair, or prime RLI Insurance Company's ("RLI") and/or Liberty Mutual Insurance Company's ("Liberty Mutual" and together with RLI, the "Surety LCs") rights or interests in any letters of credit, or the proceeds thereof, securing existing surety bonds and existing indemnity agreements ("Surety LCs' Collateral"), including, without limitation, the right to draw or use the Surety LCs' Collateral to reimburse any claim of RLI and/or Liberty Mutual under or in respect of the Surety LCs' Collateral, as applicable.

31.    Chubb Insurance Reservation of Rights.  For the avoidance of doubt, (i) nothing in this Final Order or in the DIP Documents grants liens and/or security interests in any insurance policies issued by ACE American Insurance Company and/or any of its U.S.-based affiliates (collectively, together with each of their predecessors, and solely in their roles as insurers, "Chubb") nor on any rights, interests and claims thereunder; (ii) to the extent Chubb had Prior Senior Liens, such Prior Senior Liens shall be senior to any liens and/or security interests granted pursuant to this Final Order ; (iii) the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral to the extent such proceeds are payable to the Debtors

(Page 87)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy or any related agreements, provided, however, that the Debtors shall pursue any such claim for insurance proceeds in accordance with the terms of the applicable insurance policy or any related agreements, provided, further that Chubb shall not have any duty to effectuate any turnover of such property or payment of such insurance proceeds directly to the DIP Agent or any other third party; and (iv) nothing in this Final Order or in the DIP Documents alters or modifies the terms and conditions of any insurance policies issued by Chubb and/or any agreements related thereto. Nothing set forth in this paragraph 31 shall operate as a waiver of the rights, if any exist under applicable law, of the Debtors and their estates, the DIP Secured Parties, the STG Distribution Secured Parties, the Committee, or any other third party from challenging or otherwise objecting to the validity, priority, or extent of the liens and security interests of Chubb or any claims relating thereto, or from Chubb's rights and defenses with respect to the foregoing, and any and all such rights shall be reserved.

32. <u>Chubb Surety Reservation of Rights</u>.

(a)     Nothing in the DIP Documents shall in any way prime or affect the rights of Federal Insurance Company and Westchester Fire Insurance Company, or their past, present, or future parents, subsidiaries, or affiliates (collectively, and each as surety in their role as an issuer of surety bonds, surety guaranties, or surety-related products, "<u>Surety</u>") as to (a) any funds it is holding and/or being held for it presently or in the future, whether in trust, as security, or otherwise, including any proceeds due or to become due to any of the Debtors or their non-debtor affiliates

| | |
|---|---|
| (Page 88) | |
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

in relation to obligations bonded by the Surety; (b) any substitutions or replacements of said funds including accretions to and interest earned on said funds; or (c) any letters of credit related to any indemnity collateral trust, bond or agreements between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates (collectively (a) to (c), the "Surety Assets"). Nothing in the DIP Documents shall affect the rights of the Surety under any current or future indemnity, collateral, trust or related agreements between or involving the Surety and any of the Debtors or any of the Debtors' non-debtor affiliates as to the Surety Assets, including, but not limited to, the General Indemnity Agreement dated April 5, 2022 executed by certain debtors (STG Acquisition Corp. and STG Logistics, Inc.) and non-debtor (STG Holdings, LLC).

(b)     In addition, nothing in the DIP Documents shall prime or otherwise impact (x) current or future setoff and/or recoupment rights and/or the lien rights of the Surety or any party to whose rights the Surety has or may be subrogated; and/or (y) any existing or future subrogation or other common law rights of the Surety. Moreover, notwithstanding anything in the DIP Documents to the contrary, the rights, claims and defenses of the Debtors, the Surety, and creditors, including the Surety's rights under any properly perfected lien and claims and/or claim for equitable rights of subrogation, and rights of the Debtors and of any successors in interest to any of the Debtors and the creditors, to object to any such liens, claims and/or equitable subrogation and other rights, are fully preserved. Nothing herein is an admission by the Surety or the Debtors, or a determination by the Bankruptcy Court, regarding any claims under any bonds,

(Page 89)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

and the Surety and the Debtors reserve any and all rights, remedies and defenses in connection therewith.

33.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in the DIP Orders, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the STG Distribution Documents, or the DIP Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding,

| (Page 90) | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the STG Distribution Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the STG Distribution Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders', the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the STG Distribution Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the STG Distribution Liens) held by or on behalf of each of the Prepetition Secured Parties related to the STG Distribution Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the STG

| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

Distribution Obligations, or the STG Distribution Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the STG Distribution Liens or any other rights or interests of any of the Prepetition Secured Parties related to the STG Distribution Obligations or the STG Distribution Liens, <u>provided</u> that no more than $200,000 (the "<u>Investigation Budget</u>") of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if any, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the STG Distribution Liens) held by or on behalf of each of the Prepetition Secured Parties (the "<u>Investigation</u>"); <u>provided</u> that the Creditors' Committee's rights to seek allowance of the Creditors' Committee's professional fees and expenses incurred in connection with the Investigation in excess of the Investigation Budget as administrative expenses under section 503(b) of the Bankruptcy Code are fully preserved, and the right of any party-in-interest to object to such allowance is fully preserved.

34.    <u>Conditions Precedent</u>.  No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making

(Page 92)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

of such extensions of credit under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Documents.

35.     <u>Prepetition Pari Passu Intercreditor Agreement</u>.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Pari Passu Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the STG Distribution Documents, the Prepetition Intercompany Documents, or the Reception Purchaser Documents (i) shall remain in full force and effect (and all covenants therein shall be fully enforceable), (ii) shall govern the relative priorities, rights, and remedies of the Prepetition Collateral, the STG Distribution Secured Parties, the Intercompany Secured Parties, and the Reception Purchaser Secured Parties, and (iii) shall not be deemed amended, altered or modified by the terms of this Final Order, except to the extent expressly set forth herein.

36.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Secured Parties, the STG Distribution Secured Parties, the Creditors' Committee, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; <u>provided</u> that, except to the extent expressly

(Page 93)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

set forth in the DIP Orders, the STG Distribution Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note, or otherwise) to permit the use of Cash Collateral pursuant to the DIP Orders or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

37.    <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents, or permitting the use of Cash Collateral, pursuant to the DIP Orders or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Final Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

38.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation,

(Page 94)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al*. |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, the DIP Orders, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest.

39.    <u>No Requirement to File Claim for STG Distribution Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the STG Distribution Agent nor any Prepetition Secured Parties shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the STG Distribution Obligations; and the failure to file any such proof of claim or request for payment of administrative

(Page 95)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

expenses shall not affect the validity, priority, or enforceability of any of the STG Distribution Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the STG Distribution Agent's or any Prepetition Secured Party's rights, remedies, powers, or privileges under any of the STG Distribution Documents, the DIP Orders, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest.

40.    No Marshaling.  Subject to the priorities set forth in the DIP Orders and effective immediately upon entry of this Final Order, except as set forth herein with respect to holders of the (a) Roll-Up Obligations and Adequate Protection Obligations using commercially reasonable efforts to first seek recovery from DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order and (b) New Money DIP Claims using commercially reasonable efforts to first seek recovery from DIP Collateral other than proceeds of Excluded Actions, the DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the DIP Orders, the DIP Documents, and the STG Distribution Documents, notwithstanding any other agreement or provision to the contrary, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

(Page 96)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

41.     <u>Application of Proceeds of DIP Collateral.</u>  Subject to the priorities set forth in the DIP Orders and effective immediately upon entry of this Final Order, and except as set forth herein with respect to holders of the (a) Roll-Up Obligations and Adequate Protection Obligations using commercially reasonable efforts to first seek recovery from DIP Collateral other than DIP Collateral identified in clause 7(a)(i) of this Final Order and (b) DIP New Money Claims using commercially reasonable efforts to first seek recovery from DIP Collateral other than proceeds of Excluded Actions, the DIP Obligations, at the option of the applicable Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral identified in clause 7(a)(i) of this Final Order, (b) second, DIP Collateral constituting Intercompany Collateral, and (c) third, from all other DIP Collateral.

42.     <u>Equities of the Case</u>.  The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

43.     <u>Effect of this Final Order</u>.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

(Page 97)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

44. <u>Retention of Jurisdiction</u>. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of the DIP Orders.

45. <u>Reservation of Rights In Respect of Bidding Procedures</u>. The Debtors, the Creditors' Committee, and the DIP Lenders are continuing to negotiate the terms of the relief requested in the *Debtors' Motion for Entry of An Order (I) Approving the Bidding Procedures and Auction(s), (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Granting Related Relief* [Docket No. 199], and such parties' rights in respect of such relief are fully preserved in the context of such discussions.

46. <u>Final New Money DIP Loan Allocation</u>. Notwithstanding anything to the contrary herein and/or the DIP Documents, and for the avoidance of doubt, at any time prior to or in connection with the funding of the Final New Money DIP Loans, each DIP Lender shall be permitted to assign, transfer, syndicate, or allocate all or any portion of its commitments or loans in respect of the New Money DIP Loans and/or the Roll-Up DIP Loans to any other party who is eligible to act as a DIP Lender under the DIP Documents (without regard to whether such party elected or agreed to act as a DIP Lender, or satisfied any timing, notice, or election requirements, within any period specified in the DIP Documents), including pursuant to one or more written agreements executed prior to such funding, and the DIP Documents and the parties thereto shall

| | |
|---|---|
| (Page 98) | |
| Debtors: | STG LOGISTICS, INC., *et al*. |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

recognize, give effect to, and enforce any such assignment, transfer, syndication, or allocation in accordance with the terms of such written agreement (including, unless stated otherwise in such written agreement, the transferee's right to receive, collect, enforce, and retain all fees, accrued and unaccrued interest, principal, and any other amounts, proceeds, or economic benefits arising therefrom), without the need for any further consent, condition, or action by the Court or any other party.

47.     Preservation of Status Quo as to LMT Transactions; Conditionality of DIP Relief; Remedial Flexibility. Notwithstanding anything in this Final Order or in any of the DIP Documents to the contrary, nothing in this Final Order or in any of the DIP Documents shall, or shall be deemed to prejudice, limit, estop, preclude (including based on principles of waiver), or otherwise impair any legal or equitable claim, cause of action, counterclaim, objection, defense, or remedy of Axos Financial, Inc. ("Axos") and/or Siemens Financial Services, Inc. ("Siemens," and together with Axos the "Minority Lenders")  or any other substantive or procedural right related to any Claims of Axos or Siemens that have been or that may be asserted or sought by Axos or Siemens in Axos Financial, Inc. and Siemens Financial Services, Inc. v. Reception Purchaser, LLC, et al., Case Index No. 650108/2025 (N.Y. Sup. Ct.), or any other proceeding then-pending or subsequently commenced (whether by Axos, Siemens or any other party in interest), including that certain adversary proceeding commenced by the Minority Lenders on February 4, 2026 (the "LMT Adversary Proceeding") or any contested matter commenced in these Cases prior to the Challenge Period Termination Date; provided further that:

(Page 99)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

(a)     <u>Preservation of Status Quo; No Adjudication of LMT Disputes</u>.  Nothing in the DIP Orders shall constitute, effectuate, or be deemed to be an adjudication, allowance, disallowance, validation, ratification, approval, compromise, waiver, release, impairment, or limitation of any claim, cause of action, defense, counterclaim, or remedy of the Minority Lenders arising out of or relating to the October 2024 liability management transaction and related transactions (collectively, the "<u>LMT Transactions</u>").

(b)     <u>No Law-of-the-Case or Preclusive Effect; Remedial Flexibility</u>.    All findings, Debtors' Stipulations, acknowledgments, admissions, waivers, releases, and determinations in the DIP Orders are entered solely for purposes of approving the DIP Facility and authorizing the use of Cash Collateral in these Cases and shall not in any way affect, predetermine or create law of the case, collateral estoppel, res judicata, issue preclusion, judicial estoppel, or be given any other preclusive or evidentiary effect in the LMT Adversary Proceeding.  The Court may fashion any appropriate remedy in connection with the LMT Adversary Proceeding, including, without limitation, regarding the permissibility of the Roll-Up Loans, treatment thereof, adequate protection rights, and any party's right to credit-bid a secured claim.

(c)     <u>Survival</u>.  This paragraph shall survive entry of this Final Order, any amendment or modification of the DIP Documents, any sale of assets, plan confirmation, and any conversion or dismissal of these Cases, and shall be binding on the Debtors, the DIP Secured Parties, the STG Distribution Secured Parties, the Reception Purchaser Secured Parties, the Prepetition Secured Parties, and their respective successors and assigns. The reservation of rights

(Page 100)

| | |
|---|---|
| Debtors: | STG LOGISTICS, INC., *et al.* |
| Case No. | 26-10258 (MEH) |
| Caption of Order: | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief |

herein shall carry forward in all future orders approving the DIP Financing prior to entry of a final

non-appealable order in the LMT Adversary Proceeding and shall be without prejudice to any

additional objections by the Minority Lenders to any pending or future motions.

## EXHIBIT A

**DIP Credit Agreement**

*Execution Version*

_____

_____

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of January 14, 2026,**

**by and among**

**STG DISTRIBUTION, LLC,**
**as the Borrower and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,**

**STG DISTRIBUTION HOLDINGS, LLC,**
**as Newco Holdings and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,**

**RECEPTION PURCHASER, LLC,**
**as the Company and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,**

**RECEPTION MEZZANINE HOLDINGS, LLC,**
**as Holdings and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,**

**THE OTHER PERSONS PARTY HERETO THAT ARE**
**DESIGNATED AS CREDIT PARTIES,**

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**
**as the Agent for all Lenders,**

**and**

**THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO AS LENDERS**

_____

_____

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................................ 2

    1.1     Defined Terms ............................................................................................................. 2
    1.2     Other Interpretive Provisions .................................................................................. 34
    1.3     Accounting Terms and Principles ........................................................................... 35
    1.4     Payments ................................................................................................................... 36

ARTICLE II THE CREDITS ........................................................................................................... 36

    2.1     Amounts and Terms of Commitments ..................................................................... 36
    2.2     Evidence of Loans; Notes ........................................................................................ 41
    2.3     Interest ...................................................................................................................... 41
    2.4     Loan Accounts; Register .......................................................................................... 41
    2.5     Procedure for Borrowings, Conversions and Continuations of Loans ................... 42
    2.6     [Reserved] ................................................................................................................. 43
    2.7     Optional Prepayments .............................................................................................. 43
    2.8     Mandatory Prepayments of Loans and Commitment Reductions. .......................... 44
    2.9     Fees .......................................................................................................................... 47
    2.10    Payments by the Borrower ....................................................................................... 48
    2.11    Payments by the Lenders to the Agent; Settlement. ................................................ 50
    2.12    Syndication .............................................................................................................. 51

ARTICLE III CONDITIONS PRECEDENT ................................................................................... 51

    3.1     Conditions to Effectiveness of this Agreement and the Interim Draw ................... 51
    3.2     Conditions to the Final Draw ................................................................................... 54
    3.3     Conditions to the Delayed Draw ............................................................................. 55

ARTICLE IV REPRESENTATIONS AND WARRANTIES ............................................................ 56

    4.1     Corporate Existence and Power ............................................................................... 56
    4.2     Corporate Authorization; No Contravention ........................................................... 57
    4.3     Governmental Authorization ................................................................................... 57
    4.4     Binding Effect .......................................................................................................... 58
    4.5     Litigation .................................................................................................................. 58
    4.6     No Default ................................................................................................................ 58
    4.7     ERISA Compliance .................................................................................................. 58
    4.8     Use of Proceeds; Margin Regulations ..................................................................... 59
    4.9     Ownership of Property; Liens .................................................................................. 59
    4.10    Taxes ........................................................................................................................ 59
    4.11    Financial Condition; No Material Adverse Effect ................................................... 59
    4.12    Environmental Matters ............................................................................................ 60
    4.13    Regulated Entities .................................................................................................... 60
    4.14    [Reserved] ................................................................................................................. 60
    4.15    Labor Relations ........................................................................................................ 60
    4.16    Intellectual Property ................................................................................................. 61
    4.17    [Reserved] ................................................................................................................. 61

i

4.18    Ventures, Subsidiaries and Affiliates; Outstanding Stock ........................................ 61
4.19    Jurisdiction of Organization; Chief Executive Office ............................................. 61
4.20    Deposit Accounts and Other Accounts .................................................................... 61
4.21    [Reserved] ................................................................................................................ 62
4.22    [Reserved] ................................................................................................................ 62
4.23    Full Disclosure ......................................................................................................... 62
4.24    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption
          Practices ................................................................................................................... 62
4.25    Status of Holdings .................................................................................................... 63
4.26    Collateral Documents ............................................................................................... 63
4.27    Bankruptcy Matters .................................................................................................. 63

ARTICLE V AFFIRMATIVE COVENANTS ........................................................................... 64

5.1     Financial Statements ................................................................................................. 64
5.2     Certificates; Other Information ................................................................................ 64
5.3     Notices ...................................................................................................................... 65
5.4     Preservation of Corporate Existence, Etc. ............................................................... 67
5.5     Maintenance of Property ........................................................................................... 67
5.6     Insurance ................................................................................................................... 67
5.7     Payment of Tax Obligations ..................................................................................... 68
5.8     Compliance with Laws ............................................................................................. 68
5.9     Inspection of Property and Books and Records ....................................................... 68
5.10    Use of Proceeds ........................................................................................................ 69
5.11    [Reserved] ................................................................................................................ 69
5.12    [Reserved] ................................................................................................................ 69
5.13    Further Assurances ................................................................................................... 69
5.14    Environmental Matters ............................................................................................. 70
5.15    [Reserved] ................................................................................................................ 70
5.16    Post-Closing Requirement ........................................................................................ 70
5.17    Credit Ratings ........................................................................................................... 70
5.18    Litigation Updates .................................................................................................... 71
5.19    [Reserved] ................................................................................................................ 71
5.20    [Reserved] ................................................................................................................ 71
5.21    [Reserved] ................................................................................................................ 71
5.22    Weekly Advisor Calls ............................................................................................... 71
5.23    Milestones ................................................................................................................. 71
5.24    Approved Budget; Approved Variance Report ......................................................... 71
5.25    Cash Management ..................................................................................................... 73

ARTICLE VI NEGATIVE COVENANTS ................................................................................ 73

6.1     Limitation on Liens ................................................................................................... 73
6.2     Disposition of Assets ................................................................................................ 76
6.3     Consolidations and Mergers ..................................................................................... 78
6.4     Loans and Investments ............................................................................................. 78
6.5     Limitation on Indebtedness ...................................................................................... 80
6.6     Transactions with Affiliates ..................................................................................... 81
6.7     Compliance with ERISA ........................................................................................... 82

ii

| | | |
|---|---|---:|
| 6.8 | Restricted Payments | 82 |
| 6.9 | Change in Business | 83 |
| 6.10 | Change in Structure | 83 |
| 6.11 | Changes in Accounting, Name and Jurisdiction of Organization | 83 |
| 6.12 | Limitation on Payments of Certain Indebtedness | 83 |
| 6.13 | Amendments to Certain Indebtedness | 83 |
| 6.14 | No Negative Pledges | 84 |
| 6.15 | OFAC; USA Patriot Act; Anti-Corruption Laws | 84 |
| 6.16 | Sale Leasebacks | 85 |
| 6.17 | Hazardous Materials | 85 |
| 6.18 | Material Property | 85 |
| 6.19 | Voting Threshold Influences | 85 |
| 6.20 | [Reserved] | 85 |
| 6.21 | Variance Testing | 85 |
| 6.22 | DIP Order | 85 |
| 6.23 | Insolvency Proceeding Claims | 86 |
| 6.24 | Bankruptcy Actions | 86 |
| 6.25 | Liability Management Transaction; Certain Payments | 86 |

**ARTICLE VII [RESERVED]** ........................................................................ 86

**ARTICLE VIII EVENTS OF DEFAULT** ........................................................ 86

| | | |
|---|---|---:|
| 8.1 | Event of Default | 86 |
| 8.2 | Remedies | 92 |
| 8.3 | Rights Not Exclusive | 92 |

**ARTICLE IX AGENT** ................................................................................... 92

| | | |
|---|---|---:|
| 9.1 | Appointment and Duties | 92 |
| 9.2 | Binding Effect | 93 |
| 9.3 | Use of Discretion | 94 |
| 9.4 | Delegation of Rights and Duties | 94 |
| 9.5 | Reliance and Liability | 94 |
| 9.6 | Agent Individually | 96 |
| 9.7 | Lender Credit Decision | 97 |
| 9.8 | Expenses; Indemnities | 97 |
| 9.9 | Resignation of the Agent | 98 |
| 9.10 | Release of Collateral or Guarantors | 98 |
| 9.11 | Additional Secured Parties | 99 |
| 9.12 | [Reserved] | 100 |
| 9.13 | Credit Bid | 100 |
| 9.14 | Erroneous Payments | 101 |

**ARTICLE X MISCELLANEOUS** .................................................................. 102

| | | |
|---|---|---:|
| 10.1 | Amendments and Waivers | 102 |
| 10.2 | Notices | 106 |
| 10.3 | Electronic Transmissions | 107 |

iii

10.4    No Waiver; Cumulative Remedies ........................................................ 108
10.5    Costs and Expenses ........................................................................... 108
10.6    Indemnity ........................................................................................... 109
10.7    Marshaling; Payments Set Aside ...................................................... 111
10.8    Successors and Assigns .................................................................... 111
10.9    Binding Effect; Assignments and Participations ............................. 111
10.10   Non-Public Information; Confidentiality.......................................... 115
10.11   Set-off; Sharing of Payments ........................................................... 117
10.12   Counterparts; Facsimile Signature ................................................... 118
10.13   Severability; Captions; Independence of Provisions ....................... 118
10.14   Interpretation...................................................................................... 118
10.15   No Third Parties Benefited ............................................................... 118
10.16   Governing Law and Jurisdiction ...................................................... 119
10.17   Waiver of Jury Trial.......................................................................... 119
10.18   Entire Agreement; Release; Survival ............................................... 120
10.19   USA Patriot Act ................................................................................ 120
10.20   Replacement of Lender ..................................................................... 120
10.21   Joint and Several ............................................................................... 121
10.22   Creditor-Debtor Relationship............................................................ 121
10.23   Keepwell ............................................................................................ 121
10.24   DIP Orders; Conflicts ....................................................................... 122

ARTICLE XI TAXES, YIELD PROTECTION AND ILLEGALITY ......................... 122

11.1    Taxes.................................................................................................. 122
11.2    Increased Costs and Reduction of Return......................................... 126
11.3    [Reserved].......................................................................................... 127
11.4    Certificates of Lenders...................................................................... 127
11.5    Acknowledgement and Consent to Bail-In of Affected Financial Institutions .............. 127

ARTICLE XII GUARANTY ............................................................................... 127

12.1    Guaranty............................................................................................. 127
12.2    Limitation of Guaranty ..................................................................... 128
12.3    Contribution ...................................................................................... 128
12.4    Authorization; Other Agreements..................................................... 128
12.5    Guaranty Absolute and Unconditional.............................................. 129
12.6    Waivers .............................................................................................. 129
12.7    Reliance ............................................................................................. 130
12.8    Independent Obligations ................................................................... 130
12.9    Reinstatement.................................................................................... 130

iv

## SCHEDULES

Schedule 1.1        Closing Date Guarantors
Schedule 2.1(a)     Term Loan Commitments
Schedule 2.9        Backstop Parties
Schedule 2.12       Syndication Schedule
Schedule 4.5        Litigation
Schedule 4.7        ERISA
Schedule 4.9        Real Estate
Schedule 4.12       Environmental
Schedule 4.15       Labor Relations
Schedule 4.18       Ventures, Subsidiaries and Affiliates; Outstanding Stock
Schedule 4.19       Jurisdiction of Organization; Chief Executive Office
Schedule 4.20       Deposit Accounts and Other Accounts
Schedule 5.16       Post-Closing Requirements
Schedule 6.1        Liens
Schedule 6.4        Investments
Schedule 6.5        Indebtedness
Schedule 6.6        Transactions with Affiliates

## EXHIBITS

Exhibit 1.1(a)        Form of Assignment
Exhibit 1.1(b)        Form of Committed Loan Notice
Exhibit 1.1(c)        Form of Note
Exhibit 1.1(d)        Approved Business Plan
Exhibit 1.1(e)        Initial Budget
Exhibit 1.1(f)        Syndication Procedures
Exhibit 5.2(b)        Form of Compliance Certificate
Exhibit 11.1(g)(i)-1  Form of Non-Bank Tax Certificate
Exhibit 11.1(g)(i)-2  Form of Non-Bank Tax Certificate
Exhibit 11.1(g)(i)-3  Form of Non-Bank Tax Certificate
Exhibit 11.1(g)(i)-4  Form of Non-Bank Tax Certificate

## ANNEXES

Annex I               Milestones

v

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, this "**Agreement**") is entered into as of January 14, 2026, by among STG Distribution, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) (the "**Borrower**"), STG Distribution Holdings, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("**Newco Holdings**"), Reception Purchaser, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Company**"), Reception Mezzanine Holdings, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), the other Persons from time to time party hereto that are designated as a "**Credit Party**", Wilmington Savings Fund Society, FSB (in its individual capacity, "**WSFS**"), as administrative agent and collateral agent (in such capacities, including any successor thereto, the "**Agent**") for the lenders from time to time party to this Agreement (collectively, the "**Lenders**" and individually each a "**Lender**"), and the Lenders.

## RECITALS

A.    On or around January 12, 2026 (the "**Petition Date**"), the Borrower, Newco Holdings, the Company, Holdings and certain of their Subsidiaries (as defined below) (collectively, the "**Debtors**" and each, individually, a "**Debtor**") voluntarily commenced cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") and the Debtors have retained possession of their assets and the management of their business pursuant to sections 1107 and 1108 of the Bankruptcy Code (as defined below).

B.    Prior to the Petition Date, certain of the Lenders (together with the Prepetition First Lien Lenders (as defined below)) provided certain secured Indebtedness to the Borrower pursuant to that certain Credit Agreement, dated as of October 3, 2024, among the Borrower, Newco Holdings, the Company, Holdings, the other Credit Parties from time to time party thereto, WSFS, as administrative agent and collateral agent (in such capacities, including any successor thereto, the "**Prepetition First Lien Agent**"), and the lenders from time to time party thereto (the "**Prepetition First Lien Lenders**") (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition First Lien Credit Agreement**").

C.    Prior to the Petition Date, (i) certain of the Prepetition First Lien Lenders (the "**Prepetition FLFO Lenders**") were owed approximately $209,105,951 in outstanding First-Out Term Loans (as defined in, and in accordance with, the Prepetition First Lien Credit Agreement) (the "**Prepetition FLFO Loans**") plus interest, fees, premiums, costs and expenses and all other Prepetition FLFO Obligations (as defined below) under the Prepetition First Lien Credit Agreement; and (ii) certain of the Prepetition First Lien Lenders (the "**Prepetition FLSO Lenders**") were owed approximately $668,651,248 in outstanding Second-Out Term Loans (as defined in, and in accordance with, the Prepetition First Lien Credit Agreement) (the "**Prepetition FLSO Loans**") plus interest, fees, premiums, costs and expenses and all other Prepetition FLSO Obligations (as defined below) under the Prepetition First Lien Credit Agreement.

D.    The Borrower has requested that the Lenders extend credit to the Borrower in the form of a senior secured superpriority debtor-in-possession credit facility (the "**DIP Facility**") comprised

of (i) term loans in an initial aggregate principal amount equal to $125,000,000 (the "**Initial New Money Term Loans**") available in Dollars (as defined below); (ii) delayed draw term loans in an initial aggregate principal amount up to $25,000,000 (the "**Delayed Draw New Money Term Loans**", together with the Initial New Money Term Loans, the "**New Money Term Loans**"); and (iii) term loans in an aggregate principal amount not to exceed, after giving effect to the making of the Interim Initial New Money Term Loans (as defined below) and the Final Initial New Money Term Loans (as defined below) (on a proportional basis), $143,750,000 (such amount, the "**Roll-Up Cap**" and such loans, the "**Roll-Up Loans**", together with the New Money Term Loans, the "**Term Loans**"), which Roll-Up Loans will be issued as described in Section 2.1 of this Agreement.

E.        The priority of the DIP Facility with respect to the Collateral (as defined below) granted as security for the payment and performance of the Obligations (as defined below) under the Loan Documents (as defined below) shall be as set forth in the Interim Order (as defined below) and the Final Order (as defined below), as applicable, upon the entry thereof by the Bankruptcy Court, and in the Collateral Documents (as defined below).

F.        All claims and the Liens (as defined below) granted under the Orders (as defined below) and the Loan Documents to the Agent, the Lenders and the other Secured Parties (as defined below) in respect of the DIP Facility shall be subject to the Carve-Out (as defined below).

G.        The Borrower's and the Guarantors' (as defined below) business is a mutual and collective enterprise and the Borrower and the Guarantors believe that the loans and other financial accommodations to the Borrower under this Agreement will enhance the financial position of the Borrower to the mutual advantage of the Borrower and the Guarantors.

H.        Each of the Company, Holdings, Newco Holdings and the Borrower acknowledges on behalf of itself and its respective Subsidiaries that Holdings, Newco Holdings, the Company and the Borrower and their respective Subsidiaries will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in the Agreement.

I.        The Lenders are willing to extend such credit hereunder on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

1.1        Defined Terms. The following terms have the following meanings:

"**Accepting Lender**" as defined in Section 2.8(d)(ii).

"**Account**" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Credit Parties and their Subsidiaries, including the unpaid portion of the obligation of an Account Debtor in respect of Inventory purchased by and shipped to such Account Debtor and/or the rendition of services by the Company or such Subsidiary, as stated on the respective invoice of the Company or such Subsidiary, net of any credits, rebates or offsets owed to such Account Debtor.

"**Account Debtor**" means the customer of the Company or any of the Company's Subsidiaries who is obligated on or under an Account.

2

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person (b) the acquisition of in excess of fifty percent (50%) of the Stock of any Person or otherwise causing any Person to become a Subsidiary of the Company or (c) a merger or consolidation or any other combination with another Person.

"**Actual Disbursements**" means, with respect to any period, as the context requires, (x) the line-by-line amount of actual operating disbursements during such period made by the Credit Parties and their Subsidiaries under the heading "Operating Disbursements" in the Approved Budget and (y) the sum, for such period, of all such operating disbursements (other than Actual Restructuring Related Amounts) for all such line items which comprise "Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget then in effect.

"**Actual Receipts**" means, with respect to any period, as the context requires, (x) the line-by-line amount of actual receipts during such period of the Credit Parties and their Subsidiaries under the heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"**Actual Restructuring Related Amounts**" means the Credit Parties' disbursements (or in respect of Credit Parties' restructuring professionals, disbursement or reserve) in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) on a line-by-line and aggregate basis during the applicable Disbursement Variance Testing Period.

"**Ad Hoc Group**" means the ad hoc group of Lenders and Prepetition First Lien Lenders represented by the Lender Advisors.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affected Lender**" as defined in <u>Section 10.20</u>.

"**Affected SPV/Participant**" as defined in <u>Section 10.20</u>.

"**Affiliate**" means, with respect to any Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; *provided*, *however*, that no Secured Party shall be an Affiliate of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents; *provided*, except for purposes of <u>Section 6.6</u> of this Agreement, no other portfolio company of any Sponsor shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries as a result of common ownership by such Sponsor.  For purposes of this definition, "**control**" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.  For the avoidance of doubt, no Person shall be an Affiliate of any Credit Party or of any Subsidiary of any Credit Party solely by virtue of it being a non-controlling limited partner in any fund pursuant to which the Sponsor holds any equity interests in Holdings.

"**Agent**" as defined in the preamble.

3

"**Agent Fee Letter**" means the Fee Letter dated as of the date hereof by and between the Agent and the Borrower, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Aggregate Commitment**" means, with respect to any Class of Loans, the combined Commitments of the Lenders with respect to such Class of Loans, as such amount may be increased or reduced from time to time pursuant to this Agreement.

"**Agreement**" as defined in the preamble.

"**Ancillary Fees**" as defined in Section 10.1(a)(xvii)(B).

"**Annual Financial Statements**" means the audited consolidated balance sheet of Holdings and each of its Subsidiaries for the fiscal year ended December 31, 2024, and the related audited consolidated statements of operations and cash flows of Holdings and each of its Subsidiaries for the fiscal year ended December 31, 2024.

"**Anti-Corruption Laws**" as defined in Section 4.24(c).

"**Applicable Rate**" as defined in Section 2.3(a).

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Budget**" means the then most current budget prepared by the Borrower and approved by the Required Lenders (which may be communicated via a Direction of the Required Lenders) in accordance with Section 5.24. As of the Closing Date, the Approved DIP Budget is the Initial Budget.

"**Approved Business Plan**" means the business plan attached as Exhibit 1.1(d) hereto, together with any modifications and updates thereto mutually agreed between the Borrower and the Lender Advisors.

"**Approved Variance Report**" as defined in Section 5.24(c).

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person) that (a)(i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"**Assignment**" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, substantially in the form of Exhibit 1.1(a) or any other form approved by the Agent.

"**Attorney Costs**" means the reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of (a) one external counsel for the Agent, (b) one external counsel for the Lenders, other than the Fronting Lender, (which shall initially be Gibson, Dunn and Crutcher LLP), (c) one external counsel, at a time, for the Fronting Lender, (d) to the extent necessary, one local counsel in each relevant jurisdiction, (e) regulatory counsel if reasonably required and (f) solely in the event of a conflict of interest,

4

one additional counsel (and, if necessary, one local counsel in each relevant jurisdiction and one regulatory counsel) to each group (which may be a single Person) of similarly situated affected Persons.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (i) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Backstop Party**" means each of the entities set forth on Schedule 2.9.

"**Backstop Premium**" as defined in Section 2.9(c).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"**Bankruptcy Court**" as defined in the recitals hereto.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Bona Fide Debt Fund**" means any bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans or bonds and/or similar extensions of credit in the ordinary course of business.

"**Borrower**" as defined in the preamble.

"**Borrower Materials**" as defined in Section 10.10(a)(i).

"**Borrowing**" means a borrowing hereunder consisting of Loans made to or for the benefit of the Borrower on the same day by the Lenders pursuant to Article II.

"**Budgeted Disbursements**" means, with respect to any period, as the context requires, (x) the projected line-by-line amount of operating disbursements during such period made by the Credit Parties and their Subsidiaries under the heading "Operating Disbursements" in the Approved Budget and (y) the sum, for such period, of all such operating disbursements (other than Budgeted Restructuring Related Amounts) for all such line items which comprise "Operating Disbursements" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget then in effect.

"**Budgeted Receipts**" means, with respect to any period, as the context requires, (x) the projected line-by-line amount of receipts during such period of the Credit Parties and their Subsidiaries under the

5

heading "Receipts" in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise "Receipts" (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"**Budgeted Restructuring Related Amounts**" means the Credit Parties' projected disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) during the applicable Disbursement Variance Testing Period as set forth in the applicable Approved Budget and amounts owed to the U.S. Trustee.

"**Budgeted Liquidity**" shall mean as of any date of determination, as the context requires, for the Debtors, the amount set forth as of such date as Liquidity, in each case as determined by reference to the Approved Budget as then in effect.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks are required or authorized to close in Chicago, Illinois, or New York, New York.

"**Cancelled Eligible Prepetition 1L Claims**" as defined in Section 2.1(b)(i).

"**Capital Adequacy Regulation**" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"**Capital Lease**" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, any Property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP (subject to Section 1.3(d)).

"**Capital Lease Obligations**" means, at any time, with respect to any Capital Lease, any lease entered into as part of any sale leaseback transaction of any Person or any synthetic lease, the amount of all obligations of such Person that is (or that would be, if such synthetic lease or other lease were accounted for as a Capital Lease) capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"**Carve-Out**" as defined in the Orders.

"**Cash Collateral**" as defined in the Orders.

"**Cash Equivalents**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that

6

(i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"**Cash Management Order**" means an order of the Bankruptcy Court approving the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records, and (D) Continue Intercompany Transactions and (II) Granting Related Relief in the Chapter 11 Cases.

"**Change of Control**" means (a) Holdings shall at any time cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Stock of the Borrower, (b) prior to the occurrence of the first public offering by Holdings (or by its direct or indirect parent company) of Stock in Holdings (or in its direct or indirect parent company, as the case may be) after the Closing Date pursuant to a registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act (a "**Qualified Initial Public Offering**"), Sponsors and their Controlled Investment Affiliates shall fail to own, directly or indirectly, at least a majority of the voting interests in Holdings' Stock, (c) after the occurrence of a Qualified Initial Public Offering, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Sponsors and their Controlled Investment Affiliates is or shall at any time become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of the greater of (I) 35% or more on a fully diluted basis of the voting interests in Holdings' Stock and (II) the percentage (measured on a fully diluted basis) of the voting interests in Holdings' Stock then owned, directly or indirectly, by Sponsors and their Controlled Investment Affiliates, or (d) a "change of control" however so defined in any document governing any Indebtedness referred to in Section 8.1(e) or, in each case, any term of similar effect, shall occur; provided that, in the case of clause (b) or clause (c) above, no Change of Control shall have occurred so long as Sponsors and their Controlled Investment Affiliates have, at such time, the right or the ability by voting power, contract, or otherwise to elect or designate for election at least a majority of the board of directors (or analogous governing body) of Holdings.

"**Chapter 11 Cases**" as defined in the recitals hereto.

"**Chapter 11 Plan**" means a plan of reorganization with respect to one or more of the Debtors in the Chapter 11 Cases.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders have a Loan or Commitment with respect to a particular "class" (as described in clause (b) or (c) of this definition) of Loans or Commitments, (b) when used with respect to Commitments, refers to whether such Commitments are Term Loan Commitments, Interim Initial New Money Term Loan Commitments, Final Initial New Money Term Loan Commitments, Initial New Money Term Loan Commitments, Delayed Draw New Money Term Loan Commitments and/or New Money Term Loan Commitments, as applicable, and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Term Loans, Interim Initial New Money Term Loans, Final Initial New Money Term Loans, Initial New Money Term Loans, Delayed Draw New Money Term Loans, New Money Term Loans, Roll-Up FLFO Loans, Roll-Up FLSO Loans and/or Roll-Up Loans, as applicable, in each case, under this

7

Agreement as originally in effect or amended pursuant to <u>Section 10.1</u>, of which such Loans, Borrowing or Commitments shall be a part.  Commitments (and in each case, the Loans made pursuant to such Commitments) that have different terms and conditions shall be construed to be in different Classes.

"**Closing Date**" means January 14, 2026.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations, which, for the avoidance of doubt, shall exclude all Excluded Property.

"**Collateral and Guarantee Requirement**" means, at any time, subject to the applicable limitations set forth in this Agreement and the other Loan Documents, the requirements that:

        (a)      the Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to <u>Section 3.1</u> and (ii) at such time as may be designated therein, pursuant to the Collateral Documents or <u>Section 5.13</u>, subject, in each case, to the limitations and exceptions of this Agreement, duly executed by each Credit Party party thereto;

        (b)      all Obligations shall have been guaranteed by each Debtor, each Subsidiary that is a wholly owned Subsidiary of another Credit Party (other than any Excluded Subsidiary), including those that are listed on <u>Schedule 1.1</u> hereto; and

        (c)      the Obligations shall have been secured by a perfected security interest in the Collateral with the priority required by the Orders (subject in all respects to the Carve-Out) through the provisions of the Orders, to the extent such security interest may be perfected by virtue of the Orders or by filings of UCC financing statements;

*provided*, *however*, that notwithstanding anything in this Agreement or the Collateral Documents to the contrary, (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation or perfection of pledges of, security interests in, mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Property, (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents and (iii) no actions to perfect by "control" (as defined in the UCC) shall be required with respect to Collateral requiring perfection through control agreements or perfection by "control" (as defined in the UCC) (including deposit accounts or other bank accounts or securities accounts), (iv) no Credit Party shall be required to cause annotations to be made on certificates of title and (v) no Credit Party shall be required to make any filings or take any other actions of record or perfect the Agent's Lien on and security interest in the Collateral other than UCC-1 financing statements in the applicable jurisdiction of organization of such Credit Party.

"**Collateral Documents**" means, collectively, the Security Agreement, the Orders and all other security agreements, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, any of their respective Subsidiaries, and any Lender or the Agent for the benefit of the Agent, the Lenders and the other Secured Parties now or hereafter delivered to the Lenders or the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or

8

hereafter filed in accordance with the UCC or comparable law) against any Credit Party or its Subsidiaries as debtor in favor of any Lender or the Agent for the benefit of the Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Commitment**" means, for each Lender, its Term Loan Commitment, Interim Initial New Money Term Loan Commitment, Final Initial New Money Term Loan Commitment, Initial New Money Term Loan Commitment, Delayed Draw New Money Term Loan Commitment and/or New Money Term Loan Commitment, as the context may require.

"**Commitment Percentage**" means, as to any Lender, the percentage equivalent of such Lender's Commitment in respect of any Class of Loans, as applicable, divided by the Aggregate Commitment in respect of the applicable Class of Loans, as applicable; *provided* that after any Class of Term Loan has been funded, Commitment Percentages shall be determined for such Class of Term Loan by reference to the outstanding principal balance thereof as of any date of determination rather than the Commitments therefor; *provided*, *further*, that following acceleration of the Loans, such term means, as to any Lender, the percentage equivalent of the principal amount of the Loans held by such Lender, divided by the aggregate principal amount of the Loans held by all Lenders.

"**Committed Loan Notice**" means a notice of a Borrowing with respect to a given Class of Loans pursuant to Section 2.5, which shall be substantially in the form of Exhibit 1.1(b), or such other form as may be approved by the Agent and the Borrower, appropriately completed and signed by a Responsible Officer of the Borrower.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Company**" as defined in the recitals hereto.

"**Competitor**" means any Person that is an operating company directly engaged in substantially similar business operations as the Company.

"**Compliance Certificate**" as defined in Section 5.2(b).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"**Contractual Obligations**" means, as to any Person, any provision of any security (whether in the nature of Stock, or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Loan Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"**Controlled Investment Affiliate**" means, with respect to any Sponsor, any other investment fund or similar Person that (i) is organized for the purpose of making equity investments in one or more companies and (ii) is controlled by, or is under common control with, such Sponsor. For purposes of this definition "control" means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

"**Copyrights**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether

9

or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"**Credit Parties**" means the Company, Holdings, Newco Holdings, the Borrower and each other Guarantor.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtor(s)**" as defined in the recitals hereto.

"**Declined Prepayment Amount**" as defined in Section 2.8(d)(ii).

"**Declining Lender**" as defined in Section 2.8(d)(ii).

"**Default**" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"**Definitive Document**" as defined in the Restructuring Support Agreement.

"**Delayed Draw New Money Term Loan Commitment**" means, with respect to the Fronting Lender, the commitment of the Fronting Lender to make the Delayed Draw New Money Term Loans in an aggregate amount not to exceed the amount set forth opposite such Fronting Lender's name on Schedule 2.1(a) under the heading "Delayed Draw New Money Term Loan Commitment". The aggregate amount of the Fronting Lender's Delayed Draw New Money Term Loan Commitments as of the Closing Date is $25,000,000. Once funded (even if such funding is less than the available amount of Delayed Draw New Money Term Loan Commitments) or upon the occurrence of the Delayed Draw New Money Term Loans Funding Outside Date, whichever is earlier, the Delayed Draw New Money Term Loan Commitments on the Delayed Draw New Money Term Loans Funding Date shall be reduced to zero and terminated.

"**Delayed Draw**" as defined in Section 2.1(c)(i).

"**Delayed Draw New Money Commitment Fee**" as defined in Section 2.9(b)(ii).

"**Delayed Draw New Money Term Loans**" as defined in the recitals hereto.

"**Delayed Draw New Money Term Loans Funding Date**" as defined in Section 2.1(c)(i).

"**Delayed Draw New Money Term Loans Funding Outside Date**" means the date that is the earlier of (i) five (5) Business Days prior to the Effective Date (as defined in the Restructuring Support Agreement) and (ii) six (6) months following the Closing Date, unless extended with the prior written consent of the Fronting Lender, the Borrower and the Required Lenders.

"**Delayed Draw New Money Term Loans Syndication**" as defined in Section 2.1(c)(ii).

"**DIP Facility**" as defined in the recitals hereto.

"**DIP Term Loan Claims**" means any Claim that arises under the Loan Documents.

10

"**Direction of the Required Lenders**" means a written direction or instruction from Lenders constituting the Required Lenders which may be in the form of an email or other form of written communication, which may come from legal counsel to such Lenders (which shall initially be Gibson, Dunn & Crutcher LLP (other than, to the extent applicable, the Fronting Lender)), which shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders and shall be conclusively presumed to represent the written direction or instruction from the Required Lenders (and the Agent shall be entitled to rely on such presumption).  For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Lenders may be communicated by a Direction of the Required Lenders as contemplated above and any reference to the Agent taking an action or omitting to take an action with the "consent" or at the "direction" or "instruction" of the Required Lenders (or any expressions of similar import) shall be interpreted to include a Direction of the Required Lenders.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any written direction or instruction from the Required Lenders that is purported to be a Direction of the Required Lenders, and the Agent shall not have any responsibility to independently determine whether such direction has in fact been authorized by Required Lenders.

"**Direction of the Super Majority Lenders**" means a written direction or instruction from Lenders constituting the Super Majority Lenders which may be in the form of an email or other form of written communication, which may come from legal counsel to such Lenders (which shall initially be Gibson, Dunn & Crutcher LLP (other than, to the extent applicable, the Fronting Lender)), which shall be conclusively presumed to have been authorized by a written direction or instruction from the Super Majority Lenders and shall be conclusively presumed to represent the written direction or instruction from the Super Majority Lenders (and the Agent shall be entitled to rely on such presumption).  For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Super Majority Lenders such determination may be communicated by a Direction of the Super Majority Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Super Majority Lenders may be communicated by a Direction of the Super Majority Lenders as contemplated above and any reference to the Agent taking an action or omitting to take an action with the "consent" or at the "direction" or "instruction" of the Super Majority Lenders (or any expressions of similar import) shall be interpreted to include a Direction of the Super Majority Lenders.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any written direction or instruction from the Super Majority Lenders that is purported to be a Direction of the Super Majority Lenders, and the Agent shall not have any responsibility to independently determine whether such direction has in fact been authorized by Super Majority Lenders.

"**Disbursement Variance Testing Period**" as defined in Section 5.24(c)(i).

"**Disclosure Statement**" means the disclosure statement in respect of the Chapter 11 Plan, including all exhibits and schedules thereto, each as may be amended, supplemented, or modified from time to time.

"**Disposition**" means (a) the sale, lease, conveyance or other disposition of Property and (b) the sale or transfer of any Stock held by a Credit Party of any of its Subsidiaries.

11

"**Disqualified Stock**" means any Stock which, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days following the Latest Maturity Date (excluding any provisions requiring redemption upon a "change of control" or similar event; *provided* that such "change of control" or similar event results in the occurrence of the Termination Date), (b) is convertible into or exchangeable for (i) debt securities or (ii) any Stock referred to in clause (a) above, in each case, at any time on or prior to the date that is ninety-one (91) days following the Latest Maturity Date at the time such Stock was issued or (c) is entitled to receive scheduled dividends or distributions in cash prior to the date that is ninety-one (91) days following the Latest Maturity Date.

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

"**Earnout**" means any unsecured liabilities of the Company or any of its Subsidiaries arising under an agreement to make any deferred payment as a part of the purchase consideration for an Acquisition, regardless of whether such amount is fixed or is subject to or contingent upon the revenues, income, cash flow or profits (or the like) of the Person or business unit or asset group acquired; *provided* that, such unsecured liabilities shall not constitute an "Earnout" for any purpose under the Loan Documents to the extent the deferred payment amounts are supported by equivalent amounts on deposit in an escrow account (and for the avoidance of doubt the portions thereof that are not so supported shall constitute an "Earnout").

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System.

"**Eligible Prepetition First Lien Claims**" means, collectively, the Eligible Prepetition FLFO Claims and the Eligible Prepetition FLSO Claims.

"**Eligible Prepetition FLFO Claims**" means the Prepetition FLFO Loans.

"**Eligible Prepetition FLSO Claims**" means the Prepetition FLSO Loans.

12

"**Environmental Laws**" means all Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies) that are imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Credit Party, any Subsidiary of a Credit Party, and any Person under common control or treated as a single employer with, any Credit Party or any Subsidiary of a Credit Party, within the meaning of Section 414(b) or (c) of the Code, and solely with respect to Section 412 of the Code (and other provisions of the Code significantly related thereto (e.g., Sections 430 through 436 of the Code), under Section 414(m) or (o) of the Code.

"**ERISA Event**" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the thirty (30)-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 430 of the Code or Section 302 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the written determination of the IRS that a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law failed to qualify thereunder; and (j) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"**Erroneous Payment**" as defined in Section 9.14(a).

"**Erroneous Payment Recipient**" as defined in Section 9.14(a).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

13

"**Event of Default**" as defined in Section 8.1.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Domestic Subsidiary**" means any Domestic Subsidiary that is (a) a direct or indirect Subsidiary of an Excluded Foreign Subsidiary or (b) an Excluded Foreign Holdco, in each case, to the extent such Excluded Domestic Subsidiary being a Guarantor would have a material adverse tax effect on the Borrower, the Company and the other Guarantors taken as a whole, in each case, as mutually and reasonably agreed by the Company and the Agent (acting at the Direction of the Required Lenders); *provided* that, notwithstanding anything herein or the other Loan Documents to the contrary, no Credit Party may be designated or otherwise become an Excluded Domestic Subsidiary on or after the Closing Date.  For the avoidance of doubt, as of the Closing Date, none of the Credit Parties or any of their Subsidiaries is an Excluded Domestic Subsidiary.

"**Excluded Equity**" means (x) the Stock of a Subsidiary to the extent prohibited by applicable law, rule or regulation, after giving effect to the applicable anti-assignment provisions of the UCC and (y) any Stock of any Excluded Subsidiary of the type set forth in clauses (e) or (f) of the definition of "Excluded Subsidiary".  For the purposes of this definition, "voting stock" means, with respect to any issuer, the issued and outstanding shares of each class of Stock of such issuer entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)).

"**Excluded Foreign Holdco**" means a Subsidiary substantially all of the assets of which consist of Stock or Stock and Indebtedness of one or more Foreign Subsidiaries that is a controlled foreign corporation (as defined in Section 957 of the Code) or Excluded Foreign Holdcos; *provided* that, notwithstanding anything herein or the other Loan Documents to the contrary, no Credit Party may be designated or otherwise become an Excluded Foreign Holdco on or after the Closing Date.  For the avoidance of doubt, as of the Closing Date, none of the Credit Parties or any of their Subsidiaries is an Excluded Foreign Holdco.

"**Excluded Foreign Subsidiary**" means a Foreign Subsidiary which is (a) a controlled foreign corporation (as defined in Section 957 of the Code), (b) an Excluded Foreign Holdco or (c) a Foreign Subsidiary owned by a Foreign Subsidiary described in clause (a) or an Excluded Foreign Holdco described in clause (b), in each case, to the extent such Foreign Subsidiary being a Guarantor would have a material adverse tax effect on the Borrower, the Company and the other Guarantors taken as a whole, in each case, as mutually and reasonably agreed by the Company and the Agent (acting at the Direction of the Required Lenders); *provided* that, notwithstanding anything herein or the other Loan Documents to the contrary, no Credit Party may be designated or otherwise become an Excluded Foreign Subsidiary on or after the Closing Date.  For the avoidance of doubt, none of the Credit Parties or any of their Subsidiaries is an Excluded Foreign Subsidiary.

"**Excluded Prepayment Amount**" as defined in Section 2.8(f).

"**Excluded Property**" means, after giving effect to the Orders, collectively, (i) Excluded Equity, (ii) any permit, contract, lease, franchise, license, general intangible or any Contractual Obligation entered into by any Credit Party to the extent that any Requirement of Law applicable thereto prohibits the creation

14

of a Lien thereon, to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other Requirement of Law (after giving effect to the applicable anti-assignment provisions of the UCC) and other than proceeds and receivables thereof, (iii) any assets if the taking of any action to create such security interest would result in materially adverse tax consequences (as agreed in writing by Agent (acting at the Direction of the Required Lenders) and the Borrower in a reasonable manner), (iv) Property owned by any Credit Party on the date hereof that is subject to a purchase money Lien or a Capital Lease permitted under this Agreement if the Contractual Obligation pursuant to which such Lien is granted (or in the document providing for such purchase money Lien or Capital Lease, as in effect on the date hereof), as in effect on the date hereof, prohibits the creation of any other Lien on such Property or requires the consent of any Person other than a Borrower and its Affiliates which has not been obtained as a condition to the creation of any other Lien on such equipment, other than proceeds and receivables thereof; provided that the Credit Parties agree that they shall use commercially reasonable efforts to remove any such prohibition and/or obtain such consent, (v) any "intent to use" Trademark applications for which a statement of use has not been filed with and accepted by (but only until such statement is filed with and accepted by) the U.S. Patent and Trademark Office and (vi) any assets with respect to which Agent (acting at the Direction of the Required Lenders) and the Borrower have mutually and reasonably agreed in writing that the cost of obtaining security interests in such assets is excessive in relation to the benefit afforded thereby to Agent and the other Secured Parties; *provided* that, notwithstanding the foregoing, a security interest shall be, and is hereby, granted in any property described above immediately upon such property ceasing to be Excluded Property; *provided*, *further* that, notwithstanding anything to contrary, any economic value and any proceeds, dividends, distributions and other income, economic interest and economic value, products, substitutions and replacements of Excluded Property shall be Collateral (and not Excluded Property) unless they expressly fall into one of the categories of Excluded Property set forth above.

"**Excluded Rate Contract Obligation**" means, with respect to any Guarantor, any guarantee of any Swap Obligations under a Secured Rate Contract if, and only to the extent that and for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under a Secured Rate Contract (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract.  If a Swap Obligation under a Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Secured Rate Contract that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Subsidiary**" means (a) an Excluded Domestic Subsidiary, (b) each Excluded Foreign Subsidiary, (c) any Subsidiary to the extent a guarantee of the Obligations by such Subsidiary is (i) legally prohibited or requires governmental consent, approval, license or authorization or (ii) contractually prohibited on the Closing Date or the date of Acquisition thereof, so long as, in either case, such prohibition is not created in contemplation of such transaction, and unless such consent, approval, license or authorization has been received (but only for so long as such prohibition or restriction exists), (d) subject to Section 9.10, any Subsidiary that ceases to be a Wholly-Owned Subsidiary after the Closing Date, (e) any captive insurance Subsidiary, (f) any not-for-profit Subsidiary, (g) STG Logistics S. de R.L. de C.V., (h) Stacktrain Mexico S. de R.L. de C.V., and (i) any other Subsidiary with respect to which, in the reasonable judgment of the Agent (acting at the Direction of the Required Lenders, acting reasonably) and the Borrower, the cost or other consequences (including any adverse tax consequences) of providing a

15

guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom; *provided* that, notwithstanding anything herein or the other Loan Documents to the contrary, no Credit Party may be designated or otherwise become an Excluded Domestic Subsidiary on or after the Closing Date.  For the avoidance of doubt, as of the Closing Date, other than the Subsidiaries described in clauses (e), (g) and (h), none of the Credit Parties or any of their Subsidiaries is an Excluded Subsidiary.

"**Excluded Tax**" means with respect to any Secured Party: (a) Taxes measured by net income (however denominated), branch profit Taxes and franchise Taxes imposed in lieu of net income Taxes, in each case (i) imposed on any Secured Party as a result of being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) withholding Taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a Secured Party under this Agreement in the capacity under which such Person makes a claim under Section 11.1(b) or designates a new Lending Office, except in each case to the extent (i) such Person is a direct or indirect assignee (other than pursuant to Section 10.20) of any other Secured Party that was entitled, immediately before the assignment to such Person became effective, to receive additional amounts under Section 11.1(b) or (ii) such Person was entitled to receive additional amounts under Section 11.1(b) immediately before such Person designated a new Lending Office; (c) Taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by any Secured Party to deliver the documentation required to be delivered pursuant to Section 11.1(g) or (h); and (d) any withholding Taxes imposed under FATCA.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**E-Signature**" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"**E-System**" means any electronic system approved by the Agent, including Syndtrak®, Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**FATCA**" means Sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**FCPA**" as defined in Section 4.24(c).

"**Federal Flood Insurance**" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System of the United States.

16

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"**Final Draw**" as defined in Section 2.1(a)(i).

"**Final Draw Funding Date**" as defined in Section 2.1(a)(i).

"**Final Initial New Money Term Loan Commitment**" means, with respect to the Fronting Lender, the commitment of the Fronting Lender to make the Final Initial New Money Term Loans in an aggregate amount not to exceed the amount set forth opposite such Fronting Lender's name on Schedule 2.1(a) under the heading "Final Initial New Money Term Loan Commitment". The aggregate amount of the Fronting Lender's Final Initial New Money Term Loan Commitments as of the Closing Date is $40,000,000. Once funded, the Final Initial New Money Term Loan Commitments shall be reduced to zero and terminated.

"**Final Initial New Money Term Loan Syndication**" as defined in Section 2.1(a)(iii).

"**Final Initial New Money Term Loans**" as defined in Section 2.1(a)(i).

"**Final Order**" as defined in the Restructuring Support Agreement.

"**Final Roll-Up Loan Syndication**" as defined in Section 2.1(b)(ii).

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

"**First Day Orders**" means the orders entered by the Bankruptcy Court in respect of first day motions and applications in respect of the Chapter 11 Cases.

"**First Day Pleadings**" means the first-day motions and related pleadings that the Debtors determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Fiscal Quarter**" means any of the quarterly accounting periods of Holdings and its Subsidiaries ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of Holdings and its Subsidiaries ending on December 31 of each year.

"**Fitch**" means Fitch Ratings, Inc.

"**Flood Insurance**" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance reasonably satisfactory to the Agent (acting at the Direction of the Required Lenders, acting reasonably), in either case, that (a) meets the requirements of FEMA and any other applicable federal agencies, (b) includes a deductible not to exceed $50,000 and (c) has a coverage amount equal to the lesser of (i) the insurable value of the buildings and any personal property Collateral located on the Real Estate as determined by the Agent (acting at the Direction of the Required Lenders) and (ii) the maximum policy limits set under the National Flood Insurance Program.

"**Flood Insurance Requirements**" means, with respect to any Real Estate constituting Collateral, the Agent shall have received: (i) evidence as to whether the applicable Real Estate is located in a Special Flood Hazard Area pursuant to a standard flood hazard determination form received by the Agent, and (ii) if such Real Estate is located in a Special Flood Hazard Area, (A) evidence as to whether the community

17

in which such Real Estate is located is participating in the National Flood Insurance Program, (B) the applicable Credit Party's written acknowledgment of receipt of written notification as to the fact that such Real Estate is located in a Special Flood Hazard Area and as to whether the community in which such Real Estate is located is participating in the National Flood Insurance Program and (C) copies of the applicable Credit Party's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Agent (acting at the Direction of the Required Lenders) and naming Agent as sole loss payee on behalf of the Secured Parties.

"**Forecasted Liquidity**" means the forecasted Liquidity for the Projection Period set forth in the Approved Business Plan.

"**Foreign Subsidiary**" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"**Fraudulent Transfer Laws**" as defined in Section 12.2.

"**Fronting Fee Letter**" means that certain letter agreement, dated as of the Closing Date, between the Borrower and the Fronting Lender, as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"**Fronting Lender**" means Jefferies Capital Services, LLC.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination. Subject to Section 1.3, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Section 5.1(a).

"**Governmental Authority**" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Guaranteed Obligations**" as defined in Section 12.1.

"**Guarantor**" means any Person that guarantees any Obligations, including any Person that is a party hereto as a "Guarantor".

"**Guaranty**" as defined in Section 12.1.

"**Security Agreement**" means that certain Security Agreement made by the Credit Parties in favor of the Agent, for the benefit of the Secured Parties entered into in accordance with Section 5.16.

"**Hazardous Material**" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or

18

by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"**Holdings**" as defined in the recitals hereto.

"**Indebtedness**" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (not including (x) any working capital adjustments payable in connection with any Acquisition or (y) Earnouts unless and until due and payable (and not yet paid)) (other than trade payables entered into in the ordinary course of business); (c) the face amount of all letters of credit issued for the account of such Person (or for which such Person is liable) and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person (or for which such Person is liable); (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations of such Person, whether or not contingent, in respect of Disqualified Stock or preferred Stock of a direct or indirect Subsidiary of a Credit Party, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; (j) all direct or indirect liability, contingent or otherwise, of that Person with respect to any other Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (k) all direct or indirect liability, contingent or otherwise, of that Person under any Rate Contracts; (l) all direct or indirect liability, contingent or otherwise, of that Person to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (m) all direct or indirect liability, contingent or otherwise, of that Person for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Indebtedness under the foregoing clauses (j) through (m) shall be equal to the amount of the obligation so guarantied or otherwise supported or, if not a fixed and determined amount, the maximum amount so guarantied or supported.  "Indebtedness" shall not include (i) trade payables arising in the ordinary course of business, (ii) obligations or liabilities of any Person in respect of any of its Stock (except as provided by clause (h) above) nor the obligations of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the Closing Date (whether or not such lease exists on the Closing Date or hereafter arises), (iii) customary obligations under employment agreements and deferred compensation, (iv) deferred tax liabilities, (v) post-closing purchase price adjustments and any sums for which such Person is obligated pursuant to noncompetition, consulting or similar arrangements entered into in connection with

19

any Acquisition (except as provided by clause (d) above), (vi) royalty payments made in the ordinary course of business in respect of exclusive and non-exclusive licenses, (vii) any accruals for (A) payroll and (B) other non-interest bearing (or accreting) liabilities (which have been or will be expensed) accrued in the ordinary course of business, (viii) employee commitments, (ix) accrued licensing fees incurred in the ordinary course of business and owed under licenses (including intellectual property licenses) and (x) deferred rent obligations in respect of real property leases incurred in the ordinary course of business.

"**Indemnified Matter**" as defined in Section 10.6.

"**Indemnified Tax**" means (a) any Tax other than an Excluded Tax imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" as defined in Section 10.6.

"**Independent Debt Fund Affiliate**" means an Affiliate of any Sponsor (other than Holdings, any of its Subsidiaries or a natural Person) that is a Bona Fide Debt Fund and with respect to which none of the Borrower, any Sponsor or any of their Affiliates that is not a Bona Fide Debt Fund makes investment decisions or has the power, directly or indirectly, to cause the direction of such Affiliate's investment decisions.

"**Initial Budget**" means the budget attached as Exhibit 1.1(e) hereto, which shall constitute the initial Approved Budget.

"**Initial New Money Commitment Fee**" as defined in Section 2.9(b)(i).

"**Initial New Money Term Loan Commitments**" means, collectively, the Interim Initial New Money Term Loan Commitments and the Final Initial New Money Term Loan Commitments.

"**Initial New Money Term Loans**" as defined in the recitals hereto.

"**Initial Variance Testing Period End Date**" as defined in Section 5.24(c).

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in clauses (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"**Intellectual Property**" means all rights, title and interests in or relating to (a) intellectual property and industrial property arising under any Requirement of Law, including all Copyrights, Patents, Software, Trademarks, Internet Domain Names, Trade Secrets, (b) all IP Ancillary Rights relating thereto and (c) IP Licenses.

"**Interest Payment Date**" means, with respect to any Loan, each of (i) the last day of each calendar month and (ii) the Maturity Date; *provided* that, any Interest Payment Date of the type described in clause (i) is not a Business Day, the Interest Payment Date shall be the next succeeding Business Day (unless, for the avoidance of doubt, such date would be after the Maturity Date).

20

"**Internet Domain Name**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"**Interim Draw**" as defined in Section 2.1(a)(i).

"**Interim Draw Funding Date**" as defined in Section 2.1(a)(i).

"**Interim Initial New Money Term Loan Commitment**" means, with respect to the Fronting Lender, the commitment of the Fronting Lender to make the Interim Initial New Money Term Loans in an aggregate amount not to exceed the amount set forth opposite such Fronting Lender's name on Schedule 2.1(a) under the heading "Interim Initial New Money Term Loan Commitment". The aggregate amount of the Fronting Lender's Interim Initial New Money Term Loan Commitments as of the Closing Date is $85,000,000. Once funded, the Interim Initial New Money Term Loan Commitments shall be reduced to zero and terminated.

"**Interim Initial New Money Term Loan Syndication**" as defined in Section 2.1(a)(ii).

"**Interim Initial New Money Term Loans**" as defined in Section 2.1(a)(i).

"**Interim DIP Order**" as defined in the Restructuring Support Agreement.

"**Interim Roll-Up Loan Syndication**" as defined in Section 2.1(b)(i).

"**Inventory**" means all "inventory" (as such term is defined in the UCC) of the Company and its Subsidiaries.

"**Investment**" as defined in Section 6.4.

"**IP Ancillary Rights**" means, with respect to any Intellectual Property (of the type described in clauses (a) and (c) of the definition of "Intellectual Property"), as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"**IP License**" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property of the type described in clause (a) of the definition of "Intellectual Property".

"**IRS**" means the Internal Revenue Service of the United States and any successor thereto.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to the latest to mature of any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Term Loan.

"**Lender**" as defined in the preamble hereto.

21

"**Lender Advisors**" means (i) Gibson, Dunn & Crutcher LLP, as legal counsel; (ii) Gibbons, P.C., as legal counsel; (iii) Evercore Group L.L.C., as financial advisor; (iv) the Operational Consultant; and (v) any other professionals or advisors retained by the Ad Hoc Group in connection with the Restructuring Transactions.

"**Lending Office**" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify the Borrower and the Agent.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**Liability Management Transaction**" means (a) any restructuring, reorganization, rescheduling, recapitalization, reduction, cancellation, termination, elimination, refinancing, retirement, exchange, repurchase or defeasance of any existing Indebtedness of any Credit Party or any Subsidiary with any other Indebtedness or preferred Stock (or the proceeds of any other Indebtedness or preferred Stock) that is contractually, structurally or temporally senior (including as to right of payment, Lien priority or additional collateral) to any of the Loans in any manner (including, for the avoidance of doubt, through any incurrence of Indebtedness or issuance of preferred Stock by any Subsidiary or an Affiliate that is not a Credit Party, whether or not such Person owns any assets or property), (b) any transaction or series of transactions that would have the effect of reducing the value of any of the Collateral in any material respect or disadvantaging any of the Lenders in respect of their rights as creditors relative to other creditors or holders of Stock or Stock equivalents in any material respect and (c) any other transaction that has an effect consistent with any of the foregoing.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, collateral assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"**Liquidity**" means, as of any date, an amount equal to the aggregate amount of cash and Cash Equivalents of the Debtors as of such date, but excluding any such cash and Cash Equivalents that would be listed as "restricted" on a balance sheet of the Debtors as of such date (other than amounts restricted solely in favor of the Prepetition First Lien Agent or subject to a Permitted Prior Lien).

"**Loan**" means any loan made or deemed made by any Lender hereunder.

"**Loan Documents**" means this Agreement, the Notes, the Agent Fee Letter, the Fronting Fee Letter, the Orders, the Collateral Documents and all documents or agreements executed and delivered to the Agent and/or any Lender in connection with any of the foregoing to evidence or secure the Obligations or otherwise agreed in writing by the Borrower and the Agent (acting at the Direction of the Required Lenders) to be a Loan Document.

"**Loan Transactions**" means the (i) execution, delivery and performance of the Credit Parties of the Loan Documents to which they are a party and the making of the Term Loans hereunder and (ii) all fees, costs and expenses in connection with the foregoing.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Master Consent to Assignment**" means that certain master consent to assignment, dated as of the Closing Date, among the Borrower, the Agent and the Fronting Lender, as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"**Material Adverse Effect**" means, since the Petition Date, any event, circumstance or condition that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on (i) the business, assets, properties, contingent liabilities, financial condition or results of operations of the Debtors, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases or the existence of the Chapter 11 Cases, (ii) the ability of the Debtors to perform their obligations under the Loan Documents, (iii) the validity or enforceability against the Debtors of the Loan Documents and Restructuring Support Agreement or (iv) the material rights and remedies of the Lenders under the Loan Documents.

"**Material Environmental Liabilities**" means Environmental Liabilities exceeding $5,500,000 in the aggregate (to the extent not covered by indemnification obligations in favor of any Credit Party or any Subsidiary).

"**Material Property**" means any Property (including Intellectual Property) owned by any Credit Party or its Subsidiaries that is material to the business, operations, financial condition or prospects of the Credit Parties and their Subsidiaries, taken as a whole, both prior to and pro forma for any applicable transfer or disposition.

"**Maturity Date**" means the earliest to occur of: (a) July 13, 2026 (as such date may be extended with the prior written consent of the Required Lenders), (b) the date of consummation of a sale of all or substantially all of the Debtors' assets, (c) the effective date of a Chapter 11 Plan and (d) the date the Loans become due and payable in full hereunder, whether by acceleration or otherwise.

"**Maximum Lawful Rate**" as defined in Section 2.3(d).

"**Milestones**" as defined in Section 5.23.

"**MNPI**" as defined in Section 10.10(a).

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or Liabilities.

"**National Flood Insurance Program**" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that, among other things, mandates the purchase of flood insurance to cover real property improvements and contents located in Special Flood Hazard Areas in

23

participating communities and may provide protection to property owners through a federal insurance program.

"**Net Issuance Proceeds**" means, in respect of any issuance of equity (other than common equity) incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of the Borrower.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to the Borrower or any Affiliate of the Borrower, (ii) sales, use or other transaction Taxes paid or payable as a result thereof (including a reasonable reserve for income taxes payable as a result of such Disposition and Tax Distributions), (iii) amounts required to be applied to pay principal, interest and prepayment premiums and penalties on Indebtedness (other than the Obligations) secured by a Lien on the asset which is the subject of such Disposition and (iv) any cash held in escrow or reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser, purchase price adjustments or other contingent or deferred liabilities in respect of the applicable Disposition undertaken by the Company, Holdings, Newco Holdings, the Borrower or any of their respective Subsidiaries or other liabilities in connection with such Disposition (*provided* that upon release of any such escrow or reserve, the amount released shall be considered Net Proceeds) and (b) in the event of an Event of Loss, (i) all money actually applied to repair, reconstruct, refurnish or replace the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, (iii) Taxes paid or payable as a result thereof, (iv) amounts required to be applied to pay principal, interest and prepayment premiums and penalties on Indebtedness (other than the Obligations) secured by a Lien on the asset which is the subject of such Event of Loss senior to any Lien on such asset securing the Obligations and (v) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.  After netting out items in clauses (a) and (b) of the foregoing definition, if the amount of Net Proceeds would be less than zero, such amount shall be deemed to equal zero.

"**Newco Holdings**" as defined in the recitals hereto.

"**New Money Commitment Fee**" as defined in Section 2.9(b)(ii).

"**New Money Term Loan Commitments**" means, collectively, the Initial New Money Term Loans Commitments and the Delayed Draw New Money Term Loan Commitments.

"**New Money Term Loans**" as defined in the recitals hereto.

"**Non-Bank Tax Certificate**" as defined in Section 11.1(g)(i).

"**Non-U.S. Lender Party**" means each of the Agent (if applicable), each Lender, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Note**" means any Term Note and "**Notes**" means all such Notes.

24

"**Obligations**" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, interest (including post-petition interest, whether or not allowed or applicable in any Insolvency Proceeding or under any Debtor Relief Law), fees, premiums (whether or not allowed or applicable in any Insolvency Proceeding or under any Debtor Relief Law), covenants and duties owing by any Credit Party to any Lender, the Agent, any Secured Swap Provider or any Person required to be indemnified, that arises under any Loan Document or any Secured Rate Contract or similar agreement, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not allowed or applicable in any Insolvency Proceeding or under any Debtor Relief Law, including for the avoidance of doubt, the Guaranteed Obligations; *provided*, that Obligations of any Guarantor shall not include any Excluded Rate Contract Obligations solely of such Guarantor.

"**OFAC**" as defined in Section 4.24(a).

"**Operational Consultant**" means Alvarez and Marsal Holdings, LLC.

"**Orders**" means the Interim Order and the Final Order.

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) for any other entity, any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of such entity.

"**Other Connection Taxes**" means, with respect to any Secured Party, Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Tax, other than any such connection arising from the Secured Party having executed, delivered, become a party to, performed its obligations or received a payment under, received or perfected as a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document or sold or assigned an interest in any Loan or Loan Document.

"**Other Taxes**" as defined in Section 11.1(c).

"**Paid in Kind**" as used with respect to payment of any accrued interest on any Term Loan, or the payment of any fee or any other amount hereunder that is expressly specified as being required to or permitted to be Paid in Kind (or payable in kind, capitalized or similar) (the applicable interest, fee or other amount, the "**Reference Obligation**"), means that such Reference Obligation shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment), be deemed paid at 12:01 a.m. (New York City time) on the due date therefor, by deeming the equivalent Dollar amount of such Reference Obligation (calculated in accordance with Section 2.3, as applicable, and as otherwise provided in this Agreement) to be automatically capitalized as an equivalent principal amount of the Term Loans due in respect of (as determined in accordance with this Agreement), and, accordingly, such amount shall be compounded onto, and added to the aggregate principal amount of the Term Loans outstanding immediately prior to such payment, such that, immediately after giving effect to the payment of the applicable Reference Obligation

25

as described herein, the aggregate outstanding principal amount of the Term Loans shall include the amount of such Reference Obligation.  For the avoidance of doubt, without limiting the foregoing, (i) with respect to any Reference Obligation owing with respect to any Term Loans, once such Reference Obligation has been Paid in Kind in accordance with the foregoing, the amount of such Reference Obligation shall constitute, for all purposes hereunder, Term Loans incurred as of such time, which shall thereupon accrue interest in accordance with Section 2.3 and (ii) the aggregate principal amount of Term Loans outstanding as of any time shall be calculated to include (without duplication) (x) the original principal amount thereof, (y) the aggregate amount of PIK Interest through the time of determination, and (z) any other amounts previously Paid in Kind hereunder.

"**Participant Register**" as defined in Section 10.9(f).

"**Participating Lender**" as defined in Section 10.20.

"**Patents**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation or any successor thereto.

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Permitted Liens**" as defined in Section 6.1.

"**Permitted Prior Liens**" means any valid and unavoidable Liens that are (i) in existence on the Petition Date and (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code.

"**Permitted Variance**" means (a) in respect of aggregate Actual Disbursements (excluding, for the avoidance of doubt, Actual Restructuring Related Amounts), 15% of Budgeted Disbursements (excluding, for the avoidance of doubt, Budgeted Restructuring Related Amounts) for each Disbursement Variance Testing Period and (b) in respect of aggregate Actual Receipts, 20% of Budgeted Receipts for each Receipt Variance Testing Period; *provided* that for purposes of calculating any Permitted Variance, any payments received (or to budgeted to be received), from a customer previously disclosed to the Lender Advisors prior to the Closing Date shall be disregarded.

"**Person**" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"**Petition Date**" as defined in the recitals hereto.

"**PIK Interest**" means that the portion of the interest with respect to any Term Loans that is Paid in Kind by capitalizing and adding such amount of accrued interest to the principal balance of such Term Loans on the applicable Interest Payment Date.

"**Prepayment Notice**" as defined in Section 2.8(d)(ii).

26

"**Prepetition First Lien Agent**" as defined in the recitals hereto.

"**Prepetition First Lien Claims**" means any Claim of the Prepetition FLFO Lenders and Prepetition FLSO Lenders that arises under the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Credit Agreement**" as defined in the recitals hereto.

"**Prepetition First Lien Lenders**" as defined in the recitals hereto.

"**Prepetition FLFO Lenders**" as defined in the recitals hereto.

"**Prepetition FLFO Loans**" as defined in the recitals hereto.

"**Prepetition FLFO Obligations**" means the "Obligations" (as defined in the Prepetition First Lien Credit Agreement (as in effect on the Closing Date)) with respect to the Prepetition FLFO Loans.

"**Prepetition FLSO Lenders**" as defined in the recitals hereto.

"**Prepetition FLSO Loans**" as defined in the recitals hereto.

"**Prepetition FLSO Obligations**" means the "Obligations" (as defined in the Prepetition First Lien Credit Agreement (as in effect on the Closing Date)) with respect to the Prepetition FLSO Loans.

"**Projection Period**" means the period of time commencing on the Effective Date (as defined in the Restructuring Support Agreement) through December 31, 2026.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Public Lender**" as defined in Section 10.10(a)(i).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation under a Secured Rate Contract, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Initial Public Offering**" as defined in the definition of "Change of Control".

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheet of Holdings and each of its Subsidiaries as of the last day of the fiscal quarters ended March 31, 2025, June 30, 2025, and September 30, 2025, and the related unaudited consolidated statements of operations and cash flows of the Holdings and each of its Subsidiaries for each such fiscal quarter.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) designed to provide protection against fluctuations in interest or currency exchange rates and any other agreements or arrangements designed to provide such protection.

27

"**Real Estate**" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"**Receipt Variance Testing Period**" as defined in Section 5.24(c)(ii).

"**Reference Obligation**" as defined in the definition of "Paid in Kind".

"**Register**" as defined in Section 2.4(b).

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article III) and other consultants and agents of or to such Person or any of its Affiliates.

"**Releases**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"**Remedial Action**" means all actions by Environmental Law or a Governmental Authority required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"**Repatriation**"; "**Repatriate**" as defined in Section 2.8(f).

"**Replacement Lender**" as defined in Section 10.20.

"**Required Lenders**" means, at any time, collectively, (a) both (i) Lenders then holding more than 50% of the aggregate unpaid principal balance of the Term Loans held by all Lenders then outstanding and (ii) Backstop Parties then holding more than 50% of the aggregate unpaid principal balance of the Term Loans held by all Backstop Parties then outstanding, and (b) so long as any Obligations payable under the New Money Term Loans remain outstanding, both (i) Lenders then holding more than 50% of the aggregate unpaid principal balance of the New Money Term Loans held by all Lenders then outstanding and (ii) Backstop Parties then holding more than 50% of the aggregate unpaid principal balance of the New Money Term Loans held by all Backstop Parties then outstanding. For the avoidance of doubt, the Fronting Lender shall not, solely by virtue of holding record title pending assignment, be entitled to exercise any voting or consent rights under this Agreement; *provided* that the Fronting Lender shall retain voting rights (and be included in "Required Lenders") in respect of the Term Loans that it holds as a fronting lender (i) with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender or (ii) to the extent that the Fronting Lender holds any such Term Loans after fifteen (15) Business Days after the Closing Date or the Final Draw Funding Date, as applicable.

"**Requirement of Law**" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines (which have the effect of law), ordinances, orders, judgments, writs, injunctions, binding decrees (including administrative or judicial precedents or authorities) and the interpretation or administration

28

thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.  For the avoidance of doubt, when used with respect to any Person or such Person's property or assets, Requirement of Law shall mean only such Requirements of Law that are applicable to and binding upon such Person or such Person's property or assets.

"**Resolution Authority**" means (a) any EEA Resolution Authority or (b) any UK Resolution Authority.

"**Responsible Officer**" means the chief executive officer or the president the Borrower, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of the Borrower, as applicable, or any other officer having substantially the same authority and responsibility.

"**Restricted Debt Payments**" as defined in Section 6.12.

"**Restricted Payments**" as defined in Section 6.8.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of January 12, 2026 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) between the Company Parties and the Consenting Stakeholders (each as defined therein).

"**Restructuring Transactions**" means the transactions contemplated by the Restructuring Support Agreement.

"**Roll-Up Cap**" as defined in the recitals hereto.

"**Roll-Up FLFO Loans**" means, collectively, the Roll-Up Loans issued in connection the cancellation of Eligible Prepetition FLFO Claims in accordance with Section 2.1(b).

"**Roll-Up FLSO Loans**" means, collectively, the Roll-Up Loans issued in exchange in connection the cancellation of Eligible Prepetition FLSO Claims in accordance with Section 2.1(b).

"**Roll-Up Lender**" means each Lender who holds a Roll-Up Loan.

"**Roll-Up Loans**" as defined in the recitals hereto.

"**Roll-Up Loan Syndication**" as defined in Section 2.1(b)(ii).

"**Term Loans**" as defined in the recitals hereto.

"**Sale**" as defined in Section 10.9(b).

"**Sale of the Business**" means the "Sale" as defined in the Restructuring Term Sheet (as defined the Restructuring Support Agreement).

"**Sanctioned Country**" as defined in Section 4.24(a).

29

"**Sanctions**" as defined in Section 4.24(a).

"**SDN List**" as defined in Section 4.24(a).

"**S&P**" means Standard & Poor's Rating Services.

"**Second Day Orders**" as defined in the Restructuring Support Agreement.

"**Second Day Pleadings**" as defined in the Restructuring Support Agreement.

"**Secured Party**" means the Agent, each Lender, each other Indemnitee and each other holder of any Obligation of a Credit Party including each Secured Swap Provider.

"**Secured Rate Contract**" means any Rate Contract between the Borrower (or other Credit Party, excluding Holdings) and the counterparty thereto, (i) where said counterparty is (or was at the time such Rate Contract was entered into) a Lender or an Affiliate of a Lender, or (ii) which the Agent has acknowledged (acting at the Direction of the Required Lenders) in writing constitutes a "Secured Rate Contract" hereunder.

"**Secured Swap Provider**" means a Lender or an Affiliate of a Lender (or a Person who was a Lender or an Affiliate of a Lender at the time of execution and delivery of a Rate Contract) who has entered into a Secured Rate Contract with the Borrower (or other Credit Party, excluding Holdings).

"**Settlement Date**" as defined in Section 2.11(b).

"**Software**" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise and (c) all documentation, training materials and configurations related to any of the foregoing.

"**Special Flood Hazard Area**" means an area that FEMA has designated as an area subject to special flood hazards, the current standard for which is at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year, as per the applicable flood maps.

"**Specified Indebtedness**" as defined in Section 10.1(a)(xvii).

"**Sponsor**" or "**Sponsors**" means, collectively, Wind Point Investors AAV II, L.P., a Delaware limited partnership, Reception Holdings I, L.P. (Oaktree TICP) and Reception Holdings I, LLC (Oaktree Opps).

"**Sponsor Controlled Affiliated Lender**" means, at any time, any Lender that is a Sponsor or an Affiliate (other than an Independent Debt Fund Affiliate, Holdings, the Company, Newco Holdings, the Borrower, any of their respective Subsidiaries or any natural Person) of the Sponsors at such time. For the avoidance of doubt, no Person shall be a Sponsor Controlled Affiliated Lender solely by virtue of it being a non-controlling limited partner in any fund pursuant to which the Sponsor holds any equity interests in Holdings.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"**Stock**" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting; and (b) all securities convertible into or exchangeable for any other Stock and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any other Stock, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Indebtedness**" means any Indebtedness of any Credit Party or any Subsidiary of any Credit Party that is (x) unsecured Indebtedness for borrowed money, (y) secured by a Lien that is junior to the Lien securing the Obligations or (z) subordinated to the Obligations as to right and/or time of payment and/or as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to the Required Lenders; *provided* that, with respect to any Subordinated Indebtedness incurred after the Closing Date that provides for cash interest to be paid by any Credit Party, the subordination terms governing such Subordinated Indebtedness shall be reasonably satisfactory to the Agent (acting at the Direction of the Required Lenders).

"**Subsequent Budget**" as defined in Section 5.24(b).

"**Subsequent Variance Testing Period End Date**" as defined in Section 5.24(c).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than fifty percent (50%) of the voting or economic Stock is, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"**Super Majority Lenders**" means, at any time, collectively, (a) both (i) Lenders then holding more than 75% of the aggregate unpaid principal balance of the Term Loans held by all Lenders then outstanding and (ii) Backstop Parties then holding more than 50% of the aggregate unpaid principal balance of the Term Loans held by all Backstop Parties then outstanding, and (b) so long as any Obligations payable under the New Money Term Loans remain outstanding, both (i) Lenders then holding more than 75% of the aggregate unpaid principal balance of the New Money Term Loans held by all Lenders then outstanding and (ii) Backstop Parties then holding more than 50% of the aggregate unpaid principal balance of the New Money Term Loans held by all Backstop Parties then outstanding. For the avoidance of doubt, the Fronting Lender shall not, solely by virtue of holding record title pending assignment, be entitled to exercise any voting or consent rights under this Agreement; provided that the Fronting Lender shall retain voting rights (and be included in "Super Majority Lenders") in respect of the Term Loans that it holds as a fronting lender (i) with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender or (ii) to the extent that the Fronting Lender holds any such Term Loans after fifteen (15) Business Days after the Closing Date or the Final Draw Funding Date, as applicable.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Syndicated Delayed Draw New Money Term Loans**" as defined in Section 2.1(c)(ii).

"**Syndicated Final Initial New Money Term Loans**" as defined in Section 2.1(a)(iii).

31

"**Syndicated Initial New Money Term Loans**" as defined in Section 2.1(a)(iii).

"**Syndicated Interim Initial New Money Term Loans**" as defined in Section 2.1(a)(ii).

"**Syndication**" as defined in Section 2.12.

"**Syndication Procedures**" means the syndication procedures attached as Exhibit 1.1(f) hereto, together with any modifications and updates thereto mutually agreed between the Borrower and the Lender Advisors.

"**Syndication Schedule**" as defined in Section 2.12.

"**Target Liquidity Shortfall Amount**" means the minimum aggregate principal amount of Delayed Draw New Money Term Loans, which, after giving pro forma effect to such funding of Delayed Draw New Money Term Loans on the Delayed Draw New Money Term Loans Funding Date, shall result in Holdings and its Subsidiaries having Forecasted Liquidity equal to at least $75,000,000 for the entirety of the Projection Period based on the Approved Business Plan.

"**Tax Affiliate**" means, (a) the Borrower and its Subsidiaries, (b) each other Credit Party and (c) any Affiliate of the Borrower with which the Borrower files or is eligible to file consolidated, combined or unitary Tax returns.

"**Tax Distribution**" as defined in Section 6.8(c).

"**Tax Return**" as defined in Section 4.10.

"**Taxes**" as defined in Section 11.1(a).

"**Term Lender**" means each Lender who holds a Term Loan or a Term Loan Commitment.

"**Term Loan**" means any term loan made hereunder pursuant to Section 2.1, including, unless the context shall otherwise require, the New Money Term Loans and the Roll-Up Loans.

"**Term Loan Commitment**" means, with respect to each Lender, such Lender's Term Loan Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.  Unless the context shall otherwise require, the term "Term Loan Commitments" shall include any Interim Initial New Money Term Loan Commitment of such Lender, Final Initial New Money Term Loan Commitment of such Lender, Initial New Money Term Loan Commitment of such Lender, Delayed Draw New Money Term Loan Commitment of such Lender and New Money Term Loan Commitment of such Lender.

"**Term Note**" means a promissory note of the Borrower payable to a Lender, in substantially the form of Exhibit 1.1(c) hereto, evidencing the Indebtedness of the Borrower to such Lender resulting from the Term Loans made to the Borrower by such Lender or its predecessor(s).

"**Termination Date**" means the date on which with respect to all Loans and all other Obligations under the Loan Documents and all Obligations arising under Secured Rate Contracts, that the Agent has been notified in writing by the holder of such Obligation prior to such date are then due and payable have been paid and satisfied in full (other than any indemnification claim as to which any dispute exists or which has not been finally resolved) indefeasibly, subject to the last sentence of Section 2.8(a), in cash.

32

"**Title IV Plan**" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or Liabilities.

"**Trade Secrets**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"**Trademark**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"**Transactions**" means, collectively, the Loan Transactions and the Restructuring Transactions.

"**Treasury Regulations**" means the income tax regulations, including temporary regulations and, to the extent taxpayers are permitted to rely on them, proposed regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**UCC**" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the Financial Conduct Authority Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**United States**" and "**U.S.**" each means the United States of America.

"**U.S. Lender Party**" means each of the Agent (if applicable), each Lender, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"**Variance Testing Period**" as defined in <u>Section 5.24(c)(ii)</u>.

"**Wholly-Owned Subsidiary**" of a Person means any Subsidiary of such Person, all of the Stock of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

"**Write-Down and Conversion Powers**" means, (i) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are

33

described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**WSFS**" as defined in the preamble.

1.2     Other Interpretive Provisions.

(a)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)     The Agreement.  The words "**hereof**", "**herein**", "**hereunder**" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)     Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced. The term "including" is not limiting and means "including without limitation".

(d)     Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." All references to the time of day shall be a reference to New York time.  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)     Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments, restatements, substitutions, supplements and other modifications are not prohibited by the terms of any Loan Document.

(f)     Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with

34

respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(g)    Divisions.    Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.    Notwithstanding anything to the contrary in this Agreement, (i) any division of a limited liability company shall constitute a separate Person hereunder, and each resulting division of any limited liability company that, prior to such division, is a Subsidiary, Guarantor, Credit Party or any other like term shall remain a Subsidiary, Guarantor, Credit Party or other like term, respectively, after giving effect to such division, to the extent required under this Agreement, and any resulting divisions of such Persons shall remain subject to the same restrictions and corresponding exceptions applicable to the pre-division predecessor of such divisions, (ii) in no event shall Holdings or Newco Holdings be permitted to effectuate a division and (iii) if any Subsidiary shall consummate a division permitted under this Agreement in accordance with the foregoing, such Subsidiary shall be required to (effective simultaneously with the effectiveness of such division) comply with the requirements set forth in Section 5.13, to the extent applicable.

1.3    Accounting Terms and Principles.

(a)    All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.    No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Holdings or any of its Subsidiaries shall be given effect for purposes of measuring compliance with any provision of Article VI or otherwise determining any relevant ratios and baskets which govern whether any action is permitted hereunder unless the Borrower and the Agent (acting at the Direction of the Required Lenders, acting reasonably) agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article VI shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other Liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value".

(b)    Unless expressly specified otherwise or required by context, references in this Agreement and in any other Loan Document to EBITDA, any other financial definitions and any component definitions thereof shall refer to Holdings and its Subsidiaries on a consolidated basis.

(c)    If the availability of Indebtedness under this Agreement, or other incurrence of Indebtedness in compliance with this Agreement, is subject to a maximum leverage ratio, then, solely for the purposes of determining such availability or compliance, the cash proceeds of such Indebtedness, shall not be included in the calculation, if applicable, of cash or Cash Equivalents included in the determination of such leverage ratio.

35

(d)    Notwithstanding anything to the contrary contained herein, any change to GAAP that would require obligations that would be required to be classified and accounted for as an operating lease under GAAP as existing prior to December 31, 2018, to be re-characterized as Capital Leases due to a change in GAAP after December 31, 2018, shall not be treated as Capital Leases for any purpose under this Agreement, but instead shall be accounted for as if they were operating leases for all purposes under this Agreement.

1.4    Payments.    The Agent (acting at the Direction of the Required Lenders) may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party.  Any such determination or redetermination by the Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than the Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  The Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable *de minimis* payment thresholds.

<u>ARTICLE II</u>
<u>THE CREDITS</u>

2.1    <u>Amounts and Terms of Commitments</u>.

(a)    <u>Initial New Money Term Loans</u>.

(i)    Subject to the terms and conditions in <u>Section 3.1</u> and, with respect to the Final Draw, <u>Section 3.2</u>, the Fronting Lender severally agrees to make to the Borrower Initial New Money Term Loans denominated in Dollars in a principal amount equal to the Fronting Lender's Initial New Money Term Loan Commitment in up to two (2) drawings. The (I) first such drawing on the Closing Date (the "**Interim Draw**" and the date on which the Interim Draw occurs, the "**Interim Draw Funding Date**") shall be in an initial principal amount (prior to giving effect to any amounts Paid in Kind upon the making of such Term Loans and excluding, for the avoidance of doubt, any fees or interest Paid in Kind pursuant to this Agreement) not to exceed $85,000,000 (the "**Interim Initial New Money Term Loans**") and (II) second such drawing within two (2) Business Days of the entry of the Final Order (the "**Final Draw**" and the date on which the Final Draw occurs, the "**Final Draw Funding Date**") shall be in an initial principal amount (prior to giving effect to any amounts Paid in Kind upon the making of such Term Loans and excluding, for the avoidance of doubt, any fees or interest Paid in Kind pursuant to this Agreement) not to exceed $40,000,000 (the "**Final Initial New Money Term Loans**"); *provided* that no Initial New Money Term Loans (excluding any fees or interest Paid in Kind) may exceed the amount of unused Initial New Money Term Loan Commitments.  Upon each funding by the Fronting Lender, such Fronting Lender's Initial New Money Term Loan Commitment shall be permanently reduced by the amount of such funding and, upon drawing in full of the Initial New Money Term Loan Commitments, the Fronting Lender's Initial New Money Term Loan Commitment shall terminate.  The Initial New Money Term Loans shall be made by the Fronting Lender on the date of each applicable Borrowing.  For the avoidance of doubt, (x) the funding of the Interim Initial New Money Term Loans shall

36

be subject to entry and the terms of the Interim Order by the Bankruptcy Court and the satisfaction or waiver of all other conditions precedent required under Section 3.1 and (y) the funding of the Final Initial New Money Term Loans shall be subject to the entry and the terms of the Final Order by the Bankruptcy Court and the satisfaction or waiver of all other conditions precedent required under Section 3.2.

(ii)      On and after the Interim Draw Funding Date, the Fronting Lender shall enter into trades to assign to (I) each Participating Interim DIP Term Lender (as defined in the Syndication Procedures) its pro rata share of the Interim New Money DIP Loans (as defined in the Syndication Procedures) that such Participating Interim DIP Term Lender elected to purchase in accordance with the Syndication Procedures and (II) to each Backstop Party, its applicable share of the Interim Initial New Money Term Loans (the syndication of New Money Term Loans pursuant to the foregoing clauses (I) and (II), the "**Interim Initial New Money Term Loan Syndication**" and the New Money Term Loans assigned by the Fronting Lender in connection therewith, the "**Syndicated Interim Initial New Money Term Loans**").

(iii)      On and after the Final Draw Funding Date, the Fronting Lender shall enter into trades to assign to (I) each Participating Final DIP Term Lender (as defined in the Syndication Procedures) its pro rata share of the Final New Money DIP Loans (as defined in the Syndication Procedures) that such Participating Final DIP Term Lender elected to purchase in accordance with the Syndication Procedures and (II) each Backstop Party, its applicable share of the Final Initial New Money Term Loans (the syndication of New Money Term Loans pursuant to the foregoing clauses (I) and (II), the "**Final Initial New Money Term Loan Syndication**" and the New Money Term Loans assigned by the Fronting Lender in connection therewith, the "**Syndicated Final Initial New Money Term Loans**" and together with the Syndicated Interim Initial New Money Term Loans, the "**Syndicated Initial New Money Term Loans**").

(iv)      All Syndicated Initial New Money Term Loans will be denominated in Dollars at the time such Syndicated Initial New Money Term Loans are assigned by the Fronting Lender in accordance with this Section 2.1.

(v)      The Borrower and each other Credit Party hereby irrevocably consents to all assignments of Syndicated Initial New Money Term Loans by the Fronting Lender necessary and desirable to effectuate the Interim Initial New Money Term Loan Syndication and the Final Initial New Money Term Loan Syndication in accordance with the Syndication Schedule.  Amounts borrowed under this Section 2.1(a) and repaid or prepaid may not be reborrowed.

(b)      Roll-Up Loans.

(i)      Each beneficial holder of Interim Initial New Money Term Loans and, subject to the occurrence of the Interim Initial New Money Term Loan Syndication, each beneficial holder of Syndicated Interim Initial New Money Term Loans, as consideration for purchasing such applicable Interim Initial New Money Term Loans, shall be deemed to have (x) (I) if such holder is a Prepetition FLFO Lender participating on account of its Eligible Prepetition FLFO Claims, assigned $1.15 of principal of its Eligible Prepetition FLFO Claims to the Agent and received $1.15 of principal of Roll-Up FLFO Loans for

37

every $1.00 of principal of Interim Initial New Money Term Loans purchased by such beneficial holder (in its capacity as a Prepetition FLFO Lender) from the Fronting Lender pursuant to Section 2.1(a) and (II) if such holder is a Prepetition FLSO Lender participating on account of its Eligible Prepetition FLSO Claims, assigned $1.15 of principal of its Eligible Prepetition FLSO Claims to the Agent and received $1.15 of principal of Roll-Up FLSO Loans for every $1.00 of principal of Interim Initial New Money Term Loans purchased by such beneficial holder (in its capacity as a Prepetition FLSO Lender) from the Fronting Lender pursuant to Section 2.1(a) (the foregoing assignment and exchange described in clauses (I) and (II), the "**Interim Roll-Up Loan Syndication**") on (a) the date the Fronting Lender funded the Interim Initial New Money Term Loans or (b) a date as otherwise agreed between such beneficial holder, the Company and the Lender Advisors and (y) directed the Agent, which such direction will be deemed to have been given by such beneficial holder immediately after purchasing its Interim Initial New Money Term Loans, to irrevocably cancel, extinguish and waive the full principal amount of any claims in respect of any Eligible Prepetition First Lien Claims (such claims, "**Cancelled Eligible Prepetition First Lien Claims**") received by the Agent in connection with the Interim Roll-Up Loan Syndication.    Upon consummation of any Interim Roll-Up Loan Syndication, the Agent shall be deemed to have, at the Direction of the Required Lenders, irrevocably cancelled, extinguished and waived all Cancelled Eligible Prepetition First Lien Claims received by the Agent in connection with the Interim Roll-Up Loan Syndication (including all accrued interest on account thereof that has accrued since the Interim Draw Funding Date) as of the Interim Draw Funding Date.  Any Roll-Up Loans incurred by the Borrower pursuant to this Section 2.1(b)(i) shall be deemed incurred on the date that the Interim Initial New Money Term Loans were funded by the Fronting Lender.

(ii)    Each beneficial holder of Final Initial New Money Term Loans and, subject to the occurrence of the Final Initial New Money Term Loan Syndication, each beneficial holder of Syndicated Interim Initial New Money Term Loans, as consideration for purchasing such applicable Final Initial New Money Term Loans, shall be deemed to have (x) (I) if such holder is a Prepetition FLFO Lender participating on account of its Eligible Prepetition FLFO Claims, assigned $1.15 of principal of its Eligible Prepetition FLFO Claims to the Agent and received $1.15 of principal of Roll-Up FLFO Loans for every $1.00 of principal of Final Initial New Money Term Loans purchased by such beneficial holder (in its capacity as a Prepetition FLFO Lender) from the Fronting Lender pursuant to Section 2.1(a) and (II) if such holder is a Prepetition FLSO Lender participating on account of its Eligible Prepetition FLSO Claims, assigned $1.15 of principal of its Eligible Prepetition FLSO Claims to the Agent and received $1.15 of principal of Roll-Up FLSO Loans for every $1.00 of principal of Final Initial New Money Term Loans purchased by such beneficial holder (in its capacity as a Prepetition FLSO Lender) from the Fronting Lender pursuant to Section 2.1(a) (the foregoing assignment and exchange described in clauses (I) and (II), the "**Final Roll-Up Loan Syndication**" and together with the Interim Roll-Up Loan Syndication, the "**Roll-Up Syndication**") on (a) the date the Fronting Lender funded the Final Initial New Money Term Loans or (b) a date as otherwise agreed between such beneficial holder, the Company and the Lender Advisors and (y) directed the Agent, which such direction will be deemed to have been given by such beneficial holder immediately after purchasing its Syndicated Final Initial New Money Term Loans, to irrevocably cancel, extinguish and waive the full principal amount of any claims in respect of any Cancelled Eligible Prepetition First Lien Claims received by the Agent in connection with the Final Roll-Up Loan Syndication.  Upon consummation of

38

any Final Roll-Up Loan Syndication, the Agent shall be deemed to have, at the Direction of the Required Lenders, irrevocably cancelled, extinguished and waived all Cancelled Eligible Prepetition First Lien Claims received by the Agent in connection with the Final Roll-Up Loan Syndication (including all accrued interest on account thereof that has accrued since the Final Draw Funding Date) as of the Final Draw Funding Date. Any Roll-Up Loans incurred by the Borrower pursuant to this <u>Section 2.1(b)(i)</u> shall be deemed incurred on the date that the Final Initial New Money Term Loans were funded by the Fronting Lender.

(iii)     In exchange for the Agent agreeing to take assignment of and subsequently cancel, extinguish and waive the Cancelled Eligible Prepetition First Lien Claims constituting Eligible Prepetition FLFO Claims in connection with the Roll-Up Syndication, the Borrower will be deemed to have issued, immediately after the funding of the Interim Initial New Money Term Loans or the Final Initial New Money Term Loans, as applicable, Roll-Up FLFO Loans to the Agent in the same amount of such Cancelled Eligible Prepetition First Lien Claims constituting Eligible Prepetition FLFO Claims. In exchange for the Agent agreeing to take assignment of and subsequently cancel, extinguish and waive the Cancelled Eligible Prepetition First Lien Claims constituting Eligible Prepetition FLSO Claims in connection with the Roll-Up Syndication, the Borrower will be deemed to have issued, immediately after the funding of the Interim Initial New Money Term Loans or the Final Initial New Money Term Loans, as applicable, Roll-Up FLSO Loans to the Agent in the same amount of such Cancelled Eligible Prepetition First Lien Claims constituting Eligible Prepetition FLSO Claims. As set forth in <u>Section 2.1(b)(i)</u> and <u>Section 2.1(b)(ii)</u>, the Agent shall use such Roll-Up Loans as consideration to take assignment of the Cancelled Eligible Prepetition First Lien Claims in connection with the Roll-Up Loan Syndication; *provided* that the total principal amount of Roll-Up Loans shall not exceed the Roll-Up Cap at any time (exclusive of any fees or interest Paid in Kind).

(iv)     All Roll-Up Loans incurred by the Borrower pursuant to this <u>Section 2.1(b)</u> shall be denominated in Dollars.

(v)     The Roll-Up Loans deemed assigned pursuant to this <u>Section 2.1(b)</u> shall be deemed to be made by each Roll-Up Lender (or an investment advisor, manager or beneficial owner for the account of a Roll-Up Lender, or an affiliated fund or trade counterparty designated by such Roll-Up Lender).

(vi)     [Reserved].

(vii)     Amounts borrowed under this <u>Section 2.1(b)</u> and repaid or prepaid may not be reborrowed.

(viii)     Each Participating Interim DIP Term Lender must, subject to the occurrence of the Final Initial New Money Term Loan Syndication, also be a Participating Final DIP Term Lender unless such obligation is properly assigned or designated pursuant to the Syndication Procedures.

(c)     <u>Delayed Draw New Money Term Loans</u>.

39

(i)      Subject to the terms and conditions in <u>Section 3.1</u> and <u>Section 3.3</u>, the Fronting Lender severally agrees to make to the Borrower Delayed Draw New Money Term Loans denominated in Dollars in a principal amount equal to the Fronting Lender's Delayed Draw New Money Term Loan Commitment in one (1) drawing (the "**Delayed Draw**") on a date no later than the Delayed Draw New Money Term Loans Funding Outside Date in an initial principal amount (prior to giving effect to any amounts Paid in Kind upon the making of such Term Loans and excluding, for the avoidance of doubt, any fees or interest Paid in Kind pursuant to this Agreement) not to exceed $25,000,000; *provided* that no Delayed Draw New Money Term Loans (excluding any fees or interest Paid in Kind) may exceed the amount of unused Delayed Draw New Money Term Loan Commitments.  Upon the earlier of (I) the date on which the funding by the Fronting Lender of any Delayed Draw New Money Term Loan Commitments (even if such funding is less than the available amount of Delayed Draw New Money Term Loan Commitments) (such date, the "**Delayed Draw New Money Term Loans Funding Date**") occurs and (II) the occurrence of the Delayed Draw New Money Term Loans Funding Outside Date, the Fronting Lender's Delayed Draw New Money Term Loan Commitment shall automatically and permanently terminate.  For the avoidance of doubt, the amount of Delayed Draw New Money Term Loans funded by the Lenders (including the Fronting Lender) on the Delayed Draw New Money Term Loans Funding Date shall not exceed the Target Liquidity Shortfall Amount.

(ii)      On and after the Delayed Draw New Money Term Loans Funding Date , the Fronting Lender shall enter into trades to assign to (I) each Participating Delayed Draw DIP Term Lender (as defined in the Syndication Procedures) its pro rata share of the Contingent Draw New Money DIP Loans (as defined in the Syndication Procedures) that such Participating Delayed Draw DIP Term Lender elected to purchase in accordance with the Syndication Procedures and (II) to each Backstop Party, its applicable share of the Delayed Draw New Money Term Loans (the syndication of New Money Term Loans pursuant to the foregoing <u>clauses (I)</u> and <u>(II)</u>, the "**Delayed Draw New Money Term Loan Syndication**" and the New Money Term Loans assigned by the Fronting Lender in connection therewith, the "**Syndicated Delayed Draw New Money Term Loans**").

(iii)      All Syndicated Delayed Draw New Money Term Loans will be denominated in Dollars at the time such Syndicated Delayed Draw New Money Term Loans are assigned by the Fronting Lender in accordance with this <u>Section 2.1</u>.

(iv)      The Borrower and each other Credit Party hereby irrevocably consents to all assignments of Syndicated Delayed Draw New Money Term Loans by the Fronting Lender necessary and desirable to effectuate the Delayed Draw New Money Term Loan Syndication in accordance with the Syndication Schedule. Amounts borrowed under this <u>Section 2.1(c)</u> and repaid or prepaid may not be reborrowed.

(v)      Each beneficial holder of Syndicated Initial New Money Term Loans must, subject to the occurrence of the Delayed Draw New Money Term Loans Funding Date, be a Participating Delayed Draw DIP Term Lender if it holds such Syndicated Initial New Money Term Loans at the Delayed Draw New Money Term Loans Funding Date unless such obligation is properly designated pursuant to the Syndication Procedures.

40

2.2    <u>Evidence of Loans; Notes</u>. The Term Loans made by any Lender are evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to the unpaid balance of the Term Loans held by such Lender.

2.3    <u>Interest</u>.

(a)    Subject to <u>Sections 2.3(c)</u> and <u>2.3(d)</u>, each Loan shall bear interest on the outstanding principal amount thereof from the date when made, and all interest which is not paid when due shall bear interest, at a rate *per annum* equal to eight percent (8.00%) (the "**Applicable Rate**"). All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)    Interest on each Loan shall, subject to the immediately succeeding sentence and <u>Section 2.3(f)</u>, be Paid in Kind in arrears on each Interest Payment Date and at such other times as may be specified herein. Accrued and unpaid interest shall be paid in cash on the date of any payment or prepayment of the Term Loans, including on the Maturity Date.

(c)    Automatically while any Event of Default exists, the Borrower shall pay interest on past due amounts thereon from the date of occurrence of such Event of Default, at a rate *per annum* which is determined by adding two percent (2.00%) *per annum* to the Applicable Rate then in effect for such Term Loans (and, as to past due interest, the Applicable Rate applicable to the principal on which such interest accrued). All such interest shall be payable in cash on demand of the Agent (acting at the Direction of the Required Lenders) or the Required Lenders.

(d)    Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to such extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrower shall pay such Lender interest at the highest rate permitted by applicable law ("**Maximum Lawful Rate**"); *provided*, *however*, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

(e)    [Reserved].

(f)    Interest shall be Paid in Kind on each Interest Payment Date; *provided* that interest paid pursuant to <u>Section 2.3(c)</u> and on the date of any payment or prepayment of the Term Loans, including on the Maturity Date, shall be paid, subject to the last sentence of <u>Section 2.8(a)</u> in cash.

2.4    <u>Loan Accounts; Register</u>.

(a)    The Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest

41

thereon and the principal balance thereof from time to time outstanding. The Agent shall deliver, upon demand by the Borrower, to the Borrower a loan statement setting forth such record. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lender to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against the Agent.

(b)    The Agent, acting as a non-fiduciary agent of the Borrower solely for tax purposes and solely with respect to the actions described in this Section 2.4(b), shall establish and maintain at its address referred to in Section 10.2 (or at such other address as the Agent may notify the Borrower) (A) a record of ownership (the "**Register**") in which the Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of the Agent and each Lender in the Term Loans, each of their obligations under this Agreement to participate in each Loan, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders (and each change thereto pursuant to Sections 10.9 and 10.20), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, (4) the amount of any principal or interest due and payable or paid and (5) any other payment received by the Agent from the Borrower and its application to the Obligations.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans) are registered obligations, the right, title and interest of the Lenders and their assignees in and to such Loans shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein. This Section 2.4 and Section 10.9 shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)    The Credit Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement. Information contained in the Register with respect to any Lender shall be available for access by the Borrower, the Agent or such Lender during normal business hours and from time to time upon at least one (1) Business Day's prior notice. No Lender shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender unless otherwise agreed by the Borrower and the Lender Advisors.

2.5    Procedure for Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing of Term Loans shall be made upon the Borrower's irrevocable written notice to the Agent, by delivery of a Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrower. Each such Committed Loan Notice must be received by the Agent not later than (a) 1:00 p.m. one (1) Business Day prior to the requested date of any Borrowing of Term Loans (or such later time as shall be agreed by the Agent (acting at the Direction of the Required Lenders)). Except as provided in Section 2.1, (x) each Borrowing of Term Loans shall be in a principal amount $500,000 or a whole multiple amount of $100,000 in excess thereof, or if less, the entire remaining principal amount of a Class then outstanding. Each Committed Loan Notice shall specify:

(i)    the requested date of the Borrowing (which shall be a Business Day);

42

(ii)       the principal amount of Loans to be borrowed;

(iii)      the Class of Loans to be borrowed; and

(iv)      wire instructions of the account(s) to which funds are to be disbursed.

(b)       Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its *pro rata* share or other applicable share provided for under this Agreement of the applicable Class of Loans. In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Agent in immediately available funds at the Agent's Lending Office not later than 10:00 a.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Article III for any Borrowing, the Agent shall make all funds so received available to the Borrower in like funds as received by the Agent either by (a) crediting the account(s) of the Borrower on the books of the Agent with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided by the Borrower to (and reasonably acceptable to) the Agent.

(c)       The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

2.6       [Reserved].

2.7       Optional Prepayments.

(a)       Optional Prepayments Generally. The Borrower may at any time upon at least two (2) Business Days' (or such shorter period as is acceptable to the Agent (acting at the Direction of the Required Lenders)) prior written notice by the Borrower to the Agent, prepay the Loans in whole or in part in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding, in each instance, without penalty or premium except as provided in Section 2.9. Optional prepayments of Term Loans shall, subject to Section 2.10, be applied in the manner set forth in Section 2.8(d) (*i.e.*, first, ratably to payment of the Obligations payable under the New Money Term Loans until all such Obligations are repaid in full, second, ratably to payment of the Obligations payable under the Roll-Up FLFO Loans until all such Obligations are repaid in full and third, ratably to the payment of the Obligations payable under the Roll-Up FLSO Loans until all such Obligations are repaid in full).

(b)       Notices. Notice of prepayment or commitment reduction pursuant to clause (a) above shall not thereafter be revocable by the Borrower (unless such notice expressly conditions such prepayment upon consummation of a transaction which is contemplated to result in prepayment of the Loans, in which event such notice may be revocable or conditioned upon such consummation) and the Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment or reduction. Except as set forth in the previous sentence, the payment amount specified in a notice of prepayment shall be due and payable on the date specified therein. Together with each prepayment under this Section 2.7, the Borrower shall pay any amounts required pursuant to Section 2.9.

43

2.8    <u>Mandatory Prepayments of Loans and Commitment Reductions</u>.

(a)    <u>Term Loans</u>.  The Borrower shall repay to the Agent in cash for the ratable account of the Lenders on the Maturity Date, the aggregate unpaid principal amount of all Term Loans outstanding on such date, together with accrued and unpaid interest.  Notwithstanding anything herein or the other Loan Documents to the contrary, (i) if the Required Lenders support a Chapter 11 Plan that provides for the Lenders to receive non-cash distributions on account of the Obligations and the related DIP Term Loan Claims on account thereof, then each Lender shall be deemed to have consented to have its DIP Term Loan Claims paid on the effective date of such Chapter 11 Plan with the non-cash option provided in such Chapter 11 Plan and (ii) each Lender consents to have its DIP Term Loan Claims paid with the non-cash option in accordance with the Restructuring Transactions (as defined in the Restructuring Support Agreement).  For the avoidance of doubt, the Required Lenders support a Chapter 11 Plan consistent with the Restructuring Support Agreement.

(b)    <u>Asset Dispositions; Events of Loss</u>.  If a Credit Party or any Subsidiary of a Credit Party shall at any time or from time to time:

(x)    make a Disposition outside the ordinary course of business (other than sales or other dispositions expressly permitted under <u>Sections 6.2(a)</u>, <u>6.2(c)</u>, <u>6.2(e)</u> through <u>6.2(h)</u>, <u>6.2(j)</u>, <u>6.2(k)</u>, <u>6.2(l)</u>, <u>6.2(m)</u>, <u>6.2(n)</u>, <u>6.2(o)</u>, <u>6.2(q)</u>, <u>6.2(r)</u>, <u>6.2(s)</u> and <u>6.2(u)</u>); or

(y)    suffer an Event of Loss (without duplication of any amounts owed pursuant to <u>Section 2.8(b)(x)</u> as a result of a Disposition pursuant to <u>Section 6.2(d)</u>);

and the subject assets with respect to such Disposition or Event of Loss have a fair market value in excess of $500,000, then (A) the Borrower shall promptly notify the Agent of such Disposition or Event of Loss (including the amount of Net Proceeds received by the applicable Credit Party and/or Subsidiary in respect thereof) and (B) within five (5) Business Days following receipt by the applicable Credit Party and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, an amount equal to such excess Net Proceeds to the Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with <u>Section 2.8(d)</u> hereof.

(c)    <u>Incurrence of Debt</u>.  Promptly upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted hereunder), the Borrower shall deliver, or cause to be delivered, to the Agent an amount equal to such Net Issuance Proceeds, for application to the Loans in accordance with <u>Section 2.8(d)</u>.

(d)    <u>Application of Prepayments</u>.

(i)    (i)    Subject to <u>Section 2.10</u>, any prepayments pursuant to <u>Section 2.7</u>, <u>2.8(b)</u> or <u>2.8(c)</u> shall be applied, *first*, pro rata to payment of the Obligations payable under New Money Term Loans until all such Obligations are paid in full; *second*, pro rata to payment of the Obligations payable under the Roll-Up FLFO Loans until all such

44

Obligations are paid in full; and *third*, pro rata to payment of the Obligations payable under the Roll-Up FLSO Loans until all such Obligations are paid in full.

(ii)        With respect to any prepayment pursuant to Section 2.7, 2.8(b) or 2.8(c) , the Borrower will, not later than the date specified in Section 2.7, 2.8(b) or 2.8(c) , as applicable, for making such prepayment, give the Agent written notice requesting (each such notice pursuant to this clause (ii), a "**Prepayment Notice**") that the Agent provide notice of such prepayment to each Lender. Each such Prepayment Notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Agent will promptly notify each Lender of the contents of any such Prepayment Notice and of such Lender's ratable portion of such prepayment (based on such Lender's *pro rata* share of each relevant Class of the Loans). Any Lender (a "**Declining Lender**" and, any Lender which is not a Declining Lender, an "**Accepting Lender**") may elect, by delivering written notice to the Agent and the Borrower no later than 5:00 p.m. three (3) Business Days after the date of such Lender's receipt of notice from the Agent regarding such prepayment, that the full amount of any prepayment otherwise to be made with respect to the Loans of any Class held by such Lender pursuant to Section(s) 2.7, 2.8(b) and/or 2.8(c)   not be made (the aggregate amount of such prepayments declined by the Declining Lenders, the "**Declined Prepayment Amount**"). If a Lender fails to deliver notice setting forth such rejection of a prepayment to the Agent within the time frame specified above or such notice fails to specify the principal amount of the Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Loans. In the event that the Declined Prepayment Amount is greater than $0, the Agent will promptly notify each Accepting Lender of the amount of such Declined Prepayment Amount and of any such Accepting Lender's ratable portion of such Declined Prepayment Amount (based on such Lender's *pro rata* share of the Term Loans (excluding the *pro rata* share of Declining Lenders)); *provided* that:

(A)        if any such prepayment would cause, but for any Declined Prepayment Amount the New Money Term Loans to be repaid in full, such Declined Prepayment Amount shall only be applied to prepay Roll-Up FLFO Loans and Roll-Up FLSO Loans held by Accepting Lenders (based on such Lender's *pro rata* share of such Class of Loans (excluding the *pro rata* share of Declining Lenders)) (for the avoidance of doubt, solely to the extent each of the New Money Term Loans held by Accepting Lenders have been repaid in full);

(B)        if any such prepayment would cause but for any Declined Prepayment Amount, each of (x) the New Money Term Loans to be repaid in full and (y) the Roll-Up FLFO Loans to be repaid in full, such Declined Prepayment Amount shall only be applied to prepay Roll-Up FLSO Loans held by Accepting Lenders (based on such Lender's *pro rata* share of such Class of Loans (excluding the *pro rata* share of Declining Lenders)) (for the avoidance of doubt, solely to the extent each of (x) the New Money Term Loans held by Accepting Lenders have been repaid in full and (y) the Roll-Up FLFO Loans held by Accepting Lenders have been repaid in full);

(C)        if any such prepayment would not cause the New Money Term Loans to be repaid in full, but the Declined Prepayment Amount shall be in excess

45

of any additional New Money Term Loans held by Accepting Lenders, such excess shall be offered to the Lenders holding Roll-Up FLFO Loans on a *pro rata* basis (for the avoidance of doubt, solely to the extent each of the New Money Term Loans held by Accepting Lenders have been repaid in full); and

(D)     if any such prepayment would not cause (x) the New Money Term Loans to be repaid in full and (y) the Roll-Up FLFO Loans to be repaid in full, but the Declined Prepayment Amount shall be in excess of any additional New Money Term Loans and Roll-Up FLFO Loans held by Accepting Lenders, such excess shall be offered to the Lenders holding Roll-Up FLSO Loans on a *pro rata* basis (for the avoidance of doubt, solely to the extent each of (x) the New Money Term Loans held by Accepting Lenders have been repaid in full and (y) the Roll-Up FLFO Loans held by Accepting Lenders have been repaid in full).

Any such Lender offered a portion of the Declined Prepayment Amount pursuant to the immediately preceding sentence may elect, by delivering, no later than 5:00 p.m. three (3) Business Days after the date of such Lender's receipt of notice from the Agent regarding such additional prepayment, a written notice, that such Lender's ratable portion of such Declined Prepayment Amount not be applied to repay such Lender's Term Loans, in which case the portion of such Declined Prepayment Amount which would otherwise have been applied to such Loans of the Declining Lenders shall instead be retained by the Borrower for use in accordance with the Orders and the Approved Budget (subject to Permitted Variances).   Each applicable Lender's ratable portion of such Declined Prepayment Amount (unless declined by the respective Lender as described in the preceding sentence) shall be applied to the respective Loans of such Lender.

(iii)     Together with each prepayment under this <u>Section 2.8</u>, the Borrower shall pay any amounts required pursuant to <u>Section 2.9</u> hereof.

(iv)     Each prepayment of Loans shall be applied *pro rata* to the Lenders within each such Class of Loans based upon the outstanding principal amounts owing to each such Lender under each such Class of Loans.

Notwithstanding anything herein or the other Loan Documents to the contrary, no Term Lender may decline any voluntary prepayment pursuant to <u>Section 2.7</u>.

(e)     <u>No Implied Consent</u>.  Provisions contained in this <u>Section 2.8</u> for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

(f)     Notwithstanding the foregoing, to the extent any or all of the Net Proceeds of any Disposition by, or Event of Loss of, a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to <u>Section 2.8(b)</u>, would be prohibited or delayed by any applicable local Requirements of Law from being repatriated to the Company or any Domestic Subsidiary including through the repayment of intercompany Indebtedness (each, a "**Repatriation**"; with "**Repatriated**" having a correlative meaning) (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to take promptly all actions reasonably required by such Requirements of Law to permit such Repatriation), or if the Borrower and the Agent (acting at the Direction of the Required Lenders) has determined in good faith that Repatriation of any such amount would reasonably be expected

46

to have material adverse tax consequences with respect to Holdings or its Subsidiaries, an amount equal to the portion of such Net Proceeds so affected (such amount, the "**Excluded Prepayment Amount**"), would not be required to be applied to prepay Loans at the times provided in this Section 2.8; *provided* that, if and to the extent any such Repatriation ceases to (i) be prohibited or delayed by applicable local Requirements of Law at any time during the one (1) year period immediately following the date on which the applicable mandatory prepayment pursuant to this Section 2.8 was required to be made or (ii) cause material adverse tax consequences with respect to Holdings or its Subsidiaries, the Credit Parties shall reasonably promptly pay such portion of the Excluded Prepayment Amount to the Lenders, which payment shall be applied in accordance with Section 2.8(d).  For the avoidance of doubt, the non-application of any Excluded Prepayment Amount pursuant to this Section 2.8(f) shall not constitute a Default or an Event of Default, and for the avoidance of doubt, this Section 2.8 shall not require the actual repatriation of any Net Proceeds from Foreign Subsidiaries, it being agreed that whether or not a repatriation occurs shall not affect obligations to pay the applicable Excluded Prepayment Amount with respect to which Repatriation ceased to be prohibited or delayed or to cause material adverse tax consequences as described above.  Notwithstanding anything in this Section 2.8 to the contrary, to the extent any or all of the Net Proceeds of any Disposition by, or Event of Loss of, a captive insurance Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.8(b), would be prohibited or delayed by any applicable Requirements of Law from being distributed to the Company or another Credit Party, an amount equal to the portion of such Net Proceeds so affected, shall not be required to be applied to prepay Loans at the times provided in this Section 2.8.

2.9    Fees.

(a)    Fees.  The Borrower shall pay to the Agent the fees set forth in the Agent Fee Letter and to the applicable Persons any other such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified (including without limitation pursuant to the Fronting Fee Letter).  All such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Agent and/or such other applicable Person(s)).

(b)    New Money Commitment Fee.  (i) On the Closing Date, the Borrower shall pay, or cause to be paid, to the Fronting Lender, for *pro rata* distribution to each Participating Interim DIP Term Lender or Backstop Party, as applicable, on the settlement date of the Syndicated Interim Initial New Money Term Loans with respect to such Participating Interim DIP Term Lender or Backstop Party, a fully-earned, non-refundable fee (the "**Initial New Money Commitment Fee**") in an aggregate amount equal to five percent (5.00)% of the aggregate amount of $125,000,000 of the Initial New Money Term Loan Commitments (for the avoidance of doubt, excluding any Initial New Money Term Loans issued as the Backstop Premium); *provided* that such Initial New Money Commitment Fee shall not be paid in cash but shall be Paid in Kind on the Closing Date and (ii) on the Delayed Draw New Money Term Loans Funding Date, the Borrower shall pay, or cause to be paid, to the Fronting Lender, for *pro rata* distribution to each Participating Delayed Draw DIP Term Lender or Backstop Party, as applicable, on the settlement date of the Syndicated Delayed Draw New Money Term Loans with respect to such Participating Delayed Draw DIP Term Lender or Backstop Party, a fully-earned, non-refundable fee (the "**Delayed Draw New Money Commitment Fee**" and together with the "Initial New Money Commitment Fee, collectively, the "**New Money Commitment Fee**") in an aggregate amount equal to five percent (5.00)% of the aggregate amount of $25,000,000 of the Delayed New Money Term Loan Commitments (for the avoidance of doubt, excluding any New Money Term Loans issued as the Backstop Premium or

47

Initial New Money Commitment Fee); *provided* that such Delayed Draw New Money Commitment Fee shall not be paid in cash but shall be Paid in Kind on the Delayed Draw New Money Term Loans Funding Date.  Payment of the New Money Commitment Fee shall be in addition to any other fees, costs and expenses due and payable under the Loan Documents or otherwise.

(c)    Backstop Premium.  On the Closing Date, the Borrower shall pay, or cause to be paid, to the Fronting Lender, for distribution (in accordance with the percentages set forth on Schedule 2.9) to each Backstop Party on the on the settlement date of the Syndicated Interim Initial New Money Term Loans with respect to such Backstop Party, a fully-earned, non-refundable fee (the "**Backstop Premium**") in an aggregate amount equal to five and 55/100 percent (5.55)% of the aggregate amount of $150,000,000 of the New Money Term Loan Commitments (for the avoidance of doubt, excluding any New Money Term Loans issued as the New Money Commitment Fee); *provided* that such Backstop Premium shall not be paid in cash but shall be Paid in Kind on the Closing Date.  Payment of the Backstop Premium shall be in addition to any other fees, costs and expenses due and payable under the Loan Documents or otherwise.

(d)    Exit Fee.  The Borrower shall pay, or cause to be paid, to the Agent, for the ratable account of each of the Lenders, on the Maturity Date and each other date that the New Money Term Loans (including, for the avoidance of doubt, the Delayed Draw New Money Term Loans but, excluding for the avoidance of doubt, any Roll-Up Loans) are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise), as applicable, a fully-earned, non-refundable fee (the "**Exit Fee**") in an amount equal to five percent (5.00)% of the aggregate principal amount (including any amounts Paid in Kind, including, for the avoidance of doubt, the New Money Commitment Fee and the Backstop Premium) of the New Money Term Loans repaid on such applicable date; *provided* that such Exit Fee shall not be paid in cash but shall be Paid in Kind on the applicable repayment date.  Payment of the Exit Fee shall be in addition to any other fees, costs and expenses due and payable under the Loan Documents or otherwise.

(e)    All fees payable pursuant to this Section 2.9 shall be applied in accordance with Section 2.10 and all such fees shall be indefeasibly and fully earned when paid and shall not be refundable for any reason whatsoever unless otherwise explicitly specified.

(f)    Neither the New Money Commitment Fee, the Backstop Premium, nor the Exit Fee shall be treated as payments made or received for any services for U.S. federal, and applicable state, local, and foreign income tax purposes.  The Secured Parties and the Credit Parties shall not take any tax action or filing position inconsistent with the preceding sentence unless otherwise required by a determination within the meaning of Section 1313(a) of the Code (or a similar determination under applicable state or local law).

2.10    Payments by the Borrower.

(a)    All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to the Agent and for the ratable account of the Persons holding the applicable Obligations at the address for payment specified in the signature page hereof in relation to the Agent (or such other address as the Agent may from time to time specify in accordance with Section 10.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment

48

hereunder), no later than 1:00 p.m. on the date due.  Any payment which is received by the Agent later than 1:00 p.m. may in the discretion of the Agent (acting at the Direction of the Required Lenders) be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  The Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.

(b)      Subject to the provisions set forth in the definition of "Interest Payment Date" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation, and if applicable, payment, of interest or fees, as the case may be, on such next succeeding Business Day.

(c)      Notwithstanding any provision herein to the contrary, all payments (including, for the avoidance of doubt, all voluntary prepayments, mandatory prepayments and post-acceleration payments) received by the Agent or any other Secured Party hereunder, including, without limitation, all payments or distributions in any Insolvency Proceeding or under any Debtor Relief Law, all proceeds of Collateral, or any other payments or distributions received by the Agent or such other Secured Party on account of the Obligations, whether arising from realization on the Collateral, setoff or otherwise, and whether or not an Event of Default shall have occurred and be continuing, in each case, shall be applied as follows:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.5 and amounts payable under Article XI) payable to the Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.5 and amounts payable under Article XI) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting the accrued and unpaid interest and principal due on the New Money Term Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting the accrued and unpaid interest and principal due on the Roll-Up FLFO Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth payable to them;

*Fifth*, to payment of that portion of the Obligations constituting the accrued and unpaid interest and principal due on the Roll-Up FLSO Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fifth payable to them;

*Sixth*, to payment of all other Obligations of the Credit Parties that are due and payable to the Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agent and the other Secured Parties on such date in proportion to the respective amounts described in this clause Sixth payable to them; and

*Seventh*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Requirement of Law.

Notwithstanding the foregoing, (i) amounts received shall be applied to each category in the numerical order provided until exhausted prior to the application to the immediately succeeding category and (ii) no payments by a Guarantor and no proceeds of Collateral of a Guarantor shall be applied to Excluded Rate Contract Obligations of such Guarantor.

2.11    Payments by the Lenders to the Agent; Settlement.

(a)    The Agent may, on behalf of the Lenders, disburse funds to the Borrower for Loans requested (and may do so including by way of delegation under Section 9.4). Each Lender shall reimburse the Agent on demand for all funds disbursed on its behalf by the Agent, or if the Agent so requests, each Lender will remit to the Agent its Commitment Percentage of any Loan before the Agent disburses same to the Borrower. If the Agent elects to require that each Lender make funds available to the Agent prior to disbursement by the Agent to the Borrower, the Agent shall notify each Lender of the amount of such Lender's Commitment Percentage of the Loan requested by the Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay the Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to the Agent's account, as set forth on the Agent's signature page hereto (or such other account as the Agent may from time to time specify), no later than 1:00 p.m. on such scheduled Borrowing date. Nothing in this Section 2.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 2.11, shall be deemed to require the Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Agent, any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)    At least once each calendar week or more frequently at the Agent's election (each, a "**Settlement Date**"), the Agent shall notify each Lender of the amount of such Lender's Commitment Percentage of principal, interest and fees paid for the benefit of Lenders with respect to each applicable Loan. The Agent shall pay to each Lender such Lender's Commitment Percentage of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it; *provided*, *however*, that in the case of any payment of principal received by the Agent from the Borrower in respect of any Loan prior to 1:00 p.m. on any Business Day, the Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on such Business Day, and, in the case of any payment of principal in respect of any Loan later than 1:00 p.m. on any Business Day, the Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on the next Business Day. Except as provided in the preceding proviso with respect to Loan payments, such payments shall be made by wire transfer to such Lender not later than 2:00 p.m. on the next Business Day following each Settlement Date.

(c)    [Reserved].

(d)    Procedures. The Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto. Without limiting the generality of the foregoing, the Agent is hereby authorized to establish procedures to make

50

available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.

(e)    Cashless Settlement.  Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans or Commitments in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement and in accordance with the Chapter 11 Plan, pursuant to a cashless settlement mechanism approved by the Borrower, the Agent and such Lender.

2.12    Syndication.  Following the Closing Date, the Credit Parties shall use commercially reasonable efforts to assist the Lenders in connection with a syndication process (including the Interim Initial New Money Term Loan Syndication, the Final Initial New Money Term Loan Syndication, the Roll-Up Syndication and the Delayed Draw New Money Term Loan Syndication) in accordance with the Syndication Procedures (the "**Syndication**") for the assignment of a proportionate share of the New Money DIP Loans (as defined in the Syndication Procedures).  Upon completion of the Syndication, a Schedule 2.12 (the "**Syndication Schedule**"), which shall be prepared by the Lender Advisors in consultation with the Borrower and satisfactory to the Ad Hoc Group, shall be delivered to the Agent and the Borrower, which shall set forth the aggregate principal amount of New Money Term Loans and proposed Roll-Up Loans held, or to be held, by each Lender upon the occurrence of the Syndication and settlement of the assignments by the Fronting Lender.  Subject to the Roll-Up Cap, the Roll-Up shall be effective, and the deemed assignment of the Roll-Up Loans and cancellation, extinguishment and waiver of the Eligible Prepetition First Lien Claims shall occur as set forth in Section 2.1(b).

ARTICLE III
CONDITIONS PRECEDENT

3.1    Conditions to Effectiveness of this Agreement and the Interim Draw.  The effectiveness of this Agreement and the obligation of each Lender to make its Interim Initial New Money Term Loans hereunder on the Closing Date in connection with Interim Draw is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent except as otherwise agreed between the Borrower and the Agent (acting at the Direction of the Required Lenders) and, with respect to subsections (a)(i) and (k), the Fronting Lender:

(a)    The Agent's receipt of the following, each of which shall be originals, facsimiles or copies in ".pdf" format unless otherwise specified and properly executed by a Responsible Officer of the signing Credit Parties (other than in the case of clauses (iii) and (iv) below) and each other Person party thereto:

(i)    a Committed Loan Notice;

(ii)    executed counterparts of this (I) Agreement, (II) each Note requested by a Lender (if any), (III) the Agent Fee Letter, (IV) the Fronting Fee Letter and (V) the Master Consent to Assignment;

(iii)    evidence that all UCC-1 financing statements in the appropriate jurisdiction or jurisdictions for each Credit Party that the Agent (acting at the Direction of the Required Lenders) may reasonably request shall have been provided for, and

51

arrangements for the filing thereof in a manner reasonably satisfactory to the Agent (acting at the Direction of the Required Lenders) shall have been made;

(iv)    certificates of good standing from the secretary of state of the state of formation, incorporation or organization, as applicable, of each Credit Party (to the extent such concept exists in such jurisdiction), customary certificates of resolutions or other board approval or action, incumbency certificates or other certificates of Responsible Officers of each Credit Party certifying true and complete copies of the Organization Documents attached thereto and evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Credit Party is a party or is to be a party on the Closing Date;

(v)    a certificate of a Responsible Officer of each Credit Party certifying that the conditions set forth in Sections 3.1(b), 3.1(c) and 3.1(d) have been satisfied; and

(vi)    a perfection certificate in form and substance reasonably acceptable to the Agent (acting at the Direction of the Required Lenders).

(b)    Since the Petition Date, there shall have been no Material Adverse Effect other than the events and developments related to, or arising as a result of or in connection with, the Chapter 11 Cases.

(c)    Each representation and warranty by any Credit Party contained herein or in any other Loan Document shall be true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall have been true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such earlier date).

(d)    On the Closing Date, and immediately after giving effect to the funding of the Interim Initial New Money Term Loans on the Closing Date, no Default or Event of Default shall have occurred and be continuing or shall exist immediately after giving effect to the funding of the Interim Initial New Money Term Loans.

(e)    The Debtors shall have delivered to the Agent, the Lenders and the Lender Advisors, the Initial Budget and the Approved Business Plan, which shall be in form and substance acceptable to the Required Lenders.  The Lenders agree that the Initial Budget is acceptable.  The proceeds of the Interim Draw shall be used in accordance with the Approved Budget (subject to Permitted Variances).

(f)    The Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor and a debtor-in-possession.  The Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  No trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases.

52

(g)      (i) The Interim Order, which shall be in form and substance acceptable to the Required Lenders, shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, modified or amended in any manner without the consent of the Required Lenders and the Borrower, and (ii) the Debtors shall be in compliance in all material respects with the Interim Order.

(h)      After giving effect to the Interim Order, the Collateral and Guarantee Requirement shall be satisfied and the Agent shall have a fully perfected lien on the Collateral to the extent required by the other Loan Documents and the Orders, having the priorities set forth in the Orders.

(i)      All First Day Pleadings filed by the Credit Parties on the Petition Date and  First Day Orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably acceptable to the Required Lenders.

(j)      The Lenders shall have received (i) the Annual Financial Statements and (ii) the Quarterly Financial Statements.

(k)      The Fronting Lender shall have received (i) the Fronting Fee Letter duly executed by the Borrower and (ii) the Master Consent to Assignment duly executed by the Borrower and the Agent.

(l)      The Agent shall have received, at least three (3) Business Days prior to the Closing Date (to the extent requested at least seven (7) Business Days prior to the Closing Date) all documentation and other information about the Credit Parties and their Subsidiaries as has been reasonably requested in writing by the Agent or any Lender that the Agent or such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act.

(m)      All fees, expenses and other compensation required by the Restructuring Support Agreement and each of the Loan Documents (in the case of expenses, to the extent invoiced at least one (1) Business Day prior to the Closing Date (or such later period as reasonably agreed by the Borrower)), whether incurred prepetition or post-petition, shall have been paid (including, without limitation, all fees and reasonable and documented out-of-pocket fees, costs and expenses of the Lender Advisors, one external legal counsel to the Fronting Lender and ArentFox Schiff LLP, as legal counsel to the Agent which, in each case, may include a reasonable estimate of fees and expenses incurred through and including the Closing Date), except in all cases where such fees are subject to any notice and review period under the Orders.

(n)      The Restructuring Support Agreement shall be in full force and effect and the Credit Parties shall not be in breach of any covenants thereunder (other than immaterial breaches that would not give rise to a termination right thereunder).

For the purpose of determining satisfaction with the conditions specified in this Section 3.1, each Lender that has signed and delivered this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 3.1 unless the Agent shall have received written notice from such Lender or the Lender Advisors prior to the Closing Date specifying its objection thereto. The funding of the Interim Initial New Money Term Loans hereunder shall evidence the reasonable satisfaction of each of the documentary conditions set forth in Section 3.1 for which the Lenders' reasonable satisfaction is required.

53

3.2    Conditions to the Final Draw.  The obligation of each Lender to make its Final Initial New Money Term Loans hereunder on the Final Draw Funding Date in connection with the Final Draw is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent except as otherwise agreed between the Borrower and the Agent (acting at the Direction of the Required Lenders):

(a)    The Agent's receipt of a Committed Loan Notice, which shall be an original, facsimile or copy in ".pdf" format unless otherwise specified and properly executed by a Responsible Officer of the signing Credit Parties, a copy of which shall be delivered to the Fronting Lender.

(b)    Since the Petition Date, there has been no Material Adverse Effect other than the events and developments related to, or arising as a result of or in connection with, the Chapter 11 Cases.

(c)    Each representation and warranty by any Credit Party contained herein or in any other Loan Document shall be true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall have been true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such earlier date).

(d)    On the Final Draw Funding Date, and immediately after giving effect to the funding of the Final Initial New Money Term Loans on the Final Draw Funding Date, no Default or Event of Default shall have occurred and be continuing or shall exist immediately after giving effect to the funding of the Final Initial New Money Term Loans.

(e)    The Debtors shall have delivered to the Agent, the Lenders and the Lender Advisors the Approved Budget most recently required to be delivered pursuant to this Agreement. The Debtors shall be in compliance with the Approved Budget (subject to Permitted Variances) in all respects and the proceeds of the Final Draw shall be used in accordance with the Approved Budget (subject to Permitted Variances).

(f)    (i) The Final Order, which shall be in form and substance acceptable to the Required Lenders, shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, modified or amended in any manner without the consent of the Required Lenders and the Borrower, and (ii) the Debtors shall be in compliance in all material respects with the Final Order.

(g)    The Interim Initial New Money Term Loans shall have been funded, the outstanding Interim Initial New Money Term Loans Commitments shall be zero.

(h)    The Restructuring Support Agreement shall be in full force and effect and the Credit Parties shall not be in breach of any covenants thereunder (other than immaterial breaches that would not give rise to a termination right thereunder).

(i)    The Credit Parties shall be in compliance in all respects with the Milestones.

3.3    <u>Conditions to the Delayed Draw</u>.  The obligation of each Lender to make its Delayed Draw New Money Term Loans hereunder on the Delayed Draw New Money Term Loans Funding Date in connection with the Delayed Draw is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent except as otherwise agreed between the Borrower and the Agent (acting at the Direction of the Required Lenders) and, with respect to <u>subsection (n)</u>, the Fronting Lender:

(a)    The Agent's receipt of a Committed Loan Notice, which shall be an original, facsimile or copy in ".pdf" format unless otherwise specified and properly executed by a Responsible Officer of the signing Credit Parties, a copy of which shall be delivered to the Fronting Lender.

(b)    Since the Petition Date, there shall have been no Material Adverse Effect other than the events and developments related to, or arising as a result of or in connection with, the Chapter 11 Cases.

(c)    Each representation and warranty by any Credit Party contained herein or in any other Loan Document shall be true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall have been true and correct in all material respects (*provided* that any such representations or warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) as of such earlier date).

(d)    On the Delayed Draw New Money Term Loans Funding Date, and immediately after giving effect to the funding of the Delayed Draw New Money Term Loans on the Delayed Draw New Money Term Loans Funding Date, no Default or Event of Default shall have occurred and be continuing or shall exist immediately after giving effect to the funding of the Delayed Draw New Money Term Loans.

(e)    The Debtors shall have delivered to the Agent, the Lenders and the Lender Advisors the Approved Budget most recently required to be delivered pursuant to this Agreement. The Debtors shall be in compliance with the Approved Budget (subject to Permitted Variances) in all respects and the proceeds of the Delayed Draw shall be used in accordance with the Approved Budget (subject to Permitted Variances).

(f)    The Chapter 11 Plan, subject to the consent rights of the Lenders set forth in the Restructuring Support Agreement shall have been confirmed by the Bankruptcy Court in accordance with the Restructuring Support Agreement.

(g)    The Initial New Money Term Loans shall have been funded and the Initial New Money Term Loan Commitments shall be zero.

(h)    The Restructuring Support Agreement shall continue to be in full force and effect and the Credit Parties shall not be in breach of any covenants thereunder (other than immaterial breaches that would not give rise to a termination right thereunder).

(i)    The Credit Parties shall be in compliance in all respects with the Milestones.

55

(j)      No Sale of the Business has occurred or is contemplated to occur under the Third-Party Sale Transaction (as defined in the Restructuring Support Agreement).

(k)      At least fifteen (15) Business Days prior to consummation of the Chapter 11 Plan (or such later date as the Required Lenders may agree), the Debtors shall have delivered an update on the status of bids received during the Debtors' "bid season" and the projected forecasts, in each case in a similar level of detail as the Approved Business Plan.

(l)      Actual consolidated revenue of the Debtors and their Subsidiaries for the most recent fiscal quarter for which financial statements are required to have been delivered under Section 5.1(b) (the "**Section 3.3 Test Period**") and trailing 3-month period immediately prior to emergence for which financials are available shall be greater than or equal to at least 85% of the consolidated revenue for the same period set forth in the Approved Business Plan, (II) variance of consolidated gross margin for the Section 3.3 Test Period shall be greater than or equal to at least 62.5% of the consolidated gross margin for such period in the Approved Business Plan and (III) Debtors shall have delivered a certificate duly executed by the chief executive officer, chief restructuring officer, president or chief financial officer (or other responsible officer with equivalent duties) of the Borrower, appropriately completed, by which such officer shall certify to the Lenders that the conditions precedent to the Incremental New Money Term Loans set forth in this Section 3.3(l) have been satisfied as of such date and that forecasted calendar 2026 consolidated revenue and gross margin are estimated to be greater than or equal to 85% of consolidated revenue and 62.5% of consolidated gross margin set forth in the Approved Business Plan; *provided* that such forecasts referenced in this Section 3.3(l) represent the Credit Parties' good faith estimate of future financial performance (for the periods covered thereby) and are based on assumptions believed by the Credit Parties to be fair and reasonable in light of current market conditions at the time made, and it is acknowledged and agreed by the Agent and Lenders that projections as to future events are not to be viewed as facts, are not a guarantee of future performance and are subject to uncertainties many of which are beyond Holdings or its Subsidiaries control, no assurances are given or representations made that such results will be realized and that the actual results during the period or periods covered by such projections may differ materially from the projected results.

(m)      The Delayed Draw New Money Term Loans to be funded shall not exceed the Target Liquidity Shortfall Amount.

(n)      The Delayed Draw New Money Term Loans Funding Outside Date shall not have occurred.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Subject to the entry of the Interim Order or the Final Order, as applicable, the Credit Parties, jointly and severally, represent and warrant to the Agent and each Lender that the following are, and after giving effect to the Loan Transactions will be, true, correct and complete:

4.1      Corporate Existence and Power.

(a)      Each Credit Party and each of their respective Subsidiaries is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and, to the

56

extent applicable in the relevant jurisdiction, in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)      (i) Each Credit Party and each of their respective Subsidiaries has the organizational power and authority to execute, deliver, and perform its obligations under, the Loan Documents to which it is a party and (ii) each Credit Party and each of their Subsidiaries has the power and authority and, except where no Material Adverse Effect would reasonably be expected to result, has all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business;

(c)      each Credit Party and each of their Subsidiaries is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and, to the extent such jurisdiction recognizes the concept of good standing, is in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business as currently conducted requires such qualification or license; and

(d)      each Credit Party and each of their Subsidiaries is in compliance with all applicable Requirements of Law;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.2      Corporate Authorization; No Contravention.  The execution, delivery and performance of this Agreement by each of the Credit Parties, and by each of the Credit Parties and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not:

(a)      contravene the terms of any of that Person's Organization Documents;

(b)      result in the creation of any Lien (other than Permitted Liens) under or, except as a result of an in connection with the Chapter 11 Cases, conflict with or result in any breach or contravention of, any document evidencing a Contractual Obligation (other than any Contractual Obligation in effect immediately prior to the commencement of the Chapter 11 Cases) to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property (other than Excluded Property) is subject; or

(c)      violate any Requirement of Law;

except, in each case referred to in clauses (b) and (c), to the extent such conflict or violation would not be reasonably likely to result, either individually or in the aggregate, in a Material Adverse Effect.

4.3      Governmental Authorization.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement or any other Loan Document except (a) for recordings and filings in connection with the Liens granted to the Agent under the Collateral Documents, (b) those obtained or made on or prior to the Closing Date and (c) those approvals, consents, exemptions, authorizations or other

57

actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.4　　Binding Effect.　This Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of such Credit Party or such Subsidiary of a Credit Party which is a party thereto, enforceable against such Credit Party or such Subsidiary of a Credit Party in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability (regardless of whether such enforcement is considered in a proceeding at law or in equity).

4.5　　Litigation.　Except for (i) the Chapter 11 Cases and (ii) those actions, suits, proceedings, claims or disputes identified on the petition filed therewith, there are no actions, suits, proceedings, claims or disputes pending, or to the knowledge of any Credit Party, threatened in writing, at law, in equity or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)　　purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby or thereby; or

(b)　　would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.  As of the Closing Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit by the IRS or other Governmental Authority or, to any Credit Party's knowledge, any review or investigation by the IRS or other Governmental Authority concerning the violation or possible violation of any Requirement of Law.

4.6　　No Default.　No Default or Event of Default exists or would immediately result from the incurring of any Obligations by any Credit Party or the grant or perfection of the Agent's Liens on the Collateral or the consummation of the Loan Transactions.

4.7　　ERISA Compliance.　Schedule 4.7 sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, all (a) Title IV Plans and (b) Multiemployer Plans, but excluding in the case of both clauses (a) and (b) any such plans that would be required to be scheduled solely because of a Credit Party being treated as a single employer with an ERISA Affiliate.  Except for those that would not, in the aggregate, have a Material Adverse Effect, (w) each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law is in compliance with the requirements for such tax exempt status, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigations involving any Benefit Plan to which any Credit Party incurs or otherwise has or could reasonably be expected to have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur.  Except as would not reasonably be expected to result in material liability to any Credit Party, on the Closing

58

Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding.

4.8     Use of Proceeds; Margin Regulations.  The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 5.10.  No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  Proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock.  As of the Closing Date, no Credit Party and no Subsidiary of any Credit Party owns any Margin Stock.

4.9     Ownership of Property; Liens.  As of the Closing Date, the Real Estate listed in Schedule 4.9 constitutes all of the Real Estate of each Credit Party and each of their respective Subsidiaries. Each of the Credit Parties and each of their respective Subsidiaries has good and marketable title in fee simple to, or valid leasehold (or sub-leasehold) interests in, all Real Estate, and good and valid title to all owned personal Property, in each case, necessary or used in the ordinary conduct of their respective businesses and valid leasehold (or sub-leasehold) interests in all leased personal Property necessary in the ordinary conduct of their respective businesses except where the failure to so own or possess would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  None of the Property of any Credit Party or any Subsidiary of any Credit Party is subject to any Liens other than Permitted Liens.  As of the Closing Date, Schedule 4.9 also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any owned Real Estate.  All permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect except as would not reasonably be expected to have a Material Adverse Effect.

4.10     Taxes.  Except (i) where failure to so file would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (ii) for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP or (iii) for those stayed by the Bankruptcy Court, all U.S. federal and all state, local and foreign income and franchise and other Tax returns, reports and statements (collectively, the "**Tax Returns**") required by any Requirement of Law to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, and all Taxes, charges and other impositions reflected therein or Taxes otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof.

4.11     Financial Condition; No Material Adverse Effect.

(a)     The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of Holdings and its Subsidiaries, in each case, as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)     Since the Petition Date, there has been no Material Adverse Effect.

(c)     All financial performance projections delivered to Agent, including the financial performance projections delivered on or prior to the Closing Date, represent the Credit Parties'

59

good faith estimate of future financial performance (for the periods covered thereby) and are based on assumptions believed by the Credit Parties to be fair and reasonable in light of current market conditions at the time made, it being acknowledged and agreed by the Agent and Lenders that projections as to future events are not to be viewed as facts, are not a guarantee of future performance and are subject to uncertainties many of which are beyond Holdings or its Subsidiaries control, no assurances are given or representations made that such results will be realized and that the actual results during the period or periods covered by such projections may differ materially from the projected results.

4.12    Environmental Matters.  Except as set forth in Schedule 4.12 and except where any failures to comply would not reasonably be expected to result in, either individually or in the aggregate, Material Environmental Liabilities to the Credit Parties and their Subsidiaries, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of (or, solely with respect to any Real Estate previously owned, leased, subleased, operated or otherwise occupied by any Credit Party, was the subject of (at the time such Credit Party occupied such Real Estate)), any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened in writing) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is free of contamination by any Hazardous Materials and (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations in violation of any Environmental Law or (ii) knows of any facts, circumstances or conditions reasonably constituting notice of a violation of any Environmental Law, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act or similar Environmental Laws.  The representations and warranties contained in this Section 4.12 are the sole and exclusive representations and warranties of the Credit Parties with respect to environmental, health and safety matters including arising under or relating to Environmental Laws, Environmental Liabilities or Hazardous Materials.

4.13    Regulated Entities.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the Loan Documents.

4.14    [Reserved].

4.15    Labor Relations.  As of the Closing Date, there are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened in writing) against or

60

involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 4.15 and as would not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative with respect to any employee of any Credit Party or any Subsidiary of any Credit Party is pending before the National Labor Relations Board, and (c) in the past three (3) years, to the knowledge of any Credit Party, no such representative has filed a certification or recognition petition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party with the National Labor Relations Board.

4.16    Intellectual Property.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed or otherwise has the right to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested in writing any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as would not reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.17    [Reserved].

4.18    Ventures, Subsidiaries and Affiliates; Outstanding Stock.  Except as set forth in Schedule 4.18, as of the Closing Date, no Credit Party and no Subsidiary of any Credit Party (a) has any Subsidiaries, or (b) is engaged in any joint venture or partnership with any other Person.  All issued and outstanding Stock of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable (if applicable), and free and clear of all Liens other than Permitted Liens. All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  All of the issued and outstanding Stock of each Credit Party, each Subsidiary of each Credit Party is owned by each of the Persons and in the amounts set forth in Schedule 4.18.  Except as set forth in Schedule 4.18, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or any Stock of its Subsidiaries.

4.19    Jurisdiction of Organization; Chief Executive Office.  Schedule 4.19 lists each Credit Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or principal place of business, in each case as of the Closing Date, and such Schedule 4.19 also lists all jurisdictions of organization and legal names of such Credit Party for the five (5) years preceding the Closing Date.

4.20    Deposit Accounts and Other Accounts.  Schedule 4.20 lists all banks and other financial institutions securities intermediaries or commodity intermediaries at which any Credit Party maintains deposit, securities, commodities or similar accounts as of the Closing Date, and such Schedule correctly identifies the name and address with respect to each depository or intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

61

4.21     [Reserved].

4.22     [Reserved].

4.23     Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the written statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to the Agent or the Lenders prior to the Closing Date, but excluding financial projections, *pro forma* financial information and information of a general economic or industry nature, as applicable, prepared in good faith, taken as a whole, as of the date furnished), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not materially misleading, when taken as a whole, as of the time when made or delivered; *provided*, that (i) with respect to information relating to the Credit Party's industry generally and trade data which relates to a Person that is not a Credit Party or a Subsidiary thereof, the Credit Parties represent and warrant only that such information is believed in good faith to be accurate in all material respects and (ii) any statements describing documents and agreements are summary only and as such are qualified in their entirety by reference to such documents and agreements.

4.24     Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices.

(a)     Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all applicable U.S. economic sanctions laws, Executive Orders and implementing regulations ("**Sanctions**") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") and the U.S. State Department.  No Credit Party and no Subsidiary of a Credit Party (i) is a Person on the list of the Specially Designated Nationals and Blocked Persons (the "**SDN List**"), (ii) is a Person who is otherwise the subject or the target of U.S. economic sanctions laws, (iii) is a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "**Sanctioned Country**") or (iv) is owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country.

(b)     Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations.  No action, suit or proceeding by or before any court or Governmental Authority with respect to compliance with such anti-money laundering laws is pending or threatened to the knowledge of each Credit Party and each Subsidiary of each Credit Party.

(c)     Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt

Practices Act of 1977 ("**FCPA**") and the U.K. Bribery Act 2010 ("**Anti-Corruption Laws**").  None of the Credit Party or any Subsidiary, nor to the knowledge of the Credit Party, any director, officer, agent, employee, or other Person, in each case, acting on behalf of the Credit Party or any Subsidiary, has taken any action, directly or indirectly, that would result in a violation of Anti-Corruption Laws.  Each Credit Party and each Subsidiary has instituted and will continue to maintain policies and procedures reasonably designed to promote compliance with applicable Anti-Corruption Laws.

4.25    Status of Holdings.  Holdings has not engaged in any material business activities other than (a) ownership of the Stock of the Company and its indirect Subsidiaries and activities incidental thereto, (b) activities incidental to maintenance of its corporate existence (including the ability to incur fees, costs and expenses relating to such maintenance), (c) performance of its obligations under the Loan Documents or any other Indebtedness permitted under this Agreement, in each case, to which it is a party, (d) the employment of members of senior management of the Credit Parties, (e) any public offering of its common stock or any other issuance or sale of its Stock, (f) guarantees in respect of Indebtedness of the Company and its Subsidiaries permitted under Section 6.5, (g) guarantees of other obligations not constituting Indebtedness incurred by the Company and its Subsidiaries, (h) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries, (i) making any Restricted Payment or Investment permitted under this Agreement, (j) any transactions permitted under Section 6.9 and (k) any other activities permitted to be conducted by Holdings pursuant to the Loan Documents.

4.26    Collateral Documents.  Subject to the entry and terms thereof, the Interim Order creates in favor of the Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest in and Liens on the Collateral described therein and proceeds thereof, which security interest and Lien shall be valid and perfected as of the Closing Date by entry of the Interim Order with respect to each Credit Party and which shall constitute a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing the Obligations, in each case, other than as set forth in the Interim Order.  The Agent and the Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the Interim Order.

Pursuant to Section 364(c)(1) of the Bankruptcy Code, subject to the entry and terms of the Orders, the Obligations of the Credit Parties shall at all times constitute allowed senior administrative expenses against each of the Credit Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Credit Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, and shall be payable from and have recourse to all pre- and post-petition property of the Credit Parties and their estates and all proceeds thereof subject to the Carve-Out and other than as set forth in the Orders.

4.27    Bankruptcy Matters.

63

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given.  Proper notice under the circumstances was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the Orders and (y) the hearing for the approval of the Orders.

(b)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out and the Prior Senior Liens (as defined in the Orders) and subject to the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended in a manner adverse to the Lenders without the Required Lenders' consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lenders).

ARTICLE V
AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that until the Termination Date:

5.1     Financial Statements.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (or the applicable foreign equivalent in the case of Foreign Subsidiaries) (*provided* that monthly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments) in all material respects.  The Borrower shall deliver to the Agent (for distribution to each Lender) by Electronic Transmission:

(a)     [Reserved].

(b)     Not later than forty-five (45) days after the end of each Fiscal Quarter ending on or after December 31, 2025, a copy of the unaudited consolidated balance sheets of Holdings and each of its Subsidiaries, and the related consolidated statements of income, shareholders' equity and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

5.2     Certificates; Other Information.  The Borrower shall furnish to the Agent (and the Agent shall thereafter make available to each Lender) by Electronic Transmission:

(a)     together with each delivery of annual financial statements and financial statements for each Fiscal Quarter pursuant to Section 5.1(a) and 5.1(b), as applicable, (i) a customary

64

narrative, in reasonable detail, signed by a Responsible Officer of the Borrower, describing the financial condition and results of operation of the Credit Parties and their Subsidiaries for the Fiscal Quarter and the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements) and (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to Section 5.2(d) and discussing the reasons for any significant variations;

(b)    concurrently with the delivery of the annual financial statements and financial statements for each Fiscal Quarter referred to in Sections 5.1(a) and 5.1(b) above, a fully and properly completed certificate in the form of Exhibit 5.2(b) (a "**Compliance Certificate**"), certified on behalf of the Borrower by a Responsible Officer of the Borrower, which Compliance Certificate shall set forth in reasonable detail any Margin Stock owned by each Credit Party and each Subsidiary of each Credit Party, in each instance, as of the last day of each Fiscal Quarter;

(c)    promptly after the same are publicly available, copies of all financial statements, special reports and registration statements which the Company, Holdings, Newco Holdings, the Borrower or any Subsidiary files with the Securities Exchange Commission or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8);

(d)    no later than sixty (60) days after the beginning of each Fiscal Year, projections of the Credit Parties' (and their Subsidiaries') consolidated financial performance for the then current Fiscal Year on a month-by-month basis;

(e)    promptly upon receipt thereof, copies of any final reports submitted by the Borrower's certified public accountants in connection with each annual, interim or special audit of any Credit Party or any of their Subsidiaries made by such accountants, including any comment letters submitted by such accountants to management of any Credit Party in connection with their services;

(f)    promptly following request therefor, such additional information regarding the business, financial or corporate affairs of any Credit Party or any of its Subsidiaries, perfection certificates and other information relating to compliance with the terms of this Agreement or the perfection of the Agent's Liens, in each case, as any Lender Advisor or the Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing (email to be sufficient) from time to time, other than such additional information that (i) is subject to attorney-client or similar privilege or constitutes attorney work-product or confidentiality obligations, (ii) constitutes non-financial trade secrets or non-financial proprietary information or (iii) in respect of which disclosure to the Agent or any Lender (or their respective representatives) is prohibited by Requirements of Law; and

(g)    promptly upon receipt thereof, copies of any annual insurance reports of any Credit Party or any of its Subsidiaries.

5.3    Notices.  The Borrower shall promptly notify the Agent (and the Agent shall thereafter notify each Lender) of each of the following (and in no event later than two (2) Business Days after a

65

Responsible Officer becomes aware thereof (or such other period as the Agent may agree (acting at the Direction of the Required Lenders)):

(a)      the occurrence or existence of any Default or Event of Default;

(b)      any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(c)      the commencement of, or any material adverse development in, any litigation or proceeding against any Credit Party or any Subsidiary of any Credit Party (i) in which the amount of damages claimed is $15,000,000 (or its equivalent in another currency or currencies) or more, (ii) in which injunctive or similar relief is sought and which has a reasonable probability of being adversely determined and if adversely determined, would reasonably be expected to have a Material Adverse Effect or (iii) in which the relief sought is an injunction or other stay of the performance of any Loan Document;

(d)      (i) to the extent that any of the following would reasonably be expected to have a Material Adverse Effect: (x) the receipt by any Credit Party of any written notice from any Governmental Authority of violation of or potential liability or similar notice under Environmental Law, (y)(A) Releases in violation of Environmental Law, (B) the existence of any condition that would reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any materially adverse change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law, and (z) the receipt by any Credit Party of notification that any Property of any Credit Party or any of its Subsidiaries is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities, and (ii) any proposed acquisition or lease of Real Estate, if such acquisition or lease would have a reasonable likelihood in the good faith opinion of the Borrower of resulting in Material Environmental Liabilities;

(e)      (i) on or prior to any filing by any ERISA Affiliate of any notice of intent to terminate any Title IV Plan reasonably likely to result in material liability to any Credit Party, a copy of such notice and (ii) promptly, and in any event within ten (10) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice (which may be made by telephone if promptly confirmed in writing) describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto;

(f)      any Material Adverse Effect subsequent to the later of (i) the Petition Date and (ii) the date of the most recent audited financial statements delivered to the Agent and Lenders pursuant to Section 5.1(a) of this Agreement;

(g)      any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(h)      any actual strike or work stoppage against any Credit Party or any Subsidiary of any Credit Party by any employees of such Credit Party or Subsidiary of any Credit Party if the

66

same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(i)      any event that results in a mandatory prepayment of the Obligations pursuant to Section 2.8.

Each notice pursuant to this Section shall be an Electronic Transmission accompanied by a statement by a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein, and stating what action the Borrower or other Person proposes to take with respect thereto and at what time.

5.4     Preservation of Corporate Existence, Etc.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)     preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 6.3;

(b)     preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 6.3 and sales of assets permitted by Section 6.2 and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)     use its commercially reasonable efforts, in the ordinary course of business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it except to the extent any failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(d)     preserve or renew all of its registered Trademarks and material Intellectual Property, the non-preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect (provided that the foregoing does not include expirations of registered Intellectual Property at the end of the applicable statutory term).

5.5     Maintenance of Property.  Each Credit Party shall use commercially reasonable efforts to maintain, and shall cause each of its Subsidiaries to use commercially reasonable efforts to maintain, and preserve all its tangible Property which is necessary in its business in good working order and condition, ordinary wear and tear and damage by casualty or condemnation excepted (subject to the Credit Parties' right to repair or restore such Property to the extent such Credit Party has elected to use insurance proceeds in accordance with Section 2.8(b) hereof with respect to such Property) and shall make all necessary repairs thereto and renewals and replacements thereof, in each case, in accordance with its commercially reasonable business judgment except, in each case, where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

5.6     Insurance.  The Credit Parties shall, and shall cause each of their Subsidiaries to, maintain with financially sound and reputable insurance companies insurance with respect to their assets, properties and business, against such hazards and liabilities, of such types and in such amounts, as is customarily maintained by companies in the same or similar businesses similarly situated, including Flood Insurance,

67

to the extent requested by any Lender, the Agent or the Lender Advisors, sufficient to satisfy the Flood Insurance Requirement. A true and complete listing of such insurance, including issuers, coverages and deductibles, shall be provided to the Agent promptly following the Agent's reasonable request therefor. Notwithstanding the requirements above, Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

5.7    Payment of Tax Obligations.    Each Credit Party shall, and shall cause each of its Subsidiaries to, pay as the same shall become due and payable (subject to any applicable grace or cure periods) all federal and other Tax liabilities, assessments and governmental charges or levies upon it or its Property, except to the extent the same are stayed by the Bankruptcy Court or are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP (or the applicable foreign equivalent in the case of Foreign Subsidiaries) are being maintained by such Person, except where the failure to so pay would not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

5.8    Compliance with Laws.    Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except (i) where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect or (ii) as otherwise excused or prohibited by the Bankruptcy Code and subject to any required approval of the Bankruptcy Court.

5.9    Inspection of Property and Books and Records.    Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain books of record and account, in which full, true and correct entries in conformity with GAAP (or the applicable foreign equivalent in the case of Foreign Subsidiaries) in all material respects consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person. Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased or controlled property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event (x) no notice shall be required and (y) the Agent shall have access at any and all times during the continuance thereof): (a) provide access to such property to the Agent and any of its Related Persons, as frequently as the Agent reasonably determines to be appropriate, but, unless an Event of Default shall have occurred and be continuing, no more than once per calendar year; and (b) permit the Agent and any of its Related Persons to conduct field examinations, audit, inspect, and make extracts and copies (or take originals if reasonably necessary) from all of such Credit Party's books and records, and evaluate and make physical verifications and appraisals of the Inventory and other Collateral in any manner and through any medium that the Agent reasonably considers advisable, in each instance, at the Credit Parties' reasonable expense; *provided* that the Credit Parties shall only be obligated to reimburse the Agent for the expenses of one such field examination, audit and inspection per calendar year or more frequently if an Event of Default has occurred and is continuing. Any Lender may at its sole cost and expense accompany the Agent or its Related Persons in connection with any inspection. Without limiting the foregoing, the Borrower will participate and will cause its key management personnel to participate in one (1) meeting per Fiscal Quarter with the Agent and the Lenders, which meetings shall be held at such times and such places reasonably convenient to the Required Lenders and the Borrower (which such meeting may be a telephonic or video conference meeting as determined by the Agent (acting at the Direction of the Required Lenders) and the Borrower in their reasonable discretion).

In no event shall the requirements set forth in this Section 5.9 require Holdings or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-

68

financial proprietary information Holdings of its Subsidiaries, (ii) in respect of which disclosure to the Agent or any Lender (or their respective representatives) is prohibited by Requirements of Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product or confidentiality obligations.

5.10   Use of Proceeds.  Each Credit Party shall, and shall cause each of its Subsidiaries to, subject to the terms and conditions herein, use the proceeds of the Loans on or after the Closing Date, in accordance with the Orders and the Approved Budget (subject to Permitted Variances), including to: (i) pay related transaction costs, fees and expenses (including attorney's fees) required to be paid hereunder with respect to the DIP Facility; (ii) fund interest, fees, and other payments contemplated in respect of the DIP Facility and adequate protection payments contemplated by the Orders; (iii) provide working capital and for other general corporate purposes of the Credit Parties and their Subsidiaries; (iv) fund the costs of the administration of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court for payment, including amounts paid pursuant to the First Day Orders; (v) fund and pay obligations arising out of, or that are related to, the Carve-Out; and (vi) any other purpose set forth in the Approved Budget.  The Credit Parties shall not be permitted to use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Loan Documents, the Approved Budget (subject to Permitted Variances), the Orders or the Bankruptcy Code; *provided* that this Section 5.10 shall not be construed to limit Allowed Professional Fees (as defined in the Interim Order).

5.11   [Reserved].

5.12   [Reserved].

5.13   Further Assurances.

(a)      Each Credit Party shall ensure that all written information, exhibits and reports prepared for and furnished to the Agent or the Lenders (other than projections and other forward looking statements prepared in good faith), when taken as a whole, do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not materially misleading when taken as a whole in light of the circumstances in which made, and will promptly disclose to the Agent and the Lenders and correct any material defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof (it being acknowledged and agreed by the Agent and the Lenders that projections as to future events are not to be viewed as facts and are subject to uncertainties many of which are beyond Holdings or its Subsidiaries control, no assurances are given or representations made that such results will be realized and that the actual results during the period or periods covered by such projections may differ materially from the projected results).

(b)      Promptly upon the reasonable written request by the Agent (acting at the Direction of the Required Lenders, acting reasonably), the Credit Parties shall (and, subject to the limitations set forth herein and in the Collateral Documents, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as the Agent (acting at the Direction of the Required Lenders) may reasonably require from time to time in order (i) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (ii) to perfect and maintain the validity, effectiveness and (to the extent required hereby) priority of any of the Collateral Documents and the Liens intended to be created thereby and (iii) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to

69

the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document. Without limiting the generality of the foregoing and except as otherwise approved in writing by the Required Lenders, the Credit Parties shall cause each of their Subsidiaries (other than Excluded Subsidiaries) within fifteen (15) days (or such later date as may be agreed to by Agent (acting at the Direction of the Required Lenders in their sole discretion)) after formation or acquisition thereof, to guaranty the Obligations and to cause each such Subsidiary to grant to the Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations set forth herein and in the Collateral Documents, all of such Subsidiary's Property (other than Excluded Property) to secure such guaranty. Within fifteen (15) days (or such later date as may be agreed to by Agent (acting at the Direction of the Required Lenders in their sole discretion)) after the formation of acquisition thereof, the Credit Parties shall deliver, or cause to be delivered, to Agent, customary resolutions, secretary certificates and certified Organization Documents, in each instance with respect to each Credit Party formed or acquired, and each Credit Party or Person (other than a Credit Party) whose Stock is being pledged, after the Closing Date.

5.14    Environmental Matters. Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Environmental Liability; *provided* that no Credit Party shall be required to undertake any Remedial Action to the extent that such Credit Party's obligation to do so is being contested in good faith, by proper proceedings, in accordance with applicable Requirements of Law (including Environmental Laws) or has been stayed by the Bankruptcy Court. Without limiting the foregoing, if an Event of Default is continuing or if the Agent or the Required Lenders at any time have a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any non-contingent Environmental Liabilities that would reasonably be expected to, individually or in the aggregate, result in a Material Environmental Liability, then each Credit Party shall, promptly upon receipt of request from the Agent (acting at the Direction of the Required Lenders), cause the performance of, and allow the Agent and its Related Persons reasonable access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case to the extent necessary to investigate the breach. Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent (acting at the Direction of the Required Lenders) and shall be in form and substance reasonably acceptable to Agent (acting at the Direction of the Required Lenders).

5.15    [Reserved].

5.16    Post-Closing Requirement. Each Credit Party agrees to deliver or to cause to be delivered to the Agent, in form and substance reasonably satisfactory to the Agent (acting at the Direction of the Required Lenders, acting reasonably), the items described on Schedule 5.16 on or before the dates specified with respect to such items, or such later dates as may be agreed to the Agent (acting at the Direction of the Required Lenders).

5.17    Credit Ratings. The Borrower shall at all times use commercially reasonable efforts to obtain within thirty (30) days following the date the Final Order is entered to obtain and thereafter to maintain, (a) a public rating (but not any particular rating) in respect of each Class of Loans under this

70

Agreement from each of S&P and Fitch and (b) maintain a public rating (but not any particular rating) in respect of the Loans from each of S&P and Fitch.

5.18   Litigation Updates.   The Borrower will, and will cause its key, relevant management members to participate and to, provide, as part of the weekly calls required by Section 5.22, any updates regarding the claims arising from the audit of XPO Intermodal by the California Employment Development Department and/or the New Jersey Department of Labor, as applicable, regarding the classification of independent contractors operating in California and New Jersey, as applicable.

5.19   [Reserved].

5.20   [Reserved].

5.21   [Reserved].

5.22   Weekly Advisor Calls.

(a)   Commencing the week of January 18, 2026, the Borrower and the Borrower's advisors shall hold weekly calls with the Lender Advisors; *provided* that, to the extent requested by the Lender Advisors, such weekly call shall include representatives from the Lenders (other than Public Lenders) and the Borrower, as applicable.   The date and time of the weekly advisor calls shall be agreed among, the Lender Advisors, the Borrower and the Borrower's advisors.

(b)   At the reasonable request of the Lender Advisors or any Lender, the Credit Parties shall, and shall cause their Subsidiaries to, provide the Lender Advisors with any reasonably available backup models, analysis or other materials reasonably requested by the Lender Advisors or any Lender to monitor the financial and operating performance of the business of the Credit Parties and their Subsidiaries or otherwise.

5.23   Milestones.   The Credit Parties shall, or shall cause, the actions and events set forth on Annex I to occur by the times and dates set forth therein, unless waived either (i) by the Agent (acting at the Direction of the Required Lenders) or (ii) to the same extent under the Restructuring Support Agreement, as any such time and date may be extended from time to time either (i) by the Agent (acting at the Direction of the Required Lenders) or (ii) to the same extent under the Restructuring Support Agreement; *provided* that, without limiting the foregoing, where used in Annex I, any "delivery" required by this Section 5.23 shall require delivery to the Lender Advisors (and all such deliveries are to be in form and substance satisfactory to the Required Lenders in their sole discretion), as well as to any other Person specified in Annex I attached hereto (each, a "**Milestone**" and collectively, the "**Milestones**").

5.24   Approved Budget; Approved Variance Report.

(a) The use of Loans by the Credit Parties under this Agreement and the other Loan Documents shall be in accordance with the Approved Budget (subject to Permitted Variances).   The Approved Budget shall set forth, on a weekly basis, for the 13-week period covered thereby, the Budgeted Receipts, Budgeted Disbursements and Budgeted Liquidity for the period commencing with the week that includes the Petition Date and shall be approved by, and be in form and substance satisfactory to, the Required Lenders (it being acknowledged and agreed that the Initial Budget set forth as Exhibit 1.1(e) hereto is approved by and satisfactory to the Required Lenders and is and shall be the Approved Budget unless and until replaced in accordance with the terms of this Section

71

5.24).  The Approved Budget shall (i) include line-item reporting, the nature and scope of which shall be satisfactory to the Required Lenders and (ii) otherwise be in form and substance satisfactory to, and subject to the approval of, the Required Lenders.

(b)  On or before 5:00 p.m. on each Friday of every fourth calendar week (commencing on February 6, 2026), the Approved Budget shall be updated, modified or supplemented by the Borrower for the subsequent 13-week period (each, a "**Subsequent Budget**") and delivered to the Agent, the Lenders and the Lender Advisors, which Subsequent Budget shall be in form and substance  satisfactory to, and subject to the approval of, the Required Lenders (which may be communicated via a Direction of the Required Lenders); *provided* that the Lenders acknowledge and agree that the form of the Initial Budget is satisfactory; *provided further* that such Subsequent Budget shall not be effective unless the Agent (acting at the Direction of the Required Lenders in their sole discretion) or the Lender Advisors (on behalf of the Required Lenders) approves in writing (email to be sufficient) in their sole discretion; *provided*, *further* that, in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to a Subsequent Budget, the then current Approved Budget shall remain in effect unless and until such Subsequent Budget is approved as a new "Approved Budget" by the Agent (acting at the Direction of the Required Lenders in their sole discretion) or the Lender Advisors (on behalf of the Required Lenders).  Each Approved Budget delivered to the Agent and the Lender Advisors shall be accompanied by such supporting documentation as reasonably requested by the Required Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time of preparation thereof.  Notwithstanding anything herein to the contrary, if the Agent (acting at the Direction of the Required Lenders in their sole discretion) or the Lender Advisors (on behalf of the Required Lenders) have failed to object in writing (email to be sufficient) within three (3) Business Days after receipt of the proposed Subsequent Budget, the Agent (acting at the Direction of the Required Lenders in their sole discretion) shall be deemed to have approved such Subsequent Budget.

(c)  On the fourth (4th) Business Day of (i) the third (3rd) full calendar week (ending on Friday (such Friday, the "**Initial Variance Testing Period End Date**")) following the Petition Date and (ii) every second (2nd) calendar week (ending on Friday) following the third (3rd) full calendar week (ending on Friday (each such Friday, a "**Subsequent Variance Testing Period End Date**")) following the Petition Date, on or prior to 5:00 p.m., the Borrower shall deliver a budget variance report/reconciliation, certified by a Responsible Officer of the Borrower, in form satisfactory to the Required Lenders (the "**Approved Variance Report**"), setting forth in detail:

(i)  the Actual Disbursements on a line-by-line and aggregate basis for the two-week period (or, in the case of the initial Approved Variance Report, the three-week period) ending on the Initial Variance Testing Period End Date or the immediately preceding Subsequent Variance Testing Period End Date, as applicable (each such period, a "**Disbursement Variance Testing Period**");

(ii)  the Actual Receipts on a line-by-line and aggregate basis for the four-week period ending on the Initial Variance Testing Period End Date or the immediately preceding Subsequent Variance Testing Period End Date, as applicable (each such period, a "**Receipt Variance Testing Period**" and together with the Disbursement Variance Testing Period, each a "**Variance Testing Period**");

72

(iii)   a comparison (whether positive or negative, in dollars and expressed as a percentage) of (1) the Actual Receipts (and each line item thereof) for the Receipt Variance Testing Period to the Budgeted Receipts (and each line item thereof) and (2) the Actual Disbursements (and each line item thereof) for the Disbursement Variance Testing Period to the amount of Budgeted Disbursements (and each line item thereof), in each case, as set forth in the Approved Budget for the applicable Variance Testing Period; and

(iv)   as to each material variance contained in the Approved Variance Report, an indication as to whether such variance is temporary or permanent and, as to such variance, an analysis and explanation in reasonable detail for such material variance; and

(d)  The Borrowers shall deliver to the Agent and the Lender Advisors concurrently with the delivery of the Approved Variance Report pursuant to clause (c) above, a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders, signed by a Responsible Officer of the Borrower certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(e)  The Lenders (i) may assume that the Credit Parties will comply with the Approved Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent and the Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

5.25   Cash Management.  Each of the Credit Parties shall, and shall cause each of its Subsidiaries to, maintain the cash management of the Credit Parties in accordance with the Cash Management Order.

ARTICLE VI
NEGATIVE COVENANTS

Each Credit Party covenants and agrees that until the Termination Date:

6.1   Limitation on Liens.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("**Permitted Liens**"):

(a)   any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Closing Date and set forth in Schedule 6.1 securing Indebtedness outstanding on such date and permitted by Section 6.5(b), including replacement Liens on the Property currently subject to such Liens securing Indebtedness and/or other obligations permitted by Section 6.5(b);

(b)   any Lien created under any Loan Document or in accordance with the Orders;

73

(c)      Liens for Taxes, fees, assessments or other governmental charges (i) which are not past due, or (ii) the non-payment of which is permitted by Section 5.7;

(d)      carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the ordinary course of business which are (i) stayed by the Bankruptcy Court or (ii) not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP (or the applicable foreign equivalent in the case of Foreign Subsidiaries) are being maintained;

(e)      Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security and other government-mandated pension plan legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f)      Liens consisting of judgment or judicial attachment liens (other than for the payment of Taxes) in respect of judgments, the existence of which do not constitute an Event of Default; *provided* that the enforcement of such Liens is effectively stayed;

(g)      easements, covenants, conditions, rights of way, servitudes, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances which, either individually or in the aggregate, do not secure Indebtedness, and which do not interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party (including all encumbrances on each policy of title insurance in favor of the Agent delivered on the Closing Date);

(h)      [reserved];

(i)      Liens securing obligations contemplated by and in accordance with the Approved Budget (subject to Permitted Variances), which shall, for the avoidance of doubt, be junior in all respects to the Liens securing the Obligations under the Loan Documents;

(j)      any interest or title of a lessor or sublessor under any lease not prohibited by this Agreement;

(k)      Liens arising from precautionary uniform commercial code financing statements or similar filings under applicable laws filed under any lease not prohibited by this Agreement;

(l)      licenses (including licenses of Intellectual Property), sublicenses, leases or subleases granted by a Credit Party to non-Affiliate third parties in the ordinary course of business not interfering with the business of the Credit Parties or any of their Subsidiaries in any material respect (and not for any other purpose, including, without limitation, a Liability Management Transaction);

74

(m)    Liens in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC, in each case, solely to the extent not given in connection with the issuance of Indebtedness;

(n)    Liens (including the right of set-off) in favor of a bank, intermediary or other depository institution arising as a matter of law encumbering deposits and/or created pursuant to any agreement (including account control agreements) agreed to by the Agent (acting at the Direction of the Required Lenders acting reasonably);

(o)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Company or any Subsidiary of the Company in the ordinary course of business;

(p)    Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(q)    Liens explicitly permitted by the First Day Orders or Second Day Orders, including the Cash Management Order, which shall, for the avoidance of doubt, be junior in all respects to the Liens securing the Obligations under the Loan Documents (unless expressly contemplated otherwise);

(r)    intercompany licenses, sublicenses, leases or subleases permitted pursuant to Section 6.6;

(s)    liens solely on cash earnest money deposits made in connection with any Investments permitted under Section 6.4;

(t)    Liens that are contractual rights or set-off relating to purchase orders and other agreements entered into with customers of the Company or any of its Subsidiaries in the ordinary course of business;

(u)    Liens consisting of prepayments and security deposits in connection with leases, subleases, licenses, sublicenses, use and occupancy agreements, utility services and similar transactions entered into by the applicable Credit Party or Subsidiary of a Credit Party in the ordinary course of business;

(v)    Liens in favor of insurers (or other Persons financing the payment of insurance premiums) securing Indebtedness of the type described in and permitted under Section 6.5(r) hereof financing the premiums payable in respect of insurance policies issued by such insurers;

(w)    Liens on Property to be disposed of in accordance with Section 6.2 hereof in favor of the purchaser of such Property;

(x)    [reserved];

(y)    other Liens not otherwise permitted by the foregoing clauses (a) through (x) and (z); *provided* that the aggregate outstanding amount of all obligations secured thereby do not exceed $1,000,000 in the aggregate at any one time; *provided* that, if such Lien is securing Indebtedness

75

for borrowed money, such Lien shall be expressly subordinated and junior to the Liens securing the Obligations;

(z)      Liens on Property, and only such Property, which is the subject of an unconsummated asset purchase agreement in connection with an asset disposition permitted hereunder, which Liens secure the obligation of a Credit Party or any Subsidiary of a Credit Party under such agreement; and

(aa)      Permitted Prior Liens.

6.2      <u>Disposition of Assets</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly Dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse), except:

(a)      Dispositions of (i) Inventory, or used, damaged, obsolete, worn out or surplus equipment and (ii) other assets no longer used or useful in the business (including, the abandonment or Disposition of Intellectual Property), in each case, in the ordinary course of business;

(b)      Dispositions not otherwise permitted hereunder which are made for fair market value and the mandatory prepayment in the amount of the Net Proceeds of such Disposition is made if and to the extent required by <u>Section 2.8</u>; *provided* that, (i) at the time of any Disposition, no Event of Default shall exist or shall result from such Disposition, (ii) not less than one hundred percent (100%) of the aggregate sales price from such Disposition shall be paid in cash (*provided* that, for the avoidance of doubt, any repayment, forgiveness, extinguishment, satisfaction or other similar treatment of debt shall not constitute payment in cash) and (iii) the aggregate fair market value of all assets so sold by the Credit Parties and their Subsidiaries in reliance on this clause (b), taken together, shall not exceed $20,000,000 in the aggregate;

(c)      (i) Dispositions of Cash Equivalents in the ordinary course of business and (ii) conversions of Cash Equivalents into cash or other Cash Equivalents;

(d)      Dispositions resulting from an Event of Loss; *provided* that the proceeds are used and applied as required by <u>Section 2.8</u> hereof;

(e)      licenses, sublicenses, leases or subleases granted to non-Affiliate third parties in the ordinary course of business not interfering with the business of the Credit Parties in any material respect;

(f)      the sale or issuance of (i) the Stock in the Company or a Subsidiary to any Credit Party or (ii) the Stock of a Foreign Subsidiary that is not a Credit Party to another Foreign Subsidiary that is not a Credit Party (so long as such sale or issuance, to the extent constituting an Investment, is permitted pursuant to <u>Section 6.4</u>);

(g)      the transfer of Property (i) by a Credit Party to a Credit Party or (ii) by a Subsidiary that is not a Credit Party to (A) a Credit Party for no more than fair market value or (B) any other Subsidiary;

76

(h)        any Foreign Subsidiary may issue Stock to qualified directors where required by or to satisfy any applicable Requirement of Law, including any Requirement of Law with respect to ownership of Stock in Foreign Subsidiaries;

(i)        [reserved];

(j)        transactions permitted by <u>Section 6.3</u>;

(k)        Dispositions of past due accounts receivable in the ordinary course of business (including any discount and/or forgiveness thereof) or, in the case of accounts receivable in default, in connection with the collection or compromise thereof and in any event, not involving any securitization thereof;

(l)        (i) any termination of any lease in the ordinary course of business, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business;

(m)        Dispositions of Property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

(n)        Restricted Payments expressly permitted by <u>Section 6.8</u> hereof;

(o)        Dispositions of equipment to the extent that such equipment is simultaneously exchanged for credit against the purchase price of replacement equipment;

(p)        [reserved];

(q)        transfers of assets by a Credit Party to any Foreign Subsidiary; *provided* that the aggregate fair market value of all assets so transferred by the Credit Parties, collectively, shall not exceed $1,000,000 in the aggregate;

(r)        the termination of Rate Contracts;

(s)        (i) the lapse of registered Patents, Trademarks, Copyrights and other Intellectual Property as determined by any Credit Party or any of its Subsidiaries in the exercise of its reasonable business judgment or (ii) the abandonment of Patents, Trademarks, Copyrights and other Intellectual Property rights as determined by any Credit Party or any of its Subsidiaries in the exercise of its reasonable business judgment;

(t)        [reserved];

(u)        Dispositions of Property (other than of Real Estate) with an aggregate fair market value not to exceed $1,000,000 in the aggregate to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement Property; and

(v)        Dispositions of Property explicitly permitted by the First Day Orders or the Second Day Orders, including the Cash Management Order.

77

6.3    <u>Consolidations and Mergers</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge with, consolidate with or into, dissolve or liquidate into or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except:

(a)    any Subsidiary of the Borrower may be merged with or dissolved or liquidated into the Borrower or a Guarantor (other than Holdings) in connection with the Chapter 11 Cases (*provided* that the Borrower or such Guarantor shall be the continuing or surviving Person); and

(b)    the Credit Parties and their Subsidiaries may consummate mergers, consolidations, dissolutions, liquidations, conveyances, transfers, leases or dispositions contemplated by the Chapter 11 Plan consummated in accordance with the Restructuring Support Agreement and the Loan Documents.

6.4    <u>Loans and Investments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) purchase, acquire or hold any Stock, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination or (iii) make, purchase or acquire any advance, loan, note, extension of credit (other than trade payables in the ordinary course of business) or capital contribution to or any other investment in, any Person including the Borrower, any Affiliate of the Borrower or any Subsidiary of the Borrower (the items described in <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> are referred to as "**Investments**"); *provided* that, in determining the amount of Investments permitted under this <u>Section 6.4</u> the amount of any Investment not constituting Indebtedness outstanding at any time shall be the fair market value of the Investment by the applicable Person at the time of the initial making of such Investment, except for:

(a)    Investments in cash and Cash Equivalents, including, without limitation, deposit accounts;

(b)    Investments (i) by Holdings in then existing Credit Parties; (ii) by any Credit Party to or in any other then existing Credit Party; and (iii) by a Subsidiary of the Company that is not a Credit Party to or in any Credit Party or another then existing Subsidiary of the Company which is not a Credit Party; *provided* that any Investments made pursuant to this <u>clause (b)</u> constituting Indebtedness owed to a non-Credit Party by a Credit Party shall, in each case, at all times be unsecured and subordinated in right of payment to the Obligations;

(c)    [reserved];

(d)    Investments received as the non-cash portion of consideration received in connection with transactions permitted pursuant to <u>Section 6.2(b)</u>;

(e)    Investments acquired in connection with the settlement of delinquent Accounts in the ordinary course of business or in connection with the bankruptcy or reorganization of suppliers or customers or upon foreclosure with respect to any secured Investment;

(f)    [reserved];

(g)    Investments existing on the Closing Date and set forth on <u>Schedule 6.4</u>;

78

(h)        Investments comprised of Indebtedness permitted by Section 6.5(n);

(i)        [reserved];

(j)        the Transactions (to the extent constituting Investments);

(k)        to the extent constituting an Investment, transactions permitted under Section 6.3 hereof;

(l)        Investments, to the extent made prior to the Closing Date, consisting of Tranche A Revolving Loan Commitments and Tranche A Revolving Loans (each as defined in and issued under, the Existing Amended Credit Agreement (as defined in the Prepetition First Lien Credit Agreement));

(m)        [reserved];

(n)        to the extent constituting Investments, Rate Contracts permitted by Section 6.5(i) entered into in the ordinary course of business for bona fide hedging purposes and not for speculation;

(o)        accounts receivables acquired or held by the Credit Parties and their Subsidiaries owing to any of them, customer deposits for the purchase of goods and other similar amounts, in each case, to the extent created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Credit Parties or such Subsidiary;

(p)        to the extent constituting Investments, deposits made in the ordinary course of business securing Contractual Obligations of a Credit Party to the extent constituting a Permitted Lien;

(q)        to the extent constituting Investments, deposit and securities accounts maintained by any Credit Party and any of their Subsidiaries;

(r)        Investments of Holdings or any Subsidiary consisting of the Stock of a Subsidiary of Holdings or such Subsidiary on the Closing Date;

(s)        Guaranty obligations in respect of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business and consistent with past practice;

(t)        other Investments made by a Credit Party or any Subsidiary of a Credit Party not otherwise permitted by this Section 6.4 in an aggregate amount not to exceed $1,000,000 in the aggregate; *provided* that no Event of Default shall have occurred and be continuing or would immediately result therefrom; and

(u)        Investments (i) explicitly contemplated by and in accordance with the Approved Budget (subject to Permitted Variances), (ii) contemplated by and in accordance with the Restructuring Support Agreement or (iii) permitted by and in accordance with the First Day Orders or the Second Day Orders, including the Cash Management Order.

79

6.5    Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness existing on the Closing Date and set forth in Schedule 6.5;

(c)    [reserved];

(d)    unsecured intercompany Indebtedness permitted pursuant to Section 6.4(b);

(e)    Indebtedness outstanding under the Prepetition First Lien Credit Agreement on the Closing Date;

(f)    other Indebtedness not exceeding in the aggregate at any time outstanding $1,000,000;

(g)    [reserved];

(h)    endorsements for collection or deposit in the ordinary course of business;

(i)    Rate Contracts entered into in the ordinary course of business for bona fide hedging purposes and not for speculation with the Required Lenders' prior written consent;

(j)    Indebtedness arising under indemnity agreements to title insurers to cause such title insurers to issue to the Agent title insurance policies;

(k)    unsecured Indebtedness arising with respect to customary indemnification obligations and purchase price adjustments in favor of purchasers in connection with Dispositions permitted under Section 6.2(b);

(l)    Indebtedness arising under letters of credit supporting Indebtedness otherwise permitted to be incurred by this Section 6.5;

(m)    Indebtedness arising under guaranties made in the ordinary course of business of obligations of any Credit Party (other than Holdings), which obligations are otherwise permitted hereunder; *provided* that, if such obligation is (x) subordinated to the Obligations, such guaranty shall be subordinated to the same extent or (y) otherwise not senior to the Obligations, such guaranty shall not be senior to the Obligations to the same extent;

(n)    Indebtedness incurred in the ordinary course of business with respect to surety and appeals bonds, performance bonds and other similar obligations;

(o)    [reserved];

(p)    [reserved];

(q)    [reserved];

80

(r)      Indebtedness incurred in order to finance the payment of insurance premiums in the ordinary course of business;

(s)      Indebtedness in respect of netting services, overdraft protection and similar arrangements in connection with deposit accounts;

(t)      Indebtedness consisting of corporate credit cards, purchase cards and similar arrangements (but, for the avoidance of doubt, not including the Credit Parties' driver fuel purchasing programs) not to exceed $500,000 at any one time outstanding;

(u)      Indebtedness incurred by Foreign Subsidiaries in an aggregate principal amount (excluding any interest thereon that has been paid-in-kind) not to exceed the United States dollar equivalent $500,000; *provided* that such Indebtedness shall not be incurred or guaranteed by any Credit Party; and

(v)      unsecured Indebtedness representing reasonable deferred compensation to employees of Holdings and its Subsidiaries incurred in the ordinary course of business.

6.6      Transactions with Affiliates.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (w) enter into any transaction with any Sponsor or any Affiliate of any Sponsor, of the Borrower or of any such Subsidiary (other than, in each case, transactions between or among (i) solely Credit Parties or (ii) solely Subsidiaries of the Credit Parties that are not Credit Parties or any director (or similar official)) of any of the foregoing, (x) pay any management, consulting or similar fees to any of the foregoing, (y) pay or reimburse any of the foregoing for any costs, expenses and similar items or (z) pay any indemnification payments to any Sponsor, except:

(a)      (i) with respect to transactions between or among the Company and its Subsidiaries as expressly permitted by this Agreement and (ii) with respect to any other Affiliate or any other such Person as expressly permitted by Sections 6.4(j), 6.8 and 6.12 of this Agreement;

(b)      upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of the Credit Parties or their Subsidiaries; *provided* that in no event shall a Credit Party or any Subsidiary of a Credit Party perform or provide any management, consulting, administrative or similar services to or for any Person other than another Credit Party, a Subsidiary of a Credit Party or a customer who is not an Affiliate in the ordinary course of business (for the avoidance of doubt, this proviso shall not prohibit any director, officer or employee of any Credit Party or its Subsidiaries from serving on the board of directors (or analogous governing body) of any other Person owned or controlled by Sponsors);

(c)      employment, indemnity and severance arrangements between any Credit Party and its officers and employees;

(d)      payment of reasonable compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries and for the reimbursement of out-of-pocket expenses actually incurred by such officers and employees in the ordinary course of business;

(e)      as set forth on Schedule 6.6 as of the Closing Date;

81

(f)        payment of directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings not to exceed in the aggregate, with respect to all such items, $1,000,000; and

(g)        transactions contemplated by and in accordance with the Approved Budget (subject to Permitted Variances).

6.7        <u>Compliance with ERISA</u>.  No ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.8        <u>Restricted Payments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or (ii) purchase, redeem or otherwise acquire for value any Stock now or hereafter outstanding (the items described in <u>clauses (i)</u> and <u>(ii)</u> above are referred to as "**Restricted Payments**"); except that (x) any Wholly-Owned Subsidiary of Newco Holdings may declare and pay dividends or make distributions to Newco Holdings or any Wholly-Owned Subsidiary of Newco Holdings, (y) any Wholly-Owned Subsidiary of the Company (other than Newco Holdings or any Subsidiary of Newco Holdings) may declare and pay dividends or make distributions to the Company or any Wholly-Owned Subsidiary of the Company and (z) so long as no equityholder of such Subsidiary is an Affiliate of the Credit Parties (not including any other Credit Party (other than Holdings)), any Subsidiary that is not a Wholly-Owned Subsidiary may declare and pay dividends or make distributions on a pro rata basis, and except that:

(a)        [reserved];

(b)        [reserved];

(c)        in the event any Credit Party and/or any of its Subsidiaries are members of (or such Credit Party is a disregarded entity or partnership directly or indirectly owned by members of such a group) a consolidated, combined, unitary or similar Tax group for U.S. federal, state and local income Tax purposes of which a direct or indirect parent of such Credit Party is the common parent, such Credit Party may make distributions to such direct or indirect parent to pay U.S. federal, state, and local income Taxes then due and payable, or expected to become due and payable within ten (10) Business Days; *provided* that the amount of such distribution shall not be greater than the amount of such Taxes or expenses that would have been due and payable by such Credit Party and its relevant Subsidiaries as a stand-alone consolidated, combined, unitary or similar Tax group with Holdings as the common parent (a "**Tax Distribution**") and to pay franchise Taxes and other similar licensing expenses incurred in the ordinary course of business; and

(d)        the Company may make cash distributions to Holdings and used by Holdings to pay operating expenses incurred in the ordinary course of business and other similar corporate overhead costs and expenses (including salaries and other benefits payable to officers of Holdings and payments of directors fees, consulting fees and reimbursement of out-of-pocket costs and expenses, and indemnification payments in respect of such officers and directors), in each case, incurred in the ordinary course of business; *provided* that the aggregate amount of all Restricted Payments paid pursuant to this <u>Section 6.8(d)</u> shall not exceed $1,000,000.

82

For the avoidance of doubt, when calculating whether any Restricted Payment is permitted to be made pursuant to this Section 6.8, any *pro forma* calculation shall take into account such Restricted Payment and all other Restricted Payments made substantially contemporaneously therewith and the *pro forma* impact of all such Restricted Payments.

6.9    Change in Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any material line of business substantially different from those lines of business carried on by it on the Closing Date and those reasonable extensions thereof and activities reasonably related or complementary thereto, unless consented to by the Agent (acting at the Direction of the Required Lenders).  Holdings shall not engage in any business activities or own any Property other than (i) ownership of the Stock of the Company (and indirectly the Subsidiaries thereof), (ii) activities incidental to maintenance of its corporate existence, (iii) performance of its obligations under the Loan Documents to which it is a party and (iv) activities permitted to be conducted by Holdings pursuant to the terms of the Loan Documents.

6.10    Change in Structure.  Except as expressly permitted under Section 6.3, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to amend any of its Organization Documents in any respect materially adverse to the Agent or the Lenders.  It is understood and agreed that the mere issuance of Stock not otherwise prohibited by this Agreement in and of itself is not prohibited by this Section 6.10.

6.11    Changes in Accounting, Name and Jurisdiction of Organization.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to: (i) make any material change in accounting treatment or reporting practices, except as required by GAAP or its auditor in order to comply with GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) solely with respect a Credit Party, change its name as it appears in official filings in its jurisdiction of organization or (iv) solely with respect a Credit Party, change its jurisdiction of organization, in the case of clauses (iii) and (iv), without at least ten (10) days' prior written notice to the Agent (or other time period as the Agent (acting at the Direction of the Required Lenders) may agree).

6.12    Limitation on Payments of Certain Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, make any payment or prepayment of principal of, premium, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to Subordinated Indebtedness (the items described above are referred to as "**Restricted Debt Payments**"), except that:

(a)    the Credit Parties and their Subsidiaries may make payments of intercompany Indebtedness permitted under Section 6.5;

(b)    the Credit Parties and their Subsidiaries may make payments to certain creditors as contemplated by and in accordance with the Approved Budget (subject to Permitted Variances), the Restructuring Support Agreement, the First Day Orders or Second Day Orders.

6.13    Amendments to Certain Indebtedness.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend, supplement, waive or otherwise modify any provision of any Subordinated Indebtedness except to the extent permitted by the applicable subordination agreement or subordination terms.

83

(b)     Except as permitted by the First Day Orders, Second Day Orders or the Restructuring Support Agreement, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend the terms of any Subordinated Indebtedness if the effect of such change or amendment is to: (A) increase the interest rate on such Indebtedness in excess of the amount permitted under the relevant subordination arrangement; (B) shorten the dates upon which payments of principal or interest are due on such Indebtedness; (C) add or change in a manner materially adverse to the Credit Parties any event of default or add or make more restrictive any covenant with respect to such Indebtedness, unless the parties hereto have agreed to and have made a corresponding change hereunder (but in such event maintaining any applicable cushion in such corresponding provisions); (D) change in a manner materially adverse to the Credit Parties the prepayment provisions of such Indebtedness in a manner adverse to the Agent or the Lenders unless the Agent (acting at the Direction of the Required Lenders) shall consent to such change; (E) change the subordination provisions thereof (or the subordination terms of any guaranty thereof); (F) change or amend any other term if such change or amendment would materially increase the obligations of the Credit Parties or confer additional material rights on the holder of such Indebtedness in a manner materially adverse to the Credit Parties, the Agent or the Lenders unless the parties hereto have agreed to and have made a corresponding change hereunder (but in such event maintaining any applicable cushion in such corresponding provisions); or (G) reasonably likely to materially adversely affect the Lenders and/or the Agent hereunder.

6.14    No Negative Pledges.  After the Petition Date, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective after the Petition Date any consensual restriction or encumbrance of any kind on the ability of any Credit Party or Subsidiary to pay dividends or make any other distribution on any of such Credit Party's or Subsidiary's Stock to pay fees, including management fees, or make other payments and distributions to the Borrower or any other Credit Party except (i) in connection with any document or instrument governing Indebtedness permitted pursuant to Sections 6.1(g), 6.1(y) and 6.5(e) or (ii) as permitted by the Restructuring Support Agreement or the First Day Orders or Second Day Orders.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation after the Petition Date prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of the Agent or any Lender, whether now owned or hereafter acquired except (a) in connection with any document or instrument governing Liens permitted pursuant to Section 6.1; *provided* that (other than with respect to Section 6.1(y)) any such restriction contained therein relates only to the asset or assets subject to such permitted Liens, (b) any such prohibition or restriction by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and joint venture agreements entered into in the ordinary course of business and permitted under the terms of this Agreement, so long as any such prohibition or restriction on creation of Liens contained therein relates only to the particular asset or assets the subject of such lease or license or the equity interests of the joint venture issued to any such Person and (c) as permitted by the Restructuring Support Agreement or the First Day Orders or Second Day Orders.

6.15    OFAC; USA Patriot Act; Anti-Corruption Laws.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, fail to comply with the laws, regulations and executive orders referred to in Section 4.24.  No Credit Party or Subsidiary, nor to the knowledge of the Credit Party, any director, officer, agent, employee or other Person, in each case, acting on behalf of a Credit Party or any Subsidiary, will use the proceeds of any Loan, directly or indirectly, for any payments to any Person, including any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, or otherwise take any action, directly or indirectly, that would result in a violation of

84

any Anti-Corruption Laws.  Furthermore, the Credit Parties will not, directly or indirectly, use the proceeds of the transaction, or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation of any Sanctions.

6.16    <u>Sale Leasebacks</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

6.17    <u>Hazardous Materials</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Credit Party or any Subsidiary of any Credit Party), other than such violations, Environmental Liabilities and effects that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.18    <u>Material Property</u>.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to sell, transfer or otherwise dispose (whether pursuant to a sale, lease, license, transfer, investment, restricted payment, dividend, designation or otherwise relating to the exclusive rights thereto, including without limitation, any Investment, Restricted Payment, Disposition, assignment or transfer) any Material Property to any Affiliate or Subsidiary that is not a Credit Party.

(b)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, allow any Subsidiary that is not a Credit Party to own or hold an exclusive license to any Material Property .

6.19    <u>Voting Threshold Influences</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries or controlled Affiliates to, enter into any transaction, agreement, waiver, amendment or modification to this Agreement or any Loan Document that authorizes additional Indebtedness for the purpose of, or that has the effect of, obtaining consent to any transaction pursuant to any voting threshold required under this Agreement, unless consented to by each Lender directly and adversely affected thereby.

6.20    [Reserved].

6.21    <u>Variance Testing</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, permit (i) the aggregate (and for the avoidance of doubt, not on a line-by-line basis) Actual Disbursements (excluding, for the avoidance of doubt, Actual Restructuring Related Amounts) to exceed the aggregate (and for the avoidance of doubt, not on a line-by-line basis) Budgeted Disbursements (excluding, for the avoidance of doubt, Budgeted Restructuring Related Amounts) or (ii) the aggregate (and for the avoidance of doubt, not on a line-by-line basis) Actual Receipts to be less than the aggregate (and for the avoidance of doubt, not on a line-by-line basis) Budgeted Receipts, in each case, as of the last day of such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period.

6.22    <u>DIP Order</u>.  Notwithstanding anything to the contrary herein, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, use any portion or proceeds of the Loans or the

85

Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the Orders.

6.23    <u>Insolvency Proceeding Claims</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, incur, create, assume, suffer to exist, or permit any other superpriority administrative claim that is *pari passu* with or senior to the claim of the Agent or the Lenders against the Debtors or any Credit Party, except as set forth in the Orders or the Cash Management Order (including, for the avoidance of doubt, the Carve-Out).

6.24    <u>Bankruptcy Actions</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, absent Direction of the Required Lenders, file a motion seeking, or consent to the entry of, any order of the Bankruptcy Court granting authority to (x) take any action materially inconsistent with the terms of this Agreement, the Orders or the other Loan Documents or (y) refrain from taking any action that, if not taken would be materially inconsistent with the terms of the Orders or any of the other Loan Documents.

6.25    <u>Liability Management Transaction; Certain Payments</u>.

(a)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, during the term of this Agreement, and so long as the discharge of the Obligations has not occurred, enter into any Liability Management Transaction.

(b)    No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, during the term of this Agreement, and so long as the discharge of the Obligations has not occurred, pay any management or other fees to any Sponsor.

ARTICLE VII
[RESERVED]

ARTICLE VIII
EVENTS OF DEFAULT

8.1    <u>Event of Default</u>. Any of the following shall constitute an "**Event of Default**":

(a)    <u>Non-Payment</u>.  Any Credit Party fails (i) to pay when and as required to be paid herein, any amount of principal of any Loan, including after maturity of the Loans (ii) to pay within three (3) Business Days after the same shall become due, interest on any Loan or (iii) within five (5) Business Days after the same shall become due, any fee, premium or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)    <u>Representation or Warranty</u>.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other written statement (other than projections, estimates, other forward looking information or general economic or industry information) by any such Person, or any of their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

86

(c)    Specific Defaults.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in (i) any of Section 5.13 and 5.24, and such failure shall continue for one (1) Business Day or (ii) any of Sections 5.1, 5.2(a), 5.2(b), 5.3(a), 5.10, 5.16, 5.18, 5.22, 5.23 and 5.25 or Article VI; *provided*, that any grace period otherwise set forth in the Orders in respect of any covenant in this clause (c) shall be applicable herein; or

(d)    Other Defaults.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Agent (acting at the Direction of the Required Lenders); or

(e)    Cross-Default.  Any Credit Party or any Subsidiary of any Credit Party (i) fails to make any payment in respect of any Indebtedness (other any such Indebtedness that was incurred prior to the commencement of the Chapter 11 Cases (including Indebtedness under the Prepetition First Lien Credit Agreement), as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $15,000,000 (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness referred to in clause (i) above and such failure continues after the applicable grace or notice period, if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or cash collateral in respect thereof to be demanded, in each case of clause (i) and (ii), other than in connection with the Chapter 11 Cases or entry into this Agreement, and unless the payment with respect to such Indebtedness is stayed by the Bankruptcy Court or unless any of the foregoing results from the obligations with respect to which the Bankruptcy Court prohibits or does not permit any Credit Party from applicable compliance; or

(f)    Insolvency; Voluntary Proceedings.  Other than in connection with the Chapter 11 Cases, any Subsidiary of a Credit Party (other than a Credit Party): (i) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (ii) except as expressly permitted under Section 6.3, voluntarily ceases to conduct its business in the ordinary course; (iii) commences any Insolvency Proceeding with respect to itself; or (iv) takes any action to authorize any of the foregoing; or

(g)    Involuntary Proceedings.  Other than the Chapter 11 Cases, (i) any involuntary Insolvency Proceeding is commenced or filed against any Subsidiary of a Credit Party (other than a Credit Party), or any writ, judgment, warrant of attachment, execution or similar process, is issued or levied against a material part of any such Person's Properties, and any such proceeding or petition shall not be dismissed, or such writ, judgment, warrant of attachment, execution or similar

87

process shall not be released, vacated or fully bonded within sixty (60) days after commencement, filing or levy; (ii) any Subsidiary of a Credit Party (other than a Credit Party) admits the material allegations of a petition against it in any Insolvency Proceeding, or an order for relief (or similar order under non-U.S. law) is ordered in any Insolvency Proceeding; or (iii) any Subsidiary of a Credit Party (other than a Credit Party) acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefor), or other similar Person for itself or a substantial portion of its Property or business; or

(h)      Monetary Judgments.  One or more judgments, non-interlocutory orders, decrees or arbitration awards (other than, for the avoidance of doubt, any judgments, non-interlocutory orders decrees or arbitration awards stayed by the Bankruptcy Court) shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability (to the extent (A) not covered by independent third-party insurance or subject to any deductible (but solely to the extent of such deductible) or (B) not covered by any applicable indemnification provision in the any document executed in connection with any Acquisition consented to in writing by the Required Lenders) as to any single or related series of transactions, incidents or conditions, of at least $15,000,000, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of sixty (60) days after the entry thereof; or

(i)      Non-Monetary Judgments.  One or more non-monetary judgments, orders or decrees (other than, for the avoidance of doubt, any judgments, non-interlocutory orders decrees or arbitration awards stayed by the Bankruptcy Court) shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)      Collateral.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring, permit or fail to object to an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in a material portion of the Collateral (to the extent that such perfection or priority is required hereby) purported to be covered thereby or such security interest shall for any reason (other than the result of an action taken by the Agent in accordance with the terms hereof or the failure of Agent to take any action within its control) cease to be a perfected and first priority security interest subject only to Permitted Liens with respect to a material portion of the Collateral; or

(k)      Ownership.  A Change of Control shall occur; or

(l)      Restructuring Support Agreement.  A default under the Restructuring Support Agreement by any Credit Party or any of its Affiliates or Subsidiaries party to the Restructuring Support Agreement shall have occurred and be continuing (with all applicable grace periods having expired) or the Restructuring Support Agreement is terminated for any reason; or

(m)      [Reserved]

88

(n)      Bankruptcy Matters.  Any of the following occurs in any of the Chapter 11 Cases, except to the extent consented to by the Required Lenders (which may be communicated via a Direction of the Required Lenders):

(i)      other than a motion in support of the Orders or actions in accordance with the Restructuring Support Agreement, the bringing of any motion, taking of any action, or the filing of any pleading, Chapter 11 Plan, or Disclosure Statement attendant to such plan, by any of the Credit Parties or any controlled Affiliates or  Subsidiary of a Credit Party in the Chapter 11 Cases (or the entry of an order of the Bankruptcy Court granting a motion) seeking: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens; (C) except as provided in the Orders, to use cash collateral of the Agent and the other Secured Parties or the Prepetition First Lien Lenders under Section 363(c) of the Bankruptcy Code without the written consent of such parties; or (D) to approve any other action or actions adverse to the Agent and the other Secured Parties' rights and remedies under the Loan Documents or the validity or perfection of their Liens on the Collateral;

(ii)      other than in accordance with the Restructuring Support Agreement or with the consent of the Required Lenders, (A) the filing of any Chapter 11 Plan or Disclosure Statement attendant thereto by a Credit Party that would not result in the full and final satisfaction and discharge of all Obligations on or before the effective date of such Chapter 11 Plan or (B) if any of the Credit Parties or their Subsidiaries or their controlled Affiliates shall seek, support or fail to contest in good faith the filing or confirmation of any Chapter 11 Plan or entry of any such order that would not result in the full and final satisfaction and discharge of all Obligations on or before the effective date of any such Chapter 11 Plan;

(iii)      the entry of any final order terminating any Credit Party's exclusive right to file a Chapter 11 Plan or the expiration of any Credit Party's exclusive right to file a Chapter 11 Plan; *provided* that termination of such exclusivity periods is not the result of any action by a Lender or any controlled Affiliate of a Lender;

(iv)      the entry of an order in the Chapter 11 Cases confirming a Chapter 11 Plan that is not either (A) in accordance with the Restructuring Support Agreement or (B) otherwise acceptable to the Required Lenders, other than to the extent that such Chapter 11 Plan provides for the full and final satisfaction and discharge of all Obligations in cash on or before the effective date of any such Chapter 11 Plan;

(v)      the entry by a Credit Party into any proposed settlement of any Claim, litigation, dispute, cause of action, or other proceeding, in each case, against the Debtors which requires a payment by the Debtors of any amount greater than $150,000 that is not contemplated by the Approved Budget (subject to Permitted Variances);

(vi)      the Debtors' filing of a Definitive Document that is not acceptable or reasonably acceptable, as applicable, to the Required Lenders (in accordance with the consent rights set forth in the Restructuring Support Agreement) or the filing of a Chapter 11 Plan that provides for any treatment or recovery on account of DIP Term Loan Claims or Prepetition First Lien Claims that are not consented to by the Required Lenders;

89

(vii)    (A) the entry of an order amending, supplementing, staying, revoking, vacating or otherwise modifying the Loan Documents, the Cash Management Order, or the Orders (including any order in respect of the Milestones specified herein), (B) the filing by a Credit Party of a motion for reconsideration with respect to the Orders, or (C) any Credit Party or of any Subsidiary or controlled Affiliate of a Credit Party shall fail to comply in all material respects with the Orders;

(viii)    (A) the dismissal or conversion of any Chapter 11 Case or (B) any Credit Party or any controlled Affiliate or Subsidiary of a Credit Party shall file a motion or other pleading seeking the conversion or dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(ix)    any Credit Party or any Subsidiary of a Credit Party shall file a motion (without consent of the Required Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral, solely if the value of such collateral exceeds $500,000;

(x)    the entry of an order in the Chapter 11 Cases avoiding or requiring the disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents, the Restructuring Support Agreement or the Orders;

(xi)    other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents, the Orders, or the orders approving any of the First Day Pleadings or the Second Day Pleadings, (A) the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code, clause (b) of Section 503 of the Bankruptcy Code, or clause (b) of Section 507 of the Bankruptcy Code of the Bankruptcy Code *pari passu* with or senior to the claims of the Agent and the Secured Parties under this Agreement and the other Loan Documents or (B) there shall arise or be granted by the Bankruptcy Court any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted by the Loan Documents except, in each case, as expressly provided in the Loan Documents or in the Order then in effect (including the Carve Out);

(xii)    the Orders shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal (other than through the entry of the Final Order), in each case so as to cause the Orders to cease to create a valid and perfected Lien on the Collateral (without further action other than the entry and terms of the Orders) to the extent the Orders do so on the Closing Date;

(xiii)    subject to the Carve-Out, an order in the Chapter 11 Cases shall be entered (i) charging any of, or authorizing the recovery of any amount from, the Collateral under Section 506(c) of the Bankruptcy Code, or (ii) prohibiting or limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition First Lien Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date;

90

(xiv)    any order having been entered or granted (or requested, unless actively opposed by the Credit Parties) by either the Bankruptcy Court or any other court of competent jurisdiction adversely and materially impacting the rights of the Agent and the other Secured Parties under the Loan Documents, except in each case, as expressly provided in the Loan Documents (including the Carve-Out);

(xv)    an order of the Court shall be entered denying or terminating use of cash collateral by the Credit Parties authorized by the Orders;

(xvi)    if the Final Order does not include a waiver, in form and substance acceptable to the Required Lenders, of (i) the right to surcharge, or recover any amount from, the Collateral under Section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition First Lien Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Credit Party after the Petition Date;

(xvii)    (A) any Credit Party shall seek discovery in connection with, prepare, commence or support any Person in connection with any proceeding or other action that challenges (i) the amount, validity, allowance, character, enforceability or priority of any Company Claims/Equity Interests (as defined in the Restructuring Support Agreement) held by the Agent or the Lenders, (ii) the validity, enforceability or perfection of any Lien or other encumbrance securing (or purporting to secure) any Company Claims/Equity Interests (as defined in the Restructuring Support Agreement) held by the Agent or the Lenders or (iii) any payments made (I) to any Secured Party with respect to the Obligations or (II) to any Prepetition Secured Party (as defined in the Orders) with respect to the obligations under the Prepetition First Lien Credit Agreement or any Loan Document (as defined therein) or (B) the filing of any motion by the Credit Parties or any of their Affiliates or Subsidiaries seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition creditor in respect of Liens on the Collateral that is inconsistent with the Orders;

(xviii)    if, unless otherwise approved by the Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days;

(xix)    any Credit Party or any Subsidiary thereof files any motion, pleading or other request with the Bankruptcy Court seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Equity Interests (as defined in the Restructuring Support Agreement), Lien, or interest held by the Agent or the Lenders under the Orders or the Loan Documents without the prior written consent of the Agent or the Required Lenders (which consent may be communicated via a Direction of the Required Lenders);

(xx)    (A) any Credit Party or any Subsidiary thereof supports any other party in taking an action would constitute an Event of Default under this Section 8.1(n) if effected by a Credit Party or (B) any other Person files a motion or pleading before the Bankruptcy Court seeking the entry of that would constitute an Event of Default under this Section

91

8.1(n) if sought by a Credit Party and such motion is not contested in good faith by the Credit Parties;

(xxi)    the filing of a motion, pleading or the taking of any action in the Chapter 11 Cases by any Credit Party seeking the entry of an order by the Bankruptcy Court precluding the Agent or the Prepetition First Lien Agent from having the right to, or being permitted to, or precluding any holder of Prepetition First Lien Claims from directing or instructing any of the foregoing parties to exercise the right to, "credit bid" in any manner in respect of any applicable collateral; or

(xxii)   (A) either the Litigation Condition and/or the Allocation Condition (each as defined in the Restructuring Support Agreement) is not met and any Credit Party seeks entry of an order by the Bankruptcy Court approving any Sale Order (as defined in the Restructuring Support Agreement) or any confirmation order or (B) in the event of a Third-Party Sale (as defined in the Restructuring Support Agreement), the Sale Order has not become a Final Order prior to the closing of any Sale of the Business, in each case subject to the limitations set forth in the Restructuring Term Sheet.

8.2    Remedies.  Subject to the provisions of the Orders and all notice requirements therein, upon the occurrence and during the continuance of any Event of Default, the Agent may, and shall at the Direction of the Required Lenders:

(a)    declare all or any portion of any one or more of the Commitments of each Lender to make Loans to be suspended or terminated, whereupon all or such portion of such Commitments shall forthwith be suspended or terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or

(c)    exercise on behalf of itself and the Lenders all other rights and remedies available to it and the Lenders under the Loan Documents or applicable law.

8.3    Rights Not Exclusive.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

ARTICLE IX
AGENT

9.1    Appointment and Duties.

(a)    Appointment of the Agent.  Each Secured Party hereby appoints WSFS (together with any successor Agent pursuant to Section 9.9) as the Agent hereunder (and WSFS hereby accepts such appointment) and authorizes the Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such other actions on its

92

behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto. Each Secured Party consents to and authorizes the Agent's execution and delivery of any intercreditor or subordination agreements from time to time as contemplated by the terms hereof on behalf of such Secured Party and agrees to be bound by the terms and provisions thereof, including any purchase option contained therein.

(b)      <u>Duties as Collateral and Disbursing Agent</u>. Without limiting the generality of <u>clause (a)</u> above, the Agent shall have the sole and exclusive right and authority (to the exclusion of the Secured Parties), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in <u>Section 8.1(f)</u> or <u>8.1(g)</u> or any other bankruptcy, insolvency or similar proceeding (including, for the avoidance of doubt, the Chapter 11 Cases)), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in <u>Section 8.1(f)</u> or <u>8.1(g)</u> or any other bankruptcy, insolvency or similar proceeding (including, for the avoidance of doubt, the Chapter 11 Cases) (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; *provided*, *however*, that the Agent hereby appoints, authorizes and directs each Secured Party to act as collateral sub-agent for the Agent, the Secured Parties for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account or securities account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Secured Party, and may further authorize and direct the Secured Parties to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Agent, and each Secured Party hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)      <u>Limited Duties</u>. Under the Loan Documents, the Agent (i) is acting solely on behalf of the Secured Parties, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to the Agent, which terms are used for title purposes only, (ii) is not assuming and shall not have any actual or implied obligations, functions, responsibilities, duties, under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Secured Party or any other Person, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against the Agent based on the roles, duties and legal relationships expressly disclaimed in <u>clauses (i)</u> and <u>(ii)</u> above.

9.2      <u>Binding Effect</u>. Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken (or omitted to be taken) by the Agent or the Required Lenders (or, if

93

expressly required hereby, a greater or different proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken (or omitted to be taken) by the Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater or different proportion) and (iii) the exercise by the Agent or the Required Lenders (or, where so required, such greater or different proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

9.3    Use of Discretion.

(a)    No Action Without Instructions.  The Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where so required, such greater or different proportion of the Lenders).

(b)    Right Not to Follow Certain Instructions.  Notwithstanding clause (a) above, the Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Agent or any Related Person thereof or (ii) that would, in the opinion of the Agent or its counsel, expose the Agent to liability or is contrary to any Loan Document or applicable Requirement of Law.

(c)    Exclusive Right to Enforce Rights and Remedies.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with the Loan Documents for the benefit of all the Secured Parties; *provided* that the foregoing shall not prohibit (i) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 10.11 and this Section 9.3 or (iii) any Secured Party from filing proofs of claim (and thereafter appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other Debtor Relief Law), but in the case of this clause (iii) if, and solely if, the Agent has not filed such proof of claim or other instrument of similar character in respect of the Obligations within five (5) days before the expiration of the time to file the same.

9.4    Delegation of Rights and Duties.  The Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article IX to the extent provided by the Agent.

9.5    Reliance and Liability.  The Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 10.9, (ii) rely on the Register to the extent set forth in Section 2.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and

94

information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(a)        None of the Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, the Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein; *provided* that any action or inaction taken at the Direction of the Required Lenders (or, if expressly required hereby, an instruction from a greater or different proportion of the Lenders as shall be necessary, or the Agent shall believe in good faith to be necessary) shall not be deemed gross negligence or willful misconduct.  Without limiting the foregoing, the Agent and its Related Persons:

(i)        shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Agent, when acting on behalf of the Agent);

(ii)        shall not be responsible to any Secured Party or other Person, or have any duty to ascertain or inquire into (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral;

(iii)        makes no warranty or representation, and shall not be responsible, to any Secured Party or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Agent in connection with the Loan Documents;

(iv)        shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence

95

or continuation unless it has received a notice from the Borrower or any Secured Party describing such Default or Event of Default clearly labeled "notice of default" (in which case the Agent shall promptly give notice of such receipt to all Lenders);

(v)      shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to compliance by Sponsor Controlled Affiliated Lenders with the terms hereof relating to Sponsor Controlled Affiliated Lenders.

(vi)      shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability a wire or communication facility; and

(vii)      shall not be liable for any action omitted to be taken by it by reason of the lack of direction or instruction for such action (including, without limitation, for refusing to exercise discretion or for withholding its consent in the absence of receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such direction or grant such consent from any such Lender, as applicable).  The Agent shall have no liability for any failure, inability or unwillingness on the part of any Secured Party or Credit Party to provide accurate and complete information on a timely basis to the Agent, as applicable, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on the Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof;

and, for each of the items set forth in clauses (i) through (vii) above, each Secured Party, Holdings, the Borrower and each other Credit Party hereby waives and agrees not to assert any right, claim or cause of action it might have against the Agent based thereon.

For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Section 9.5), phrases such as "satisfactory to the Agent," "approved by the Agent," "acceptable to the Agent," "as determined by the Agent," "in the Agent's discretion," "selected by the Agent," "elected by the Agent," "requested by the Agent," and phrases of similar import that authorize and permit the Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

9.6      Agent Individually.  The Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as the Agent and may receive separate fees and other payments therefor.  To the extent the Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall

96

have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender", "Term Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include the Agent or such Affiliate, as the case may be, in its individual capacity as Lender, Term Lender or one of the Required Lenders, respectively.

9.7    <u>Lender Credit Decision</u>.  Each Secured Party acknowledges that it shall, independently and without reliance upon the Agent, any other Secured Party or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by the Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by the Agent to the Lenders, the Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of the Agent or any of its Related Persons.

9.8    <u>Expenses; Indemnities</u>.

(a)    Each Lender agrees to reimburse the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors paid in the name of, or on behalf of, any Credit Party) that may be incurred by the Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify the Agent and each of their respective Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (other than any Liabilities addressed in <u>Section 9.8(c)</u>) that may be imposed on, incurred by or asserted against the Agent or any of their respective Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Agent or any of their respective Related Persons under or with respect to any of the foregoing; *provided* that, no Lender shall be liable to the Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)    Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to

97

comply with the provisions of Section 10.9(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this Section 9.8(c).

9.9    Resignation of the Agent.

(a)    The Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 9.9.  If the Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent.  If, after thirty (30) days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this clause (a) shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)    Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of the Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as the Agent under the Loan Documents and (iv) subject to its rights under Section 9.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as the Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as the Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c)    After the Agent's resignation or removal hereunder, the provisions of this Article IX and Section 10.5 shall continue in effect for the benefit of such retiring or removed Agent and its Related Persons in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Agent (including for this purpose holding any collateral security following the retirement or removal of the Agent).

9.10    Release of Collateral or Guarantors.  Subject to the last paragraph of this Section 9.10, each Secured Party hereby consents to the release and hereby directs the Agent to release the following:

(a)    any Subsidiary of the Borrower from its guaranty of any Obligation if such Subsidiary becomes an Excluded Subsidiary or all of the Stock of such Subsidiary owned by any Credit Party is sold or transferred, in each case, in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such

transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to Section 5.13; and

(b)    any Lien held by the Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction expressly permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to Section 5.13 after giving effect to such transaction have been granted, (ii) Property constituting Excluded Property (*provided* that, such Property may be released only if such Property constitutes or becomes Excluded Property) and (iii) all of the Collateral and all Credit Parties, upon (A) the occurrence of the Termination Date and (B) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance reasonably acceptable to Agent.

Each Secured Party hereby directs the Agent, and the Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary at the Borrower's expense to release the guaranties and Liens when and as directed in this Section 9.10. In connection with any such release, the Agent shall promptly execute and deliver to any Credit Party, at such Credit Party's expense, all documents that such Credit Party shall reasonably request to evidence termination or release.  Any execution and delivery of documents pursuant to the preceding sentence of this Section 9.10 shall be without recourse to or warranty by the Agent (other than to Agent's authority to deliver such documents).

Notwithstanding anything herein or any other Loan Document to the contrary, if any Guarantor becomes an Excluded Subsidiary as a result of (a) the sale of Stock to a Person or (b) issuance of Stock by such Subsidiary, such Subsidiary will remain a Guarantor notwithstanding its status as an Excluded Subsidiary unless (1) no Event of Default shall have occurred and be continuing, (2) after giving pro forma effect to such release and the consummation of the transaction or event that causes such Person to be an Excluded Subsidiary, the Borrower is deemed to have made a new Investment in such Person (as if such Person were then newly acquired) and such Investment is permitted at such time, (3) the transaction or event that causes such Person to be an Excluded Subsidiary of such type was consummated for a bona fide business purposes (as determined by the Borrower in good faith) and the primary purpose of which was not to obtain the release of such obligations incur Indebtedness or engage in a Liability Management Transaction, (4) such sale or issuance is for fair market value, (5) such sale or issuance of Stock is not to the Sponsors or any of their Controlled Investment Affiliates and (6) a Responsible Officer of the Borrower certifies to the Agent compliance with preceding clauses (1), (2), (3), (4) and (5).

9.11    Additional Secured Parties.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among the Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to the Agent) this Article IX, Section 10.3, Section 10.9, Section 10.10, Section 10.11, Section 10.15, Section 10.16, Section 10.17, Section 10.20, Section 10.23 and Section 11.1 and the decisions and actions of the Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater or other proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; *provided*, *however*, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 9.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited

99

by any concept of *pro rata* share or similar concept, (b) each of the Agent and the Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

9.12    [Reserved].

9.13    Credit Bid. Each of the Lenders hereby irrevocably authorizes (and by entering into a Secured Rate Contract, each Secured Swap Provider hereby authorizes and shall be deemed to authorize) the Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)    consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof;

(b)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof;

(c)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC;

(d)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure or other Disposition conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)    estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amount (other than by means of offset) in connection with any purchase of all or any portion of the Collateral by the Agent pursuant to the foregoing clause (b), (c) or (d) without its prior written consent.

Each Secured Party agrees that the Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the Collateral; *provided* that, in connection with any credit bid or purchase described under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) may be, and shall be, credit bid by the Agent on a ratable basis, in each instance, subject to the provisions of Sections 2.8(f) and 2.10 hereof.

100

With respect to each contingent or unliquidated claim that is an Obligation, the Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the estimation of the amount or liquidation of such claim would not unduly delay the ability of the Agent to credit bid the Obligations or purchase the Collateral in the relevant Disposition.  In the event that the Agent, in its sole and absolute discretion, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of the Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Subject to the provisions of Sections 2.8(f) and 2.10 hereof, each Secured Party whose Obligations are credit bid under clauses (b), (c) or (d) of the third preceding paragraph shall be entitled to receive interests in the Collateral or any other asset acquired in connection with such credit bid (or in the Stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

9.14    Erroneous Payments.

(a)    Each Lender hereby agrees that if the Agent notifies a Lender or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "**Erroneous Payment Recipient**") in writing that the Agent has determined in its reasonable discretion that the Agent or its Affiliates mistakenly transmitted funds to such Erroneous Payment Recipient, as a result of a clerical, mechanical, technological or other error, whether or not known to such Erroneous Payment Recipient (any such funds, whether as a payment, prepayment or repayment of principal, interest, fees or otherwise, individually and collectively, an "**Erroneous Payment**") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment Recipient shall make commercially reasonable efforts to promptly return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a written demand was made, in same day funds (in the currency so received).  A notice from the Agent to any Lender under this Section 9.14(a) shall set forth the facts and circumstances resulting in such Erroneous Payment; *provided* that the Agent shall not make any demand under this Section 9.14(a) unless the notice described herein is delivered within 90 days after the making of the applicable Erroneous Payment.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it (or an Erroneous Payment Recipient on its behalf) receives a payment from the Agent (x) in a different amount or on a different date than the amount or date specified in a notice of payment sent by the Agent with respect to such payment, (y) that was not preceded or accompanied by a notice of payment sent by the Agent, or (z) that Lender (or Erroneous Payment Recipient on its behalf) otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) then, in each case, such Lender shall presume that an error has been made (absent written confirmation from the Agent) and shall promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 9.14(b).

(c)      Each Erroneous Payment Recipient hereby authorizes the Agent to set off, net and apply any amounts at any time owing to such Erroneous Payment Recipient under any Loan Document against any amount due to the Agent under the preceding <u>clause (a)</u>.

(d)      The Borrower and each other Credit Party hereby agrees that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment.  If the amount of any Erroneous Payment is subsequently recovered by the Agent or its Affiliates, the Agent or such Affiliate shall return to the applicable Erroneous Payment Recipient either (x) the Loans acquired pursuant to this <u>clause (d)</u> or (y) if applicable, the proceeds of such Loans.  Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or any rights of the Agent in respect of an Erroneous Payment) result in the Agent becoming or being deemed to be a Lender hereunder or the holder of any Loans hereunder.

(e)      In addition to any rights and remedies of the Agent provided by law, the Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this <u>Section 9.14</u> and which has not been returned to the Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Agent or any Affiliate, branch or agency thereof to or for the credit or the account of such Lender.  The Agent agrees to promptly notify the Lender after any such setoff and application made by the Agent; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

(f)      Each party's obligations under this <u>Section 9.14</u> shall survive the resignation or replacement of the Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

ARTICLE X
MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>.

(a)      <u>Amendments and Deviating Transactions Generally</u>.  Subject to the provisions of <u>Sections 10.1(e)</u> and <u>(g)</u>, hereof, no amendment or waiver of, or supplement or other modification (which shall include any direction to the Agent pursuant) to, any Loan Document (other than the Agent Fee Letter) or any provision thereof, and no consent with respect to any departure by any Credit Party from any such Loan Documents, shall be effective unless the same shall be documented in writing and signed by the Required Lenders (or (i) by the Agent with the consent of the Required Lenders or (ii) at the Direction of the Required Lenders), and the Borrower and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that (x) no such waiver, amendment, supplement (including any additional Loan Document), modification or consent shall, unless in writing and signed by all the

102

Lenders directly and adversely affected thereby (or by the Agent with the consent of all the Lenders directly and adversely affected thereby), and the Borrower, do any of the following (*provided* that any agreement pursuant to this proviso shall not be required to be signed by the Required Lenders) and (y) any transaction, action, arrangement, plan or agreement undertaken, consummated or effectuated by any Credit Party having the purpose or effect of doing any of the following shall have no force or effect and shall be void *ab initio* unless the same shall be approved or consented to in writing by all the Lenders directly and adversely affected thereby (or by the Agent with the consent of all Lenders directly and adversely affected thereby):

(i)      increase or extend the Commitment of a Lender (or reinstate any Commitment terminated pursuant to Section 8.2(a));

(ii)     postpone or delay any date fixed for, or reduce or waive, the final scheduled maturity date of any Loan or any scheduled installment of principal or any payment of interest, fees, premiums or other amounts (other than principal) due to the Lenders (or any of them) hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.8 may be postponed, delayed, reduced, waived or modified with the consent of Required Lenders (which may be communicated via a Direction of the Required Lenders) and waiver of default interest shall only require the consent of Required Lenders (which may be communicated via a Direction of the Required Lenders));

(iii)    reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of Required Lenders (which may be communicated via a Direction of the Required Lenders)) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.8 may be postponed, delayed, reduced, waived or modified and Events of Default may be waived with the consent of Required Lenders);

(iv)     (A) amend or modify the priority or *pro rata* sharing provisions of Section 2.7(a), 2.8(d), 2.10(c) or 10.11(b) or any other provision of the Loan Documents in a manner that would change or have the effect of changing the priority or *pro rata* treatment of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments, or (B) advance the date fixed for, or increase, any scheduled installment of principal due to any of the Lenders under any Loan Document;

(v)      change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi)     amend, modify or waive this Section 10.1 (other than Section 10.1(g)) or the definition of "Required Lenders" or any provision providing for consent or other action by all Lenders;

103

(vii)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release a material portion of the Collateral, except as otherwise may be explicitly provided in this Agreement or the other Loan Documents;

(viii)    amend, modify or waive Section 9.10;

(ix)    amend, modify or waive any provision of the Loan Documents in a manner that would permit any Subsidiary to be designated as an "Unrestricted Subsidiary" or permit the transfer of any assets (including by Disposition, Investment or Restricted Payments) to "Unrestricted Subsidiaries" or otherwise permit the creation or existence of, or transfer of any assets (including by Disposition, Investment or Restricted Payments) to, a Subsidiary of Holdings otherwise not subject to the provisions of the Loan Documents (it being acknowledged that no Subsidiary is an "Unrestricted Subsidiary" hereunder as of the Closing Date);

(x)    (A) amend, modify or waive Section 6.19 or (B) permit any Credit Party or any of its Subsidiaries or Affiliates, to enter into any transaction, agreement, waiver, amendment or modification to this Agreement or any other Loan Document that authorizes additional Indebtedness for the purpose of, or that has the effect of, obtaining consent to any transaction pursuant to any voting threshold required under this Agreement;

(xi)    amend, modify or waive Section 6.18 or any provision of the Loan Documents in a manner that would permit transfers (whether pursuant to a sale, lease, license, transfer, Disposition, Investment, Restricted Payment, dividend, designation or otherwise relating to the exclusive rights thereto) of (x) Material Property to any Subsidiary or Affiliate of Holdings that is not a Credit Party (including for the avoidance of doubt, (I) Section 6.18 or (II) the definition of "Material Property");

(xii)    amend, modify or waive any provision of the Loan Documents to allow for purchases of any Class of Loans (by open market purchase or through other assignments) by the Sponsors, the Credit Parties, the Company of their Subsidiaries or other Affiliates;

(xiii)    amend, modify or waive this Agreement or the other Loan Documents in a manner that disproportionately and adversely affects one or more Classes of Loans or Commitments relative to any other Class or Classes of Loans or Commitments without the consent of each Lender of such disproportionately and adversely affected Class;

(xiv)    [reserved];

(xv)    amend, modify, or waive any provision of any Loan Document in any way that directly or indirectly permits additional incurrence of Indebtedness or Liens, in each case by, Subsidiaries of Holdings that are not Credit Parties without the consent of the Super Majority Lenders (which may be communicated via a Direction of the Super Majority Lenders);

(xvi)    amend, modify, or waive (A) the proviso to Section 6.4(b), (B) [reserved], (C) [reserved] or (D) Section 6.25(a) (including, for the avoidance of doubt, the definition of "Liability Management Transaction"); or

104

(xvii)    amend, modify or waive any term or provision of any Loan Document to permit and/or consent to the issuance or incurrence of any Indebtedness (including, for the avoidance of doubt, through an upsize of the existing tranches of such Indebtedness or issuance of preferred equity) that would (a) subordinate or have the direct or indirect effect of subordinating all or any portion of the Obligations in respect of any Class of Loans in right of payment directly or indirectly to any other Indebtedness, (b) subordinate or have the direct or indirect effect of subordinating any Liens on the Collateral securing the Obligations in respect of any Class of Loans directly or indirectly to the Liens on the Collateral securing any other Indebtedness (any such other Indebtedness described in the foregoing clauses (a) and (b), "**Specified Indebtedness**"), or (c) be contractually *pari passu* in right of payment or lien priority with any Obligations in respect of any Class of Loans (including through an upsize of the existing tranches of such Indebtedness) except:

(A)    Indebtedness that is expressly permitted by this Agreement to be senior to or *pari passu*, as applicable, with the Obligations in respect of any Class of Loans as of the Closing Date; and

(B)    pursuant to a transaction consented to by the Required Lenders (which may be communicated via a Direction of the Required Lenders) providing for the incurrence of Specified Indebtedness that is either (x) senior in right of payment to the Obligations with respect to the New Money Term Loans and/or (y) senior to the Liens on the Collateral securing the New Money Term Loans, in each case, so long as each Lender holding New Money Term Loans has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the principal amount of New Money Term Loans held by each Lender holding New Money Term Loans) of such Specified Indebtedness (other than customary bona fide backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "**Ancillary Fees**") as offered to all other providers (or their Affiliates) of the Specified Indebtedness and to the extent such Lender holding New Money Term Loans decides to participate in the Specified Indebtedness, it receives its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Specified Indebtedness afforded to the providers of the Specified Indebtedness (or any of their Affiliates) in connection with providing the Specified Indebtedness (which, for the avoidance of doubt, will not require the consent of each Lender); provided, that, for the avoidance of doubt, any such opportunity (including any fees available prior to closing thereof) may be provided in connection with a post-closing syndication of the Specified Indebtedness; provided, further, that any offer to participate must be held open for at least five (5) Business Days;

it being agreed that all Lenders shall be deemed to be directly and adversely affected by an amendment, waiver or supplement described in the preceding clause (iv), (v), (vi), (vii), (viii), (ix), (x), (xi), (xii), (xv), (xvi) or (xvii).

(b)    Agent.  No amendment, waiver or consent shall, unless in writing and signed by the Agent, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by the Agent (acting at the Direction of the Required Lenders), the Required Lenders (which may be communicated via a Direction of the Required Lenders) or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent under this Agreement or

any other Loan Document.  No amendment, modification or waiver of this Agreement or any Loan Document altering the ratable treatment of Obligations arising under Secured Rate Contracts resulting in such Obligations being junior in right of payment to principal on the Loans or resulting in Obligations owing to any Secured Swap Provider becoming unsecured (other than releases of Liens applicable to all Lenders permitted in accordance with the terms hereof), in each case in a manner adverse to any Secured Swap Provider, shall be effective without the written consent of such Secured Swap Provider.

(c)     [Reserved].

(d)     [Reserved].

(e)     Schedules; Corrections; Liens.    Notwithstanding anything to the contrary contained in this Section 10.1, (i) the Borrower may amend Schedules 4.19 and 4.20 upon notice to the Agent and the Lenders, (ii) Agent may amend Schedules 2.1(a) and 2.12 to reflect Sales entered into and made effective pursuant to the Syndications and Section 10.9 and (iii) the Agent and the Borrower may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

(f)     [Reserved].

(g)     Certain Other Loan Documents.    The Agent Fee Letter may be amended as provided therein and if not provided therein, by each of the parties thereto.

10.2    Notices.

(a)     Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of the Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com or using such other means of posting to Intralinks ® as may be available and reasonably acceptable to the Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of the Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Borrower and the Agent, to the other parties hereto and (B) in the case of all other parties, to the Borrower and the Agent. Transmissions made by electronic mail or E-Fax to the Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of the Agent applicable at the time and previously communicated to the Borrower, and (z) if receipt of such transmission is acknowledged by the Agent.

(b)     Effectiveness.

(i)     All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon

106

personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to <u>clause (a)(ii)</u> or <u>(a)(iii)</u> above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; *provided*, *however*, that no communications to the Agent pursuant to <u>Article II</u> shall be effective until received by the Agent.

(ii)      The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Credit Party in connection with any such communication is true, correct and complete in all material respects except as expressly noted in such communication or E-System.

(c)      Each Lender shall notify the Agent in writing (email to be sufficient) of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as the Agent shall reasonably request.

10.3    <u>Electronic Transmissions</u>.

(a)      <u>Authorization</u>.  Subject to the provisions of <u>Section 10.2(a)</u>, each of the Agent, the Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)      <u>Signatures</u>.  Subject to the provisions of <u>Section 10.2(a)</u>, (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which the Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; *provided*, *however*, that nothing herein shall limit such party's

107

or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)      Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 10.2 and this Section 10.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by the Agent and Credit Parties in connection with the use of such E-System.

(d)      LIMITATION OF LIABILITY.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF THE AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN (OTHER THAN ERRORS OR OMISSIONS ARISING FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF THE AGENT, SUCH LENDER OR SUCH RELATED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL NON-APPEALABLE JUDGMENT OR ORDER).  NO WARRANTY OF ANY KIND IS MADE BY THE AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  The Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that the Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

10.4      No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, the Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

10.5      Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Agent or the Required Lenders, shall be at the expense of such Credit Party, and neither the Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, the Borrower agrees to pay or reimburse within fifteen (15) Business Days following written demand therefor, subject to Section 5.9 hereof (a) the Agent and the Lenders (regardless of whether such Lender is a Lender at the time reimbursement is requested so long as either (i) such expenses were incurred when such Lender was a Lender or (ii) such expenses are in connection with the Transactions) for all reasonable and documented out-of-pocket costs and expenses incurred by it or any of its Related Persons (but only to the extent the Agent or its Affiliates are required to reimburse such Related Persons) (i) in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction

108

contemplated therein, in each case including Attorney Costs of the Agent and the Lenders (regardless of whether any Lender is a Lender at the time reimbursement is requested so long as (i) such expenses were incurred when such Lender was a Lender or (ii) such expenses are in connection with the Transactions) (which shall initially include Attorney Costs payable to Gibson, Dunn & Crutcher LLP as counsel to the Lenders, other than the Fronting Lender which shall retain its own counsel (which shall be limited to one law firm counsel at a time)), the cost of environmental audits, syndication, distribution, Collateral audits and appraisals, background checks and similar expenses, to the extent permitted hereunder and (ii) in obtaining and maintaining no more than three (3) credit ratings or estimates per calendar year in respect of the Loans from ratings agencies, whether obtained prior to or subsequent to the Closing Date, (b) the Agent for all reasonable and documented out-of-pocket costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations, subject to <u>Section 5.9</u> hereof (which shall be reimbursed, in addition to the reasonable and documented out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of the Agent, the Lenders (regardless of whether any Lender is a Lender at the time reimbursement is requested so long as (i) such expenses were incurred when such Lender was a Lender or (ii) such expenses are in connection with the Transactions) and each of their Related Persons for all costs and expenses, including Attorney Costs (which shall initially include Attorney Costs payable to Gibson, Dunn & Crutcher LLP as counsel to the Lenders, other than the Fronting Lender which shall retain its own counsel (which shall be limited to one law firm counsel at a time)) incurred in connection with (i) the creation, perfection and maintenance of the perfection of Agent's Liens upon the Collateral, including Lien search, filing and recording fees, (ii) [reserved], (iii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or any attempt to inspect, verify, protect, insure, collect, sell, liquidate or otherwise dispose of any Collateral or (iv) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation or Transaction, (d) the cost of purchasing insurance that the Credit Parties fail to obtain as required by the Loan Documents; *provided*, that any Attorney Costs reimbursed pursuant to the foregoing clauses (a) through (d) shall be limited in accordance with such definition. Nothing contained in this Agreement shall limit or impair the Borrower's reimbursement or indemnification obligations set forth in the Fronting Fee Letter.

10.6    <u>Indemnity</u>.

(a)      Each Credit Party agrees to indemnify, hold harmless and defend the Agent, each Lender (regardless of whether such Lender is a Lender at the time reimbursement is requested so long as (i) such Liabilities accrued when such Lender was a Lender or (ii) such Liabilities are in connection with the Transactions) and each of their respective Related Persons (each such Person being an "**Indemnitee**") from and against all Liabilities, (including and in the case of Attorney Costs, limited to the extent set forth in such definition) Attorney Costs (which shall initially include Attorney Costs payable to Gibson, Dunn & Crutcher LLP as counsel to the Lenders), brokerage commissions, fees and other compensation that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, or the Transactions, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing

109

and any Contractual Obligation in connection with this Agreement entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including, and limited as set forth in the definition thereof, Attorney Costs in any case (which shall initially include Attorney Costs payable to Gibson, Dunn & Crutcher LLP as counsel to the Lenders)), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "**Indemnified Matters**"); *provided*, *however*, that no Credit Party shall have any liability under this Section 10.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter (i) to the extent arising from a dispute among Lenders, a dispute between a Lender and the Agent, in any case, only so long as such dispute is wholly unrelated to (A) any dispute involving, or claim against, a Credit Party or any of its Affiliates or (B) the Transactions or (ii) to the extent such liability has resulted solely from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or from a breach by such Indemnitee of its obligations hereunder or under any other Loan Document, in each instance, (A) as determined by a court of competent jurisdiction in a final non-appealable judgment or order and (B) solely to the extent not arising from, related to or in connection with the Transactions or (y) any claims arising solely from actions by and among Indemnitees and not involving any Credit Party or any of their Affiliates (other than claims arising from, related to or in connection with the Transactions) (*provided* that, notwithstanding the foregoing clause (y), the Agent, acting in its capacity as such, shall be indemnified, subject to clause (x) above).  Furthermore, the Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.  This Section 10.6(a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.  In no event shall any Credit Party or any Affiliate thereof be liable to any Indemnitee on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).

(b)    Without limiting the foregoing, "**Indemnified Matters**" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (1) arise from a dispute among Lenders, or a dispute between a Lender and the Agent, in either case, only so long as such dispute is wholly unrelated to any dispute involving, or claim against, a Credit Party or any of its Affiliates or (2)(i) are incurred solely following foreclosure by the Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee or any of its controlled Affiliates or other Related Persons.

110

10.7    <u>Marshaling; Payments Set Aside</u>.  No Secured Party shall be under any obligation to marshal any Property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from the Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

10.8    <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> that any assignment by any Lender shall be subject to the provisions of <u>Section 10.9</u>; <u>provided</u>, <u>further</u>, that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agent and each Lender.

10.9    <u>Binding Effect; Assignments and Participations</u>.

(a)    <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by Holdings, Newco Holdings, the Borrower, the other Credit Parties signatory hereto and the Agent and when the Agent shall have been notified by each Lender that such Lender has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Holdings, Newco Holdings, the Borrower, the other Credit Parties hereto (in each case except for <u>Article VIII</u>), the Agent and each Lender receiving the benefits of the Loan Documents and, to the extent provided in <u>Section 9.11</u>, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in <u>Section 9.9</u>), none of Holdings, Newco Holdings, the Borrower, any other Credit Party or the Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)    <u>Right to Assign</u>.  Each Lender may sell, transfer, negotiate or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans) to:

(i)    any existing Lender (other than a Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate);

(ii)    any Affiliate or Approved Fund of any existing Lender (other than a natural Person, Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate);

(iii)    [reserved]; or

(iv)    any other Person (other than a natural Person, a Sponsor Controlled Affiliated Lender, an Independent Debt Fund Affiliate a Credit Party or any Credit Party's Affiliates or Subsidiaries) who is an "accredited investor" (as defined in Regulation D of the Securities Act of 1933) acceptable (which acceptances shall not be unreasonably withheld or delayed) to the Agent.  Notwithstanding any provision herein to the contrary:

111

(A)    such Sales do not have to be ratable between each Term Loan but must be ratable among the Obligations owing to and owed by such Lender with respect to a Term Loan;

(B)    for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans, Commitments subject to any such Sale shall be in a minimum amount of $10,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of the Agent; and

(C)    interest accrued, other than any interest that is payable-in-kind, prior to and through the date of any such Sale may not be assigned.

In the event of any purported assignment or transfer by a Lender of its rights or obligations under this Agreement and the other Loan Documents to any Affiliate (including any Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate) of the Borrower (other than Holdings or any Subsidiary) that does not comply with the terms hereof, the Borrower shall, within ten (10) Business Days cause the applicable Affiliate to contribute such Loans to the common equity of the Borrower (which such Term Loans and all rights and obligations as a Lender related thereto, immediately and automatically, without any further action on the part of the Borrower, any Lender, Agent or any other Person, upon such contribution shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and the Borrower shall neither obtain nor have any rights as a Lender hereunder or under the other Loan Documents by virtue of such assignment).  Any Loan acquired by Holdings or any Subsidiary thereof shall immediately upon such acquisition be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect.  Any purported assignment or transfer by a Lender of its rights or obligations under this Agreement and the other Loan Documents to any Person not Affiliated with the Borrower that does not comply with the terms hereof shall be treated for purposes of this Agreement as a sale by such Lender of a participation of such rights and obligations in accordance with <u>Section 10.9(f)</u>; *provided* that such treatment shall not relieve any assigning Lender from any Liabilities arising as a consequence of its breach of this Agreement.

(c)    <u>Procedure</u>.  The parties to each Sale made in reliance on <u>clause (b)</u> above (other than those described in <u>clause (e)</u> or <u>(f)</u> below) shall execute and deliver to the Agent an Assignment via an electronic settlement system designated by the Agent (or, if previously agreed with the Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any Tax forms required to be delivered pursuant to <u>Section 11.1</u> and payment of an assignment fee in the amount of $3,500 to the Agent, unless waived or reduced by the Agent (it being understood and agreed, (x) that no assignment fee shall be due in connection with any Syndication or any assignments by the Fronting Lender contemplated by the Master Consent to Assignment and (y) with respect to any assignment made in connection with <u>Section 10.20</u>, the assignment fee shall be paid by the Borrower); *provided* that, (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee,

112

then only one assignment fee of $3,500 (unless waived or reduced by the Agent) shall be due in connection with such Sale (it being understood and agreed, that no assignment fee shall be due in connection with any Syndication or any assignments by the Fronting Lender contemplated by the Master Consent to Assignment).  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iv) of Section 10.9(b), upon the Agent consenting to such Assignment, from and after the effective date specified in such Assignment, the Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)     Effectiveness.  Subject to the recording of an Assignment by the Agent in the Register pursuant to Section 2.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)     Grant of Security Interests.  Subject to the Restructuring Support Agreement, in addition to the other rights provided in this Section 10.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to the Agent or (B) any holder of, or trustee or collateral agent for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to the Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)     Participants and SPVs.  In addition to the other rights provided in this Section 10.9, but subject to the provisions of Section 10.9(i), each Lender may, (x) with notice to the Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from the Agent or the Borrower, sell participations to one or more Persons (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Term Loans); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's

113

rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article XI, but, with respect to Section 11.1, only to the extent such participant or SPV delivers the Tax forms such Lender is required to collect pursuant to Section 11.1(g) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation except to the extent such entitlement to receive a greater amount results from any change in, or in the interpretation of, any Requirement of Law that occurs after the date such grant or participation is made (and in consideration of the foregoing, each such Participant and SPV shall be deemed to have acknowledged and agreed to be bound by the provisions of Section 10.20) and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to the Agent by such SPV and such Lender; *provided*, *however*, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of Section 10.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vii) of Section 10.1(a).  No party hereto shall institute (and the Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; *provided*, *however*, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability).  The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other Obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other Obligations under any Loan Document) to any Person other than the Agent except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other Obligation is in registered form under Treasury Regulations Section 5f.103-1(c).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent shall have no responsibility for maintaining a Participant Register.

(g)     [Reserved].

(h)     [Reserved].

114

(i)     [Reserved].

(j)     <u>Waiver</u>.  No Sponsor Controlled Affiliated Lender and no Independent Debt Fund Affiliate shall (i) be entitled to bring actions against the Agent, in its role as such, (ii) receive advice of counsel or other advisors to the Agent or any other Lender or (iii) challenge the attorney client privilege of the Agent or any Lender and their respective counsel.

(k)     <u>Syndications</u>.  Notwithstanding anything herein to the contrary, (i) neither the consent of the Agent nor any Credit Party will be required to effectuate any Syndication or any assignments by the Fronting Lender in its capacity as a fronting lender and (ii) the Fronting Lender may assign Loans separately from Commitments.

10.10   <u>Non-Public Information; Confidentiality</u>.

(a)     <u>Non-Public Information</u>.

(i)     <u>Distribution of Materials to Lenders</u>.  The Credit Parties acknowledge and agree that (A) the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "**Borrower Materials**") may be disseminated by, or on behalf of, the Agent, and made available, to the Lenders by posting such Borrower Materials on an E-System; and (B) certain of the Lenders (each a "**Public Lender**") may have personnel who do not wish to receive material non-public information ("**MNPI**") with respect to the Holdings or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Credit Parties authorize the Agent to download copies of their logos from its website and post copies thereof on an E-System.

(ii)     <u>Material Non-Public Information</u>.  The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has publicly traded equity or debt securities in the United States, they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (A) identify in writing, and (B) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of United States federal and state securities laws as "PUBLIC".  The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then the Agent, the Lenders shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of United States federal and state securities laws.  The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI:  (I) the Loan Documents, including the schedules and exhibits attached thereto, and (II) administrative materials of a customary nature prepared by the Credit Parties or the Agent (including, Committed Loan Notices and any similar requests or notices posted on or through an E-System).  Before distribution of Borrower Materials, the Credit Parties agree to execute and deliver to the Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

115

(iii)    The Agent and each Lender acknowledges and agrees that it may receive MNPI hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state securities laws and regulations).  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirement of Law, including United States Federal and state securities Requirements of Law, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Holdings or its securities for purposes of United States Federal or state securities laws.

(b)    Confidential Information.  The Agent and each Lender agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's consent, (ii) to Related Persons or investors of such Lender or the Agent, as the case may be, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 10.10 or (B) available to or in the possession of such Lender or the Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process and the Borrower received prior written notice thereof (to the extent allowed) or requested or demanded by any Governmental Authority or any other regulatory or self-regulatory authority having jurisdiction over such Person or its Affiliates, (v) to the extent necessary or customary for inclusion in league table measurements, (vi)(A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein and financing sources therefor) or participants, financing sources (including Persons that hold a security interest in any Lender's rights under this Agreement in accordance with Section 10.9(e)), direct or contractual counterparties to any Secured Rate Contracts and to their respective Related Persons, in each case to the extent such assignees, investors, participants, financing sources, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 10.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender or the Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender or the Agent or any of their Related Persons.  In addition, the Agent and the Lenders may disclose this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents and the Commitments and for purposes of general portfolio, benchmarking and market data analysis.  In the event of any conflict between the terms of this Section 10.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 10.10 shall govern.

116

(c)     Tombstones.  Each Credit Party consents to the publication by the Agent or any Lender of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark.  The Agent or such Lender shall provide a draft of any such press release, advertising or other promotional material to the Borrower for review and comment prior to the publication thereof and no such press release, tombstone, advertising or promotional material will contain dollar amounts or other financial information concerning any Credit Party without the prior consent of the Borrower.

(d)     Press Release and Related Matters.  No Credit Party shall, and no Credit Party shall permit any of its controlled Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party or the Bankruptcy Court) using the name, logo or otherwise referring to the Agent or of any of its Affiliates, the Loan Documents or any transaction contemplated herein or therein to which the Agent or any of its Affiliates is party without the prior written consent of the Agent or such Affiliate except to the extent required to do so under applicable Requirements of Law or by the Bankruptcy Court and then, only after consulting with the Agent or such Affiliate, as applicable.

10.11   Set-off; Sharing of Payments.

(a)     Right of Setoff.  Each of the Agent, each Lender and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final, but excluding payroll and tax withholding accounts and accounts holding Cash Collateral subject to Permitted Liens) at any time held and other Indebtedness, claims or other obligations at any time owing by the Agent, such Lender or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  No Lender shall exercise any such right of setoff without the prior consent of the Agent or the Required Lenders.  The Agent and each Lender agrees promptly to notify the Borrower and the Agent after any such setoff and application made by such Lender or its Affiliates; *provided*, *however*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 10.11 are in addition to any other rights and remedies (including other rights of setoff) that the Agent, the Lenders, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) (and other than pursuant to Section 10.9, Section 10.20, Article XI or any purchase option pursuant to any intercreditor agreement or any subordination agreement to which the Agent is a party) and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had

117

been received by the Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); *provided*, *however*, that (i) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender without interest and (ii) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  Notwithstanding anything to the contrary set forth in the foregoing or in any other Loan Document, in the event any payment to a Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate is invalidated, avoided, declared to be fraudulent or preferential, set aside or otherwise required to be transferred to a trustee, receiver, Credit Party or estate of a Credit Party in connection with any Insolvency Proceeding as a result of such Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate being an Affiliate of a Credit Party or otherwise required to be transferred to any other Person, such Sponsor Controlled Affiliated Lender or Independent Debt Fund Affiliate shall have no right, in respect of such payment, of contribution or payment (including by way of participation) from any Lender or the Agent under this <u>Section 10.11(b)</u> or any other term or provision of any Loan Document providing for the *pro rata* treatment of Lenders.

10.12   <u>Counterparts; Facsimile Signature</u>.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

10.13   <u>Severability; Captions; Independence of Provisions</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

10.14   <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, the Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or the Agent merely because of the Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to <u>Sections 10.18</u> and <u>10.19</u>.

10.15   <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the other Credit Parties, the Lenders, the Agent and, subject to the provisions of <u>Section 9.11</u>, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither the Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

118

10.16    Governing Law and Jurisdiction.

(a)    Governing Law.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest) and to the extent applicable, the Bankruptcy Code.

(b)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document (including any claims sounding in contract or tort law arising out of the subject matter hereof) shall be brought exclusively in the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting in the Southern District of New York and, by execution and delivery of this Agreement, the Borrower and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; *provided* that nothing in this Agreement shall limit the right of the Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent the Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum *non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction.  Subject to the Bankruptcy Code, nothing contained in this Section 10.16 shall affect the right of the Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

10.17    Waiver of Jury Trial.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF). THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE. EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO RELATED PERSON OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER

119

AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS, AS APPLICABLE, BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.18    <u>Entire Agreement; Release; Survival</u>.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY OF ITS RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE AGENT FEE LETTER. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENTS OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH); *PROVIDED* THAT THE INCLUSION OF SUPPLEMENTAL RIGHTS OR REMEDIES IN FAVOR OF THE FRONTING LENDER IN THE FRONTING FEE LETTER SHALL NOT BE DEEMED A CONFLICT WITH THIS AGREEMENT.

(b)    Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  The Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    (i) Any indemnification or other protection provided to any Indemnitee pursuant to this <u>Section 10.18</u>, <u>Sections 10.5</u> and <u>10.6</u>, <u>Article IX</u>, <u>Article XI</u> and <u>Article XII</u>, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to <u>clause (i)</u> above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

10.19    <u>USA Patriot Act</u>.  Each Lender that is subject to the USA Patriot Act (and the Agent (for itself and not on behalf of any Lender)) hereby notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Agent to identify each Credit Party in accordance with the USA Patriot Act.

10.20    <u>Replacement of Lender</u>.  Within forty-five days (45) after receipt by the Borrower of written notice and demand from (i) any Lender (an "**Affected Lender**") for payment of additional costs as provided in <u>Sections 11.1</u>, <u>11.2</u> and/or <u>10.6</u> or (ii) any SPV or participant (an "**Affected SPV/Participant**")

120

for payment of additional costs as provided in Section 10.9(f), unless the option or participation of such Affected SPV/Participant shall have been terminated prior to the exercise by the Borrower of its rights hereunder, the Borrower may, at its option, notify (A) in the case of clause (i) above, the Agent and such Affected Lender of the Borrower's intention to obtain, at the Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Affected Lender, or (B) in the case of clause (ii) above, the Agent, such Affected SPV/Participant, if known, and the applicable Lender (such Lender, a "**Participating Lender**") that (1) granted to such Affected SPV/Participant the option to make all or any part of any Loan that such Participating Lender would otherwise be required to make hereunder or (2) sold to such Affected SPV/Participant a participation in or to all or a portion of its rights and obligations under the Loan Documents, of the Borrower's intention to obtain, at the Borrower's expense, a Replacement Lender for such Participating Lender, in each case, which Replacement Lender shall be reasonably satisfactory to the Agent.  In the event the Borrower obtains a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender or Participating Lender, as the case may be, shall sell and assign its Loans and Commitments to such Replacement Lender, at par; *provided* that the Borrower has reimbursed such Affected Lender or Affected SPV/Participant, as applicable, for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment, and in the case of a Participating Lender being replaced by a Replacement Lender, (x) all right, title and interest in and to the Obligations and Commitments so assigned to the Replacement Lender shall be assigned free and clear of all Liens or other claims (including pursuant to the underlying option or participation granted or sold to the Affected SPV/Participant, but without affecting any rights, if any, of the Affected SPV/Participant to the proceeds constituting the purchase price thereof) of the Affected SPV/Participant, and (y) to the extent required by the underlying option or participation documentation, such Participating Lender shall apply all or a portion of the proceeds received by it as a result of such assignment, as applicable, to terminate in full the option or participation of such Affected SPV/Participant. In the event that a replaced Lender does not execute an Assignment pursuant to Section 10.9 within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 10.20 and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this Section 10.20, the Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by the Borrower, the Replacement Lender and the Agent, shall be effective for purposes of this Section 10.20 and Section 10.9.  Upon any such assignment and payment and compliance with the other provisions of Section 10.9, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; provided that any rights of such replaced Lender to indemnification hereunder shall survive.

10.21    Joint and Several.  The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.

10.22    Creditor-Debtor Relationship.  The relationship between the Agent and each Lender , on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

10.23    Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its payment obligations under the this Agreement in respect of Swap Obligations under any Secured Rate Contract (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 10.23 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.23, or otherwise under this

121

Agreement, voidable under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 10.23 shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Secured Rate Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement.  Each Qualified ECP Guarantor intends that this Section 10.23 constitute, and this Section 10.23 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

10.24   DIP Orders; Conflicts.

(a)      Each Lender hereunder:

(i)      consents to the subordination of Liens provided for in the Orders, solely to the extent provided therein; and

(ii)      agrees that it will be bound by and will take not actions contrary to the provisions of the Orders.

(b)      The parties hereto agree that, in the event of any conflict between the Orders and this Agreement or any other Loan Document, that the terms of the Orders shall govern and control.

ARTICLE XI
TAXES, YIELD PROTECTION AND ILLEGALITY

11.1   Taxes.

(a)      Except as required by a Requirement of Law, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or other Liabilities with respect thereto (collectively, "**Taxes**").

(b)      If any Taxes shall be required by any Requirement of Law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) if such Tax is an Indemnified Tax, such amount payable shall be increased as necessary to ensure that, after all required deductions for Indemnified Taxes are made (including deductions applicable to any increases to any amount under this Section 11.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant withholding agent shall be entitled to make such deductions, (iii) the relevant withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iv) within thirty (30) days after such payment under clause (b)(ii) is made, the relevant Credit Party shall deliver to the Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to the Agent.

(c)      Without duplication of any obligation set forth in Section 11.1(b), the Borrower agrees to pay, and authorize the Agent to pay in its name, any stamp, court or documentary, excise, intangible, filing or property Tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery, performance,

122

enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document or any transaction contemplated therein, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 10.20</u>) (collectively, "**Other Taxes**").  As soon as practicable and within thirty (30) days after the date of any payment of Other Taxes by any Credit Party, the Borrower shall furnish to the Agent, at its address referred to in <u>Section 10.2</u>, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Agent.

(d)     The Credit Parties hereby acknowledge and agree that (i) neither the Agent, nor any Affiliate of the Agent has provided any Tax advice to any Tax Affiliate in connection with the transactions contemplated hereby or any other matters and (ii) the Credit Parties have received appropriate Tax advice to the extent necessary to confirm that the structure of any transaction contemplated by the Credit Parties in connection with this Agreement complies in all material respects with applicable federal, state and foreign Tax laws.

(e)     Without duplication of any obligation set forth in <u>Section 11.1(b)</u> and <u>(c)</u>, the Borrower shall reimburse and indemnify, within ten (10) days after receipt of demand therefor (with copy to the Agent), each Secured Party for all Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any jurisdiction on or attributable to amounts payable under this <u>Section 11.1</u>) paid or payable by such Secured Party or required to be withheld or deducted from a payment to such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of the Agent on behalf of such Secured Party) claiming any compensation under this <u>clause (e)</u>, setting forth the amounts to be paid thereunder and delivered to the Borrower with copy to the Agent, shall be conclusive, binding and final for all purposes, absent manifest error.

(f)     Any Lender claiming any additional amounts payable pursuant to this <u>Section 11.1</u> shall use its reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the reasonable determination of such Lender, be otherwise disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such change under this <u>clause (f)</u>.

(g)     Any Lender that is entitled to an exemption from or reduction or withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Requirement of Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>paragraphs (g)(i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u> of this Section) shall not be required if, in the Lender's reasonable judgment, such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

123

(i)      Each Non-U.S. Lender Party, to the extent legally entitled to do so, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if reasonably requested by the Borrower or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two (2) duly-signed, properly completed copies of whichever of the following, as applicable: (A) Forms W-8ECI (or any successor form) (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (or any successor form) (claiming exemption from, or a reduction of, U.S. withholding Tax) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming the benefits of portfolio interest exemption under Sections 871(h) or 881(c) of the Code, Form 871(h) or W-8BEN-E (claiming exemption from U.S. withholding Tax) or any successor form and a certificate substantially in the form of Exhibit 11.1(g)(i)-1 and substance acceptable to the Agent (a "**Non-Bank Tax Certificate**") that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code or (3) a "controlled foreign corporation" related to the Borrower described in Section 881(c)(3)(C) of the Code, (C) where such Non-U.S. Lender Party is a partnership (for U.S. federal income tax purposes) or otherwise not a beneficial owner (e.g., where such Non-U.S. Lender Party has sold a participation), Form W-8IMY (or any successor form) accompanied by Form W-9, Form W-8ECI, Form W-8BEN, Form W-8BEN-E (each, as applicable) and all other required supporting documentation (including, where one or more of the underlying beneficial owner(s) is claiming the benefits of the portfolio interest exemption, a Non-Bank Tax Certificate substantially in the form of Exhibit 11.1(g)(i)-2 or Exhibit 11.1(g)(i)-3 of such beneficial owner(s)) (*provided* that, if the Non-U.S. Lender Party is a partnership and not a participating Lender, the Non-Bank Tax Certificate(s) substantially in the form of Exhibit 11.1(g)(i)-4 may be provided by the Non-U.S. Lender Party on behalf of the direct or indirect partner(s)) or (D) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents, including exemptions or reductions under an applicable Tax treaty.  Unless the Borrower and the Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding Tax or are subject to such Tax at a rate reduced by an applicable Tax treaty, the Credit Parties and the Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)      Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (g) and (D) from time to time if reasonably requested by the Borrower or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender)

124

with two completed originals of Form W-9 (certifying that such U.S. Lender Party is not subject to U.S. backup withholding Tax) or any successor form.

(iii)      Each Lender having sold a participation in any of its Obligations or identified an SPV as such to the Agent shall collect from such participant or SPV the documents described in this clause (g) and provide them to the Agent.

(iv)      If a payment made to a Non-U.S. Lender Party would be subject to United States federal withholding Tax imposed by FATCA if such Non-U.S. Lender Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. Lender Party shall deliver to the Agent and the Borrower any documentation under any Requirement of Law or reasonably requested by the Agent or the Borrower sufficient for the Agent or the Borrower to comply with its obligations under FATCA and to determine that such Non-U.S. Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment under FATCA, if any.  Solely for the purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and the Agent in writing of its legal inability to do so.

(h)      On or before the date the Agent (or any successor thereto) becomes a party to this Agreement, the Agent shall provide to the Borrower, two (2) duly-signed, properly completed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto): (i) IRS Form W-9 (or successor form), or (ii)(A) IRS Form W-8ECI (or successor form), and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY (or successor form) evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, the Agent shall provide updated documentation previously provided (or successor form) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower.

(i)      If any Secured Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 11.1 (including by the payment of additional amounts pursuant to Section 11.1(b)), it shall pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 11.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Secured Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such Credit Party, upon the request of such Secured Party, shall repay to such Secured Party the amount paid over pursuant to this Section 11.1(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Secured Party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 11.1(h), in no event shall the Secured Party be required to pay any amount to a Credit Party pursuant to this Section 11.1(h) the payment of which would place the Secured Party in a less favorable net after-Tax position than the Secured Party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such

125

Tax had never been paid.  This Section 11.1(h) shall not be construed to require any Secured Party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Credit Party or any other Person.

(j)     For purposes of this Section 11.1, the term "Requirement of Law" shall include FATCA.

11.2     Increased Costs and Reduction of Return.

(a)     If any Lender shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, the Lender shall be subject to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, then the Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender, additional amounts as are sufficient to compensate such Lender for such increased costs or such Taxes; *provided* that the Borrower shall not be required to compensate any Lender pursuant to this Section 11.2(a) for any increased costs incurred more than nine (9) months prior to the date that such Lender notifies the Borrower in writing of the increased costs or Taxes and of such Lender's intention to claim compensation thereof; *provided*, *further*, that if the circumstance giving rise to such increased costs is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender shall have determined that:

(i)     the introduction of any Capital Adequacy Regulation;

(ii)    any change in any Capital Adequacy Regulation;

(iii)   any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)    compliance by such Lender (or its Lending Office) or any entity controlling the Lender , with any Capital Adequacy Regulation,

affects the amount of capital required or expected to be maintained by such Lender or any entity controlling such Lender and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender (with a copy to the Agent), the Borrower shall pay to such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender (or the entity controlling the Lender) for such increase; *provided* that the Borrower shall not be required to compensate any Lender pursuant to this Section 11.2(b) for any amounts incurred more than 180 days prior to the date that such

126

Lender notifies the Borrower, in writing of the amounts and of such Lender's intention to claim compensation thereof; *provided*, *further*, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)     Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III, shall, in each case, be deemed to be a change in a Requirement of Law under Section 11.2(a) above and/or a change in Capital Adequacy Regulation under Section 11.2(b) above, as applicable, regardless of the date enacted, adopted or issued.

11.3     [Reserved].

11.4     Certificates of Lenders.  Any Lender claiming reimbursement or compensation pursuant to this Article XI shall deliver to the Borrower (with a copy to the Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

11.5     Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution, and (b) the effects of any Bail-in Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document, or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any applicable Resolution Authority.

ARTICLE XII
GUARANTY

12.1     Guaranty.  To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of one or more Credit Parties, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Loan Document, of all the Obligations of the Borrower whether existing on the date hereof or hereinafter incurred or created (the "**Guaranteed Obligations**").  This guaranty (this "**Guaranty**") by each Guarantor hereunder constitutes a

127

guaranty of payment and not of collection.  Subject to <u>Section 9.10</u> hereof, this Guaranty shall terminate upon the occurrence of the Termination Date.

12.2    <u>Limitation of Guaranty</u>.  Any term or provision of this Guaranty or any other Loan Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable hereunder as of any date of determination shall not exceed the maximum amount for which such Guarantor can be liable without rendering this Guaranty or any other Loan Document, as it relates to such Guarantor, subject to avoidance, after giving effect to the Interim Order and, after the effectiveness thereof, the Final Order, under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable Requirements of Law) (collectively, "**Fraudulent Transfer Laws**").  Any analysis of the provisions of this Guaranty for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section 12.3 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under the Guaranty.

12.3    <u>Contribution</u>.  To the extent that any Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrower) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date.

12.4    <u>Authorization; Other Agreements</u>.  The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    subject to compliance, if applicable, with <u>Section 10.1</u>, (i) modify, amend, supplement or otherwise change any Loan Document, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with any Guaranteed Obligation or any Loan Document, in each case in accordance with the Loan Documents;

(b)    apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Loan Documents;

(c)    refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)    (i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner not otherwise prohibited with the Borrower and any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, in each case in accordance with the Loan Documents; and

128

(e)    settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations, in each case in accordance with the Loan Documents.

12.5    <u>Guaranty Absolute and Unconditional</u>.  Each Guarantor hereby waives and agrees not to assert, in each case, to the fullest extent permitted by applicable Requirements of Law, any defense (other than defenses of payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions), whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by Agent (acting at the Direction of the Required Lenders)):

(a)    the invalidity or unenforceability of any obligation of a Borrower or any other Guarantor under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)    the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from a Borrower or any other Guarantor or other action to enforce the same or (ii) any action to enforce any Loan Document or any Lien thereunder;

(c)    the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)    any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against a Borrower, any other Guarantor or any of Holdings' other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)    any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence and during the continuance of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)    any other defense (other than defenses of payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions), setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower, any other Guarantor or any of Holdings' other Subsidiaries, in each case other than the payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions.

12.6    <u>Waivers</u>.  Each Guarantor hereby unconditionally and irrevocably waives and agrees not to assert, in each case, to the fullest extent permitted by applicable Requirements of Law, any claim, defense (other than defenses of payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions), setoff or

129

counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following:  (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of a Borrower or any other Guarantor, in each case, other than the payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions.  Each Guarantor further unconditionally and irrevocably agrees not to, until the Termination Date, (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against a Borrower or any other Guarantor by reason of any Loan Document or any payment made thereunder or (y) assert any claim, defense (other than defenses of payment in full of the Guaranteed Obligations, the occurrence of the Termination Date or the release of this Guaranty in accordance with any relevant release provisions), setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Guarantor; provided, however, that any of the foregoing to the contrary notwithstanding, effective upon any sale, registration, assignment or transfer of or foreclosure on, or any other disposition or remedial action in respect of any Pledged Stock of a Borrower or any Subsidiary of any Guarantor or a Borrower by Agent or any Lender pursuant to the Loan Documents and/or applicable law, all such rights and claims of subrogation, contribution, reimbursement, any other claims, defenses or rights of setoff against such Borrower or Subsidiary shall be, and hereby are, forever extinguished and indefeasibly waived and released by each Guarantor.  No obligation of any Guarantor hereunder shall be discharged other than upon the occurrence of the Termination Date.

12.7    Reliance.  Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Guarantor hereby agrees that no Secured Party shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

12.8    Independent Obligations.  The obligations of each Guarantor and the Borrower hereunder are independent of and separate from the Obligations and the Guaranteed Obligations.  If any Obligation or Guaranteed Obligation is not paid when due, or during the existence of any Event of Default, Agent (acting at the Direction of the Required Lenders) may proceed directly and at once, without notice, against any Credit Party and any Collateral to collect and recover the full amount of any Secured Obligation or Guaranteed Obligation then due, without first proceeding against any other Credit Party, any other Credit Party or any other Collateral and without first joining any other Credit Party in any proceeding.

12.9    Reinstatement.  Each Credit Party agrees that, if any payment made by any Credit Party or other Person and applied to the Obligations is at any time during the term of this Agreement annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by any Secured Party to such Credit Party, its estate, trustee, receiver or any other party, including any Credit Party, under any

130

bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made.  If, prior to any of the foregoing, (a) any Lien or other Collateral securing such Credit Party's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Credit Party in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

[Signature Pages Follow.]

131